**Best Practices Panel**
**Minority Report**


Shelby Keiser, M.S.
January 26, 2015


The term "Best Practice" implies that a recommended action is supported with a theoretical basis and is validated through rigorous evaluation and empirical research. As noted in research on defining and applying best practices, "best practices are empirically-based practices" and an idea or policy must be supported by a solid body of evidence that supports its designation and use as a "best practice."

While I find some of the Panel's recommendations to have merit, I do not support those recommendations which either lack empirical support or disregard existing research. Therefore, I submit the following alternative recommendations:


Documentation

The Panel's recommendation on documentation notes that "LSAC's use of the 'compared to most people' rule has resulted in insufficient attention to the 'condition, manner, or duration' under which a candidate completes a major life activity." The Panel's majority also recommends that "individuals who have average overall reading abilities be eligible to receive accommodations on the LSAT without excessive documentation requirements if, for example, the manner in which they read is impaired as compared to the general population."

In my opinion, designating individuals who have "average overall reading abilities" as disabled for the purpose of receiving an accommodation of additional testing time does not properly reflect the ADA's definition of disability nor does it reflect the spirit of fairness inherent in the law. "Average" is generally recognized as a range of functioning by "most people;" therefore, an individual with average reading abilities is not substantially limited or materially restricted in reading ability compared to most other people.

In its report to accompany the ADA Amendments Act of 2008, the House Committee on Education and Labor clarified that "a person is considered an individual with a disability…when an individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed *in comparison to most people.*" In its Proposed Rules issued in The Federal Register on January 30, 2014

(p. 4845 and p. 4846) the EEOC reiterates this definition stating "having established the existence of the impairment, the individual must still demonstrate that his or her impairment substantially limits a major life activity *as compared to most people in the general population.*"

Consideration of difficulty, effort or time required to perform a major life activity is highly subjective and therefore is not an accurate or reasonable measure of an individual's degree of impairment. Such idiosyncratic determination is not grounded in research nor is it likely to result in fair and impartial decision-making. Therefore, I disagree with the recommendation to approve accommodations to individuals with average overall reading abilities unless the candidate presents other measurable data which would meet the ADA definition of disability.

Most testing, licensing and certification entities post on their websites documentation guidelines to assist applicants in gathering appropriate information to demonstrate their claimed disability and need for accommodation. LSAC should revise its documentation guidelines to insure that they communicate clear, comprehensive guidelines which reflect current research-based professional practice. Such guidelines (modelled on those of other testing entities such as College Board, SAT, GMAT, USMLE and others) will facilitate fair and consistent evaluation of requests and subsequent decision-making. The USMLE documentation guidelines, available at http://www.usmle.org/test-accommodations/ provide a useful model.

Review of Testing Accommodation Requests

Qualified Professionals
*(The Panel shall determine whether more than one qualified professional should review a documented request for testing accommodations before LSAC may deny the request in whole or in part.)*

Most testing entities do not have professional reviewers on staff; those that do generally also use external reviewers to facilitate review of the large number of requests received close to test registration deadlines. LSAC has two qualified professional reviewers on staff and two outside consultants, one each for learning disorders and vision. Because of the volume of requests and the short turn-around time for documentation review, LSAC should secure the services of perhaps five to 10 additional outside professionals with expertise across the range of disability types generally received. At least three additional experts in learning disabilities and 2-3 ADHD experts are recommended. LSAC should randomly assign LD applications among their internal and external reviewers. Applications for other disabilities should be assigned to outside experts who are qualified in the appropriate disability area.

A determination of eligibility for accommodations must be based on objective data provided by the applicant and while there may be legitimate differences of opinion among professionals, it is not valid or professionally appropriate to routinely make test accommodation decisions based on "votes."

All reviewers--LSAT internal reviewers and outside consultants alike--should apply the same professional standards to their consideration of a request. In most cases, an internal reviewer would presumably arrive at the same conclusion as an outside reviewer.  The Panel's recommendation for multiple considerations of a request creates frivolous reviews in order to manufacture a rationale for approving requests. The purpose of documentation review is to objectively and impartially determine an applicant's standing vis-à-vis the ADA's definition of disability and if determined to meet that standard, to next determine what, if any, accommodations are appropriate to provide the individual with equal access to the LSAT exam. It is excessive to require outside review of a request denied by internal LSAC professionals; giving applicants not just a second but a third bite of the apple is certainly unwarranted and unfair.  LSAC internal professional reviewers should refer requests to outside reviewers at their discretion when they feel further professional validation is needed to clarify any issues in the documentation.

The conclusions of LSAC's qualified internal reviewers and outside reviewers should be given at least equal consideration as those of an applicant's treating professional. If it is the opinion of the professional reviewer that an accommodation request is not supported by the documentation and therefore should be denied, then the applicant should have the right to appeal that decision.  There is no need for a second or third review. If LSAC disagrees with the reviewer's recommendation, then the LSAC decision-maker must write and retain an internal report which justifies the final decision.

Criteria and Guidelines for Reviewers

In considering the question of whether the candidate has a disability ((Part 1 of the Panel's recommended two-step process described in Section 5), the Panel recommends as a Best Practice that a candidate previously found to have a disability by his or her secondary school, university, a medical doctor or a private evaluator should be considered to be currently disabled for the purpose of receiving accommodations on the LSAT so long as the candidate "certifies that he or she continues to have a disability."

