RECEIVED

APR 2 7 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

April 24, 2015

The Honorable Edward M. Chen
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

   Re: *Department of Fair Employment and Housing v. Law School Admission Council Inc.*
   Case CV 12-1830-EMC
   Amicus Curiae Letter

Dear Judge Chen:

Enclosed please find a statement from 17 experts in disability diagnosis and testing
accommodations, concerning certain recommendations of the "Best Practices" panel in the
*DFEH v. LSAC* case named above. We are not organized as a formal group, and we speak only
for ourselves, rather than for any institutions that employ us. We hope that the information in the
statement will be of assistance to the Court.

Sincerely,

*Benji J. Lovett*

Benjamin J. Lovett, Ph.D.
Psychology Department
SUNY Cortland
132 Old Main, Gerhart Drive
Cortland, NY 13045

## A Response to the "Best Practices" Report

We are a group of professionals with expertise in diagnosing disabilities, evaluating resulting functional limitations, and recommending academic and testing accommodations when they are needed to ensure that individuals with disabilities can obtain equal access and compete on a level playing field. We have a broad range of backgrounds that include experience in K-12 settings, post-secondary education settings, major hospitals, and private practices. We have often been in the position of recommending accommodations for individuals with disabilities. In addition, we have all worked as consultants for testing entities (including independent testing agencies as well as educational institutions). In our consulting work, we have all reviewed files of examinees who are requesting disability accommodations in various settings. We have clinical experience and hold licensure as clinical professionals, but we are also involved with research on disabilities (either as researchers or as avid consumers of research) and we keep abreast of legal developments related to disability policies. We have particular expertise in assessment issues, and many of us supervise graduate students training to become assessment professionals.

It is our understanding that, in 2014, as part of a Consent Decree between the California Department of Fair Employment and Housing, the United States of America, and the Law School Admission Council (LSAC), a "Best Practices" panel was formed to make recommendations about how LSAC should handle future applications for accommodations on the Law School Admission Test (LSAT). The "Best Practices" panel released its report in January 2015 (hereafter, the Report), and it has been widely publicized. We are familiar with the Report's recommendations and submit this letter because of our strong concern that efforts will be made (indeed, have already been made) to extend these recommendations beyond the scope of LSAC and its accommodation policies and practices.

We believe that several of the Report's recommendations do not constitute "best practices" and will lead to results that are unfair to many examinees, including examinees with disabilities. The recommendations are unworkable in many respects, and some are in conflict with scientific research. They are likely to lead to more accommodations being granted in instances in which accommodations are not needed or warranted. This sets up deeply problematic incentives, since inappropriate accommodations can give examinees who receive them an unfair advantage over other examinees. On admission tests, examinees are judged (when being considered as applicants) in relation to their fellow examinees. An unfair advantage can lead to a different rank ordering of scores, such that an applicant with lower skills is accepted whereas an applicant with higher skills is rejected. Obviously, no test is free from error, but inappropriate provision of accommodations makes the chance of error much greater.

To be clear, we are very much in favor of testing accommodations in many cases. Indeed, we regularly recommend accommodations in our clinical work, as well as in our consultation to testing entities. However, we believe that accommodations should only be used when they are actually needed for examinees to access tests, and that when they are used unnecessarily, they threaten the validity of the resulting test scores.

Based on our experience serving as external reviewers, as well as our clinical experience and knowledge of relevant research literature, we consider selected recommendations from the

Report below. We understand that the Consent Decree requires that the "Best Practices" recommendations be consistent with the Decree's other terms, but we do not address that subject in this letter. Instead, we limit our discussion to ways in which the Report's recommendations fail to constitute "best practices" from a professional standpoint.

We only discuss the recommendations that we feel are most problematic, and where our experience and knowledge of the research literature leads us to have strong evidence against the recommendations' validity. The fact that we do not discuss a recommendation does not necessarily mean that we endorse it.

We have included, as an attachment, brief biographies of each individual who has joined in submitting this letter. As the Court will see, we have many years of collective experience providing professional services in support of individuals with disabilities, and most of us have served both as supporting professionals for individuals seeking accommodations on standardized tests, and as consultants to testing entities.

