1

2

3

4              UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7   DEPARTMENT OF FAIR EMPLOYMENT
    AND HOUSING,                              Case No.  12-cv-01830-JCS

8                    Plaintiff,

                                             **ORDER GRANTING IN PART AND**
9            v.                              **DENYING IN PART APPEAL OF BEST**
                                             **PRACTICES PANEL REPORT**
10  LAW SCHOOL ADMISSION COUNCIL
    INC,                                     Re: Dkt. No. 220
11
                     Defendant.
12

13  **I.      INTRODUCTION**

14          This case concerns the procedures used by Defendant Law School Admission Council Inc.

15  ("LSAC") to determine whether candidates should receive accommodation for disabilities while

16  taking the Law School Admission Test ("LSAT"), a standardized test administered by LSAC and

17  widely used in law school admissions.  The United States and the California Department of Fair

18  Employment and Housing ("DFEH"), as Plaintiffs,[1] claimed that LSAC's procedures violated

19  state and federal law protecting people with disabilities.  The Parties reached a settlement,

20  memorialized in a Consent Decree (dkt. 203), requiring certain changes to those procedures.  The

21  Consent Decree delegated aspects of those changes to a panel of experts selected by the Parties

22  (the "Panel"), but allowed an appeal to the Court if the Panel's decisions "are believed to violate

23  the ADA or its implementing regulations, or California law where applicable, or to conflict with

24  the provisions of [the Consent] Decree."  Consent Decree ¶ 7(d)(iv).  LSAC now appeals several

25  ─────────────────

26  [1] The case also included a number of individual plaintiffs who are not involved in the present
    appeal.  Those individuals are no longer party to this action, having released their claims by
27  entering the Consent Decree.  *See* Consent Decree ¶ 34.  The Consent Decree only allows the
    United States, DFEH, or LSAC to enforce any violations thereof.  *See id.* ¶¶ 30−31.  In this Order,
    unless otherwise specified, the term "Plaintiffs" refers to DFEH and the United States, and the
28  term "Parties" refers to DFEH, the United States, and LSAC.

*United States District Court*
*Northern District of California*

aspects of the Panel's final Report.  The Court held a hearing on July 31, 2015.  For the reasons stated below, the Court finds portions of the Panel's conclusions invalid, but upholds most of the Panel's Report.[2]  A summary of the Court's conclusions is included at the end of this Order.

## II.   BACKGROUND

### A.   Procedural History

DFEH brought this action against LSAC in state court in March of 2012, alleging that LSAC's process of considering requests to accommodate disabilities made by individuals seeking to take the LSAT violated the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101−213, and in doing so also violated California's Unruh Civil Rights Act, Cal. Civ. Code § 51.  The Court granted the United States' motion to intervene as a plaintiff in October of 2012. *See* dkt. 60.

The Parties reached a settlement and the Court accepted their proposed Consent Decree in May of 2014.  *See* Consent Decree.  As discussed in more detail below, the Consent Decree imposed certain obligations on LSAC, but delegated other issues to the Panel, made up of experts to be selected by the Parties.  *See generally id.*  The Panel issued its final Report on January 26, 2015.  *See* Mew Decl. Ex. A (Final Report of the Best Practices Panel, hereinafter "Report," dkt. 220-2).

LSAC now appeals the Panel's Report pursuant to paragraph 7(d)(iv) of the Consent Decree, which provides that "any Party may appeal to the Court for appropriate relief if any of the Panel's final Best Practices, as written, are believed to violate the ADA or its implementing regulations, or California law where applicable, or to conflict with the provisions of this Decree." Consent Decree ¶ 5(d)(iv).  On June 23, 2015, with consent of the Parties, Judge Chen referred the appeal to the undersigned magistrate judge for decision, and the parties have since consented to the jurisdiction of the undersigned magistrate judge for all future proceedings in this case.  *See* dkts. 237, 241, 242.  The Court held a hearing on LSAC's appeal on July 31, 2015.  *See* dkt. 239.

---

[2] The remaining Parties consented to the jurisdiction of the undersigned magistrate judge to resolve LSAC's appeal, and have since consented to the jurisdiction of the undersigned for all future proceedings pursuant to 28 U.S.C. § 636(c).  *See* dkts. 237, 241, 242.

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.     Consent Decree**

The Consent Decree represents a comprehensive settlement of all parties' claims in this case, including provisions addressing injunctive relief, monetary damages to individual plaintiffs and other affected individuals, civil penalties, attorneys' fees, and ongoing auditing.  *See generally* Consent Decree.  LSAC's present appeal concerns the portion of the Consent Decree delegating certain issues to the Panel (Paragraph 7), as well as how that delegation is constrained by the portion of the Consent Decree setting standards for what documentation of disability LSAC may request (Paragraph 5).[3]

### 1.     Paragraph 5: Injunctive Relief Regarding Documentation Requests

#### a.     Paragraph 5(a): Certain Accommodations Previously Received

Paragraph 5 of the Consent Decree classifies requests for accommodations into two groups.  The first group consists of applicants seeking certain accommodations that they have previously received on "any standardized examination offered in the United States related to applications for post-secondary admission."  Consent Decree ¶ 5(a).  LSAC must grant those accommodations so long as: (1) the applicant provides proof that the sponsor of the earlier test granted the accommodation; (2) the applicant checks a box certifying that he or she continues to experience the functional limitations that required accommodation; (3) the accommodation at issue is either an extension of time, up to double time, or a non-time accommodation listed in Exhibit 1 to the Consent Decree; and (4) the accommodation would not require administering testing on more than one day.  *Id.*  The treatment of requests meeting these criteria generally falls outside the scope of the Panel's Report and is not the focus of the present appeal.

#### b.     Paragraphs 5(b)−(d): All Other Requests

All other requests for accommodation are governed by Paragraphs 5(b) through 5(d). LSAC's requests for documentation supporting such requests must be "reasonable and limited to the need for the testing accommodation requested."  *Id.* ¶ 5(b).  LSAC must "consider all facts and explanations offered by the candidate," must "give considerable weight to documentation of

---

[3] This Order summarizes certain provisions of the Consent Decree implicated by the present appeal.  It does not purport to recount all terms of the Consent Decree, or even all material terms of Paragraphs 5 and 7.  The same is true of the discussion of the Panel's Report.

3

United States District Court
Northern District of California

1  past testing accommodations received in similar testing situations not covered by Paragraph 5(a)"

2  or in the context of certain formal special education settings, and must "consider documentation

3  provided by a qualified professional who has made an individualized assessment of the candidate."

4  *Id.* ¶¶ 5(d)(i)−(iii) (footnote omitted).  For requests for accommodation of mental or cognitive

5  impairments, LSAC must allow candidates to submit evidence of "testing conducted within five

6  years of the date of the request . . . instead of within three years as currently required for certain

7  candidates."  *Id.* ¶ 5(d)(iv).

8       "LSAC may consider objective evidence relating to the candidate's diagnosed impairment

9  and its impact on the candidate."  *Id.* ¶ 5(d)(v).  It may request supplemental information "if the

10  documentation submitted by a candidate does not clearly establish the nature of the impairment or

11  the need for requested testing accommodations," and "may also have the documentation . . .

12  reviewed by one or more qualified professionals."  *Id.* ¶ 5(d)(viii).  LSAC may also "continue to

13  ask evaluators whether a candidate was on his or her prescribed medication during the evaluation,"

14  and to elaborate if relevant.  *Id.* ¶ 5(g).  LSAC "shall not reject or deny" an accommodation solely

15  on the basis of a "candidate's average or above average IQ score and/or high level of academic

16  success," or "solely because the candidate has no formal history of receiving that testing

17  accommodation."  *Id.* ¶¶ 5(d)(vi)−(vii).

18       LSAC's website must advise candidates of the documentation required for accommodation

19  requests, inform them of common reasons for denial of requests, and provide a "non-exhaustive

20  list of the types of testing accommodations available."  *Id.* ¶ 5(e).  LSAC also must advise

21  candidates: (1) that all requests for accommodation, supporting documentation, supplemental

22  documentation as may be requested by LSAC, and any request for reconsideration must be

23  submitted by the stated registration deadline for the LSAT; (2) that requests will generally be

24  considered within fourteen days; and (3) that candidates who submit requests within two weeks of

25  the registration deadline therefore may not have an opportunity to provide supplemental

26  documentation or request reconsideration.  *Id.* ¶ 5(f).  The language of that notice is "subject to

27  further direction from the Panel regarding the need for and availability of an appeals process and,

28  if needed, what that process should be."  *Id.*

## 2.   Paragraph 7: Best Practices Panel

The Panel consists of "five experts: two selected by LSAC; two selected by the United States and the DFEH; and a fifth selected by those four experts from a list prepared by the United States and the DFEH."  Consent Decree ¶ 7(a).  Each member must have expertise in standardized testing accommodations, cognitive disabilities, or ADA compliance.  *Id.*  The Panel is charged with preparing "a written report establishing Best Practices that comport with the requirements of 28 C.F.R. § 36.309, all of which LSAC shall implement to the extent that it is not already following such Best Practices."  *Id.* ¶ 7(b).  "The Best Practices shall be consistent with the provisions of [the Consent] Decree and shall not violate the ADA or its implementing regulations, or California law where applicable."  *Id.*  Some aspects of the Panel's procedures are set by the Consent Decree, while others, including "how many of the five Panel members must agree on each Best Practice in order for it to be imposed," are left to the discretion of the Panel.  *See id.* ¶¶ 7(b), (d).

Paragraph 7(c) sets forth the "issues to be addressed by [the] Panel."  *Id.* ¶ 7(c) (heading; capitalization altered).  This Order follows the practice of the Panel and the Parties in referring to these as "Issue 1" through "Issue 10," although that numbering is not used in the Consent Decree. The disputed issues are as follows:

Issue 2: "The Panel shall consider and establish the type and scope of documentation that may be requested from candidates whose requests fall under Paragraphs 5(b)−(d) . . . ."  *Id.* ¶ 7(c)(ii).

Issue 4: "The Panel shall determine whether more than one qualified professional should review a documented request for testing accommodations before LSAC may deny the request in whole or in part."  *Id.* ¶ 7(c)(iii)(2).  Issues 4 through 10 are each characterized as "elements of the process for reviewing and evaluating testing accommodation requests."  *Id.* ¶ 7(c)(iii).

Issue 5: "The Panel shall consider and establish criteria and guidelines for use by persons who review or evaluate testing accommodation requests."  *Id.* ¶ 7(c)(iii)(3).

Issue 8: "The Panel shall consider whether an automatic review of partial and/or full denials is warranted and, if warranted, how such a review should be conducted."  *Id.* ¶ 7(c)(iii)(6).

1    Issue 9: "The Panel shall consider whether there should be a process available, beyond that

2    already provided by LSAC, to candidates who wish to seek review of LSAC's decision to deny a

3    candidate's request and, if so, what that process should be relative to LSAC's existing registration

4    deadlines." *Id.* ¶ 7(c)(iii)(7).

5    Issue 10: "The Panel shall consider and establish the parameters, such as content and

6    timing of, training for persons (both LSAC staff and outside consultants) who evaluate or review

7    testing accommodation requests." *Id.* ¶ 7(c)(iii)(8).

8    The issues for which LSAC does not directly dispute the Panel's conclusions are: Issue 1,

9    recommendations on how to diversify LSAC's expert consultants, *id.* ¶ 7(c)(i); Issue 3,

10   qualifications for internal and external reviewers of accommodation requests, *id.* ¶ 7(c)(iii)(1);

11   Issue 6, parameters for written recommendations and decisions by internal and external reviewers

12   and consultants, *id.* ¶ 7(c)(iii)(4); and Issue 7, whether LSAC should provide written explanations

13   to candidates who are denied accommodations, and if so, the parameters for such explanations, *id.*

14   ¶ 7(c)(iii)(5).

