1  JON ICHINAGA (#137290)
     Chief Counsel
2  MARI MAYEDA (#110947)
     Associate Chief Counsel
3  Mari.Mayeda@dfeh.ca.gov
   JONI CARRASCO (#287679)
4    Staff Counsel
   Joni.Carrasco@dfeh.ca.gov
5  IRINA TRASOVAN (#290372)
     Staff Counsel
6  Irina.Trasovan@dfeh.ca.gov
   DEPARTMENT OF FAIR EMPLOYMENT
7    AND HOUSING
   2218 Kausen Drive, Suite 100
8  Elk Grove, CA  95758
   Telephone:  (916) 478-7251
9  Facsimile:   (888) 382-5293

10 Attorneys for Plaintiff, DFEH
   (Fee Exempt, Gov. Code, § 6103)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, an agency of the State of California, | **Case No. CV 12-1830-JCS** |
| Plaintiff, | **MOTION IN LIMINE TO EXCLUDE CONCLUSIONS, TESTIMONY OF DECREE MONITOR ARTHUR COLEMAN RE CONSENT DECREE** |
| vs. | |
| LAW SCHOOL ADMISSION COUNCIL, INC., | |
| Defendant. | Date:  December 1, 2017<br>Time:  9:30 am<br>Judge: Hon. Joseph C. Spero<br>Location: Courtroom G (15th Floor) |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Intervenor | |
| vs. | |
| LAW SCHOOL ADMISSION COUNCIL, INC., | |
| Defendant. | |

**TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................................. 1

II. FACTUAL BACKGROUND .......................................................................................... 2

    A.    Relevant Provisions of the Consent Decree ............................................................ 2

    B.    Monitor Arthur Coleman's Draft and Final Reports ............................................... 3

    C.    Deficiencies in Mr. Coleman's Report ................................................................... 4

III. LEGAL STANDARD ...................................................................................................... 9

IV. MR. COLEMAN'S REPORT FAILS TO MEET THE REQUIREMENTS OF FED. R. EVID. 702 ....................................................................................................................... 10

    A.    The Report Is Neither Reliable Nor Relevant To A Determination of LSAC's Compliance With The Consent Decree In This Case ........................................... 10

    B.    Mr. Coleman Lacked the Background to Monitor the Consent Decree and Failed to Obtain the Necessary Assistance to Perform the Analyses Required By the Consent Decree .................................................................................................................. 12

V. CONCLUSION ............................................................................................................... 14

# TABLE OF AUTHORITIES

**Federal Cases**

*City of Pomona v. SQM Medical Corporation*,
   750 F.3d 1036 (2014) ................................................................................................ 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ................................................................................... 1, 9, 10, 11

*F.T.C. v. BurnLounge, Inc.*,
   753 F.3d 878 (9th Cir. 2014) ..................................................................................... 9

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................................. 9

*Lust By and Through Lust v. Merrell Dow Pharm., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ...................................................................................... 9

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ............................................................................... 9, 11

**Federal Rules**

Federal Rule of Evidence 401, 402 ............................................................................... 1, 10

Federal Rule of Evidence 702(a) ....................................................................................... 11

Federal Rules of Evidence 702 and 403 ..................................................................... passim

PLEASE TAKE NOTICE Plaintiff, the Department of Fair Employment and Housing (DFEH or Department), hereby moves the Court and at a hearing on December 1, 2017 at 9:30 am in Courtroom G of the United States District Court for the Northern District of California located at 450 Golden Gate Avenue, San Francisco, California, requests that the Court issue an Order pursuant to Federal Rule of Evidence 401, 402, 403, 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) to exclude the conclusions and testimony of the Decree Monitor Arthur Coleman regarding LSAC's compliance with the Consent Decree because it is inadequate as a matter of law.