Relying on prior accommodations as justification for LSAC to approve a current request is not a practice supported by empirical research and should not be the sole basis for determining whether a candidate has a disability or qualifies for an accommodation. This approach assumes a high degree of trust in the decisions of clinical evaluators, prior testing entities and schools which research has shown is not warranted.  Empirical evidence indicates that 1) IEP teams' determination of disability is often neither reliable, valid, nor consistent, especially with regard to high incidence disabilities such as learning disorders and ADHD; 2) diagnoses made by private clinicians often do not conform to professionally recognized diagnostic standards; and 3) accommodations are often granted by schools and colleges/universities even when students are not properly diagnosed.

The Panel's recommendation assumes 1) the previous testing organization made an appropriate, defensible decision and 2) that the applicant is CURRENTLY disabled, regardless of how long ago and under what standards the diagnosis was given.

Granting accommodations to candidates merely because they previously received accommodations in some educational or testing situation is a flawed policy and is inherently unfair to other applicants for accommodations who, for a variety of reasons, did not previously receive accommodations.

Any candidate requesting test accommodations on the LSAT should be required to document *current* impairment as a requisite condition for receiving accommodations; candidates with a valid diagnosis and current impairment will be able to provide this information easily. Individuals with no prior record of accommodation should not be required to meet a higher standard than other applicants who may have improperly been granted accommodations in the past.

In its recommended standards for determining an accommodation of more than 50% extra time, the Panel advocates providing greater than 50% additional time on the basis of written verification by a postsecondary disability service provider that the candidate previously received more than 50% additional time on college examinations. As already noted, <u>all</u> candidates requesting accommodations should be required to properly document their disability and current need for accommodations.


<u>Written Recommendations from Reviewers</u>

Reviewers must find affirmative answers in the documentation to the following questions in order to conclude that a disability is present and accommodations are justified:

> Does the documentation support the diagnosis?
> > For developmental disorders such as ADHD and learning disorders, is there historical evidence of childhood onset?
> > Is there evidence of impairment?
> > Is there evidence of chronicity over time; pervasiveness across situations?
>
> Is the assessment and accompanying professional report thorough and complete?
> > Appropriate tests administered?
> > Defensible conclusions drawn from test data?
> > Does test data show below average performance on standardized tests of academic achievement?
>
> Does the documentation demonstrate a current impairment that substantially limits one or more major life activities?
>
> Have rule-outs (other possible reasons for poor functioning) been addressed?

>   Does the documentation support the requested accommodations?
>   In what specific ways would the impact of the individual's disorder affect his/her ability to function within the specific testing situation?
>
>   Within the context of the LSAT testing situation, what accommodations would relieve the impact of this applicant's disability and allow for equal access to the exam?
>
>   Is more documentation needed to resolve these questions? If so, what information is needed?

For each application reviewed, the reviewer, whether an LSAC staff professional or an external reviewer, will write a report addressing these questions.

<u>Automatic review of partial and full denials</u>

As noted above, it is excessive to require outside review of a denied request unless the applicant specifically initiates an appeal. An applicant whose request is denied should have the opportunity to appeal the decision. To the extent possible, LSAC should resolve an appeal request in time for the pending test date. Appeal requests received after the registration deadline may not be resolved in time for the pending test date and may need to be held over until the next scheduled test.

An appeal must be requested by the applicant. The applicant may submit additional information or request that the original documentation be reconsidered. In either case, the file should be reviewed by one of LSAC's outside professional consultants with expertise in the relevant disability area and who has not previously seen the file. The consultant should review all the documentation submitted as well as all reports written as part of the original review process. The consultant will write a report explaining his/her recommendation to LSAC. LSAC will issue the final decision.

Finally, I emphasize the need for LSAC to provide clear, comprehensive documentation guidelines which reflect current research-based professional practice. As noted above, such guidelines (modelled on those of other testing entities such as College Board, SAT, GMAT, USMLE and others) will facilitate fair and consistent evaluation of requests and subsequent decision-making.

# References

Christensen, L., Braam, M., Scullin, S., & Thurlow, M.L. (2011). *2009 State Policies on Assessment Participation and Accommodations for Students with Disabilities* (Synthesis Report 83). Minneapolis, MN: University of Minnesota, National Center on Educational Outcomes.

Flanagan, D., Keiser, S., Bernier, J. & Ortiz, S. (2003). *Diagnosis of Learning Disability in Adulthood.* Boston: Allyn and Bacon.

Lovett, B. (2014). Testing Accommodations Under the Amended Americans With Disabilities Act: The Voice of Empirical Research. *Journal of Disability Policy Studies, Vol. 2 (2).*

Osburn, M., Caruso, G., & Wolfensberger, W. (2011). The Concept of "Best Practice": A Brief overview of its meanings, scope, uses, and shortcomings. *International Journal of Disability, Development and Education, Vol. 58, No. 3.*

Sparks, R. & Lovett, B. (2009). College Students With Learning Disability Diagnoses: Who Are They and How Do They Perform? *Journal of Learning Disabilities, 42;494.*

Weis, R., Dean, E., & Osborne, K. (2014). Accommodation Decision Making for Postsecondary Students With Learning Disabilities: Individually Tailored or One Size Fits All? *Journal of Learning Disabilities, 1;15.*

Weis, R., Sykes, L., & Unadkat, D. (2011). Qualitative Differences in Learning Disabilities Across Postsecondary Institutions. *Journal of Learning Disabilities.*
URL. http: ldx.sagepub.com/content/early/2011/03/15/0022219411400747