1.  **The Report recommends that, if an applicant has evidence of a disability from age 13 or older, and the applicant offers a "reasonable explanation" of why he or she needs a testing accommodation, the accommodation should be granted.**

There is no scientific basis for using the age of 13 to determine if a disability diagnosis is likely to be stable over time. Even if we assume that typical LSAT applicants are approximately 20 years old, many psychiatric disorders (e.g., depression, anxiety disorders) can change markedly over a period of several years.[1] Even disorders such as ADHD and learning disabilities often change, in the sense that someone who might have needed accommodations to access a test at age 13 will no longer need accommodations at age 20, due to effective medication therapy, developmental maturation, or intensive remedial instruction in academic skills.[2] And of course many physical disorders can also change over time due to effective treatment, natural processes of improvement, and learned adaptations.

In addition, the phrase "reasonable explanation" is simply too vague to be useful or operationalized. In our experience, applicants mention a wide variety of explanations for their accommodation needs that may seem reasonable, but sometimes those explanations are contradicted by objective evidence in their documentation. For instance, many applicants with ADHD diagnoses report being easily distracted and therefore needing a separate room in which to take tests. However, some of those applicants report distractibility symptom levels that, when actually compared to those of the general population, are in the average range, clearly

---

[1] For instance, see Lewinsohn, P. M., et al. (1994). Major depression in community adolescents: Age at onset, episode duration, and time to recurrence. *Journal of the American Academy of Child & Adolescent Psychiatry, 33,* 809-818.
[2] For instance, between 30% and 50% of those people who met official diagnostic criteria for ADHD in childhood will no longer meet the criteria in adulthood. See Antshel, K. M., & Barkley, R. (2011). Children with ADHD grown up. In S. Goldstein, J. A. Naglieri, & M. DeVries (Eds.), *Learning and attention disorders in adolescence and adulthood: Assessment and treatment* (pp. 113-134). Hoboken, NJ: Wiley.

undermining their "reasonable explanation" of their accommodation need.[3] Similarly, many applicants report being slow readers and therefore needing additional time to take tests. However, many of those applicants submit documentation clearly showing average or above-average performance on timed diagnostic tests of reading skills, and have no history of reading problems in school. (Some of those applicants have also obtained average or above-average scores on college admissions tests taken without accommodations.)

Research has shown that many requested accommodations have an effect of making examinees more comfortable and relaxed during an exam,[4] giving them an incentive to report all kinds of "reasonable explanations" for their requested accommodations. Therefore, the standard must be that the accommodation is *needed* to access the test, and the judgment of need must be based on objective evidence. Unfortunately, examinees are not qualified to make those judgments,[5] and too often, diagnosticians are inclined to want to assist the examinee in obtaining desired accommodations.[6] They often ignore their own objective evidence from diagnostic testing, to recommend accommodations that could benefit the applicant (either in terms of emotional comfort or in terms of performance). Indeed, recent research has shown that accommodation recommendations for students with ADHD or learning disability diagnoses are often made when objective evidence argues against the need for the accommodation.[7]

Given these facts, there is always a need for independent review of an applicant's supporting documentation. The documentation should always be sufficiently recent, and what constitutes "sufficiently recent" documentation depends on the type of disability. The age of 13 would generally *not* be sufficiently recent for documenting current learning/cognitive/psychiatric disabilities, and it certainly would not be appropriate as a categorical age cut-off in all cases.

---

[3] Most college students *without* ADHD diagnoses describe themselves as easily distracted. See Lewandowski, L. J., Lovett, B. J., Codding, R. S., & Gordon, M. (2008). Symptoms of ADHD and academic concerns in college students with and without ADHD diagnoses. *Journal of Attention Disorders, 12*(2), 156-161.

[4] For a review of research studies on this topic, see Lovett, B. J., & Leja, A. (2013). Students' perceptions of testing accommodations: What we know, what we need to know, and why it matters. *Journal of Applied School Psychology, 29*, 72-89.