15   Paragraph 7(c) concludes by stating that "[t]he Best Practices shall not invalidate or

16   conflict with any other provisions of [the Consent] Decree." *Id.* ¶ 7(c)(iv).  Any Party may appeal

17   to the Court if the Panel's decisions "are believed to violate the ADA or its implementing

18   regulations, or California law where applicable, or to conflict with the provisions of [the Consent]

19   Decree." *Id.* ¶ 7(d)(iv).

20   **C.    Panel Report**

21   In accordance with the Consent Decree, the Panel determined that agreement by at least

22   four of its five members would be sufficient.  Report at 2 (citing Consent Decree ¶ 7(b)).  Four

23   members joined in the final Report, while the fifth wrote a separate "Minority Report."  *See* Mew

24   Decl. Ex. B (Shelby Keiser, M.S., "Best Practices Panel Minority Report," dkt. 220-3).  The

25   majority consisted of Dr. Nicole Ofiesh, Ph.D., chosen by Plaintiffs as an expert in testing

26   accommodations, Dr. Charles Golden, Ph.D., chosen by LSAC as an expert in cognitive

27   disabilities, Dr. Nancy Mather, Ph.D., chosen by Plaintiffs as an expert in cognitive disabilities,

28   and Professor Ruth Colker, J.D., nominated by Plaintiffs as an expert in ADA compliance and

United States District Court
Northern District of California

6

1    chosen by the remainder of the Panel from a list of three nominees.  *See* Report; Appeal (dkt. 220)

2    at 9; Opp'n (dkt. 221) at 4–5.  Shelby Keiser, M.S., chosen by LSAC as an expert in testing

3    accommodations, prepared the Minority Report.[4]  *See* Minority Report; Appeal at 9; Opp'n at 4.

4         The Panel recognizes in its Report that it was charged with addressing the ten issues

5    identified in Paragraph 7(c) of the Consent Decree.  Report at 2 ("The Consent Decree specifies

6    ten issues for the Panel to resolve . . . .").  Although the Panel concluded that certain issues tend to

7    overlap, it organized its Report into ten sections based on those issues.  The conclusions

8    challenged by LSAC are discussed below in the analysis portion of this Order.

9         **D.   Parties' Arguments**

10        LSAC brings this appeal seeking to invalidate substantial portions of the Panel's Report.

     *See generally* Appeal.  It also seeks make comparatively small corrective additions to the Report,

12   most of which mirror language in the Consent Decree.  LSAC's proposed changes are summarized

13   in a "redline" of the Report, in which proposed deletions are highlighted in yellow and proposed

14   additions are highlighted in blue.  Mew Decl. Ex. P ("LSAC Redline," dkt. 220-17).

15        LSAC's Appeal opens with discussion of the "Parties' presentation of their views to the

16   Panel," "the Panel's draft report," "the Minority Report," and "actions by certain panel members

17   after issuing the final report."  Appeal at 6–11 (headings; capitalization altered).  LSAC appears to

18   present this background to demonstrate purported bias by the Panel against LSAC or in favor of

19   Plaintiffs.  LSAC does not, however, make an argument that any of this history affects the legal

20   validity of the final Report.

21        LSAC's substantive argument is directed to the Panel's conclusions regarding Issues 2, 4,

22   5, 8, 9, and 10.  *Id.* at 13–32.  According to LSAC, the Report exceeds the Panel's authority under

23   the ten issues delegated to it and conflicts with portions of the Consent Decree.  *See id.*  LSAC

24   contends that certain provisions of the Report that may not directly conflict with the language of

25   the Consent Decree nevertheless constitute conflicts because they upset the Parties' "narrowly-

26   drawn compromise"—for example, where LSAC argues that the Report requires it to provide

27

28   ───────────────────
     [4] LSAC conceded at the July 31, 2015 hearing that the Minority Report is not legally relevant to
     the issue before the Court—whether the majority's Report conflicts with the Consent Decree.

United States District Court
Northern District of California

permissive treatment to a wider class of accommodation requests than specified in the Consent Decree. *See id.* at 22. LSAC also at times argues that the Panel's conclusions are not, in fact, best practices and fail to take into account important considerations regarding the standardization of standardized testing, *e.g.*, *id.* at 25, or that procedures set by the Panel are "virtually impossible to operationalize," *id.* at 31. LSAC's opening brief concludes with an argument on the merits of best practices for standardized testing accommodations. *Id.* at 33–35.

Plaintiffs argue in opposition that the Panel complied with its mandate under the Consent Decree and that all provisions of the Report represent proper exercises of the Panel's authority. *See generally* Opp'n. Plaintiffs contend that the Panel had broad authority under the Consent Decree, including to "lay[] out the circumstances under which LSAC should grant a request for testing accommodations." *See id.* at 19. Plaintiffs do not themselves appeal any part of the Report, and do not concede that any portion is invalid. *See generally id.*

The parties' arguments regarding each disputed issue are discussed in more detail in the context of the Court's analysis below.

### E.   Amicus Letters

Seventeen "professionals with expertise in diagnosing disabilities, evaluating resulting functional limitations, and recommending academic and testing accommodations" submitted a letter to the Court as amici curiae dated April 24, 2015. Dkt. 222. The Inter Organizational Practice Committee (IOPC), a coalition of neuropsychological professional associations, filed an amicus letter dated June 3, 2015. Dkt. 232. Both letters dispute certain aspects of the Panel's Report on the merits, arguing that they are not, in fact, "best practices" for determining how and when to grant testing accommodations. By order of the Court, LSAC and Plaintiffs each filed a response to each letter. Dkts. 225, 226, 233, 234. As discussed below, the Consent Decree provides a limited right to appeal to the Court, which does not include any right to appeal the merits of the Panel's decisions.

United States District Court
Northern District of California

8

III.   **ANALYSIS**

A.   **Legal Standards**

1.   **Interpretation of the Consent Decree**

"A consent decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles." *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 861 (9th Cir. 2007) (quoting *City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985)). The Supreme Court set forth the applicable standard as follows:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

*United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971). Accordingly, arguments that "would have great force if addressed to a court that had the responsibility for formulating original relief in this case, after the factual and legal issues raised by the pleadings had been litigated," may nevertheless be "out of place" in "deal[ing] with the construction of an existing consent decree." *Id.* at 681.

2.   **Review of the Panel's Report**

Neither party cites any authority addressing the interpretation of a report prepared by experts who have been delegated authority under a consent decree to set certain standards for the parties. The Court applies basic principles of contract interpretation, relying primarily on the plain language of the Report.

In terms of the scope of review, the Consent Decree provides for "an appeal to the Court

United States District Court
Northern District of California

1  for appropriate relief if any of the Panel's final Best Practices, as written, are believed to violate

2  the ADA or its implementing regulations, or California law where applicable, or to conflict with

3  the provisions of this Decree."  Consent Decree ¶ 7(d)(iv).  Although not separately stated as a

4  basis for appeal, the Consent Decree grants the Panel authority only as to ten enumerated issues.

5  *See id.* ¶ 7(c).  The Court therefore concludes that any directive from the Panel that exceeds that

6  authority "conflict[s] with the provisions of [the Consent] Decree" and is a proper subject of

7  appeal.  *See id.* ¶ 7(d)(iv).

8          Review beyond the scope specified—i.e., for anything other than conflicts with the

9  Consent Decree or violations of the ADA or California law—is not permitted.  The Parties elected

10  to delegate certain issues to a panel of experts with experience in relevant fields.  That decision is

11  not subject to second-guessing at this stage—the Consent Decree does not permit the Court to

12  substitute its judgment for that of the Panel on the merits of how requests for accommodation

13  should be reviewed and decided.  To the extent that the Parties and amici argue merely that the

14  Panel erred in determining how best to resolve those issues actually delegated to it, such

15  arguments are "out of place."  *See Armour & Co.*, 402 U.S. at 681.

16          **B.    Issue 2: Type and Scope of Documentation**

17                  **1.  The Panel's Report**

18          In response to its charge to "establish the type and scope of documentation that may be

19  requested," the Panel concluded that LSAC's existing requirements were "excessive for most

20  candidates who seek testing accommodations on the LSAT and inconsistent with the

21  documentation guidelines of other national testing entities."  *Id.* at 4.  Specifically, the Panel

22  rejected LSAC's practice of requiring evidence of specific diagnostic tests rather than leaving the

23  choice of diagnostic technique to the qualified professional who diagnosed the candidate.  *Id.*  The

24  Panel instead developed a system of different documentation requirements for three categories of

25  candidates, based on the principle "that the required level of documentation shall depend upon the

26  nature of the request for testing accommodations."  *Id.* at 5.

27          "Category 1" consists of candidates who "request[] a testing accommodation that does not

28  modify the amount of time permitted to respond to the questions in each test section."  *Id.*  The

Report lists a number of examples, including "permission to bring in food," "stop-the-clock breaks," "assignment to a wheelchair-accessible room," and provision of a "sign language interpreter to sign spoken instructions." *Id.* at 5−6.  Candidates requesting such accommodations need only provide "evidence of a disability from a qualified professional who examined the candidate any time after the candidate reached the age of 13, and a statement that provides a reasonable explanation for why the candidate needs the testing accommodation to best ensure that the LSAT results accurately reflect [his or her] aptitude or achievement level." *Id.* at 6 (footnotes omitted).  The candidate may provide the statement.  *Id.*

"Category 2" consists of any candidates requesting up to 50% extra time, as well as candidates with visual impairments that require an alternative test format requesting up to 100% extra time.  *Id.* at 7.  The requirements are the same as for Category 1 above, except that the statement explaining the need for accommodation "should be supported with appropriate data or other relevant information in support of the request."  *Id.*

"Category 3" consists of any candidate requesting more time than allowed for Category 2—more than 50% extra without a visual impairment, or more than 100% extra with a qualifying visual impairment.  This standard is similar to Category 2, but requires that, in addition to being supported by "data or other relevant information," the statement "should explain why more than 50% extra time is necessary."  *Id.* at 7−8.

The Panel provided additional guidance regarding the substance of accommodation requests under all three categories—as well as special guidance for Category 3 requests—as part of its response to Issue 5, discussed below.  *See id.* at 6 ("The type of acceptable documentation is described in response to Issue 5, Part I."); *id.* at 8 (referencing "Issue 5, Part II, Standards for Determining More Than Fifty Percent Extra Time").  If the candidate submits the required documentation for the appropriate category, "then LSAC shall approve the requested testing accommodations, without requiring the candidate to provide additional information."  *Id.* at 6−8.

### 2.  LSAC's Objections and the Court's Conclusions

LSAC first objects to the Panel's documentation standards to the extent that they impose "mandatory outcomes."  Appeal at 13−14.  This objection is largely intertwined with Issue 2's

United States District Court
Northern District of California

incorporation of the standards for review set forth in response to Issue 5, and tends to implicate the Panel's authority under the latter issue to set "criteria and guidelines" for use by reviewers.  It is therefore addressed in this Order under the heading "Issue 5: Criteria and Guidelines for Reviewers," below.