As set forth more fully in the accompanying Memorandum of Points and Authorities in support of this motion and the Declaration of Professor Peter Blanck, the Department respectfully prays that this Court grant its motion to exclude the testimony and conclusions of Decree Monitor Arthur Coleman because Mr. Coleman is unqualified, and his testimony is inadequate and unhelpful as a matter of law and whatever other relief the Court deems necessary.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

ADA Monitor Arthur Coleman's Report is notable for what it does not include. His Report does not mention any of the practices or the numerous violations of provisions of the Court's orders which are the subject of the DFEH's accompanying Motion to Hold Defendant in Civil Contempt. The Audit Report should not be admitted to determine whether LSAC complied with the Court's orders because Mr. Coleman's Report fails to address or analyze any of the violations raised by DFEH. Mr. Coleman refused to go "beyond the numbers" because it "would be unnecessarily burdensome and unwarranted" although the Consent Decree mandates an audit of LSAC's data, policies and practices. As a result, he failed to observe, discover and address a number of violations. Consequently, Mr. Coleman's Report fails the admissibility requirements of Federal Rules of Evidence 702 and 403. DFEH, therefore, submits that Mr. Coleman's Report should be admitted for the limited purpose of establishing Mr. Coleman's incompetence to serve as monitor in this case and the need to replace him and appoint a new monitor. However, on the issue of civil contempt, the Report should be excluded on the grounds that it fails to meet the admissibility requirements of Federal Rules of Evidence 702 and 403.

## II.   FACTUAL BACKGROUND

### A.   Relevant Provisions of the Consent Decree

Plaintiff, the California Department of Fair Employment and Housing ("DFEH" or plaintiffs) filed a complaint in which the United States intervened against the Law School Admission Council Inc. ("LSAC" or defendant) challenging its policies, procedures, and practices used "to determine whether candidates should receive accommodation for disabilities while taking the Law School Admission Test ("LSAT"), a standardized test administered by LSAC and widely used in law school admissions." The case was settled and resulted in a Consent Decree. Dkt. 203 (05/29/14) (hereinafter "Consent Decree").

The Consent Decree established a panel of experts selected by the Parties to propose "best practice" guidelines so that LSAC's procedures come into compliance with California law and the ADA as applicable. It further provided for the appointment of an "ADA Monitor" to be mutually agreed upon by the Parties within sixty (60) days of the effective date of the Consent Decree, whose purpose "*is to assist the United States, the DFEH, and the Court in evaluating LSAC's compliance with the Decree.*" Dkt. 203, ¶24 (emphasis added)

The Consent Decree requires LSAC to report specific information to the United States, DFEH and the ADA Monitor. The ADA Monitor is to conduct audits "of LSAC's compliance with this Decree, by first evaluating LSAC's Reports described in Paragraph 23, and then by requesting access to additional information, such as LSAC data and personnel, and independently observing LSAC operations, to the extent reasonable and deemed necessary by the ADA Monitor in order to evaluate LSAC's compliance with those provisions of the Decree subject to the audit . . ." It requires the monitor to audit LSAC's compliance one (1) year; two (2) years; and four (4) years after the effective date of the decree. The one (1) year audit was to address LSAC's compliance with the reporting requirements contained in Paragraphs 8 and 23. The two (2) year and four (4) year audits were to address LSAC's compliance with the reporting requirements contained in Paragraphs 8 and 23 and LSAC's implementation of the Best Practices discussed in Paragraph 7.

The ADA Monitor, pursuant to the Decree, is required to provide "a written report ("Audit Report") to LSAC, the United States, and the DFEH regarding LSAC's compliance with those

provisions of the Decree subject to the audit, as set out in Paragraph 25." The Decree specifically provides that,

> each Audit Report shall provide: (a) the scope of the audit; (b) a detailed list of the data collected and interviews conducted, if any, in the course of the audit; (c) any difficulties with conducting the audit; (d) an itemized assessment as to whether LSAC is complying with those provisions of the Decree subject to the audit; (e) what data the ADA Monitor relied upon in reaching this assessment, and what data contradicts this assessment, if any; and (f) the ADA Monitor's recommendations for further remediation if he or she determines that compliance is deficient.

Dkt. 203, ¶26.

### B. Monitor Arthur Coleman's Draft and Final Reports

LSAC nominated, and Plaintiffs accepted Arthur Coleman with reservations as Decree Monitor. Mr. Coleman provided an initial draft of the Report to Plaintiffs on October 6, 2016, which combined the one-year and two-year audit reports into a single report. Carrasco Dec., ¶ 17.[1]
Plaintiffs spoke with and emailed Mr. Coleman to raise concerns about the lack of specificity and the conclusory nature of his draft Report and informed him that he had erroneously labeled his Report as confidential. Carrasco Dec., ¶ 18.