[5] For a review of literature on the inaccuracy of students' judgments of their own disability status, see Lovett, B. J., Nelson, J. M., & Lindstrom, W. (in press). Documenting hidden disabilities in higher education: Analysis of recent guidance from the Association on Higher Education and Disability (AHEAD). *Journal of Disability Policy Studies.* Available at http://dps.sagepub.com/content/early/2014/05/05/1044207314533383.abstract

[6] Research has shown that many diagnosticians, rather than being neutral and objective third parties, view their job as needing to make the case for accommodations for their clients. See Gordon, M., Lewandowski, L., Murphy, K., & Dempsey, K. (2002). ADA-Based accommodations in higher education: A survey of clinicians about documentation requirements and diagnostic standards. *Journal of Learning Disabilities, 35*(4), 357-363.

[7] Weis, R., et al. (in press). Accommodation decision making for postsecondary students with learning disabilities: Individually tailored or one size fits all? *Journal of Learning Disabilities.* Available at: http://ldx.sagepub.com/content/early/2014/11/13/0022219414559648.abstract
See also Nelson, J. M., et al. (in press). How Is ADHD assessed and documented? Examination of psychological reports submitted to determine eligibility for postsecondary disability. *Journal of Attention Disorders.* Available at: http://jad.sagepub.com/content/early/2014/12/22/1087054714561860.abstract
See also Harrison, A. G., Lovett, B. J., & Gordon, M. (2013). Documenting disabilities in postsecondary settings: Diagnosticians' understanding of legal regulations and diagnostic standards. *Canadian Journal of School Psychology, 28*, 303-322.

2.   **The Report recommends that, when an applicant has a record of being provided accommodations in the past (either formally or informally, on any test in any setting), the LSAC should provide the same accommodations on the LSAT.**

This recommendation is deeply problematic for several reasons. First, different tests are designed to measure different skills, and so an accommodation might be appropriate on one test and not on another. For instance, some students in K-12 education receive a testing accommodation of access to a dictionary on some classroom tests. However, this would obviously be inappropriate on a test designed to measure vocabulary skills. Standardized tests such as the LSAT are designed to have a greater degree of uniformity in administration. Therefore, a testing entity must determine if an accommodation provided in the past is appropriate for its test and whether it would compromise the ability of the test to measure the skills that it is designed to measure.

Second, in many settings, accommodations are provided regardless of whether a student needs them. In K-12 settings, research has shown that accommodations are often made with the goals of increasing students' comfort, motivation, and self-esteem, and this is even true when the accommodations are formally determined as part of IEP and Section 504 plan procedures.[8] Clearly, these are not valid rationales for accommodations on a high-stakes standardized test.

Third, in many settings, accommodations are provided based on only a cursory review of disability documentation, if there is any review at all. In many classrooms (at both the K-12 and college level), teachers and professors informally provide some accommodations just because a student requests them. Even formally granted accommodations at many colleges are based on minimal review of documentation. Some colleges will permit students' own self-identifications as sufficient evidence of a disability; thus, we should expect that many students with a record of accommodations in college may not have any objective evidence supporting their disability diagnosis, let alone their need for accommodations because of functional limitations.

Fourth, and relatedly, an individual might be allowed accommodations at one college or by one professor that he or she would not have received at a different college or in a different class. Those types of happenstance disparities should not result in one student getting accommodations on a standardized test like the LSAT, while another student with the same ability profile is denied accommodations. Certain students will end up with inappropriately higher scores on such standardized tests, which disadvantages those who receive accommodations based upon legitimate needs.

An applicant's record of past accommodations is certainly valuable to have when making decisions, as is the applicant's own description of their functional limitations and accommodation needs. Consistent with federal laws, that information should be given substantial weight. However, it should not be the controlling factor in a decision; given the haphazard process by which prior accommodations are frequently proffered, objective evidence of current accommodation needs must be considered as well.

---

[8] For instance, see Crawford, L., & Ketterlin-Geller, L. R. (2013). Middle school teachers' assignment of test accommodations. *The Teacher Educator, 48*(1), 29-45.