LSAC also objects to this portion of the Report on the basis that the "Decree does not authorize the Panel to create categories of individuals who will be subject to different treatment depending on the nature of their impairment and the amount of extra time they request."  Appeal at 14.  The Court disagrees.  The Consent Decree charges the Panel with "establish[ing] the type and scope of appropriate documentation that may be requested from candidates whose requests fall under Paragraph 5(b)–(d)," i.e., all requests other than those for certain accommodations previously granted on another post-secondary standardized test.  Consent Decree ¶ 7(c)(ii).  Nothing in the Consent Decree requires that those standards must be identical for all such requests.[5]

LSAC objects to the Panel discussing standards for granting certain accommodations not listed in Exhibit 1 of the Consent Decree.  Appeal at 15 ("The last three accommodations identified by the Panel on page 6 of the Final Report are not listed in Exhibit 1 to the Consent Decree and cannot be imposed on LSAC.").  This argument misconstrues the nature of Exhibit 1, which is titled "Testing Accommodations Available Under Consent Decree Paragraph 5(a)." Consent Decree Ex. 1.  That paragraph concerns accommodations that will be granted automatically to candidates who have previously received them on other post-secondary standardized tests.  Nothing in the Consent Decree indicates that those are the only accommodations that will be available to any candidates under the standard of review discussed in Paragraphs 5(b) through (d) and delegated in part to the Panel.  To the contrary, the Consent Decree requires LSAC to provide on its website "a non-exhaustive list of the types of testing accommodations available," id. ¶ 5(e), which would make little sense if an exhaustive list was

---

[5] LSAC raises a similar objection to the Panel setting different standards of review for different impairments and accommodations in the context of Issue 5.  Appeal at 26.  Again, the Court finds no requirement that the Panel set identical standards for all requests for accommodation.

1    available as an exhibit to the Consent Decree.  The Court finds that Exhibit 1 has no bearing on

2    the types of accommodation available under Paragraphs 5(b) through (d), and that the Panel

3    therefore did not err by discussing other accommodations in its Report.

4         LSAC objects to the Panel's conclusion that candidates should be able to submit

5    "[e]vidence of a disability from a qualified professional who examined the candidate *any time*

6    *after the candidate reached the age of 13*."  Appeal at 15 (quoting Report at 6, 7) (emphasis in

7    original).  LSAC argues that this conflicts with Paragraph 5(d)(iv) of the Consent Decree, which

8    provides that LSAC will permit candidates seeking accommodation of a mental or cognitive

9    impairment "to submit testing conducted within five years of the date of the request . . . instead of

10   within three years as currently required for certain candidates."  Consent Decree ¶ 5(d)(iv)  The

11   Court agrees, but only to a point.  Paragraph 5(d)(iv) only concerns mental or cognitive

12   impairments.[6]  For candidates seeking accommodation of such impairments, that paragraph

13   controls, and LSAC need not accept documentation older than five years.[7]  For candidates seeking

14   accommodation of other forms of impairment, however, there is no conflict between the Panel's

15   conclusion and the Consent Decree, and the requirement that LSAC accept documentation from an

16   examination any time after the candidate turned 13 falls within the Panel's authority to "establish

17   the type and scope of appropriate documentation that may be requested."  *See* Consent Decree

18   ¶ 7(c)(ii).  LSAC is therefore bound by this provision of the Report except as to requests for

19   accommodation of mental or cognitive impairments.

20        LSAC finally argues that Paragraph 5(d)(viii) of the Consent Decree, which provides that

21   "LSAC may make a timely request for supplemental information if the documentation submitted

22

23   [6] LSAC asserts that the Consent Decree "provides that LSAC can require documentation . . . from
     within the past five years for candidates seeking accommodations based on mental or cognitive
24   impairment, *and within three years for all other candidates*."  Appeal at 15–16 (emphasis added).
     The last part of that sentence does not accurately reflect the terms of the Consent Decree, which
25   provides only that LSAC's existing policy imposes a three-year limitation on documentation for
     "certain candidates."  Consent Decree ¶ 5(d)(iv).  The Consent Decree does not discuss a three-
26   year limitation for "all other candidates," nor does it provide that the existing three-year policy—
     whatever its scope—cannot be altered by the Panel under its authority to set standards for
27   documentation pursuant to Issue 2.
     [7] Despite maintaining that they "endorse the Panel's recommendation as a Best Practice for all
28   candidates," Plaintiffs all but concede that it conflicts with the Consent Decree with respect to
     requests based on mental and cognitive impairments.  *See* Opp'n at 13 n.11.

United States District Court
Northern District of California

by a candidate does not clearly establish the nature of the impairment or the need for requested testing accommodations," Consent Decree ¶ 5(d)(viii), forecloses the Panel's conclusions regarding appropriate documentation.  Appeal at 16–17.  Specifically, LSAC objects to provisions deeming sufficient "a statement that provides a reasonable explanation for why the candidate needs the testing accommodation," which may be provided by the candidate, and to provisions stating that "[i]f a candidate meets these documentation requirements, which are not intended to be extensive, and provides a reasonable explanation for why these testing accommodations . . . LSAC shall approve  the requested testing accommodations, without requiring the candidate to provide additional information."  Appeal at 16–17 (quoting Report at 6–8).

The Court finds no conflict between Paragraph 5(d)(viii) and the Panel's response to Issue 2.  Through the documentation requirements discussed in response to this issue and the criteria and guidelines for reviewers discussed in response to Issue 5, the Panel essentially defined what documentation suffices to "clearly establish the nature of the impairment or the need for . . . accommodations."  *See* Consent Decree ¶ 5(d)(viii).  Further, as discussed below in the context of Issue 5, the process envisioned by the Panel still calls upon evaluators to use their professional judgment in applying the criteria established by the Report.  A reviewer might determine that a candidate's explanation of need for accommodation is not "reasonable," or that the documentation the candidate submits from a qualified professional is not "evidence of a disability."  *See* Report at 6–8.  The process through which a reviewer may reach such a determination is discussed further in the portion of this Order addressing Issue 5, below.  If the candidate's submission does not meet the documentation required under Issue 2, "LSAC may make a timely request for supplemental information" pursuant to Paragraph 5(d)(viii).

Plaintiffs are correct that LSAC's proposed revisions to the section of the Report addressing Issue 2 would essentially reduce it to restating Paragraph 5(d)(viii) of the Consent Decree, improperly nullifying Paragraph 7(c)(ii), which provides that the Panel shall set standards for the documentation LSAC may request.  *See* Opp'n at 12; LSAC Redline at 4–8.  The Court finds no basis to invalidate the documentation standards set forth in the Report, except as discussed above in the context of outdated mental or cognitive testing.

14

United States District Court
Northern District of California

**C.    Issue 4: Multiple Reviewers Before Denial**

This issue charged the Panel with determining "whether more than one qualified professional should review a documented request for testing accommodations before LSAC may deny the request in whole or in part."  Consent Decree ¶ 7(c)(iii)(2).  The Panel determined "that all accommodations that are not granted in full must be reviewed by one or two outside consultants," as "discussed [in more detail] in response to Issue 8."  Report at 9.  LSAC only objects to this response to the extent that it incorporates purportedly improper conclusions from the Panel's response to Issue 8.  *See* Appeal at 29.  LSAC also challenges "the Panel's recommendations on Issue 6, but only to the extent that they incorporate by reference objectionable recommendations in Issue 8."  *Id.* at 29 n.24.  The Court's analysis of the Panel's response to Issue 8, and of LSAC's objections to that response, falls under the heading "Issue 8: Automatic Review of Denials," below.

**D.    Issue 5: Criteria and Guidelines for Reviewers**

This issue required that the Panel "consider and establish criteria and guidelines for use by persons who review or evaluate testing accommodation requests."  Consent Decree ¶ 7(c)(iii)(3).  The Panel developed a two-step process to determine first "whether or not a candidate has a disability," and second "whether LSAC should approve the candidate's request for testing accommodations."  *See* Report at 11.

**1.  The Panel's Report**

a.  <u>Overview and General Principles Regarding Issue 5</u>

Before delving into the two steps, the Report sets forth a number of general rules and guidelines for review.  According to the Panel, "[i]t shall be the role of the LSAC reviewer(s) to look for evidence that supports the candidate's request for testing accommodations, rather than to look for evidence that denies the candidate's request," and "[a]ll reviewers shall begin the process with the presumption that the testing accommodation is justified."  *Id.*  LSAC "should accept, without further inquiry, 'documentation provided by a qualified professional[8] who has made an

_____

[8] The Panel adopts the definition of "qualified professional" used in the official guidance to the federal ADA implementing regulations: "a person who is 'licensed or otherwise properly credentialed and posess[es] expertise in the disability for which modifications or accommodations

15

individualized assessment of a candidate that supports the need for the . . . accommodation . . . requested,'" giving precedence to "experts who have personal familiarity with the candidate" over reviewers who have not met the candidate.  *Id.* at 10 (quoting 28 C.F.R. Part 36 App. A (guidance regarding 28 C.F.R. § 36.309)).

The Panel endorsed the Consent Decree's requirement that LSAC provide accommodations that candidates previously received on other standardized tests, and further determined that "an established history of testing accommodations" on non-standardized tests, such as university examinations, "shall presumptively support the request for the provision of similar testing accommodations on the LSAT."  *Id.* at 11.  It also determined that "LSAC shall presumptively grant testing accommodation requests that do not involve requests for extended time," so long as the candidate submits adequate documentation of his or her disability.  *Id.*

Finally, the Report states that "*[n]othing in these criteria or standards prevents the reviewer from using his or her professional judgment*, but these decisions must be clearly explained in detail."  *Id.* at 12 (emphasis added).  A reviewer "must provide a specific written explanation in support of" any denial of a requested accommodation, and must "provide a clear statement of what documentation is necessary" in response to any request that lacks adequate documentation.  *Id.* at 11−12.

### b. Issue 5 Part 1: Whether a Candidate Has a Disability

The Report divides its discussion of this sub-issue further into two sections.  First, it discusses what documentation is sufficient if the candidate has "a record of a disability."  *Id.* at 12, ¶ 1.  The Report states that if a candidate presents documentation that he or she has been recognized as having a disability under any of several specified educational programs, the candidate "will be found to have a disability."  *Id.* at 12−13, ¶¶ 1(a)(i)−(iv).  The same is true if the candidate presents documentation of a disability from a medical doctor or other qualified professional who has examined the candidate.  *Id.* at 13, ¶¶ 1(a)(v)−(vi).  Under any of these circumstances, the candidate must also "certif[y] that he or she continues to have a disability."  *Id.*

---

are sought.'"  Report at 10 (quoting 28 C.F.R. Part 36 App. A (guidance regarding 28 C.F.R. § 36.309)) (alteration in original).

1    at 13, ¶ 1(b).

2          The second subpart addresses candidates who "do[] not have a record of a disability." *Id.*

3    at 13, ¶ 2.  The Report cautions that someone who receives an average overall score on a test of a

4    specific skill may still warrant accommodation if they have ongoing, verifiable difficulty with that

5    skill due to a disability.  *Id.* at 13, ¶ 2(a).  It presents as an example someone who "receives

6    average scores on a reading test," but whose "history . . . reveal[s] special education in first grade

7    and several years of individualized tutoring, and who as an adult "may have trouble reading for

8    long periods of time" and find "the act of reading . . . difficult and effortful . . . as compared to

9    most people."[9]  *Id.*  The Panel recommends that such a person be granted accommodations.  *Id.*

10         In terms of documentation, the distinction between a candidate with a "record of a

11   disability" and one who "does not have a record of a disability" is not entirely clear.  As discussed

12   above, documentation from a qualified professional is presented as one way to establish a "record

13   of a disability."  *See id.* at 13, ¶¶ 1(a)(v)−(vi).  The only examples given of evidence sufficient to

14   show a non-record disability are, similarly, where a "qualified professional has provided

15   documentation that the candidate has a disability, which restricts the candidate's ability to

16   demonstrate his or her aptitude or achievement," and where a "qualified professional has provided

17   documentation that an individual has a temporary disability . . . which restricts the candidate's

18   ability to demonstrate his or her aptitude or achievement."  *Id.* at 14, ¶¶ 2(b)(i)−(ii).  The Report

19   notes that such evidence is "not limited to" these examples, *id.* at 14, ¶ 2(b), and concludes this

20   section by cautioning against denying accommodations based on the absence of historical

21   documentation, noting a number of specific factors that "can delay the identification of a

22   disability," *id.* at 14, ¶ 2(c).