Plaintiffs' informed Mr. Coleman in detail about three major deficiencies in his draft Report: "(1) lack of substantive and methodological specificity, (2) reliance on unconfirmed and overly subjective data, and (3) insufficient and limited scope of substantive analysis." Carrasco Dec., ¶18. Plaintiffs provided Mr. Coleman with an edited draft Report that included redlines and detailed comments from Plaintiffs. Plaintiffs also requested that Mr. Coleman provide copies of the underlying documents and a more detailed description of the methodology used as the bases for his conclusions. Carrasco Dec., ¶18-19.

Mr. Coleman provided a final version of his Report to Plaintiffs on February 16, 2017. The DFEH had hoped that the Final Report would remedy the issues raised by Plaintiffs. However, the Final Report largely failed to address any of the concerns raised by Plaintiffs regarding the draft

---

[1] The Declaration of Joni Carrasco is attached to Plaintiff Department of Fair Employment and Housing's Motion for Order Holding Defendant Law School Admission Council, Inc. In Civil Contempt.

-3-
PLAINTIFF'S MOTION IN LIMINE RE CONCLUSIONS, TESTIMONY OF ARTHUR COLEMAN
CV 12-1830-JCS

Report, did not provide the detailed information requested by Plaintiffs, and maintained the designation of "confidential." Carrasco Dec., ¶20 and Ex. 9 thereto.

### C. Deficiencies in Mr. Coleman's Report

DFEH retained Professor Peter D. Blanck, a nationally recognized expert and experienced court monitor to review the work of Mr. Coleman. Upon completion of his review, Professor Blanck concluded that the Report's deficiencies lead him

> to conclude that the Audit lacks basic validity and reliability, and therefore, fails to assist the Court and the Plaintiffs to meaningfully evaluate LSAC's compliance with the Consent Decree.

Declaration of Professor Peter D. Blanck (Blanck Decl.), ¶ 48.

Professor Blanck has extensive experience in the disability field. He is the Chairman of the Burton Blatt Institute (BBI) at Syracuse University, which works to advance the civic, economic, and social participation of persons with disabilities worldwide. He holds the rank of University Professor at Syracuse University, which is the highest faculty rank at the University. He received a Ph.D. in Social Psychology from Harvard University, with a minor in Organizational Behavior. He received a Juris Doctorate from Stanford University, where he served as President of the Stanford Law Review.

Professor Blanck has published more than 200 articles and books on the Americans with Disabilities Act and as amended ("ADA" and "ADAAA"), the Rehabilitation Act of 1973 (Rehabilitation Act), and other disability laws and policies, including the textbook Disability Civil Rights Law and Policy (3rd ed., 2014, with Waterstone, Myhill, & Siegel). He is a former member of the President's Committee on Employment of Persons with Disabilities and has testified about disability-related matters before Congress, the Equal Employment Opportunity Commission (EEOC), and other federal and state administrative bodies.

Dr. Blanck served as a court-appointed officer for the United States District Court of Wyoming in two class action lawsuits to monitor, assess, and ensure compliance with, among other areas, reasonable accommodations for individuals with a range of physical, mental, and cognitive disabilities across the life course. From 1995 to 2001, he was appointed as Facilitator by the United States District Court of Wyoming, in the settlement of the class action *Chris S. et al. v. Jim Geringer et al.*, 2:94-CV-00311-ABJ (D.Wyo. Dec. 29, 1994). Professor Blanck examined, monitored, and

analyzed data and case files regarding the development and implementation of state and community services, and accommodation supports, for persons with mental illness, and related conditions, to ensure their administration in a manner consistent with the principles of scientific reliability and validity, and human dignity and inclusion.  In this capacity, Dr. Blanck conducted archival, case file, interview, statistical, and programmatic analyses of qualitative and quantitative information from state programs and services serving individuals across the spectrum of disability.