3. **Although the Report states that "testing accommodations should be determined on an individual basis," the Report also specifies "minimum" accommodations that would be provided to applicants with various types of documented disabilities. For instance, individuals with documented learning disabilities or ADHD would receive at least 50% additional time on the LSAT. Similarly, individuals with documented psychiatric disorders would receive at least 50% additional time and additional breaks on the LSAT.**

This recommendation is also deeply problematic. Individualized decision making is not only a central legal standard for ADA decision making; it is also a professional best practice. The professional literature on testing accommodations makes clear that someone's diagnostic label should not be used algorithmically to determine his or her accommodation needs, given the tremendous heterogeneity within most diagnostic categories.[9] Instead, there must always be an individualized inquiry into the person's needs.

For instance, even if a student has a validated diagnosis of ADHD, they may not need any additional time on tests. Research has shown that, on average, college students with ADHD diagnoses do not take more time to complete tests or show other unusual test-taking behaviors requiring accommodations.[10] Of course, an individual student with ADHD may well need accommodations, but having a "minimum" accommodation requirement based on an ADHD diagnosis is contradicted, not supported, by scientific research. Similarly, a student with a validated diagnosis of a learning disability may only have trouble with mathematics (a recognized area of learning disability) and may not need any accommodations at all on non-mathematics tests. Research has shown that when high-performing students with learning disability diagnoses are given even 50% additional time—while nondisabled students are kept to standard time allotments—the students with disability diagnoses have an opportunity to reach many more test items than nondisabled students do.[11] Similarly, students with genuine academic skill deficits (i.e., true disabilities in the ADA sense) will be disadvantaged if accommodations are not reserved for them.

Again, there is a real need for individualized inquiry, and any "minimum" accommodation guidelines are inappropriate. A "one size fits all" approach will invariably result in widespread mismatches between applicants' actual accommodation needs and the accommodations that they will be granted.

4. **The Report places great weight on the diagnoses made by "qualified professionals," suggesting that if a professional evaluator makes a diagnosis of a disability condition, the disability should be considered to be sufficiently documented.**

---

[9] Some students benefit significantly from accommodations that lead to no benefit or actual disadvantage in other students who have the same disability label. See Elliott, S. N., & Marquart, A. M. (2004). Extended time as a testing accommodation: Its effects and perceived consequences. *Exceptional Children, 70,* 349-367.

[10] Lewandowski, L., Gathje, R. A., Lovett, B. J., & Gordon, M. (2013). Test-taking skills in college students with and without ADHD. *Journal of Psychoeducational Assessment, 31,* 41-52.

[11] Lewandowski, L., Cohen, J., & Lovett, B. J. (2013). Effects of extended time allotments on reading comprehension performance of college students with and without learning disabilities. *Journal of Psychoeducational Assessment, 31*(3), 326-336.

There are two significant problems with this recommendation. First, scientific research has shown that diagnosticians often ignore official, formal diagnostic criteria when making diagnoses.[12] For instance, in one recent study, researchers carefully reviewed 100 evaluation reports showing ADHD diagnoses in college students, and only 1 of the 100 reports was found to have documented all of the formal diagnostic criteria for ADHD.[13] In the same study, only about half of the reports documented any academic impairments in the students being evaluated, but the vast majority of reports nevertheless recommended academic accommodations for those students. Research has also found that over half of college students with learning disability diagnoses failed to meet objective criteria for the disorders.[14] And in the case of psychiatric disorders, researchers and clinicians have long known that official diagnoses are sometimes given for purposes of insurance reimbursement even when the client fails to meet the official criteria for diagnoses.

Second, even if the recognized diagnostic criteria are met for a disorder, the person may not experience functional limitations to an extent that causes substantial limitation in any major life activities.[15] For instance, it is common in disability documentation to see diagnoses of "mild" ADHD or "mild" dyslexia, where all of the diagnostic test scores are in the average range, and there is no evidence of substantial limitations. It is possible that some of these people would meet formal diagnostic criteria for a disorder, but there is clearly insufficient evidence of a disability in the legal sense. At times, evaluators will state that their client meets the ADA standard for disability, even though there is evidence in the evaluation report that clearly contradicts the claim.