23

24   _____

    [9] This example, also discussed elsewhere in the Report, is somewhat unintuitive, and is a subject
25   of criticism in the Minority Report.  *See* Minority Report at 1 ("[D]esignating individuals who
    have 'average overall reading abilities' as disabled for the purpose of receiving an accommodation
26   . . . does not properly reflect the ADA's definition of a disability nor does it reflect the spirit of
    fairness inherent in the law.").  The Court understands the Panel's position to be that if someone is
27   significantly impaired in reading ability by, for example, dyslexia, but able to compensate for that
    impairment to the extent that he or she can achieve overall average scores on reading tests by other
28   abilities, such as superior analytical ability, that person should receive accommodations for his or
    her reading disabilities so that the LSAT accurately reflects his or her other superior abilities.

### c. Issue 5 Part 2: What Accommodations Are Appropriate

This section lays out the Report's most substantive guidance on how LSAC should determine whether to approve requests for accommodations. It is further divided into two subparts: the first subpart addresses requests for non-time-based accommodations and extra time up to 50% (or up to 100% for visual impairments); the second addresses requests for greater than 50% extra time (or greater than 100% for visual impairments).

#### i. Standards for Non-Time-Based Accommodations and Accommodations Not Exceeding 50% Extra Time, or 100% Extra Time for Visual Impairments

Based on the ADA regulations' requirement that considerable weight be given to past accommodations, the Report requires that LSAC provide accommodations comparable to those that a candidate has received in virtually any other test setting, including "K-12 formal [or] informal testing accommodations," so long as the request does not exceed 50% extra time. *See id.* at 15, ¶¶ 1(a)−(b) (citing 28 C.F.R. § 36.309(b)(1)(v)). The Report notes, however, that a lack of past testing accommodations does not establish a lack of present need for accommodations. *Id.* at 15, ¶ 1(c).

If the candidate has not previously received an accommodation, he or she "should provide documentation to justify each requested testing accommodation but the burden on the candidate shall be no higher than [it would have been] if he or she had sought such testing accommodations earlier in his or her educational career." *Id.* at 16, ¶ 2(a). The candidate must provide a diagnosis of disability from a qualified professional, and an explanation by the candidate, qualified professional, or a teacher of the "accommodation as it relates to the candidate's disability." *Id.* at 16, ¶¶ 2(b)−(c). So long as the request does not exceed 50% extra time, no further documentation is required. *Id.* at 16, ¶ 2(d).

The Report also "provide[s] minimum standards that LSAC shall use when determining if a request for a testing accommodation [based on certain specified disabilities] is appropriate." *Id.* at 16, ¶ 3(a). It identifies a number of disabilities that, if a diagnosis is adequately documented, should justify "a minimum of 50% extra time," specifically "learning disabilities," ADHD, "major psychiatric disorders," and (with a history of receiving extra time or "a reasonable explanation")

"writing disorders." *Id.* at 16−18, ¶¶ 3(b)(i)−(iii), (vi).  Candidates with visual impairments "shall be allowed to use the testing accommodations that they document they have used in the past," and if they use "a reader, computer reader (text-to-speech), braille or other similar alternatives [then they] shall be granted 100% extra time." *Id.* at 17, ¶ 3(b)(iv).  This section of the Report also provides for other non-time-based accommodations for certain disabilities, including that, for writing disabilities, "LSAC shall approve requests for the use of a computer, and spell check, for any individual with the history of using such assistive devices in school or work settings."[10]  *Id.* at 18, ¶ 3(b)(vi).

  ii.  Standards for Requests Exceeding 50% Extra Time, or 100% Extra Time for Visual Impairments

    "It is the Panel's opinion that 50% additional time is a reasonable amount of time in most cases," presumably—based on the provisions discussed above—excluding cases of visual impairment.  *Id.* at 18.  The Report nevertheless discusses a number of conditions under which a candidate should receive more than 50% extra time, including (1) where the candidate received more than 50% extra time "on any past standardized test," (2) "where more than 50% extra time can be shown to have been granted as a consistent testing accommodation, and was approved by an appropriate professional," and (3) "if a postsecondary disability service provider provides a signed statement indicating that a candidate was provided with more than 50% additional time on college examinations." *Id.* at 18−19, ¶¶ 1, 4.

    Otherwise, a qualified professional may provide "documentation with a reasonable explanation that supports the need for more than 50% extra time" for either the entire LSAT or certain sections thereof, and the LSAC reviewer must base his or decision on that documentation and "give substantial weight to the recommendation of the qualified professional." *Id.* at 19, ¶¶ 2−3.  As an example of an accommodation for a specific section of the test, the Report states that "for individuals with visual impairments who are routinely granted 100% extra time, 150%

_____

[10] Read broadly, this is a somewhat odd recommendation, as a vast number of non-disabled students and employees use computers and spell check functions in school and work settings.  The Court understands the Report's use of the words "such accommodations" to limit this guidance to candidates who have been allowed to use these tools as accommodations for impairments in circumstances where they are not otherwise provided.

extra time shall be allowed on the analytical reasoning section of the LSAT exam because of its reliance on visual-spatial abilities." *Id.* at 19, ¶ 3. The Report also provides that "more than 50% extra time shall be given to an individual who, because of health or sensory impairments on psychiatric disorders, warrants such time to demonstrate his or her achievement or aptitude." *Id.* at 19 ¶ 5. The example given for that provision involves a case of multiple diagnoses, where the additional effect of a second impairment renders inadequate the 50% extra time routinely given for the first impairment. *Id.*

More generally, LSAC should grant more than 50% extra time "[a]s long as sufficient evidence is presented," LSAC should not suggest a partial accommodation (for example, 75% extra time where 100% has been requested), and reviewers "may use clinical judgment to support a candidate's request for extended time." *Id.* at 19−20, ¶¶ 6−7. "In cases where the request is for a 100% time extension or greater and a reasonable explanation is provided, the test shall be administered over two consecutive days, if the candidate requests that testing accommodation." *Id.* at 20, ¶ 9.

### 2. LSAC's Arguments and the Court's Conclusions

#### a. Criteria, Guidelines, and Outcomes

LSAC argues that the Panel exceeded its authority in a number of instances "by mandating outcomes rather than establishing 'criteria and guidelines' for reviewing candidate documentation." Appeal at 20; *see also id.* at 17–18, 20, 21, 23, 24, 25, 26, 27–29 (presenting forms of this objection in the context of Issue 5); *id.* at 13–17 (making similar arguments in the context of Issue 2). LSAC's position turns on an unreasonably limited reading of the word "criteria." While the word "guidelines" certainly implies something less than a strict rule, the Consent Decree does not limit the Panel's role to setting "guidelines" It charges the Panel with establishing "*criteria and* guidelines for use by persons who review or evaluate testing accommodation requests." Consent Decree ¶ 7(c)(iii)(3) (emphasis added). Unlike "guidelines," the word "criteria" is commonly used to describe the elements of a rule. If each criterion is met, a certain outcome may be compelled. *See, e.g.*, *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1224–25 (9th Cir. 2015) ("The statute at issue there listed nine statutory criteria; if those criteria

United States District Court
Northern District of California

were satisfied, the agency bore a *nondiscretionary* duty to perform a specific action . . . . [I]f they have been met, BSEE *must* approve the plan." (emphasis added)).  Accordingly, giving meaning to both aspects of the panel's charge under Issue 5—"criteria" as well as "guidelines"—the Court finds that the Consent Decree grants the Panel authority to establish substantive, outcome-determinative rules governing how LSAC reviews requests for accommodations.

For the most part, however, the Report does not establish mandatory criteria of that sort. Only a relatively small number of the Panel's recommendations dictate an outcome without providing room for some exercise of judgment by LSAC's reviewers.  Many of the recommendations that LSAC asserts "mandat[e] outcomes" in fact, by their own terms, require reviewers to exercise professional judgment.  For example, the Report provides that a request for no more than 50% extra time "that is appropriately documented, shall be granted," but the documentation requirement includes "a reasonable explanation for each testing accommodation as it relates to the candidate's disability," and a "clear explanation of why a specific amount of time is requested."  Report at 16; *see* Appeal at 23−24.  Although that guidance dictates that a request "shall be granted" if the documentation criteria are met, a reviewer must exercise judgment in determining whether the documentation reasonably and clearly explains a need for the accommodation.  Along the same lines, the guidance that "LSAC shall presumptively grant testing accommodation requests that do not involve requests for extra time" does not dictate outcomes, but merely establishes a default presumption that may be overcome if the reviewer determines in his or her professional judgment that the accommodation is not warranted.  *See* Report at 11; Appeal at 24.

Further, the Report provides that "[n]othing in these criteria or standards prevents the reviewer from using his or her professional judgment, but these decisions must be clearly explained in detail."  Report at 12.  The Parties appear to have overlooked this provision in their written arguments, but the Court finds that it significantly limits those few portions of the Report which, read in isolation, appear to require the sort of "mandatory outcome" to which LSAC repeatedly objects.

For example, in Part II of the response to Issue 5, "[i]t is the Panel's recommendation that

individuals with an established diagnosis of major psychiatric disorders shall be given a minimum of 50% additional time, and extra breaks, as requested." *Id.* at 17, ¶ 3(b)(iii).  Read in isolation, this appears to require that all individuals with such a diagnosis will receive at least 50% extra time and additional breaks.  Read in the context of the Report as a whole, however, it calls for that outcome *unless* the reviewer, "using his or her professional judgment," determines that such accommodations are not warranted and explains that decision "in detail."  *See id.* at 12.  As an additional example, the same is true of the provisions in Part I stating that a "candidate will be considered to have a disability" if he or she produces certain documentation and "certifies that he or she continues to have a disability." *Id.* at 13, ¶ 1(b).  In the context of the Report as whole, however, a reviewer may determine in his or her professional judgment that such a candidate does not have a disability, so long as the reviewer explains that decision in detail. *See id.* at 12.

Accordingly, in each instance where—without otherwise providing for an exercise of judgment—the Report provides that LSAC "shall" or "will" find a candidate disabled or grant an accommodation, the reviewer must respect the Panel's determination that such an outcome is appropriate in most cases meeting the criteria presented in the Report, but may nevertheless reach a different outcome if, in the reviewer's professional judgment, exceptional circumstances justify treating the request differently from the normal case anticipated by the Panel, and he or she explains in detail the exceptional circumstances that justify a departure from that presumption.

This is significant because even if the Court agreed with LSAC that the Panel lacks authority to impose outcomes, the Report does no such thing.  Instead, it sets a series of guidelines for review of requests, some more specific than others, that can be rebutted by a detailed explanation of why, in the reviewer's professional judgment, an exception applies.[11]  The Court therefore finds no basis to invalidate any portion of the Panel's responses to Issues 2 and 5 on the

---

[11] Plaintiffs also concede that "[n]othing in the Decree or Best Practices [Report] precludes LSAC from demonstrating that the provision of a particular auxiliary aid or service would result in a fundamental alteration or undue burden, consistent with the regulation implementing the ADA." Opp'n at 22.