As a professor of law, psychology, and other disciplines at Iowa and Syracuse, Professor Blanck regularly advises educational administrators and standardized testing organizations, Rehabilitation Act Section 504 coordinators, and student disability services offices regarding academic accommodations, policies, and procedures for undergraduate and graduate students with an array of physical, mental, cognitive, and other disabilities.  In this capacity, for instance, he served as Chair of the Provost Task Force to Examine Issues Facing Students with Learning Disabilities (1998-1999), at the University of Iowa.  He also has been chair of the American Psychological Association's Committee on Standards in Research and a Commissioner on the American Bar Association's Commission on Mental and Physical Disability Law.

DFEH asked Professor Blanck to review the Mr. Coleman's Report in three areas: (1) substantive and methodological specificity, (2) reliance on appropriate data and sources; and, (3) sufficiency and scope of substantive analysis.  Blanck Decl. ¶ 23.  Professor Blanck, using the Merriam Webster Dictionary definition of an audit as an independent "*formal* examination of an organization[]" and "a *methodical examination* and review,"[2] evaluated Mr. Coleman's Report in regard to the basic competencies that an audit be "conducted in this matter in a reasonably valid (i.e. asking and addressing the proper issues) and reliable (i.e., conducting the audit with transparency and capability of replication) fashion."  *Id.* ¶ 25.

Professor Blanck concluded that in his opinion

> the ADA Monitor has not fulfilled his responsibility to provide a valid and reliable report to the Court and the Parties because the nature and scope of his review, analysis, and reporting is deficient in basic aspects of the above-listed competencies and responsibilities.

*Id.* ¶ 26.

---

[2] https://www.merriam-webster.com/dictionary/audit (last visited Sept. 16, 2017).

Professor Blanck provides many examples of deficiencies in Mr. Coleman's Report. Three central deficiencies relate to the lack of specificity, reliability and analysis in the report. Professor Blanck testifies that "the Monitor's Report: (1) lacks substantive and methodological specificity, (2) relies on unconfirmed and non-representative data, and (3) lacks sufficient substantive analysis." *Id.* Professor Blanck details the reasons for each of these conclusions.

He explains that the first deficiency is that

> [t]he ADA Monitor's Report lacks basic specificity and detail regarding the Audit's methodology (e.g., nature of archival analyses and interviews), and does not appropriately consider and weigh applicable information to substantiate the conclusions presented. Besides a general listing of information collected, I did not observe meaningful discussion of the methodology employed by the ADA Monitor to conduct the Report. In my experience, methodological specificity would be expected in an Audit of a nationwide decree of this magnitude. Nor is there sufficient discussion of the reasoning and substantive analysis used to reach the conclusions stated in the Report.

*Id.* ¶ 27 (footnote omitted)

The second deficiency Professor Blanck enumerates is that Mr. Coleman's Report relies on unconfirmed and non-representative data. Professor Blanck explains that his opinion is based on the fact that the Audit "appears to rely on limited and non-representative data sources. Without additional specificity, therefore, there is no way to determine the validity and reliability of the findings." *Id.* ¶ 29. Of particular concern to Professor Blanck is the fact that Mr. Coleman "provides that he relied on LSAC's Manager of Accommodated Testing Kim Dempsey and General Counsel Joan Van Tol to select candidate files for the ADA Monitor's review." *Id.* ¶ 29 (footnote omitted). He explains that,

> it is a "red flag" in conducting an "independent" audit to allow the party being audited to essentially select the documents for review, and without any apparent or documented follow-up and confirmation (e.g., spot checking the findings). Perhaps it is too evident that an independent monitor cannot effectively perform a valid and reliable review where the defendant's attorney is centrally engaged in the file (data) selection process. By allowing LSAC to select the files without any documented verification process, the independence of the ADA Monitor is brought into question. Thus, it is possible the non-independent party non-randomly "cherry picked" the files, or not. Without any documented verification process, the Court and the Parties (or an external reviewer such as myself) simply cannot answer this crucial question.

*Id.* ¶ 30. Professor Blanck concludes that

> [t]he result of these significant methodological deficiencies is that, in my opinion, there is no reasonable basis for the Court or the Parties to be able to validate the accuracy of the ADA Monitor's conclusions based on his review of candidate files as presented.