Documentation often fails to show disability status under the ADA because many diagnosticians compare their clients to other people of the same education level, rather than to age-peers. For instance, a diagnostician may compare the scores of a 22-year-old college senior to the scores of other college seniors, rather than to all other 22-year-olds. This distinction may seem small, but it results in substantial differences in scores on assessments used to diagnose disabilities; often,

---

[12] Many diagnosticians admitted to doing just this in the following study: Harrison, A. G., Lovett, B. J., & Gordon, M. (2013). Documenting disabilities in postsecondary settings: Diagnosticians' understanding of legal regulations and diagnostic standards. *Canadian Journal of School Psychology, 28,* 303-322.

[13] Nelson, J. M., et al. (in press). How Is ADHD assessed and documented? Examination of psychological reports submitted to determine eligibility for postsecondary disability. *Journal of Attention Disorders.* Available at: http://jad.sagepub.com/content/early/2014/12/22/1087054714561860.abstract
See similar findings in an earlier study relating specifically to documentation provided in support of requests for accommodations on a high-stakes standardized test: Joy, J. A., et al. (2010). Assessment of ADHD documentation from candidates requesting Americans with Disabilities Act (ADA) accommodations for the National Board of Osteopathic Medical Examiners COMLEX exam. *Journal of Attention Disorders, 14,* 104-108.

[14] Sparks, R. S., & Lovett, B. J. (2009). Objective criteria for classification of postsecondary students as learning disabled: Effects on prevalence rates and group characteristics. *Journal of Learning Disabilities, 42,* 230-239.

[15] The official diagnostic manual for learning, cognitive, and psychiatric disorders, the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5) explicitly acknowledges this distinction, including a "cautionary statement" that "the clinical diagnosis of a DSM-5 mental disorder...does not imply that an individual with such a condition meets legal criteria for the presence of a mental disorder or a specified legal standard (e.g., for competence, criminal responsibility, or disability). For the latter, additional information is usually required beyond that contained in the DSM-5 diagnosis, which might include information about the individual's functional impairments and how those impairments affect the particular abilities in question." (page 25 of the DSM-5).

scores that are below-average in comparison to educational peers are actually in the average range when compared to age-peers.

Given all of these facts, independent review of an applicant's file is both reasonable and important. Diagnosticians may not have used recognized professional diagnostic criteria to make a diagnosis, and their diagnoses may or may not mean that someone experiences substantial limitations in a major life activity.

5. **The Report would require external consultants to complete their review of documentation in 2 business days in the case of initial requests, or in 1 business day in the case of appeals.**

This recommendation is clearly unworkable, given the schedules of external consultants. These consultants almost always have demanding full-time jobs and set aside time on evenings or weekends to review documentation. It is not unusual to be asked to review documentation of 100 pages or more for an individual applicant, and the consultant must often carefully consider multiple diagnostic evaluation reports, early educational records, supportive letters from various sources, and statements of past accommodation use. At times, it takes several hours for the consultant to review the documentation and compose a detailed report summarizing the most relevant facts and explaining the reasons for a recommendation of approval or denial. A deadline of at least one week is typical, to always allow use of a weekend by the consultant. Providing external reviewers with insufficient time in which to evaluate documentation and make informed judgments is surely not a "best practice."

Not only is the recommendation unworkable, but there is simply no evidence that it is necessary. Taking a high-stakes admissions test is rarely a last-minute decision. There is no reason why the vast majority of applicants cannot submit disability documentation with enough lead time that external consultants would be provided at least a week to review the documentation.

6. **The Report recommends that, if an applicant's request is not granted in full by in-house LSAC staff, the request should go to an external consultant, and if that consultant does not recommend granting the request in full, the request should go to a second external consultant. In addition, the Report recommends review by up to two additional external professionals as part of a separate appeals process – meaning that a request would have to be reviewed by five professionals before it could be denied, even in part.**

This recommendation seems designed to maximize the probability that each applicant will not only receive accommodations, but will receive everything that he or she asks for – for example, extra time, a separate testing room, extra breaks, access to a word processor, etc. Even if only one of several professionals believes that an accommodation is justified, this process would lead to the accommodation being granted because the Report gives successive reviewers only the option of authorizing at least as many accommodations as a prior reviewer.