United States District Court
Northern District of California

1    grounds that it purportedly imposes an outcome.[12]

2           b.   Consideration of Qualified Professionals and Candidate Statements

3          LSAC objects to a number of provisions stating that reviewers should give deference or

4    special weight to the opinions and recommendations of qualified professionals who have

5    examined the candidate.  Appeal 18–19.  According to LSAC, these provisions conflict with the

6    Consent Decree, which provides that "LSAC shall consider documentation provided by a qualified

7    professional who has made an individualized assessment of the candidate."  *See* Consent Decree

8    ¶ 5(d)(iii) (footnote omitted).

9          The Court finds no conflict.  "Considering" a form of evidence or authority is not

10   inconsistent with giving deference to it.  It is perfectly accurate to state that this Court considers

11   Ninth Circuit and Supreme Court precedent in reaching its decisions—the fact that the Court is

12   also bound by such precedent does not make that use of the word "consider" improper.  Paragraph

13   5(d)(iii) requires only that LSAC *cannot disregard* documentation submitted by a qualified

14   professional.  It does not bar the Panel from requiring that LSAC give such documentation greater

15   weight than other evidence.  Further, provisions mandating that reviewers give "precedence,"

16   "deference," "more weight," "substantial weight," or "preference" to a qualified professional's

17   diagnosis or recommendation, *see* Report at 10, 12, 13, 19, 20, do not require that a reviewer reach

18   the outcome supported by that evidence in all cases.  So long as the reviewer acknowledges and

19   applies the appropriate weight to evidence from a qualified professional, he or she may

20   nevertheless determine, applying his or her professional judgment to the request and supporting

21   documentation as a whole, that a different outcome is warranted.  The Court finds no basis to

22   invalidate the Report's provisions regarding documentation from qualified professionals.

23         Substantially the same rationale applies to LSAC's objection to a provision of the Report

24   stating that requests for up to 50% extra time "shall be granted" if the "candidate, a qualified

25

26   ───────────────────
     [12] The same is true of the related objection that certain portions of the Report conflict with
27   Paragraph 5(d)(v), which provides that "LSAC may consider objective evidence relating to the
     candidate's diagnosed impairment and its impact on the candidate."  Consent Decree ¶ 5(d)(v);
28   *see, e.g.*, Appeal at 17.  Reviewers may consider any evidence in the candidate's file in the process
     of exercising their professional judgment.

1   professional, or a teacher . . . provide[s] a reasonable explanation for each testing

2   accommodation," constituting "a clear explanation of why a specific amount of time is requested."

3   Appeal at 23–24 (quoting Report at 16, ¶¶ 2(c)–(d)).  LSAC argues that this conflicts with the

4   Consent Decree's provision that "LSAC shall consider all facts and explanations offered by the

5   candidate."  *See* Consent Decree ¶ 5(d)(1).  As discussed above, there is no conflict between

6   "considering" a type of evidence and affording it some degree of deference.  Moreover, the

7   reviewer in fact *must* consider the candidate's (or professional's or teacher's) statement—as

8   required by the Consent Decree—to determine whether, in the reviewer's professional judgment, it

9   offers a "reasonable" and "clear explanation" of the need for the accommodation—as required by

10  the Report.  *See* Report at 16, ¶¶ 2(c)–(d).  The Court finds no conflict and no basis to invalidate

11  these provisions.

12  c.   Considerable Weight Given to Education Plans

13  LSAC objects to the provisions of the Report stating that a candidate "will be found to

14  have a disability" if he or she provides documentation of a disability recognized by certain

15  enumerated education programs, such as an Individualized Education Program or a Section 504

16  Plan.  Appeal at 20–21; *see* Report at 12–13, ¶¶ 1(a)(i)–(iv).  According to LSAC, these provisions

17  conflict with Paragraph 5(d)(ii) of the Consent Decree, which provides that LSAC will give

18  "considerable weight" to such past accommodations.  *See* Appeal at 20–21; Consent Decree

19  ¶ 5(d)(ii).

20  The fact that the Consent Decree requires "considerable weight" for certain education

21  plans does not remove those plans from the realm of the Panel's authority under Issue 5.  The

22  Panel remains free to establish criteria and guidelines related to such plans—including defining

23  "considerable weight" as it has done here—so long as that guidance does not conflict with the

24  Consent Decree's requirement that LSAC afford them considerable weight.  The challenged

25  criteria do not conflict with the Consent Decree.  As previously discussed, read in the context of

26  the Report as a whole, the challenged provisions require a finding of disability unless the reviewer

27  determines in his or her professional judgment that such a finding is not warranted, and explains in

28  detail what exceptional circumstances justify a departure from the presumption set forth in the

United States District Court
Northern District of California

24

Report.  *See* Report at 12 ("Nothing in these criteria or standards prevents the reviewer from using his or her professional judgment, but these decisions must be clearly explained in detail.").  The Court finds no conflict between that standard and the "considerable weight" required by the Consent Decree.

### d.   Considerable Weight Given to Past Testing Accommodations

LSAC similarly objects to the Report's instruction that past accommodation in any of a number of test settings—ranging from "K-12 informal testing accommodations" to "[s]imilar accommodations on previous standardized . . . examinations"—is sufficient to warrant providing accommodations so long as the candidate is not requesting more than 50% extra time.  *See* Report at 15, ¶ 1(a)(i)–(vi); Appeal at 21–23.  According to LSAC, this improperly invalidates the distinction that the Consent Decree draws between certain standardized tests enumerated in Paragraph 5(a)—which automatically warrant certain equivalent accommodations—and "similar testing situations not covered by Paragraph 5(a)," which warrant "considerable weight" under Paragraph 5(d)(ii). *See* Consent Decree ¶ 5(a) & n.4; *id.* ¶ 5(d)(ii).

This guideline—that a candidate with past testing accommodations should receive comparable accommodation on the LSAT unless a reviewer explains in detail why, in his or her professional judgment, exceptional circumstances warrant a different outcome—is wholly consistent with the Consent Decree's standard of "considerable weight."  The extreme scenario discussed in LSAC's Appeal—"an informal accommodation in kindergarten or elementary school," Appeal at 23—is precisely the sort of situation where a reviewer might determine the accommodation sought on the LSAT is not, in fact, "comparable,"[13] or might exercise professional judgment and explain why that evidence is not sufficient.  Where an accommodation is found to be comparable, a reviewer may still "us[e] his or her professional judgment," *see* Report at 12, but as discussed above, must acknowledge the Panel's determination that such past accommodations are normally sufficient, and explain in detail what exceptional circumstances of the request at

---

[13] Plaintiffs acknowledged at the July 31, 2015 hearing that LSAC reviewers retain discretion in determining whether a past accommodation is "comparable" to the accommodation requested on the LSAT, and that informal accommodations provided in kindergarten are unlikely to be comparable.

issue differ from the normal case anticipated by the Panel and thus justify a departure from that presumption.

The Court is not persuaded by LSAC's argument that the criteria set by the Panel for requests falling under Paragraphs 5(b)−(d) must differ from the criteria set by the Consent Decree for requests falling under Paragraph 5(a)—i.e., that evidence of past accommodation for another test is sufficient to receive comparable accommodation for the LSAT.  LSAC argues that the distinction between Paragraphs 5(a) and 5(b)−(d) represents the Parties' "narrowly-drawn compromise."  Appeal at 22.  But while the Consent Decree undeniably represents the Parties' compromise, it is not so "narrowly-drawn" as LSAC now argues.  Nothing in the Consent Decree states that Paragraph 5(a) sets forth the *only* circumstances in which past testing accommodations may be dispositive of a candidate's request, and the Court cannot assume that Plaintiffs would have agreed to such a restriction on the Panel's authority.  *See Armour & Co.*, 402 U.S. at 681−82 ("Because [each party] has, by the decree, waived [its] right to litigate the issues raised, . . . the conditions upon which [it] has given that waiver must be respected, and the instrument must be construed as it is written . . . .").  Acting within its authority to establish criteria for review, the Panel was free to require that other tests and past accommodations besides those listed in Paragraph 5(a) be given dispositive weight.

Regardless of whether the Panel had authority to create such rules, it did not do so.  Even if the Court were to accept LSAC's argument regarding the structure of the Consent Decree, the provisions of the Report addressing past testing accommodations do not nullify the distinction between the Paragraph 5(a) tests and all other tests.  As discussed above, the Report provides that "[n]othing in these criteria or standards prevents the reviewer from using his or her professional judgment," *see* Report at 12, and a reviewer may determine in exceptional cases that even comparable past testing accommodations should not be granted for the LSAT.  In contrast, there is no room for professional judgment under the automatic procedure of Paragraph 5(a).  The Court finds no basis to invalidate the Report's provisions regarding past testing accommodations.

e.   Presumptive Approval of Non-Time Accommodations

LSAC objects to the Panel's instruction that "LSAC shall presumptively grant testing

accommodations that do not involve requests for extended time" so long as the candidate documents his or her disability.  Appeal at 24–25 (quoting Report at 11).  This provision of the Report comes from the introductory portion of Issue 5, and appears to summarize the more detailed requirements discussed later in that section.  *See* Report at 11.  The Court does not read it as negating the requirement that a candidate satisfy some portion of Part II to show what accommodation is appropriate by, for example, submitting evidence of past testing accommodations or a "reasonable explanation for each testing accommodation as it relates to the candidate's disability."  *See id.* at 15–16, ¶¶ 1–2.

To the extent that LSAC argues that this provision improperly mandates an outcome and conflicts with LSAC's right to request supplemental materials, *see id.*, the Court disagrees for the reasons discussed above.  LSAC also argues that this standard "shows a complete disregard for the importance of standardized testing conditions" and "reflects a lack of appreciation for the wide range of non-time accommodations that are requested on standardized tests, many of which may be unreasonable, unnecessary, or otherwise inappropriate."  Appeal at 25.  Even if that is true, it is not a basis for appeal under the Consent Decree.  The Parties reasonably elected to delegate these issues to a panel of experts rather than try them before the Court.  There is no basis for the Court to substitute its judgment for that of the Panel.  The Court notes, however, that the more extreme examples that LSAC puts forward may be situations where a reviewer would exercise his or her professional judgment to deny a request.  Further, as noted above, Plaintiffs concede that LSAC retains the right to "demonstrat[e] that the provision of a particular auxiliary aid or service would result in a fundamental alteration or undue burden, consistent with the regulation implementing the ADA."  Opp'n at 22.

f.   Differentiation by Type of Disability or Accommodation Requested

LSAC objects to a number of instances where the Report sets forth different standards of review based on the type of disability claimed, the accommodation requested, or some combination of the two.  Appeal at 26–28.  According to LSAC, "[s]uch recommendations conflict with Paragraph 5(d) of the Decree, which sets out the standards applicable to *all* accommodation requests, regardless of the type of accommodation requested or the nature of the underlying

United States District Court
Northern District of California

United States District Court
Northern District of California

disability." *Id.* at 26.  As with the Issue 2 documentation standards discussed above, however, the Court finds nothing in the Consent Decree to support this argument.  The fact that the Consent Decree and the ADA do not themselves differentiate between these kinds of requests does not prohibit the Panel from making such distinctions in fulfilling its charge to "establish criteria and guidelines for use by persons who review or evaluate testing accommodation requests."  *See* Consent Decree ¶ 7(c)(iii)(3).  The Court finds no basis to invalidate these provisions of the Report.