*Id.*

Professor Blanck next discusses a third deficiency concerning Mr. Coleman's analysis of information he received from LSAC. *Id.* ¶ 32. He testifies that the fact that

> Plaintiff's separate analysis of the LSAC data reports revealed errors in LSAC's reporting in regard to testing accommodation requests … suggest[s] to me that the ADA Monitor did not, or chose not to, independently analyze and verify the information reported by LSAC to determine whether it was correct and reliable.

*Id.* (footnote omitted)

He explains that

> [a]scertaining whether or not there may be deficiencies in data reporting is a *sin qua non* task to ensure validity and reliability, which any reasonable auditor, let alone a court-appointed ADA Monitor, should undertake in conducting a review as required by the present Consent Decree.

*Id.* However, Professor Blanck notes, there is no evidence "to demonstrate or suggest that the ADA Monitor undertook this important foundational review procedure." *Id.*

Professor Blanck also discusses Mr. Coleman's review of Issue Nos. 2 and 5 of the Best Practices Report concerning "the type and scope of appropriate documentation (Issue No. 2: Documentation" and "how LSAC should evaluate "documentation of requests for accommodation and, thereby, ascertain whether or not to grant or deny a request for testing accommodations (Issue No. 5: Criteria and guidelines for reviewers).[3]" *Id.* ¶¶33-34. Professor Blanck testifies that in reviewing and analyzing compliance with the documentation requirements of Issue No. 2, that Mr. Coleman

> should have reasonably considered the substance of the Best Practices, and inquired whether LSAC was requiring more documentation than necessary and whether LSAC is appropriately evaluating that documentation in determining whether to grant or deny a request for testing accommodations. [footnote omitted]

*Id.* ¶ 34. Mr. Coleman failed to do this and Professor Blanck concludes that

> it is not possible for me, and presumably the Court and the Plaintiffs, to assess the validity of the ADA Monitor's conclusions without analysis of the denial of testing accommodation requests taking into account accommodation requests categorized as "no decision." As set forth in the Declaration of Joni Carrasco, requests categorized as "no decision," in my view, should have been categorized as denials. Failure to include these requests in the analysis likely resulted in an undercounting of actual denials. This is significant because the Monitor appears to rely on the "small number of denials" to assess LSAC's compliance with the Decree. [footnotes omitted]

---

[3] Consent Decree, ¶ 7; Best Practices Report, pp. 9-20.

-7-

Blanck Dec., ¶35 (footnote omitted)

Professor Blanck also specifically identifies additional deficiencies in Mr. Coleman's Report. For example, he addresses Mr. Coleman's admission that he determined "going behind the numbers would be unnecessarily burdensome and unwarranted." *Id.* ¶38; Report, pp. 5-6 fn. 6. He testifies that Mr. Coleman's deliberate decision not to go behind the numbers fails to comply with the Decree's requirements that "[e]ach report shall provide the data required to be tracked in Paragraph 8 for the prior administration" (Decree, ¶ 23) and the ADA Monitor is required to look at data which 'contradicts' any assessment (Decree, ¶ 26(e))." Blanck Decl. ¶ 38. Professor Blanck concludes that Mr. Coleman's "failure to determine whether and, if so, the extent to which LSAC's data were valid and reliable fatally undermines the value of the findings to the Court and the Parties." *Id.* ¶ 38. Professor Blanck asserts that if Mr. Coleman had assessed the reliability and validity of LSAC's data "he would have observed such deficiencies as the column for 'outside consultants' was left blank and that LSAC created the 'no decision' category," which is not in compliance with the Decree. *Id.* In addition, Professor Blanck testifies

> [i]t appears that the ADA Monitor did not observe, or mention in his Report, that LSAC did not provide written justification of denials (Issue 6: Written Recommendations from Reviewers) and written explanations for denials (Issue 7: Written Explanations for Denials of Testing Accommodation Requests) for requests by candidates who received "50% emails" or whose requests were categorized as "no decision." My review of the candidate files reveals that at least two (2) of the twelve (12) files the ADA Monitor identified in the Audit's Appendix B contain "50% emails" and lacked the required written justifications and explanations. In addition, it is not apparent based on the information presented in the Audit that the ADA Monitor adequately analyzed candidate files. If he had done so, it is reasonable to assume that he would have noted and documented LSAC's use of the "no decision" category, given that the practice reflects LSAC's failure to either grant, deny in part, or deny in full each request as required by the Consent Decree. The limited, and potentially fatally deficient, scope of the ADA Monitor's analysis belies the Audit's conclusion that LSAC "complied" with Issues 5, 6, and 7.