The motivation behind this recommendation is well-intentioned and understandable, but we believe that it is inappropriate. First, a significant number of accommodation requests are denied

because the applicant has clearly submitted insufficient documentation. For instance, some applicants request additional time for ADHD but their only documentation is a brief note from their current treating physician, who did not make the initial diagnosis and who never assessed the applicant's speed in completing tasks. It does not take five or more people to see that the documentation in cases like these is insufficient, and it is inappropriately burdensome to require a testing entity to seek any external consultation in such cases, when internal staff can readily make such determinations. The multiple layers of review in this context seem more likely to result in unnecessary delays for applicants in having their requests decided.

Second, even when accommodation requests are accompanied by voluminous documentation, there are times when the evidence clearly does not support the need for accommodations. For instance, applicants sometimes request a reader to read test items to them, even though their documented reading skills are average or above-average for their age. Again, in clear cases, there is no need for multiple reviews of the documentation, except when an appeal is made.

Of course, there are times when it is helpful to have multiple professionals review documentation, but the decision to do so should depend on the complexity of the individual applicant's file.

### Conclusion

A formal set of "Best Practices" is potentially quite valuable, but such a set of practices should be based on the best research available, and should be open to being updated as research evolves. A "Best Practices" document that meets those guidelines would be helpful for examinees with disabilities as well as nondisabled examinees, testing agencies, diagnosticians, and the public at large. Unfortunately, many of the "Best Practices" in the Report fall far short of these standards and goals.

Respectfully submitted,

### Joseph E. Bernier, Ph.D.

Licensed as a psychologist in New York, Dr. Bernier is the training director for a doctoral internship training program at the University Counseling Center, University at Albany. For more than thirty-five years, he has been engaged in evaluating individuals for disabilities. He has consulted with licensing boards and testing organizations on disability and accommodations. Dr. Bernier has taught and supervised doctoral students and interns in assessment practices, including the diagnosis and evaluation of developmental and other disorders affecting learning and other functions. Dr. Bernier is also a coauthor of a text on diagnosing learning disability in adults.

### Marla R. Brassard, Ph.D.

Marla R. Brassard is Professor and Director of Clinical Training for the Ph.D. program in School Psychology at Teachers College, Columbia University. For 35 years she has trained graduate students in individual psychological assessment and diagnosis. She is a licensed psychologist and has conducted and/or supervised hundreds of individual psychoeducational evaluations for individuals ages 2 to 50. She is also a widely published scholar. Since 1995 she has been a consultant to testing agencies regarding applicant requests for accommodations on their exams

for neurodevelopmental and mental health problems. She is a fellow of the American Psychological Association.

**B. Christopher Frueh, Ph.D.**
B. Christopher Frueh is a clinical psychologist by training, with a focus on clinical trials and mental health service delivery in a variety of medical and mental health settings. He is a tenured Professor of Psychology at the University of Hawaii and also serves as McNair Scholar and Director of Clinical Research at The Menninger Clinic in Houston, Texas. He has been Principal Investigator on 15 federally-funded research grants and co-investigator on 25 more, has authored over 250 professional scientific publications, held an endowed research position at Baylor College of Medicine, and attained the rank of tenured professor at 3 different universities. Much of his published work is in the area of psychiatric disability and he consults regularly to testing and governmental agencies.

**Michael Gordon, Ph.D.**
Michael Gordon, Ph.D. is a clinical-child psychologist on the faculty of Upstate Medical University in Syracuse, NY. He opened one of the first ADHD specialty clinics in the country, serving as its director for over 25 years. He has authored numerous articles, chapters, and books on the diagnosis and treatment of this disorder, including two on the subject of ADA accommodations in higher education. For over twenty years he has been an ADA documentation reviewer for a host of testing organizations nationwide.