### E.    Issue 8: Automatic Review of Denials

This issue broadly tasks the Panel with determining whether full or partial denials of accommodation requests should be subject to "an automatic review," and if so, "how such a review should be conducted."  Consent Decree ¶ 7(c)(iii)(6).  The Panel determined that denials must be automatically reviewed by multiple additional reviewers, and set forth a procedure for such review.  Report at 22−24.  This section of the Report also includes standards for LSAC's first-level review of accommodation requests.  *See id.* at 22.

#### 1.  First-Level Review

In the Consent Decree, Issue 8 concerns only "automatic review[s] of partial and/or full denials."  Consent Decree ¶ 7(c)(iii)(6).  It provides the Panel no authority to directly alter LSAC's procedure for initially reviewing accommodation requests.  *See id.*  In reviewing the Panel's recommendations for first-level review, the Court therefore looks to whether other portions of the Consent Decree provide such authority.

First, the Report provides that although candidates generally "must submit all their records in support of a testing accommodation by the applicable registration date," *id.*, *see also* Consent Decree ¶ 5(f), LSAC should "waive the regular deadline and make every effort to accommodate [a] candidate" who "unexpectedly acquires a disability after the registration deadline."  Report at 22.  As stated in the Report, "[t]he Panel understands that this recommendation goes beyond its authority under the Consent Decree but believes it is a Best Practice."  *Id.*  The Court construes that statement as a concession that LSAC is not bound by this recommendation regarding late-onset disabilities, and so holds.  Although LSAC may adopt this recommendation if it so chooses,

nothing in the Consent Decree requires LSAC to consider requests for accommodation submitted after the LSAT registration deadline.

Next, the Report lays out a process for first-level review as follows:

> The Disabilities Specialist [(an LSAC employee)] shall review each file and make a recommendation whether to approve the requested accommodations in full, to approve in part, or to deny in full. He or she will then prepare a written summary based on a checklist of decision-making criteria (as described in response to Issue 5) that explains the reasoning for that decision, using a holistic approach to the file. This review shall occur within two business days of the Disability Specialist receiving a completed file.

*Id.* LSAC objects to this paragraph in its entirety, except for the portion requiring the Disabilities Specialist to prepare a written summary based on a checklist of criteria. LSAC Redline at 22. While LSAC is correct that these provisions of the Report are not authorized by Issue 8, the Court finds that they fall within the Panel's authority under Issue 5 to establish "criteria and guidelines for use by persons who review or evaluate testing accommodation requests." *See* Consent Decree ¶¶ 7(c)(iii)(3). That the Disabilities Specialist must recommend whether to approve in full, approve in part, or deny in full are "criteria." That he or she should "us[e] a holistic approach to the file" is a "guideline." The Court therefore declines to invalidate these provisions.

The two-day deadline goes beyond the Panel's authority, and improperly purports to regulate an aspect of the *process* of first-level review that was not delegated to the Panel under any of its ten issues. The same is true of the provision that if the single Disabilities Specialist that LSAC currently employs cannot meet the two-day deadline, "then LSAC shall hire additional, qualified staff as Disabilities Specialists to make that deadline feasible," because "[e]mploying adequate, qualified staff is a Best Practice." Report at 22. Because the Panel could not require LSAC to meet the two-day internal review deadline, it certainly could not require the hiring of staff to meet that deadline. Except as specified in the Consent Decree, it is for LSAC to determine *how* it will meet its obligations thereunder (including compliance with the binding portions of the Report). The Court therefore holds that these recommendations are not binding on LSAC.

As discussed below, however, the Consent Decree grants the Panel explicit authority to determine whether and how LSAC should (1) automatically review decisions to deny requests;

United States District Court
Northern District of California

1    and (2) allow candidates to seek further review of its final decision, and the Report provides for

2    such processes.  *See* Consent Decree ¶¶ 7(c)(iii)(6), (7); Report at 23−28.  LSAC must therefore

3    complete its internal review—including review by the Manager of Accommodated Testing as

4    discussed below—in sufficient time to allow for the automatic review and appeals process

5    established by the Panel in response to Issues 8 and 9.  Because the automatic review by outside

6    consultants takes four business days, Report at 23−24, transmission to the candidate takes one

7    business day, *id.* at 24, the candidate has four calendar days to submit an appeal, *id.* at 25, and the

8    appeal must be received at least twelve calendar days before the test, *id.*, LSAC effectively must

9    complete its internal review no later than five business days before the business day that is at least

10   sixteen calendar days before the LSAT test date.[14]  This timeline only applies to candidates who

11   register and request accommodation by the "regular" deadline; the process for candidates who

12   elect to use LSAC's "late registration" deadline is discussed separately in the portion of this Order

13   addressing Issue 9.

### 2.  Internal Manager's Role in Review

15   After the "first-level review" by the Disabilities Specialist, the Report provides that

16   another existing LSAC employee, the Manager of Accommodated Testing (the "Manager"), "shall

17   review the file within two business days" and either "approve the requested testing

18   accommodation in full, or write a clear rationale explaining the decision not to approve a testing

19   accommodation in full."  *Id.* at 22−23.  If the Manager approves the request in full, the written

20   summaries prepared by LSAC staff "shall be retained in LSAC's records to be reviewed in the

21   future for consistency or training purposes," and "the candidate shall receive a communication

22   within one business day stating that his or her . . . request has been approved in full."  *Id.* at 23.

23   LSAC objects to these portions of the Report because they "relate solely to the internal

---

[14] The unavoidably awkward structure of this deadline arises from the Report's timeline switching from business days in the context of automatic review to calendar days in the context of an appeal. While it is somewhat cumbersome to explain, it is not particularly difficult to calculate for a test that is only administered a handful of times per year.  For example, the internal review deadlines for the next three regular LSAT test dates—on October 3, 2015, December 5, 2015, and February 6, 2016—are September 10, 2015, November 12, 2015, and January 13, 2016, respectively (assuming that LSAC observes federal holidays).

1    process leading up to LSAC's initial decision to grant or deny a request." Appeal at 29. Again,

2    LSAC is correct that Issue 8 does not relate to the process by which LSAC reaches its initial

3    decision. The Court nevertheless finds that the Panel had authority to require that the Manager

4    review the Disability Specialist's "recommendations" to deny requests for accommodation.

5        Issue 4 authorizes the Panel to determine "whether more than one qualified professional

6    should review a documented request for testing accommodations before LSAC may deny the

7    request in whole or in part." Consent Decree ¶ 7(c)(iii)(2). As LSAC correctly argues, "[t]his

8    straightforward query contemplated a simple 'yes' or 'no' response." Reply at 7. Although very

9    little about the Panel's Report can be characterized as "simple," the framework set forth in

10   response to Issue 8 unambiguously answers "yes" to Issue 4: more than one person should review

11   a request before LSAC may deny it. *See* Report at 22−23. Issue 3, which LSAC does not

12   challenge, permits the Panel to "establish the appropriate qualifications for persons, such as LSAC

13   staff . . . who make substantive adverse decisions on requests." Consent Decree ¶ 7(c)(iii)(1). The

14   Panel is therefore within its authority in requiring that the initial review must be conducted by a

15   Disabilities Specialist, that at least one more professional should review the request before LSAC

16   may deny it, and that the second professional must be the Manager of Accommodated Testing.

17   Because the Manager is among the "persons who review or evaluate testing accommodation

18   requests," the Panel is authorized by Issue 5 to establish criteria and guidelines for his or her use in

19   reviewing requests, including a requirement to "write a clear rationale" for any denial. Consent

20   Decree ¶ 7(c)(iii)(3); Report at 22–23. The Panel is also authorized to require LSAC to maintain

21   records of its reasons for granting a request, *see* Report at 23, because Issue 6 charges the Panel to

22   "consider whether there should be particular parameters for internally documenting written

23   decisions by LSAC personnel . . . and, if so, what those parameters should be." *See* Consent

24   Decree ¶ 7(c)(iii)(4).

25       On the other hand, the requirement that the Manager complete his or her review within two

26   days is invalid because the Panel had no authority to set internal timelines for LSAC's review. As

27   discussed above, the only deadline for such review is that LSAC must reach its decision in time to

28   allow for the automatic outside review of denials and the appeals process set forth in response to

1    Issues 8 and 9, respectively.

2         Further, the Panel cannot require the Manager to review the Disability Specialist's

3    determination that an accommodation should be granted in full.  Nothing in the Consent Decree

4    prohibits LSAC from granting an accommodation based on a single reviewer's decision, nor does

5    the Consent Decree empower the Panel to establish procedures that require multiple people to

6    review a request before that request can be *granted*, because Issue 4 is limited to situations where

7    LSAC "den[ies] the request in whole or in part."  *See* Consent Decree ¶ 7(c)(iii)(2).  The

8    requirement that the Manager review a recommendation to grant an accommodation in full is not

9    binding on LSAC.

10        The Report's requirement that LSAC notify a candidate within one business day of the

11   decision that his or her request has been granted also does not fall within the scope of any issue

12   delegated to the Panel.  Report at 23.  As discussed above, the Panel had no authority to set

13   deadlines for LSAC's internal review process.  Nor is this requirement authorized by Issue 7—

14   "Written explanations for denials of testing authorizations"—because it concerns accommodations

15   that are granted, rather than denied.  *See id.* ¶ 7(c)(iii)(5).  The one-day notification requirement

16   for approvals is therefore not binding on LSAC.

17                              **3.  External Review**

18        If the Manager determines that a request should be denied in full or in part, the Report sets

19   forth a procedure for automatic external review.  LSAC must transmit the file to an outside

20   consultant of its choice who has relevant expertise and agrees to review the file within two

21   working days.  Report at 23.  The outside consultant must then review the file and reach a

22   conclusion to agree with the candidate's request in full, agree in full with LSAC's full or partial

23   denial, or suggest a partial approval falling between the candidate's request and LSAC's position.

24   *Id.*  "The outside consultant will provide a justification of his or her decision in writing."  *Id.*  If

25   the consultant agrees with the candidate in full, then the "consultant's determination will become

26   the final determination of LSAC for that candidate's request."  *Id.* at 23—24.  Otherwise, the file

27   goes to a second consultant selected by the same process, who may either approve the request in

28   full or endorse the position of the first consultant.  *Id.* at 24.  The second consultant must also

United States District Court
Northern District of California

United States District Court
Northern District of California

1    justify his or her decision in writing.  "Where a second outside consultant is used . . . the decision

2    by the second outside consultant is the final decision on the request for testing accommodation."

3    *Id.*

4         The candidate will be notified of the outcome of this process within one business day of

5    the decision.  *Id.*  If the request is not granted in full, LSAC must provide a decision letter

6    explaining the rationale of its decision, including "[q]uoted statements from the written summaries

7    and checklist indicators."  *Id.*  The letter must also "include clear suggestions, with examples, for

8    any additional information that might be helpful in the appeal process," and an explanation of that

9    process.  *Id.*

10        LSAC objects to this portion of the Panel's Report on a number of grounds.  First, LSAC

11   argues that Issue 8 only contemplated "'*an* automatic review' . . . *i.e.*, *one* review."  Appeal at 30

12   (quoting Consent Decree ¶ 7(c)(iii)(6)) (emphasis added in Appeal).  According to LSAC, "the

13   Panel did not have the authority to impose two external reviews on LSAC."  *Id.*  The Court

14   disagrees with the premise that the process described above falls outside the scope of "an

15   automatic review."  A "review" can encompass multiple steps and multiple reviewers.  The

16   Panel's decision to establish a review process that may include two outside consultants falls within

17   the Panel's authority to determine "how [an automatic] review should be conducted."  *See* Consent

18   Decree ¶ 7(c)(iii)(6).

19        LSAC also argues that the Panel exceeded its authority by:

20            making the decisions of the external reviewers binding on LSAC;
             mandating the types of decisions that external reviewers may make
21            (*i.e.*, external reviewers cannot reject any accommodation previously
             granted by LSAC, even if the external reviewer concludes that
22            accommodations are unwarranted and even though the external
             reviewer's decision is supposed to be binding on LSAC); mandating
23            the time within which the external reviewer must provide his or her
             opinion; and dictating how and when LSAC's decisions must be
24            conveyed to the candidates.