*Id.* ¶ 43 (footnotes omitted).

> Moreover, Mr. Coleman's cursory review did not fulfill his "assignment to evaluate implementation of the Best Practices Panel's recommendation providing that LSAC send any request not granted in full out for "automatic review" by at least one external consultant (Issue 8: Automatic Review of Denials). I find no evidence to suggest that the ADA Monitor addressed LSAC's failure to provide automatic review of requests made by candidates who received the '50% email' or whose requests were categorized as 'no decision.'" I would expect a reasonable monitor to address this issue because it was readily apparent that candidates were denied external review in the files referenced in the ADA Monitor's Appendix B. By contrast, the ADA Monitor focused his inquiry on the mere existence of a list of outside consultants and a log of contacts with those consultants.

*Id.* ¶ 44 (footnotes omitted).

As if that is not enough, Professor Blanck identifies another deficiency in Mr. Coleman's erroneous focus on the "small number of denials" rather than "whether any candidate whose request was not granted in full was provided an external review" as required by the Decree. *Id.* ¶ 45. Because of these numerous deficiencies resulting from Mr. Coleman's refusal to go "behind the numbers," Professor Blanck concludes that Mr. Coleman's report "lacks basic validity and reliability, and therefore, fails to assist the Court and the Plaintiffs to meaningfully evaluate LSAC's compliance with the Consent Decree." *Id.* ¶ 48.

### III. LEGAL STANDARD

Defendant bears the burden of demonstrating that Mr. Coleman's opinions are admissible. *Lust By and Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Federal Rules of Evidence 702 and 703, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admission of expert testimony. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The district court functions as a "gatekeeper" regarding expert testimony, which requires making sure the proposed testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589. The "district court's inquiry into admissibility is a flexible one" and applies to all expert testimony. *See City of Pomona v. SQM Medical Corporation*, 750 F.3d 1036, 1043 (2014); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "In sum, the trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

While there is less danger of admitting unsound opinions in a bench trial, where the court is not the jury's gatekeeper, *F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014), a court must nonetheless make a threshold determination of the admissibility of expert testimony before relying on it. *Daubert v. Merrell Dow Pharm.*, 509 U.S. at 597. Rule 702's threshold inquiry cannot be

-9-

satisfied by opinions that are unhelpful to the trier of fact and that have no indication of reliability on the issues before the court.  *See* Fed.R.Evid. 702.

Further, expert testimony, like all evidence, is subject to the restrictions of Federal Rules of Evidence 401 and 403. *Daubert*, 509 U.S. at 595 (1993). Even if evidence might be considered relevant, "if its probative value is substantially outweighed by a danger" of, *inter alia,* unfair prejudice or confusion, it may be excluded. Fed. R. of Evid. 403.

## IV. MR. COLEMAN'S REPORT FAILS TO MEET THE REQUIREMENTS OF FED. R. EVID. 702

### A. The Report Is Neither Reliable Nor Relevant To A Determination of LSAC's Compliance With The Consent Decree In This Case

Mr. Coleman's Report does not meet the requirements of the Federal Rule of Evidence 702. As Professor Blanck makes abundantly clear, the Report is neither reliable nor relevant to the determination of whether LSAC is in compliance with the Consent Decree.

#### 1. The Monitor's Methodology Is Flawed And Scientifically Invalid

Expert testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Daubert*, 509 U. S. at 592-593.  When making a determination of reliability, an analysis of expert testimony requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U. S. at 592-593.  The analysis in Mr. Coleman's Report in this case is not scientifically valid and its reasoning, methodology and conclusions are flawed.