**Allyson G. Harrison, Ph.D.**
Dr. Harrison is the clinical director of the Regional Assessment and Resource Centre at Queen's University, Kington, Ontario. She earned her Ph.D. in clinical psychology at Queen's University and has published articles on diagnostic and accommodations issues in many peer-reviewed journals. She is also a practicing psychologist and supervises graduate students who are conducting clinical assessments, often as part of requests for testing accommodations. Finally, she has consulted on ADA accommodation issues for several testing agencies.

**Larry E. Hess, Psy.D.**
Dr. Hess is a New York State licensed psychologist who practices clinical neuropsychology and has presented dozens of talks on the topics of learning disorders, ADHD, and other disorders. He has taught assessment of disabilities at Hunter College and has served as an accommodations reviewer for testing agencies. Dr. Hess has provided neuropsychological assessments for over 1000 children, adolescents, and adults over the past twenty years.

**Lawrence J. Lewandowski, Ph.D.**
Dr. Lewandowski is a Professor of Psychology at Syracuse University, holding distinction as a Laura J. and Douglas Meredith Professor for Teaching Excellence. Dr. Lewandowski also holds an appointment as Clinical Professor in the Department of Psychiatry at the Upstate Medical University. He has over 100 publications on topics such as test accommodations and test taking characteristics in students with learning disabilities, ADHD, and traumatic brain injury. He is a licensed psychologist who has completed/supervised hundreds of psychological evaluations, and also conducted ADA documentation reviews for various schools and agencies since 1994.

**George B. Litchford, Jr., Ph.D., ABPP-CL**
Dr. Litchford has been the Director of the Psychological Center at the University at Albany for the past 29 years. He has supervised over 150 senior doctoral students in Clinical and Counseling psychology in their clinical work including psychotherapy, psychological and neuropsychological testing—including many requests for accommodations under that ADA. He is a licensed psychologist and certified school psychologist in New York and has a Diplomate designation in Clinical Psychology from the American Board of Professional Psychology. For the past 20 years he has reviewed accommodation requests under the ADA for a number of testing organizations. He has also testified in 7 Federal Court cases concerning learning disabilities requests for accommodations under the ADA.

**Will Lindstrom, Ph.D.**
Will Lindstrom is the director of the Regents' Center for Learning Disorders at the University of Georgia, an evaluation, training, and research center dedicated to serving postsecondary students with learning-related disabilities. He is licensed as a psychologist in Georgia and Virginia. His primary research interests relate to the assessment and documentation of postsecondary learning-related disabilities. Relevant publications have appeared in the *Journal of Attention Disorders, Journal of Disability Policy Studies, Learning Disabilities: A Multidisciplinary Journal, The Clinical Neuropsychologist,* and *Archives of Clinical Neuropsychology.*

**Benjamin J. Lovett, Ph.D.**
Benjamin Lovett is an assistant professor of psychology at the State University of New York (SUNY) College at Cortland. His research interests include the diagnosis of learning and attention problems, and the provision of testing accommodations to students with these disorders. He has over 50 publications on these and related topics. He is also a licensed psychologist and has consulted on ADA issues to a variety of schools and testing agencies.

**Kevin Murphy, Ph.D.**
Dr. Murphy is the former Chief of the Adult Attention-Deficit Hyperactivity Disorder Clinic at The University of Massachusetts Medical Center in Worcester, MA. He is currently President of The Adult ADHD Clinic of Central MA, an Associate Research Professor of Psychiatry at SUNY Upstate Medical University in Syracuse, New York, and a consultant to numerous national and state licensing boards on issues related to ADHD, disability determination, ADA compliance, and testing/workplace accommodations. He has published extensively in these areas and has worked with both large and small companies in managing and resolving disability issues or disputes.

**Jason M. Nelson, Ph.D.**
Jason M. Nelson, Ph.D., is Head of Research and a licensed psychologist at the University of Georgia Regents' Center for Learning Disorders. He received a doctorate in Educational Psychology with a specialization in School Psychology from Indiana University. His clinical work has mainly involved conducting comprehensive psychological evaluations to determine postsecondary disability eligibility. He conducts research on ADHD and learning disabilities in postsecondary settings and has authored or co-authored over 30 publications in peer-reviewed journals.