25   Appeal at 30 (citations to the Report omitted); *see also* Reply at 7–8.  LSAC appears to believe it

26   self-evident that such determinations exceed the Panel's authority, but fails to explain why any of

27   these issues fall outside of the Panel's mandate to determine "how such a review should be

28   conducted."  *See* Consent Decree ¶ 7(c)(iii)(6).  LSAC agreed to that provision in the Consent

Decree, which by its plain language grants the Panel broad authority, and one of LSAC's appointees to the Panel joined in establishing the procedure set forth in the Report. The Court finds no basis to invalidate any portion of the Report concerning automatic review by outside consultants.[15]

### F.   Issue 9: Appeals Process

This issue asked the Panel to consider whether LSAC should provide, for candidates denied accommodations, an appeals process "beyond that already provided by LSAC . . . and, if so, what that process should be relative to LSAC's existing registration deadlines."  Consent Decree ¶ 7(c)(iii)(7).

#### 1.   Appeals Process Described in the Panel's Report

The Panel determined that such a process should be available, and "recommend[ed] that the candidate shall be able to submit an appeal up to twelve days before the actual administration of the exam" and perhaps even later, depending on circumstances.  Report at 25.  After the candidate receives notice that his or her request was not granted in full—as discussed above, within one business day of the decision—"[t]he candidate will have at least 24 hours . . . to indicate *if* the candidate desires to appeal," or more time if the candidate submitted his or her initial request before the registration deadline.  *Id.* at 25–26 (emphasis added).  The Report states that LSAC must give the candidate a total of at least four days from notification of the adverse decision to submit his or her appeal, and that "[m]ore than four days can be provided to the candidate . . . if that appeal can be received within twelve days before the scheduled test date."  *Id.* "In [his or her] appeal, the candidate may request a different testing accommodation than requested in his or her original request for testing accommodations."  *Id.* at 28.  "If the candidate desires more than four days to transmit an appeal, and those additional days would cause the file

---

[15] The Panel's authority under Issue 8 to determine "how [an automatic] review [of denials] should be conducted" is significantly broader than its authority regarding LSAC's initial review of requests for accommodation.  Accordingly, this Order reaches different conclusions as to certain portions of the Report that mandate similar steps at different stages of the review process—e.g., while the Panel lacks authority to mandate that a decision to grant accommodation on initial review be transmitted within one business day, it has authority to require such notice in the context of automatic review of a denial.

United States District Court
Northern District of California

1    to be received less than twelve days before the scheduled test date, then the candidate can request

2    that his or her application for testing accommodations be rolled-over to the next LSAC testing

3    cycle with no additional cost." *Id.* at 26.

4        Upon receiving notice that the candidate intends to appeal, "LSAC shall contact two

5    outside appeals consultants [with relevant expertise] (using the process described above [in Issue

6    8]) to ensure their availability in the event the appeals process is invoked." *Id.* at 26.  These are to

7    be different consultants than those who initially reviewed the denial of the candidate's request

8    under the Issue 8 automatic review process.  *See id.* at 28 ("LSAC will immediately secure two

9    different outside consultants . . . .").  Once LSAC receives the actual appeal, it has twenty-four

10   hours to decide whether to grant the request or to proceed with an appeal.  *Id.* at 26.  If it does not

11   grant the accommodation, it must transmit the appeal and the candidate's file to the first appeals

12   consultant for review under a process similar to that described in Issue 8, but with a twenty-four

13   hour deadline.  *Id.*  The first consultant may approve the request in full, approve in part (but not

14   less than LSAC's initial determination), or concur with LSAC's initial decision.  *Id.* at 28.  If the

15   first consultant does not grant the request in full, the appeal goes to the second consultant, who has

16   twenty-four hours to "choose between the recommendation of the first outside appeals consultant

17   and the candidate's request."  *Id.*

18       LSAC must provide the result to the candidate within one week of the candidate

19   submitting the appeal.  *Id.* at 26.  "LSAC will never refuse to provide the results of an appeal (or a

20   full consideration) because there is insufficient time to implement the requested testing

21   accommodation for that examination cycle, unless the candidate indicates that he or she would like

22   to terminate the testing accommodation request."  *Id.*

23              **2.  Arguments and Analysis**

24       LSAC asks the Court to strike nearly all of this section, leaving only the requirements that:

25   (1) a candidate may submit an appeal (with the timeline and deadline for such an appeal not

26   specified); (2) LSAC may choose to grant the request or proceed with the appeal; and (3) the

27   appeals process will involve two outside consultants and follow the procedure described in Issue

28   8—presumably as modified by LSAC's objections to that issue, so that there is no deadline for a

United States District Court
Northern District of California

response and the result is not binding on LSAC.  *See* LSAC Redline at 25–29; *see also id.* at 22–24 (proposed revisions to Issue 8).  According to LSAC, the Panel's response to this issue is "an effort to circumvent [the] agreed-upon restriction" that the Panel would not alter LSAC's existing registration deadline by "devis[ing] an appeals process that is virtually impossible to operationalize, with the fallback that LSAC can just approve requests if the Panel's facially unreasonable appeal process and deadlines cannot be met."  Appeal at 31; *see also* Reply at 13 ("At the very least, the challenged aspects of the recommended appeal process are not 'consistent' with LSAC's existing registration deadlines because they are not realistic.").  Plaintiffs argue that this is not a valid basis for appeal under the Consent Decree, and dispute LSAC's assertion that the Report's appeals process is not feasible.  *See* Opp'n at 24 ("[T]he Report explains in great detail how [the appeals process] can feasibly be implemented.").

As a starting point, it is questionable that the Court has authority to invalidate a provision of the Panel's Report because it is "facially unreasonable," or "unrealistic."  The Consent Decree provides the Parties a limited right to appeal to the Court if a provision of the Report is "believed to violate the ADA or its implementing regulations, or California law where applicable, or to conflict with the provisions of this Decree."  Consent Decree ¶ 7(d)(vii).  It includes no provision for an appeal based on the reasonableness of the Panel's choices.

In any event, even assuming that the Court has such authority, LSAC has provided no evidence whatsoever to support its contention that the prescribed appeals process is not feasible. The Parties selected members of the Panel in part based on "expertise in the provision of testing accommodations within the context of standardized test administration."  *Id.* ¶ 7(a).  Presented only with the Parties' unsupported characterizations of the appeals process as, on the one hand, "virtually impossible to operationalize" and, on the other hand, a process that "can feasibly be implemented"—*see* Appeal at 31; Opp'n at 24; *see also* Reply at 13—the Court declines to substitute its own judgment for that of the Panel, which the Parties selected specifically to determine "what that process should be."  *See* Consent Decree ¶ 7(c)(iii)(7).  The Court therefore declines to invalidate the Panel's decisions regarding the appeals process, except as discussed below in the limited context of "late registration" requests for accommodation.

United States District Court
Northern District of California

1   LSAC's only more specific objection to the Panel's response to this issue is that "[t]he

2   Panel also exceeded its authority . . . by regulating examination costs and candidate payment

3   obligations," Appeal at 31 n.26, specifically by providing that a candidate should have the option

4   to "request that his or her application for testing accommodations be rolled-over to the next LSAC

5   testing cycle with no additional cost"[16] if he or she "desires more than four days to transmit an

6   appeal," Report at 26.  LSAC has not adequately explained why the Consent Decree's broadly-

7   written mandate to determine "what [the appeals] process should be" would not allow the Panel to

8   identify circumstances where an appeal should involve continuing the candidate's test date to the

9   next regularly scheduled LSAT test in order to allow adequate time to submit and consider an

10  appeal.  Nor has LSAC identified any provision of the Consent Decree, the ADA, or California

11  state law that conflicts with this process.  In fact, LSAC seems to agree that "[a]ny decisions on

12  appeals that cannot be made within established deadlines can apply with respect to the next test

13  administration," *see* Appeal at 31, but apparently would like to reserve the right to charge

14  candidates a second registration fee in such circumstances, *see id.* at 31 n.26.  In the Court's view,

15  the fees that apply in those circumstances are a part of the appeals process, and thus fall within the

16  Panel's broad authority under Issue 9 to determine "what that process should be."  *See* Consent

17  Decree ¶ 7(c)(iii)(7).  The Court therefore finds no basis to invalidate this provision of the Report.

18  One provision of the Consent Decree could be construed as bearing on the Panel's

19  authority to set an appeals process, although neither party addresses it in the context of their

20  arguments on this issue.  The Consent Decree requires LSAC to notify candidates that the

21  registration deadline is "also the deadline for . . . <u>LSAC to receive any request for reconsideration</u>

22  of LSAC's testing accommodations determinations."  Consent Decree ¶ 5(f).  This deadline is

23  inconsistent with the Report's deadline allowing an appeal to be filed, at least in some

24  circumstances, until twelve days before the test date.  *See* Report at 25–26.  LSAC may have

25  chosen not to rely on this provision, however, because the Consent Decree specifically provides

26

27  ────────────────

28  [16] The Court construes this provision as allowing the candidate to roll over his or request for accommodation and his or her registration to take the test to the next test date.  It does not authorize a candidate to take the LSAT twice for a single registration fee.

that the notice "language is subject to further direction from the Panel regarding the need for and availability of an appeals process and, if needed, what that process should be."  Consent Decree ¶ 5(f).  The Court therefore finds that the Panel acted within its authority in allowing an appeal to be filed after the registration deadline.  The notice provided pursuant to Paragraph 5(f) of the Consent Decree shall conform to the appeals process detailed in the Report.

### 3.   Appeals After Late Registration

The Report includes a sample timeline for a full review process, including appeal, based on a June 9, 2014 test date.  Report at 26−29.  That timeline is based on a request for accommodation made on the "regular registration deadline" of May 6, 2014.  *Id.* at 27.  Although the Court is satisfied that the process is consistent with LSAC's "regular registration" deadlines, the Court takes notice of the fact that LSAC also offers "late registration" deadlines for an extra fee, and appears to allow candidates who register on those dates to request accommodations.  *See* LSAC, *Accommodations Request Packet* (rev. May 2015).[17]

The process outlined in the Report is not consistent with the late registration deadlines. For LSAC's February 6, 2016 test date, the late registration deadline is January 15, 2016, *see id.*, which—even ignoring any time for internal review by LSAC's Disabilities Specialist and Manager—does not leave enough time to complete the automatic review by outside consultants established in response to Issue 8, allow the candidate four days to submit an appeal, and receive that appeal twelve days before the test, as required by the Report.  The late registration deadlines for October and December 2015 tests would only leave enough time for the automatic review and appeals processes if LSAC completed both stages of its internal review in a single day, which is far less time than the Panel intended.  *See* Report at 22 (recommending two business days for review by the Disabilities Specialist and a further two business days for review by the Manager[18]).