As Professor Blanck explains, Mr. Coleman's report "lacks substantive and methodological specificity."  Blanck Decl. ¶ 26.  There is no "meaningful discussion of the methodology employed by the ADA Monitor to conduct the Report "[b]esides a general listing of information," *Id.* ¶ 27.  In addition,, Mr. Coleman's Report "relies on unconfirmed and non-representative data" from files obtained from LSAC's Manager of Accommodated Testing Kim Dempsey and General Counsel Joan Van Tol. *Id.* ¶¶ 26, 29.  Mr. Coleman's reliance on LSAC officials to select documents for review "[w]ithout any documented verification process" raises the question of "the independence of the ADA Monitor." *Id.* ¶ 30.  Because there was no process in place to ensure the accuracy and validity

-10-

of the information he received from LSAC "there is no reasonable basis for the Court or the Parties to be able to validate the accuracy of the ADA Monitor's conclusions based on his review of candidate files as presented." *Id.*

Moreover, in light of Mr. Coleman's failure to observe or mention *any* violations of the Decree including the use of the "No Decision" category and the "50 % emails," a methodological framework which required verification and validation of the information provided to him would have likely led to the discovery of these and other violations DFEH uncovered in its limited investigation of LSAC's data and documents. Therefore, because of Mr. Coleman's failure to verify and validate the information he received from LSAC and DFEH's subsequent discovery of LSAC's noncompliance with the Consent Decree, his Report is not reliable and fails to meet the admissibility requirements under Federal Rule of Evidence 702.

### 2. Monitor's Report Should Be Excluded Because it is not Relevant to Whether LSAC is Complying with the Consent Decree

Expert testimony is relevant if it assists the trier of fact as Federal Rule of Evidence 702(a) requires. *Primiano v. Cook*, 598 F.3d 558 at 564. "Expert testimony opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Daubert*, 509 F.3d at 591. Mr. Coleman's Report has no "valid connection" to the question of whether the Court should grant DFEH's motion to hold LSAC in civil contempt because he failed to analyze and review available data that would have revealed LSAC's obvious noncompliance with the Decree.

Mr. Coleman failed to conduct a thorough and complete review and analysis of LSAC's data and files as shown by the many areas of noncompliance which were discovered only after the limited review by DFEH permitted by LSAC. Because Mr. Coleman did not "go behind the numbers," he failed to notice any of the violations set forth in Plaintiff's contempt motion. The Report failed to acknowledge LSAC's "50% email" or "no decision" practices. The Report failed to address LSAC's use of a reporting category not included in the Consent Decree, "no decision." Nor does Mr. Coleman mention that in September 2016, LSAC increased the length of the LSAT for test takers granted the accommodation of additional test time by 20%, a substantial increase. Carrasco Dec., ¶37.

Furthermore, Mr. Coleman did not mention LSAC's use of "white out" on the internal LSAC forms.   He did not notice that LSAC was not reporting information on outside consultants as expressly required by the Decree and concluded – incorrectly – that LSAC was in compliance with the reporting requirements of Paragraph 8 of the Decree.   He, in addition, did not report that when candidates accepted the lesser accommodations offered in a "50% email" LSAC reported those partial denials as requests which were "granted in full." Carrasco Dec., ¶ 31, 35-36.

Professor Blanck, who has monitored disability cases in the past testified,

> The ADA Monitor's failure to determine whether and, if so, the extent to which, LSAC's data were valid and reliable fatally undermines the value of the findings to the Court and the Parties. If the ADA Monitor had taken these basic steps, he likely would have observed such deficiencies as the column for "outside consultants" was left blank and that LSAC created the "no decision" category.

Blanck Decl., ¶ 38 (footnotes omitted).  Mr. Coleman missed data and information that would have informed him of LSAC's noncompliance with the Decree.  However, he consciously decided not to go behind the numbers because it was too burdensome.  Report, pp. 5-6 fn. 6.  Consequently, due to these deficiencies, Mr. Coleman's conclusions will not assist the Court on the question of LSAC's compliance with the Consent Decree, and therefore, is irrelevant to the Court's determination of whether LSAC should be held in civil contempt and should be excluded under Rules 702 and 403.