**John D. Ranseen, Ph.D.**
Dr. Ranseen is a part-time Associate Professor in the Department of Psychiatry at the University of Kentucky College of Medicine with joint appointments in the Department of Neurology and the Department of Psychology. He has a private practice specializing in forensic psychology. He received his doctoral degree in clinical psychology from Ohio University and completed a post-doctoral fellowship in clinical neuropsychology at the University of Virginia. He has published in a variety of areas with particular interest in the impact of traumatic brain injury on cognitive and personality functioning as well as the diagnosis and treatment of ADHD in adults. He has also published a number of articles regarding the Americans with Disabilities Act (ADA) as it applies to the provision of accommodations on licensing exams. He is a consultant to a number of professional licensing exams reviewing documentation from students requesting accommodations based on ADHD and other neuropsychological conditions.

**Richard L. Sparks, Ed.D.**
Richard Sparks is Professor Emeritus of Special Education and Learning Disabilities at Mt. St. Joseph University in Cincinnati, Ohio. He has published extensively on topics such as learning disabilities in postsecondary settings, documentation and testing accommodations for students with learning disabilities, and second language learning difficulties. Dr. Sparks has authored over 125 peer-reviewed publications and serves as a Consulting Editor for the Journal of Learning Disabilities. His clinical work has involved conducting comprehensive psychoeducational evaluations for over 35 years. For several years, Dr. Sparks has performed ADA documentation reviews for testing agencies and has testified in federal court.

**Mark E. Wilkinson, OD**
Dr. Wilkinson is a Clinical Professor of Ophthalmology at the University of Iowa Carver College of Medicine. He is the Director of the Vision Rehabilitation Service in the Department of Ophthalmology and Visual Sciences and a member of the faculty of the Stephen A. Wynn Institute of Vision Research. Dr. Wilkinson has provided care for individuals with vision loss for 35 years. Included, as part of this care, is advocacy for appropriate accommodations in the classroom, standardized testing situations, and the workplace. He has served as a consultant on vision-related ADA accommodation issues for several testing agencies over the past 10 years.

**Steven Zecker, Ph.D.**
Steven Zecker is a cognitive and clinical psychologist who obtained his Ph.D. from Wayne State University in 1981. He has been a member of the Program in Learning Disabilities at Northwestern University for 30 years, during which time he has overseen clinical activities and evaluated hundreds of children and adults for possible learning disabilities and ADHD. Dr. Zecker has been an active researcher in the learning disabilities and ADHD fields, having been an author or co-author on over 50 published works and a presenter at over 100 conferences. Dr. Zecker also serves as a disabilities consultant to multiple testing agencies.

**Melissa Behrens-Blake, M.S., Ed.S.**
Melissa Behrens-Blake is a certified educational diagnostician at the Psychology Clinic at the University of New Mexico. She has training in both speech pathology and educational diagnostics. She has experience in test development as well as clinical treatment of a variety of disorders. For the past 15 years she has also consulted with high schools (both private and

public) concerning appropriate documentation of disabilities under the ADA and the transition to colleges and universities. During this time she has also worked with numerous testing organizations in the review of documentation requests under the ADA.

**PROOF OF SERVICE**

I, Benjamin Lovett, declare:

I am a citizen of the United States, over 18 years of age, and not a party to or interested in

the entitled action. My business address is at the Psychology Department, SUNY Cortland, 132

Old Main, Gerhart Drive, Cortland, New York 13045. On April 24, 2015, I served the attached

Amicus Curiae Letter by mail delivery to:

Nabina Sinha
United States Department of Justice
Civil Rights Division, Disability Rights Section
1425 New York Avenue, NW, 4th Floor
Washington, DC 20005

Mari Mayeda
Department of Fair Employment and Housing
2218 Kausen Drive, Suite 100
Elk Grove, CA 95758

Robert Burgoyne
Norton Rose Fulbright US, LLP
801 Pennsylvania Avenue, NW
Washington, DC 20004

I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct. Executed on April 24, 2015 at Cortland, New York.

Benjamin Lovett
_____
Benjamin Lovett