Neither the Panel nor the Parties raised this issue.  The Consent Decree and the Parties'

---

[17] http://www.lsac.org/docs/default-source/jd-docs/accommodations-form-gen-info.pdf
[18] As discussed above in the context of Issue 8, the Court holds that these internal deadlines are not binding on LSAC.  They are nevertheless useful in understanding the Panel's intent as to how the review would proceed, and support the Court's conclusion that the Panel did not foresee or intend that LSAC would make its initial decision based on only a single day of internal review.

statements at the July 31, 2015 hearing make clear that the Parties intended that candidates seeking accommodation would be able to register and request accommodation on the same registration deadlines that apply to non-disabled candidates. *See* Consent Decree ¶ 5(f) (providing notice language regarding deadlines). It is also clear that the Panel, consistent with its charge under Issue 9, intended that an appeals process would be available to candidates whose accommodation requests are denied, that such candidates would be allowed at least one day to decide whether to appeal and four days to submit an appeal, and that such appeals would be reviewed by two outside consultants before they could be denied. *See* Report at 25−26. The Panel further intended that LSAC would have at least twelve days from the submission of an appeal to allow for its review and, if warranted, implementation of the accommodation. *Id.* at 25. Finally, the Panel recognized that it lacked authority to alter LSAC's existing registration deadlines. *See id.* at 22 n.13.

In the limited context of "late registration" requests, the appeals process in the Report conflicts with the Consent Decree, because—for at least one test date—the process cannot be completed in the time between the "late registration" deadline and the test. The Consent Decree empowers the Court to determine "appropriate relief" in the event of a conflict. *See* Consent Decree ¶ 7(vii). In order to give effect to the Parties' agreement and the Panel's determinations, the Court holds that LSAC must allow candidates who register on the "late registration" deadline to submit requests for accommodation on that date and to appeal any denials of such request within four days of receiving LSAC's final decision. However, if LSAC cannot feasibly complete the review process for such appeals as outlined in the Report and provide the requested accommodation by the test date, LSAC must defer appellant candidates' registrations, requests, and appeals to the next test date at no extra charge. LSAC must also provide clear notice on its website and registration materials that selecting the "late registration" deadline may affect a candidate's ability to appeal any denial of accommodation in time for that test date, and must provide similar notice with any denial of a "late registration" accommodation request so that the candidate can make an informed choice whether to proceed on the original test date without accommodation or pursue an appeal of the accommodation request for the next test date.

Although the Panel lacks authority to directly establish internal deadlines for LSAC's

United States District Court
Northern District of California

review, the Court holds—as discussed above in the context of "regular registration"

accommodation requests—that LSAC must conduct its internal evaluation and review in a manner

that leaves sufficient time for the automatic external review and the appeal, if any, established by

the Report.  This has implications for the timing of the internal review when a candidate submits a

request for accommodation by the "late registration" deadline.  Under the process described

above, the internal process, and the outside review of any whole or partial denial, must be

completed in time for the candidate to either appeal (which may result in the candidate being

delayed to the next test administration) or make the choice to waive any appeal and proceed with

the test as scheduled, with any accommodation that the LSAC internal review and outside

automatic review have determined are appropriate.  LSAC must provide the candidate with its

final decision in time to allow the candidate at least twenty-four hours to make that choice.  *See*

Report at 26.

### G.    Issue 10: Training Parameters

The final issue delegated to the Panel is to "consider and establish the parameters, such as

content and timing of, training for persons (both LSAC staff and outside consultants) who evaluate

or review testing accommodation requests."  Consent Decree ¶ 7(c)(iii)(8).

#### 1.  Annual Training

The Panel determined that "LSAC staff and all outside consultants shall attend an annual

two-day training session" including presentations by experts with experience in standardized

testing accommodations.  Report at 29.  "During the Consent Decree, at least one member of the

Panel appointed by DOJ and one member of the Panel appointed by LSAC, who has approved all

of the recommendations of the Panel, shall participate in this training session."  *Id.*  It also

discusses subjects to be covered and "minimum objectives" to achieve.  *Id.* at 29–30.

LSAC objects to the requirement that training last two days, and to the mandatory

participation of Panel members.  Appeal at 32; Reply at 14–15.  LSAC's objection to the two-day

duration borders on frivolous.  The Consent Decree empowers the Panel to "establish the

parameters, such as content and timing of, training."  Consent Decree ¶ 7(c)(iii)(8).  LSAC argues

that "[w]here specific words follow general words in a contract, the general words are construed to

40

embrace only things similar in nature to those enumerated by the specific words."  Reply at 14

(quoting *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1045 (2008)).  The Court assumes

for the sake of argument that this principle applies to the provisions at issue.  There is no

reasonable basis, however, to conclude that the duration of training is not a parameter "similar in

nature to" the timing and content of training.  Unless the Panel's authority were limited to *only* the

duration and content of training—and by the plain language of the Consent Decree, it is not—it is

difficult to imagine what "parameters" would fall within its scope if the implied limitation to

"similar" parameters did not include duration.[19]  The Court finds no basis to invalidate the

requirement for a two-day annual training.

LSAC also challenges the provision requiring members of the Panel to participate in

LSAC's annual training sessions.  Plaintiffs stipulated to strike that provision at the July 31, 2015

hearing.  Accordingly, LSAC need not include members of the Panel in its annual trainings.

### 2.  Remedial Training

The Report also calls for "additional training" for any staff member whose decision is

reversed on review more than 25% of the time—i.e., a first-level reviewer reversed by the

Manager of Accommodated Testing, or the Manager reversed by an outside consultant.  Report at

30.  LSAC is required to keep data on these reversal rates and implement additional training if the

rate exceeds the 25% threshold at the time of any report that LSAC is required to make under

Paragraph 23 of the Consent Decree.  *Id.*; *see also* Consent Decree ¶ 23 (describing reports to be

submitted annually and after each administration of the LSAT).  "The nature and timing of that

training will be determined by DOJ, in consultation with DFEH, on a case-by-case basis

depending on the reasons for the reversals."  Report at 23.

LSAC objects to the requirement that it maintain data on how often decisions are reversed,

arguing that this exceeds the Panel's authority under Issue 10 and "effectively invalidates the

parties' agreement regarding LSAC's record-keeping obligations," because the reversal rate is not

---

[19] The California Court of Appeal's decision in *Nygard* dealt with the lack of similarity between, on the one hand, a company's trade secrets, and on the other, information about one individual's working conditions and another individual's social life.  *See Nygard, Inc.*, 159 Cal. 4th at 1045–46.  It is not applicable to the case at hand.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  among the data LSAC is required to track pursuant to Paragraph 8 of the Consent Decree.  Appeal

2  at 32.  The Court finds that even if this requirement falls outside the scope of establishing

3  parameters for training, it is within the Panel's authority under Issue 6 to set "parameters for

4  internally documenting written decisions by LSAC personnel who make substantive decisions on

5  requests for testing accommodation."  Consent Decree ¶ 7(c)(iii)(4).  There is no conflict with

6  Paragraph 8, because nothing in that paragraph limits the Panel's authority to require further

7  recordkeeping, and construing Paragraph 8 as an exhaustive and exclusive list would effectively

8  nullify the Panel's authority to set parameters for documenting decisions under Issue 6.  *See id.*

9  ¶ 8.  Further, the requirement that reviewers receive training when their reversal rate exceeds 25%

10  falls squarely within the Panel's Issue 10 authority to establish the "timing of" training.  *Id.*

11  ¶ 7(c)(iii)(8).  The Court finds no reason that the timing of training cannot be contingent on

12  conditions that, in the Panel's judgment, evince a need for such training.

13         The Panel's delegation of the "nature and timing of that training" to the Department of

14  Justice (in consultation with DFEH) is problematic.  *See* Report at 30.  The Parties agreed in the

15  Consent Decree that the Panel would establish parameters for training.  Here, the Panel failed to

16  do so.  Stating that someone else—here, a party to the dispute—will dictate the parameters is not

17  itself a parameter, and nothing in the Consent Decree granted the Panel authority to delegate its

18  duties to one of the Parties.  That delegation is therefore invalid.  LSAC must provide remedial

19  training as required by the Report, but it may determine appropriate content of such training,

20  guided by the parameters set forth in the Report for annual training.

21  **IV.    SUMMARY OF THE COURT'S CONCLUSIONS**

22         As discussed in more detail above, the following provisions of the Report are modified or

23  invalidated, or otherwise warrant explanation:

24         1.      LSAC need not accept evidence of testing for mental or cognitive impairments that

25  took place more than five years before the date of request.  *See* Report at 6−7, ¶¶ 1(b), 2(a), 3(a);

26  Consent Decree ¶ 5(d)(iv).

27         2.      Although not a conflict with the Consent Decree, the Report by its own terms states

28  that "[n]othing in [the Report's] criteria or standards prevents the reviewer from using his or her

42

United States District Court
Northern District of California

professional judgment, but these decisions must be clearly explained in detail."  Report at 12.

Giving meaning to this provision, the Court reads criteria that describe circumstances where

LSAC "shall" or "will" reach an outcome without otherwise allowing for an exercise of judgment

as presenting a strong presumption that the outcome is appropriate in ordinary circumstances.  A

reviewer may depart from that presumption only if he or she acknowledges the Panel's

determination and explains in detail what exceptional circumstances of the request at issue differ

from the normal case anticipated by the Panel and thus justify a different outcome.

> 3.      LSAC need not waive its regular deadlines to accommodate a candidate who unexpectedly acquires a disability after the registration deadline.  *See* Report at 22 (acknowledging that this recommendation exceeds the Panel's authority).

> 4.      LSAC's internal reviewers—specifically, its Disabilities Specialist and Manager of Accommodated Testing—need not complete their respective reviews of requests for accommodation within two business days.  *See* Report at 22−23.  LSAC nevertheless must complete both stages of its internal review in time to allow for automatic review and an appeal as required above.  For a request submitted on or before the "regular" registration deadline, LSAC must complete its review at least five business days before the last business day that is sixteen calendar days before the test.  For a request submitted based on the "late registration" deadline, LSAC must complete its review in time to allow for automatic outside review of a denial, notification to the candidate, and at least one day for the candidate to decide whether to appeal.

> 5.      The Panel cannot directly require LSAC to hire additional staff.  *See* Report at 22. LSAC may determine how it will meet its obligations under the Consent Decree and the Report.

> 6.      LSAC need not require that its Manager of Accommodated Testing review a decision by the Disabilities Specialist to *grant* a request for accommodation.  *See* Report at 22.

> 7.      LSAC need not notify a candidate within one business day if his or her request is granted on LSAC's initial review.  *See* Report at 23.  The Court declines to modify notification deadlines related to outcomes of automatic outside reviews or appeals, based on the Panel's broader authority over those processes under Issues 8 and 9.

> 8.      LSAC need not complete review of an appeal before the upcoming test date if the

candidate submitted his or her request as part of a "late registration."  If a candidate chooses to appeal a denial under those circumstances, and LSAC cannot complete the appeal and provide the requested accommodation by the test date, LSAC must defer the candidate's registration, request, and appeal to the next test date at no additional charge.

9.      LSAC must modify the notice language set forth in Paragraph 5(f) of the Consent Decree to reflect the appeals process established by the Report and this Order.

10.     LSAC need not allow members of the Panel to participate in annual training of LSAC's reviewers.  *See* Report at 29.

11.     LSAC need not allow the Department of Justice to determine the parameters of remedial training for LSAC reviewers whose reversal rates exceed 25%.  LSAC may determine the content of such training, guided by the parameters set forth in the Report for annual training. *See* Report at 30.

**V.      CONCLUSION**

For the reasons stated above, the Court declines to invalidate the challenged provisions of the Panel's Report except as specifically discussed.

**IT IS SO ORDERED.**

Dated: August 7, 2015

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California