**B.    Mr. Coleman Lacked the Background to Monitor the Consent Decree and Failed to Obtain the Necessary Assistance to Perform the Analyses Required By the Consent Decree**

LSAC proposed Arthur Coleman as monitor after the parties were unable to agree about other candidates. Plaintiffs conducted an initial interview and checked Mr. Coleman's references. Plaintiffs had several concerns.  First, Mr. Coleman had no experience monitoring a consent decree in a disability case.  Second, by the time LSAC proposed Mr. Coleman, Plaintiffs were familiar with the Excel spreadsheets LSAC was using to report data to Plaintiffs (and later to the Monitor) and had concerns about his ability to review and analyze LSAC's spreadsheets. DFEH's team was required to enlist staff with expertise in Excel so that it and the United States could analyze the poorly organized data on the Excel spreadsheets.  The reports LSAC submitted contain voluminous lines of spreadsheet data, with some duplication in some of the lines -- thus the cumbersome reports required the ability to distill the information so that they can be understood and reviewed. Mr. Coleman

needed the skill and resources to review large sets of poorly organized data and proficiency in working with Excel.   Mr. Coleman lacked both of these critical competencies.  Carrasco Dec., ¶9.

Plaintiffs shared an example of a data report received from LSAC to demonstrate the type of data Mr. Coleman would need to review. Carrasco Dec., ¶ 10.  Plaintiffs then spoke with Mr. Coleman regarding his ability to review and analyze the data.   Mr. Coleman conceded—a third cause for concern-- that he had not recently dealt with voluminous data and acknowledged he could not monitor the decree alone, but claimed that he could utilize other staff to assist him. Carrasco Dec., ¶ 11.

After speaking with Mr. Coleman, Plaintiffs sent an email to LSAC's counsel expressing their concerns about Mr. Coleman's ability to serve as the Monitor:

> [o]our concerns are threefold – Mr. Coleman does not have any experience working as monitor, he does not have any articulable ADA experience, and he does not have the capability to distill LSAC's report under Para. 8 of the Decree without assistance of other personnel. Plaintiffs spoke with Mr. Coleman again recently and our concerns were not dispelled.

Carrasco Dec., ¶12.

LSAC's counsel urged Plaintiffs to reconsider Mr. Coleman. Carrasco Dec., ¶12, Exh. 3. Plaintiffs responded and reiterated Plaintiffs' belief that Mr. Coleman was not the best candidate to serve as monitor, but that in the interest of filling the monitor position, Plaintiffs would agree to Mr. Coleman only "if LSAC agrees to pay for any additional staff or assistance that Mr. Coleman requires to perform his duties under the Decree, including interpreting and analyzing LSAC's data reports." Plaintiffs agreed to the selection of Mr. Coleman based on LSAC's assurances that it would pay for the additional staff and resources Mr. Coleman would need to perform his duties as monitor. Carrasco Dec., ¶ 13.

Unfortunately, Plaintiffs concerns about Mr. Coleman's qualifications to be the monitor in a nationwide case with a large amount of poorly organized data proved to be well founded. It is evident from the many omissions in his Report and his decision that going behind the numbers was a burden that Mr. Coleman, whose background is primarily in issues related to education policy rather than disability access in education, did not have the requisite background, skill and willingness required to fulfill the ADA Monitor's responsibilities pursuant to the Consent Decree.  He also may not have

-13-
PLAINTIFF'S MOTION IN LIMINE RE CONCLUSIONS, TESTIMONY OF ARTHUR COLEMAN
CV 12-1830-JCS

kept his promise to enlist the staff and resources to fulfill the duties of the Decree. For these reasons, Mr. Coleman failed to discover information that he was selected to uncover as part of his responsibilities. As a result, he drafted a report that "lacks the basic validity and reliability, and therefore, fails to assist the Court and the Plaintiffs to meaningfully evaluate LSAC's compliance with the Consent Decree." Blanck Decl. ¶ 48.

## V.  CONCLUSION

The DFEH respectfully requests the Court to exclude Mr. Coleman's Report and conclusions from consideration as to whether LSAC should be held in civil contempt. Mr. Coleman's Report should be admitted for the limited purpose of addressing DFEH's request to remove Mr. Coleman as the ADA Monitor.

Dated: October 26, 2017

DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

JON ICHINAGA
Chief Counsel

MARI MAYEDA
Associate Chief Counsel

JONI CARRASCO
Staff Counsel

IRINA TRASOVAN
Staff Counsel

By: /s/ Irina Travovan
Irina Trasovan
Attorneys for the Department