JON M. ICHINAGA (#137290)
  Chief Counsel
MARI MAYEDA (#110947)
  Associate Chief Counsel
Mari.Mayeda@dfeh.ca.gov
JONI CARRASCO (#287679)
  Staff Counsel
Joni.Carrasco@dfeh.ca.gov
IRINA TRASOVAN (#290372)
  Staff Counsel
Irina.Trasovan@dfeh.ca.gov
DEPARTMENT OF FAIR EMPLOYMENT
  AND HOUSING
2218 Kausen Drive, Suite 100
Elk Grove, CA  95758
Telephone:  (916) 478-7251
Facsimile:   (888) 382-5293

Attorneys for Plaintiff, DFEH
(Fee Exempt, Gov. Code, § 6103)

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, an agency of the State of California, <br><br> Plaintiff, <br><br> vs. <br><br> LAW SCHOOL ADMISSION COUNCIL, INC., <br><br> Defendant. <br><br> UNITED STATES OF AMERICA, <br> Plaintiff-Intervenor <br><br> vs. <br><br> LAW SCHOOL ADMISSION COUNCIL, INC., <br> Defendant | **Case No. CV 12-1830-JCS** <br><br> **NOTICE OF MOTION AND MOTION FOR AN ORDER HOLDING DEFENDANT IN CIVIL CONTEMPT IN THE ALTERNATIVE FOR MODIFICATION OF THE CONSENT DECREE or AN ORDER TO SHOW CAUSE RE CIVIL CONTEMPT AND WHY MONITOR SHOULD NOT BE REMOVED** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Date:  December 1, 2017 <br> Time:  9:30 am <br> Location:  Courtroom G (15th Floor) <br> Judge: Hon. Joseph C. Spero |

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................... 1

II.     LSAC'S VIOLATIONS OF THE COURT'S ORDERS ................................................. 3

        A.      Automatic Granting of Prior Testing Accommodations……………………….3

        B.      Scope and Type of Appropriate Documentation (Issue 2 of the Panel Report) ...........4

        C.      Multiple Reviewers Before Denial of Testing Accommodations (Issue 4) ................4

        D.      Criteria and Guidelines for Reviewers (Issue 5) ………………………...………..5

                1. Category 1 Violations…………………………………………………………..5

                2. Written Explanations……………………………………………………...…..5

                3. Cooperative and Interactive Communication …………………………………5

                4. Presumptively Granting 50% Time without Conditions ……………………...…6

                5. Reviewers Were Required to Make Substantive Decisions…..…………………..6

                6. Prohibition Against Altering Requests for Extended Time (Issue 5) ……………7

        E.      Written Explanations to Candidates for Denials of Requests (Issue 7) ……………7

        F.      Written Reports Justifying Denials and Automatic Review of Partial and Full

                Denials (Issues 6 & 8) …………………………………………………………..8

        G.      Appeals Process (Issue 9) ………………………………………………………..9

        H.      Decree Reporting Requirements ……………………………………………………9

        I.      Denial of Access to Records at LSAC's Headquarters ……………………………10

        J.      Use of "White Out" …………………………………………………………………11

III.    THE MONITOR'S FAILURE TO UNCOVER LSAC'S MANY VIOLATIONS ................. 11

        A.      LSAC Data and the Monitor's Report……………………………………………..11

        B.      Delay and Deficiencies in Reporting……...…………………………………………12

IV.     DFEH'S INVESTIGATION UNCOVERS LSAC'S HIDDEN VIOLATIONS ..................... 13

        A.      The Text of the 50% Email …………………………………………………………13

        B.      The "50% Email" was a Standard, Nationwide Practice……………………………14

        C.      "White Out" Was Used on Internal Forms …..………………………………………15

        D.      Misleading Reporting of "50% Email" as Granted in Full ………...………………..15

1. The No Decision Practice ................................................................16

2. Reporting Violations .....................................................................16

3. Candidate Files Demonstrate Incompetence of the Monitor ...........................16

V.      NOTICE OF VIOLATION AND MEET AND CONFER WITH LSAC ................................ 16

VI.     LSAC'S VIOLATIONS SPANNED NEARLY TWO YEARS .................................. 17

VII.    LSAC SHOULD BE HELD IN CIVIL CONTEMPT ............................................. 17

        A.      LSAC Violated Specific and Definite Orders of this Court ...........................18

        B.      LSAC Failed to Take Every Reasonable Step to Comply With the Court's Orders...20

        C.      LSAC Should be Required to Comply with the Court's Orders for An Additional 2
                Years .........................................................................................21

        D.      The Court Should Replace the Decree Monitor .........................................21

        E.      The Court Should Remedy LSAC's Repeated Refusal to Grant DFEH's Access to
                Files .........................................................................................22

VIII.   IN THE ALTERNATIVE, THE COURT SHOULD INVOKE FED. R. CIV. P. 60(B) TO
        EXTEND THE DECREE FOR TWO YEARS AND REPLACE THE MONITOR .............. 23

IX.     THE COURT SHOULD ENFORCE ITS ORDERS ON A NATIONWIDE BASIS .............. 24

X.      DFEH'S ENTITLMENT TO ATTORNEY'S FEES AND COSTS ........................................ 25

XI.     IN THE ALTERNATIVE, AN ORDER TO SHOW CAUSE SHOULD ISSUE ................... 25

## TABLE OF AUTHORITIES

**Federal Cases**

*California Dept. of Social Services v. Leavitt,*
523 F.3d 1025 (9th Cir. 2008)............................................................................. 25

*California v. Randtron,*
284 F.3d 969 (9th Cir. 2002)............................................................................... 18

*Earth Island Inst. v. Ruthenbeck,*
490 F.3d 687 (9th Cir. 2006)............................................................................... 25

*Emma C. v. Eastin,*
No. C 96-4179 TEH, 2001 WL 1180636 (N.D. Cal. Oct. 4, 2001) ......................... 18, 19

*F.T.C. v. Affordable Media,*
179 F.3d 1228 (9th Cir. 1999)............................................................................. 18

*Hawaii v. Trump,*
859 F.3d 741 (9th Cir. 2017)............................................................................... 25

*Herrera v. Pierce County,*
2007 WL 858341 ................................................................................................ 25

*Hook v. Arizona Dep't of Corrections,*
107 F.3d  (9th Cir. 1997)..................................................................................... 18

*Hook v. State of Ariz., Dept. of Corrections,*
972 F.2d 1012 (9th Cir. 1992)........................................................................ 23, 24

*Hutto v. Finney,*
437 U.S. 678 (1978).................................................................................... 21, 23

*In re Crystal Palace Gambling Hall, Inc.,*
817 F.2d 1361 (9th Cir. 1987)............................................................................. 18

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y,*
774 F.3d 935 (9th Cir. 2014)............................................................................... 20

*International Brotherhood of Teamsters v. United States,*
431 U.S. 324 (1977)........................................................................................... 15

*Kelly v. Wengler,*

    822 F.3d 1085 (9th Cir. 2016).................................................................... passim

*Kelly v. Wengler,*

    979 F.Supp.2d 1104 (D. Idaho 2013)............................................................. 22

*Mannick v. Kaiser Foundation Health Plan, Inc.,*

    No. C 03-5905 PJH, 2006 WL 3734390 (N.D. Cal. Dec. 18, 2006)......................... 17, 18

*McComb v. Jacksonville Paper Co.,*

    336 U.S. 187 (1949)........................................................................... 21, 22, 23

*National Presto Industries, Inc. v. Dazey Corp.,*

    107 F.3d 1576 (Fed. Cir. 1997)....................................................................... 19

*Nat'l Org. For the Reform of Marijuana Laws v. Mullen,*

    828 F.2d 536 (9th Cir. 1987).......................................................................... 22

*NLRB v. Trans Ocean Export Packing, Inc.,*

    473 F.2d 612 (9th Cir. 1973).......................................................................... 18

*Rufo v. Inmates of Suffolk County Jail,*

    502 U.S. 367 (1992).................................................................................... 23

*Shillitani v. U.S.,*

    384 U.S. 364 (1966)................................................................................ 17, 25

*Stone v. City and County of San Francisco,*

    968 F.2d 850 (9th Cir. 1992).......................................................................... 18

*Sublime v. Sublime Remembered,*

    No. CV 06-6059 CAS (FMOx), 2013 WL 3863960 (C.D. Cal. July 22, 2013) ............. 20

*United States ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County,*

    No. 06 CIV. 2860 (DLC) 2017 WL 728702 (S.D. N.Y. Feb. 23, 2017) ...................... 24

*United States v. United Mine Workers of America,*

    330 U.S. 258 (1947)................................................................................ 17, 23

*Washington v. Trump,*

    847 F.3d 1151 (9th Cir. 2017)........................................................................ 25

-iv-

**Federal Rules**

Fed. R. Civ. P 53(b) ................................................................................................................. 22

Fed. R. Civ. P. 60(b) ............................................................................................................. 1, 23

PLAINTIFF'S MOTION FOR CIVIL CONTEMPT
CV 12-1830-JCS

**NOTICE OF MOTION AND MOTION FOR AN ORDER HOLDING DEFENDANT IN CIVIL CONTEMPT; IN THE ALTERNATIVE FOR MODIFICATION OF CONSENT DECREE Or AN ORDER TO SHOW CAUSE WHY DEFENDANT SHOULD NOT BE HELD IN CIVIL CONTEMPT**

Please take notice that on December 1, 2017 at 9:30 am in Courtroom G of United States District Court for the Northern District of California located at 450 Golden Gate Avenue, San Francisco, CA, Plaintiff, the Department of Fair Employment and Housing (DFEH), hereby moves and will request the Court for an order to hold Defendant, the Law School Admission Council (LSAC), in civil contempt for violating the Court's Orders (Dkt. 203, 220, 245) in this case.  In the alternative, Plaintiff moves the Court to modify the Consent Decree under Fed. R. Civ. P. 60(b), or for an Order to Show Cause Re Civil Contempt and Why the Monitor Should Not be Removed.

DFEH asks the Court to hold LSAC in civil contempt, extend the Decree nationwide for two years (to May 28, 2020) as compensation for the two years during which LSAC violated the Court's Orders, replace the Monitor, remedy LSAC's denial of access to documents, rule that DFEH is entitled to its attorney's fees and costs and grant such other relief deemed appropriate.  This motion is based on this Notice and Motion, the accompanying Memoranda, Declarations and Motion in Limine, the [Proposed] orders, the files of this action, and such other matters as the Court may consider.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Employing nationwide practices which LSAC internally refers to as the "50% email" and "no decision," LSAC repeatedly and systematically violated Orders of this Court.[1]  LSAC's efforts to circumvent these Orders and conceal its violations demonstrate nothing short of contempt.

LSAC's "50% email" device functions as follows: Upon receiving a request for accommodation, LSAC – rather than actually providing a decision on the request and the documentation supporting it in the manner required by the Court's Orders – performs a "preliminary screening" and then emails the candidate an ultimatum.  The candidate must either agree (in as little as 36 hours) to accept fewer accommodations than requested or "LSAC will be unable to provide

---

[1] The Consent Decree (Dkt. 203), the Final Report of the Best Practices Panel (Dkt 220) to the extent unchallenged by LSAC or approved by this Court, and this Court's Order Granting in Part and Denying in Part Appeal of Best Practices Panel Report (Dkt. 245) are court orders enforceable by contempt.  For brevity, we refer to them jointly as the Orders.

1   ANY accommodations and you will remain registered to test as a standard test taker."  Carrasco Dec.,

2   ¶30, Ex. 12 [full capitalization in original].  Understandably, test takers are intimidated by LSAC's

3   email and many comply.  In the words of one test taker, "what LSAC had done was place me in a

4   situation where it seemed like I had to choose between the lesser of two evils" – partial

5   accommodations or no accommodations.  Kallman Dec., ¶23.  To accept LSAC's offer, candidates

6   were required to resubmit and downwardly revise their requests.  Because LSAC never fully and

7   properly processes the original requests of candidates who accept its ultimatum, those candidates are

8   denied the protections -- two step internal review, outside review and right to appeals -- mandated by

9   the Court's Orders.

10        It gets worse.  When a candidate accepts the "50% email" – as many feel pressured to do – in

11  the reporting to the DFEH, the United States and the Monitor mandated by the Decree, LSAC listed

12  the candidate's request as having been "granted in full."   LSAC used "white out" to alter internal

13  forms which summarize the testing accommodation requests of that candidate.  For example, DFEH

14  found a file in which a candidate originally requested 70 minutes per section (or double time) but

15  because the candidate accepted LSAC's "50% email", the number "70" was "whited out" on LSAC's

16  internal reporting form and "53" minutes (or 50% additional time) was written over it, making it

17  appear that the candidate had only requested 53 minutes and was granted 53 minutes.  Carrasco Dec.,

18  ¶35. While LSAC did not alter the underlying documents submitted by the candidate, the use of

19  "white out" made it difficult for Plaintiffs to detect LSAC's violations because both the internal form

20  and LSAC's reporting made it appear that the candidate was granted all requested accommodations.

21        Similarly, LSAC invented a "no decision" category, in which candidate requests denied for

22  purported lack of sufficient documentation are falsely classified as ones in which no decision at all

23  was made.  Using this device, LSAC systematically deprived candidates of safeguards mandated by

24  the Court's Orders:  a two step internal review, two external reviews, and two appeals.

25        Through these devices, LSAC violated myriad provisions of the Court's orders, including

26  LSAC's obligation to honestly and fairly report to DFEH, the United States and the Monitor whether

27  and to what extent accommodations had been granted or denied.  By using "white out" to alter its

28  internal forms (and thus obscure its improper practice) LSAC failed to "maintain appropriate

1   supporting records" as required by the Decree.  LSAC has violated nearly every major category of the

2   issues addressed in the Best Practices Panel Report as approved by this Court and those violations

3   occurred repeatedly on a nationwide basis for two years – nearly the entire time during which LSAC

4   was obligated to implement the Best Practices.  Dismayingly, the Decree Monitor could and should

5   have spotted the violations but either missed them entirely or ignored them, and instead, without even

6   mentioning these problems, issued a report asserting that LSAC was in compliance with the Decree.

7          As a party to this nationwide Decree, DFEH invokes the express language of the parties'

8   contract which permits "any party" to enforce the Decree's terms.  Dkt. 203, ¶31.  Based on LSAC's

9   flagrant violations, DFEH requests that the Court exercise its power to enforce its nationwide orders.

10   **II.   LSAC'S VIOLATIONS OF THE COURT'S ORDERS**

11          The DFEH filed suit in this case, in which the United States intervened, challenging LSAC's

12   practice of requiring excessive documentation from candidates for testing accommodations on the

13   Law School Admission Test (LSAT).  Dkt. 203 at 1:9-10.  After six in-person and three telephonic

14   settlement conferences (Dkt. 154, 161, 177, 184, 190, 194, 195, 196, 197) the Parties agreed to a

15   nationwide Consent Decree which was adopted as an order of this Court on May 29, 2014.  Dkt. 203.

16          The Decree "require[d] certain changes to [LSAC's] procedures [and] delegated aspects of

17   those changes to a panel of experts selected by the Parties…."  Dkt. 245 (Order Granting in Part and

18   Denying in Part Appeal of Best Practices Panel Report), at 1.  Under Paragraph 7 of the Decree, all

19   recommendations set forth in the Final Report of the Best Practices Panel (Dkt. 220) (Panel Report)

20   are binding on LSAC except to the extent that a specific recommendation was challenged by LSAC

21   *and* the Court upheld that challenge.  Dkt. 203 (Decree) ¶7(d)(v).  Thus, every Panel recommendation

22   that either went unchallenged, or that was affirmed by this Court became part of the Court's order.

23          LSAC is bound by but systematically violated the following provisions of the Court's orders.

24   Where applicable we use the issue numbers utilized in both the Panel Report (Dkt. 220) and the

25   Court's order ruling on LSAC's objections to the Panel Report (Dkt. 245):

26   **A.      Automatic Granting of Prior Testing Accommodations**:  The only area where the parties

27   could reach specific agreement regarding documentation required for testing accommodations

28   concerned candidates who previously received accommodations from certain testing entities.  Dkt.

1   203, ¶5(a); Carrasco Dec., ¶3.  The Parties call these "5(a)" requests, a reference to the applicable

2   paragraph of the Decree under which, upon proof of the prior testing accommodations "*without*

3   *further inquiry or request for additional documentation,* LSAC shall grant those previously approved

4   testing accommodations" including additional time. Dkt. 203, ¶5(a) (emphasis added).

5          LSAC violated 5(a) by sending candidates a "50% email" in violation of the Decree

6   requirement that such accommodations be granted "without further inquiry or documentation."

7   Although labeled the "50% email" by LSAC, the practice applied to any request, not just those for

8   additional time.  Kallman Dec., ¶6.  Thus, one candidate who had received 50% additional time on

9   the LSAT itself, was sent a "50% email" when he requested both 50% time plus an additional

10  accommodation.  Rather than grant the 50% time "without further inquiry or documentation," LSAC

11  conditioned the 50% time to which he was entitled by 5(a) upon deletion of the additional requested

12  accommodations and resubmission of a revised request.  Movaghar Dec., ¶¶4-6.

13  **B.      Scope and Type of Appropriate Documentation (Issue 2 of the Panel Report):**  The Panel

14  examined and rejected LSAC's existing system and established documentation requirements. Dkt.

15  245 at 10.  Under the portion of the Panel Report upheld by the Court, if the candidate provides the

16  documentation recommended by the Panel, LSAC must presumptively grant the requested

17  accommodation "without requiring the candidate to provide additional information."  Dkt. 220 at 7-8.

18         LSAC committed Issue 2 violations when – instead of actually determining what

19  accommodations candidates were entitled to receive and granting them – it sent "50% emails"

20  threatening to withhold "ANY" accommodation unless the candidates withdrew their original

21  requests.  For example, approximately half of the 50% email files reviewed by DFEH involve denials

22  of Category 1 requests which are requests that do "not modify the amount of time permitted to

23  respond to the questions in each test section" (e.g., separate testing room, large-print test book, or

24  break time). Carrasco Dec., ¶32; Dkt. 220 at 5. The Panel Report states that LSAC should

25  presumptively grant such requests. Dkt. 220 at 6, 11.

26  **C.      Multiple Reviewers Before Denial of Testing Accommodations (Issue 4):**  The Panel

27  Report required that "all applications for testing accommodations that are not granted in full must be

28  reviewed by one or two outside consultants." Dkt. 220 at 9.

LSAC committed Issue 4 violations when it falsely classified requests it was denying as "no decision," depriving candidates of outside review.  LSAC committed Issue 4 violations when under the "50% email," LSAC effectively denied a portion of the candidate's request but falsely reported the request as "granted in full," depriving candidates of outside review.

**D.     Criteria and Guidelines for Reviewers (Issue 5):**  LSAC committed multiple violations of this portion of the Final Report which "lays out the most substantive guidance on how LSAC should determine whether to approve requests for accommodations."  Dkt. 245 at 18:1-2.

**1. Category 1 Violations:**  As noted above, half of the 50% email files reviewed by DFEH involve denial of these requests for accommodations such as additional breaks. Carrasco Dec., ¶32.

**2. Written Explanations:**  LSAC was required to provide written explanations of denials to candidates, as follows:

> "In cases where a reviewer does not approve all of a candidate's requests for testing accommodations, the reviewer must provide a specific written explanation in support of that determination." Dkt. 220 at 11.

> "In cases where the reviewer concludes there is a lack of documentation, the reviewer shall provide a clear statement of what additional documentation is necessary so that the request for testing accommodation could be considered in the future." Dkt. 220 at 11-12.

LSAC violated these provisions by failing to provide "50% email" and "no decision" candidates with a "specific written explanation" and statement of "what additional documentation is necessary."  One candidate requested double time and submitted the required forms, two physicians' recommendations, and a letter documenting his history of testing accommodations in college.  He provided an explanation as to why double time is an appropriate accommodation, even though he had received time and a half in the past.  In response LSAC sent him a "50% email" informing him that "if [he] did not either modify [his] request to remove [his] request for double time or provide 'more documents' supporting [his] request for double time, LSAC would not provide [him] with 'ANY' accommodations."  Harris Dec, ¶¶5-6.   LSAC did not provide the candidate with the required "clear statement of what additional documentation is necessary."  Dkt. 220 at 11-12.

**3. Cooperative and Interactive Communication:**  LSAC was required to engage in cooperative and interactive communications with candidates seeking testing accommodations:

> "LSAC staff shall engage in cooperative and interactive communication with candidates concerning any modifications or specific arrangements needed for the provision of testing accommodations." Dkt. 220 at 15.

-5-

1    Rather than engaging in "cooperative and interactive communication" with candidates, LSAC

2    sent the "50% email," presenting them with an ultimatum: take partial accommodations or risk

3    receiving no accommodations at all. Neither option allows candidates to avail themselves of the

4    safeguards that the Court's Orders put into place.   A candidate who received a "50% email" reported

5    "I was confused about why I would not receive 'ANY' accommodations unless I rescinded my

6    request for double time…. I felt pressured to give up my request for double time, or risk receiving no

7    accommodations…." Harris Dec., ¶¶8-9.  A candidate entitled to the 50% additional time which he

8    received previously *on the LSAT*, received a "50% email."  He explained why he accepted the offer

9    and waived his additional accommodation request:  "I felt compelled [to accept because] the

10   February 2017 administration was my last chance to take the LSAT before my law school

11   applications were due, so I needed to focus on preparing for the test rather than engaging in a drawn

12   out battle with LSAC."  Movaghar Dec., ¶30.  Another candidate stated "The LSAT is a difficult

13   enough test on its own, but then when you add in all the mind games and mental trauma that LSAC

14   imposes on test takers with disabilities, it makes the test virtually impossible." Kallman Dec., ¶26;

15   see also Blanck Dec., ¶39 [interactive communication process a central concept in disability matters].

16       **4.  Presumptively Granting 50% Time without Conditions:**  LSAC was required

17   presumptively to grant test takers at least 50% additional time, without requiring withdrawal or

18   resubmission of the request for testing accommodations:

19        "individuals with documented learning disabilities [are presumptively to] be given a
         minimum of 50% additional time." Dkt. 220 at 16-17.

20

21        "individuals with an established diagnosis of ADHD [are presumptively to] be given a
         minimum of 50% additional time." Dkt. 220 at 17.

22       LSAC failed to provide these minimum accommodations to candidates who did not revise

23   their request in the time and manner required by LSAC. Candidate Kallman was entitled to additional

24   time under the Court's orders, but received a "50% email" which he reluctantly attempted to accept.

25   Because LSAC imposed shifting and inconsistent conditions, Kallman did not receive the additional

26   time accommodation to which he was entitled under the Orders.  Kallman Dec., ¶¶7-10, 18-23.

27       **5.  Reviewers Were Required to Make Substantive Decisions:**  The Court held "that the

28   Consent Decree grants the Panel authority to establish substantive, outcome-determinative rules

governing how LSAC reviews requests for accommodations." Dkt. 245 at 21:3-5.  The Court repeatedly explained that LSAC would be required to exercise judgment, make decisions and explain those decisions.  See Dkt. 245 at 21-22.

LSAC's "no decision" and "50% email" devices are Issue 5 violations.  By these devices, LSAC falsely represented that it made no decision at all, thus skirting the Decree requirement that "a reviewer must exercise judgment in determining whether the documentation reasonably and clearly explains a need for the accommodation." Dkt. 245 at 21.  The failure to make substantive decisions or misrepresenting them as "preliminary" decisions also violated Paragraph 5 of the Decree which requires LSAC to fully consider the entirety of a candidate's request for testing accommodations.

**6.  Prohibition Against Altering Requests for Extended Time (Issue 5)**:  LSAC was ordered not to attempt to alter a request for extended time:

> As long as sufficient evidence is presented, LSAC shall grant the candidate more than 50% extra time*. **It is further recommended that LSAC does not attempt to alter the request for an extended time testing accommodation, such as suggesting 75% additional time for an individual who has requested double-time (100% time extension)**. (Emphasis added.) Dkt. 220 at 19-20.

By sending the "50% email" LSAC routinely attempted to downwardly revise requests for more than 50% time thus violating the express requirement "that LSAC … not attempt to alter the request for an extended time testing accommodation."

**E.     Written Explanations to Candidates for Denials of Requests (Issue 7)**:  LSAC must:

> "prepare a clear written explanation to support their decision regarding testing accommodations requests. In cases where the candidates' requests for testing accommodations are not approved in full, the candidates shall be informed, in writing, why each of their requests for testing accommodations are not approved in full, and what additional information, if any, could lead LSAC to approve their requests in the future. An explanation of the appeals process (described in response to Issue 9) shall be included in all correspondence to candidates whose requests for testing accommodations are not approved in full."   Dkt. 220 at 21.

Recipients of the "50% email" and those who received "no decision" were denied a "clear written explanation," of "what additional information, if any" was required and an explanation of the appeals process.  As recently as the September 2017 LSAT a student filed suit to obtain his testing accommodations. *Harris v. Law School Admission Council*, No. 17-cv-01261 RSM (W.D. Wa. 2017).  LSAC had sent him a "50% email" and he was told that he needed to submit an "appropriately documented statement of need" with no explanation as to "what additional

1   information" was needed.  He was given no explanation of the appeals process.  Harris Dec., ¶¶5-6.

2   **F.      Written Reports Justifying Denials and Automatic Review of Partial and Full Denials**

3   **(Issues 6 & 8):**  As to "both in-house staff and outside consultants" LSAC was "required to follow

4   certain guidelines in writing reports to justify their recommendations if they recommend that LSAC

5   not approve in full a testing accommodation request."  Dkt. 220 at 20.

6          Under both the "50% email" and "no decision" practices, LSAC committed Issue 6 violations,

7   by failing to prepare detailed explanations for what were in fact denials for lack of documentation.

8          **Issue 8:**  The Court's order requires LSAC to conduct a first level of internal review by an

9   LSAC Disabilities Specialist, a second level of internal review by the LSAC Manager of

10  Accommodated Testing and -- if the request is denied in whole or in part -- two levels of review by

11  outside consultants.  Dkt. 245 at 31:13-16.

12         The Court's Order rejecting LSAC's challenge to this requirement makes clear that at the first

13  level of review, by the Disability Specialist was required to reach some form of decision:

14         "[t]hat the Disabilities Specialist must recommend whether to approve in full, approve in part,
       or deny in full" because that is a "criteria" and thus an issue within the Panel's purview.   Dkt.
15     245 at 29:13-14.

16         "The Disabilities Specialist shall review each file and make a recommendation whether to
       approve the requested accommodations in full, to approve in part, or to deny in full."  Dkt.
17     245 at 29:4-7 (quoting with approval Dkt. 220 at 22).

18  Similarly, the Panel required LSAC's Manager of Accommodated Testing to reach a substantive

19  decision:

20         "In all cases, the Manager of Accommodated Testing shall approve the requested testing
       accommodation in full, or write a clear rationale explaining the decision not to approve a
21     testing accommodation request in full."  Dkt. 220 at 22-23.

22         "If the Manager of Accommodated Testing does not approve in full each of the candidate's
       requests for testing accommodations, then the consideration process shall continue with the
23     use of one or two outside consultants."  Dkt. 220 at 23.

24         "If the outside consultant does not approve the original request in full, a second reviewer will
    be selected and proceed as above."  Dkt. 220 at 24.

25         LSAC's "no decision" and "50% email" practices are flagrant violations of the Issue 8

26  requirements. Candidates receiving a "no decision" letter were denied first level review and

27  determination, denied review by the Manager of Accommodated Testing and denied review by two

28  external reviewers, because LSAC's engaged in the artifice that "no decision" had been made.  This

-8-

practice flouted the Court's order requiring that "the Disabilities Specialist must recommend whether to approve in full, approve in part, or deny in full." Dkt. 245 at 29.  The "50% email" device violated Issue 8 requirements because LSAC falsely categorized many of those requests as "granted in full," denying candidates of safeguards of review contemplated by the Court's Orders.  Dkt. 245 at 32:2-7.

**G.     Appeals Process (Issue 9):**  LSAC was required to provide two outside appeals to candidates whose requests were denied in part or in full.  Dkt. 220 at 25-28.  The timing of the appeals clearly was a concern to the Court; the Court reiterated the importance of LSAC making decisions so that candidates would have the right to review by two external consultants and the right to two appeals. Dkt. 245 at 40:1-4; 40:5-10.

Depriving applicants of the right to appeal was not just the effect of its "50% email" or "no decision" actions but LSAC's crude attempt to circumvent this Court's Orders. *Harris v. LSAC*, *supra*, is illustrative.  That candidate received a 50% email and submitted a pro se appeal to LSAC only to be told that "LSAC's determination was that your request did not meet documentation guidelines therefore your request is not subject to the appeals process, which is reserved for final decisions on the merits of requests for testing accommodations."  Harris Dec., ¶¶10-11

LSAC's email to Harris demonstrates LSAC's contemptuous conduct:  LSAC admits it made a "determination" that Mr. Harris' request "did not meet documentation guidelines" but went on to deny him the protections of the review process in violation of this Court's order.[2]

**H.     Decree Reporting Requirements**:  The reporting provisions of the Decree are vital for monitoring LSAC's compliance and require provision of data from which DFEH could determine the rate at which LSAC was granting or denying accommodation requests.  Carrasco Dec., ¶6; Blanck Dec., ¶32 ["Ascertaining whether or not there may be deficiencies in data reporting is a sin qua non task to ensure validity and reliability…"].

The Decree specifies the only three categories that were to be used for reporting on LSAC's

---

[2] Issues 1 and 10 were impacted by LSAC's violations because both were tied to the number of requests which were denied – a fact which LSAC falsely under reported.  Carrasco Dec., ¶¶31, 41.  As to Issue 1, Diversification of Consultants, the Panel Report recommended that LSAC maintain a list of 25-40 outside consultants.  Dkt. 220 at 3. In light of the reduced number of denials that LSAC reported to Plaintiffs in the wake of implementation of the Best Practices, at LSAC's request, the Parties agreed to modify this recommendation to just 10 consultants.  Similarly Issue 10, Training, ties "remedial training" to denials which are overturned. Dkt. 245 at 42.

1 actions on accommodation requests:  "granted in full, denied in full, and denied in part".  Dkt. 203,

2 ¶8(a)(k).  The Panel Report mandated that all requests not "approved in full" "*include situations*

3 *where LSAC denies a testing accommodation request due to a lack of documentation*."  Such

4 denials will be subject to the outside consultant review rules."  Dkt. 220 at 21 n. 11 (emphasis added).

5 LSAC's use of the "no decision" category in and of itself violated the specific requirement

6 that LSAC use only three reporting categories:  approved in full or denied in part or denied in full.

7 LSAC repeatedly and systematically reported data inaccurately. For example, Paragraph 8(j)

8 requires LSAC to report "whether LSAC requested additional documentation from the candidate."

9 LSAC repeatedly reported that it did not request additional documentation even though candidate

10 files show that LSAC did request additional information. The "50% email" to candidates states that in

11 order to pursue their request, "you must submit [additional documentation]."  Carrasco Dec., ¶30, Ex.

12 12.  LSAC failed to report at all on outside consultant names in violation of Paragraph 8(m) of the

13 Decree.  Paragraph 8(n) requires LSAC to report "the name(s) of all other individual(s) who reviewed

14 the request for the purpose of making a substantive decision whether to grant or deny a request."

15 Plaintiffs reviewed numerous files listing various LSAC personnel who confirmed a substantive

16 decision, but LSAC's reporting uniformly lists only one individual, LSAC employee Kim Dempsey,

17 and systematically does not list the LSAC Disabilities Specialist.  Carrasco Dec., ¶36.

18 **I.      Denial of Access to Records at LSAC's Headquarters**:  The Decree is structured so that the

19 Monitor has superior access to LSAC "data and personnel" to conduct the required audits.  Dkt. 203,

20 ¶25 at 33:17-21.  In contrast, Plaintiffs' access is limited to "LSAC's materials in Newtown,

21 Pennsylvania, for a period of no longer than five (5) business days and during LSAC's regular

22 business hours, following at least ten (10) days written notice to LSAC."  Dkt. 203, ¶26(a) at 34-35.

23 LSAC violated the Decree by systematically denying DFEH access to all "granted in full"

24 files.  Twenty-five days before arriving at LSAC's headquarters, DFEH requested access to "granted

25 in full" files which LSAC denied.  DFEH amended the request to a sample of ten of those files in

26 response to LSAC's objections about burdensomeness to which LSAC responded "We don't

27 understand what interest the DFEH has in reviewing the files of candidates whose requests for

28 accommodations were granted in full. Therefore…those files will not be available for your review."

-10-

PLAINTIFF'S MOTION FOR CIVIL CONTEMPT
CV 12-1830-JCS

1  Carrasco Dec., ¶¶24-29.  DFEH renewed the request to see "granted in full" files explaining DFEH

2  was entitled to a reasonable sample to determine if there were inaccuracies in reporting.  LSAC again

3  refused.  *Ibid.*  DFEH believes that the bulk of the "50% email" violations are documented in the

4  "granted in full" files to which LSAC repeatedly denied DFEH access.  Carrasco Dec., ¶31.

5  **J.      Use of "White Out":**  The Decree requires LSAC to "maintain appropriate supporting

6  records for the information contained in the Reports, including but not limited to those described in

7  Paragraph 8."  Dkt. 203, ¶23 at 32:17-19.

8          LSAC used "white out" to alter the internal form used to summarize the candidates requested

9  testing accommodations, concealing detection of its violations of the Decree. Carrasco Dec., ¶35.

10  LSAC's required reporting reflected the data on the altered forms rather than the actual

11  documentation submitted by candidates.

12          **III. THE MONITOR'S FAILURE TO UNCOVER LSAC'S MANY VIOLATIONS**

13          The Decree provides that "the purpose of the ADA Monitor is to assist the United States, the

14  DFEH and the Court in evaluating LSAC's compliance with the Decree."  Dkt. 203, ¶24 at 33:1-2.

15  The Monitor failed to notice any of the above detailed violations of the Court's orders.  He has failed

16  in his duties and a new Monitor should be appointed.

17  **A.      LSAC Data and the Monitor's Report**:  By the time the Monitor was selected, Plaintiffs

18  were familiar with the Excel spreadsheets LSAC was using to report data to Plaintiffs (and later to the

19  Monitor).  In order to review them, DFEH's team had to enlist assistance of a staff person with

20  expertise in Excel; this individual provided assistance to the United States so that DOJ could conduct

21  a meaningful review of the poorly organized data on the Excel spreadsheets.  Carrasco Dec., ¶9.

22  DFEH thus realized that the Monitor would have to be willing and able to review large sets of poorly

23  organized data and would need proficiency working with Excel.  Plaintiffs had concerns that Arthur

24  Coleman -- the monitoring candidate proposed by LSAC -- lacked *both* of these critical

25  competencies.  When questioned, Mr. Coleman assured plaintiffs that he had staff who could review

26  and analyze the extensive data.   Concerned that LSAC might not reimburse Mr. Coleman for such

27  staff, Plaintiffs contacted LSAC and LSAC agreed to pay for such staff.  Based upon these

28  assurances, Plaintiffs agreed to Mr. Coleman. Carrasco Dec., ¶¶11-13.

**B.       Delay and Deficiencies in Reporting:** There was a nearly 16 month delay from the time the Parties agreed on the Monitor to the time he issued a draft report in which he sua sponte combined the first and second year reports. Carrasco Dec., ¶¶13-17.  Unless remedied by this Court, Plaintiffs will receive only one additional report at the conclusion of the Decree in May 2018.

Mr. Coleman's report was conclusory without providing explanation, detail or analysis.  In hopes of assessing LSAC's compliance with the Decree and improving the quality of the report, Plaintiffs provided comments to Mr. Coleman and requested that he revise the Report.  Carrasco Dec., ¶¶17-19.  Mr. Coleman largely failed to address Plaintiffs concerns.

DFEH asked Professor Peter Blanck, a nationally recognized expert in disability law and policy and experienced court monitor, to review Mr. Coleman's report.  As Professor Blanck explains, Mr. Coleman's report "lacks substantive and methodological specificity."  Blanck Dec., ¶26.  There is no "meaningful discussion of the methodology employed by the ADA Monitor to conduct the Report "[b]esides a general listing of information."  Blanck Dec., ¶27.  In addition, Mr. Coleman's Report "relies on unconfirmed and non-representative data" from files obtained from LSAC's Manager of Accommodated Testing Kim Dempsey and General Counsel Joan Van Tol. Blanck Dec., ¶¶ 26, 29.  Dr. Blanck concluded "the ADA Monitor has not fulfilled his responsibility to provide a valid and reliable report to the Court and the Parties because the nature and scope of his review, analysis, and reporting is deficient in basic aspects..."  Blanck Dec., ¶26.

Fatal to the report's validity and reliability is Mr. Coleman's admission that he determined that "going behind the numbers would be unnecessarily burdensome and unwarranted." Carrasco Dec., ¶30, Ex. 9 (Final Report) at 5-6 n.6.  Professor Blanck concludes that Mr. Coleman's "failure to determine whether and, if so, the extent to which LSAC's data were valid and reliable fatally undermines the value of the findings to the Court and the Parties."  Blanck Dec., ¶ 38.  The numerous deficiencies in Mr. Coleman's report are addressed in our accompanying Motion in Limine and the Declaration of Professor Blanck.

For purposes of the Contempt Motion, what is most significant is what the Monitor's report does *not* mention.  Mr. Coleman decision that it would be to "burdensome" to go "behind the numbers" likely explains why his report does not mention LSAC's "50% email" or "no decision"

1   practices.  Nor did he mention the fact that in September 2016, LSAC increased by 20% -- a

2   substantial change -- the length of the LSAT for test takers granted the accommodation of additional

3   test time.  He did not mention LSAC's use of white-out on internal forms.  He did not notice that

4   LSAC was failing to report information on outside consultants as expressly required by the Decree

5   and concluded -- incorrectly -- that LSAC was in compliance with the reporting requirements.  He did

6   not mention that LSAC reported accepted "50% email" requests as "granted in full."

7        Mr. Coleman incorrectly designated his report as Confidential and rejected Plaintiff's request

8   to correct his error.  As a final violation, Plaintiffs requested Mr. Coleman's billing statements from

9   LSAC to determine what the Monitor had and had not done.  Mr. Coleman billed LSAC $70,000 but

10  provided a billing statement which simply said he was requesting payment for "fees for professional

11  services," providing no detail at all. Carrasco Dec., ¶48. The Monitor violated the Decree's

12  requirement that he provide detailed monthly billing statements.  Dkt. 220, ¶28.

13  **IV.  DFEH'S INVESTIGATION UNCOVERS LSAC'S HIDDEN VIOLATIONS**

14       DFEH sought reassurance that the Monitor reached accurate conclusions and invoked its right

15  under the Decree to review documents at LSAC's headquarters in Pennsylvania.  Carrasco Dec., ¶21.

16  Because DFEH is limited to five days of document review, DFEH took the unusual step of sending

17  three attorneys across the country for three full days of document review.  *Ibid.*

18  **A.**      **The Text of the 50% Email:**  While in Pennsylvania, DFEH discovered the serious and

19  substantial nature of LSAC's violations of the Court's orders.  DFEH discovered that the "50%

20  email" was a routine practice memorialized on LSAC's internal checklist as a standard

21  communication with test takers.  Carrasco Dec., ¶34.  DFEH discovered that numerous candidates

22  received the "50% email."   A typical "50% email" from LSAC to an applicant reads:

23       The Law School Admission Council (LSAC) has done a preliminary screening of your file
         and currently you have not been granted any accommodations for the [date] LSAT. In order to
24       proceed, you must indicate which of the options below you intend to pursue by replying to
         this email no later than 11:59 ET on [a date]. If you do not reply by that date your request to
25       include option 1 will be withdrawn. You will remain registered to test as a standard test taker.

26       We have deemed that you are currently eligible for [lesser accommodation].

27       However, we cannot process the remainder of your request and determine your eligibility for
         [additional requested testing accommodations] because the documentation required to support
28       these requests was not submitted.

1    You have two options:

2    1.  You can revise your request and accept the accommodations described above for which
     you are *currently* eligible.

3    Or

4    2.  If you wish to pursue your request for more [additional requested testing accommodations]
     you must submit [additional documentation].

5    *See* Movaghar Dec., Ex. D. Other "50% emails" include:

6

7    In order to proceed, you must indicate which of the options described above you intend to
     pursue by replying to this email no later than 11:59 ET on [a date].  If you do not reply by that
     date LSAC will be unable to provide ANY accommodations and you will remain registered to
8    test as a standard test taker.

9    *See* Carrasco Dec., ¶30, Ex. 12. When a candidate accepts the 50% email option of revising the

10   request downward, it was reported by LSAC as a request that was "granted in full."  If the candidate

11   did not respond to LSAC's "50% email" by the stated deadline, it appears the requests are reported as

12   "no decision."  DFEH found this by comparing the reports LSAC was required to send to DFEH

13   (which reported a candidate as "granted in full") with the documents in the candidate's file (which

14   demonstrated the candidate's original request had not been granted in full).  This practice results in an

15   underreporting of files that are actually "denied in full" or "denied in part." The only reason DFEH

16   was able to make this determination was because some candidate files which were designated as "no

17   decision" for certain test administrations included information for other test administrations where

18   the same candidate received a "50% email."  DFEH believes the files it reviewed represent only a

19   small subset of candidates who received the "50% email" -- those whose files contained both a "50%

20   email" and which were designated for a different administration of the LSAT as "no decision."

21   DFEH believes that the bulk of the "50% email" violations would be found in the "granted in full"

22   files to which LSAC repeatedly and systemically denied DFEH access.  Carrasco Dec., ¶¶24-29.

23   **B.      The "50% Email" was a Standard, Nationwide Practice:**  At LSAC's headquarters, DFEH

24   observed that each file contains a standardized checklist which summarizes the types of

25   communications contained in the file.  On that form, under the category of "miscellaneous"

26   correspondence, the notation of a "50%" communication is recorded in handwriting in a file which

27   contains a "50% email" with the date January 20, 2016.  DFEH cannot attach the document because

28   LSAC refused to give DFEH a paper copy of this file.  Carrasco Dec., ¶34.

-14-

1    The "50% email" was institutionalized as a nationwide practice.  By the June 2016 LSAT,

2  recording of the "50% email" no longer needed to be written in by hand on the form as it had been

3  added to the list of standard correspondence sent to test takers.  Although not required for contempt,

4  DFEH could establish intentional discrimination by LSAC under the pattern or practice theory.

5  LSAC's use of the "50% email" establishes "that [] discrimination was the company's standard

6  operating procedure[,] the regular rather than the unusual practice." *International Brotherhood of*

7  *Teamsters v. United States*, 431 U.S. 324, 336 (1977). Thus, the "50% email was a regular practice as

8  demonstrated by LSAC's standardized list of test taker communications:



| | LETTERS/EMAILS SENT TO CANDIDATE |
|---|---|
| | NO REGISTRATION LETTER |
| | APPROVED ACCOMMODATIONS/EMAIL TO SUPERVISOR |
| | 50% EMAIL |
| | UNABLE TO PROCESS EMAIL |
| | REQUEST RECEIVED LATE |
| | ADDITIONAL DOCUMENTATION RECEIVED LATE |
| | MISC. |

12  Carrasco Dec., Ex. 13.

13  **C.     "White Out" Was Used on Internal Forms:**  While reviewing files at LSAC's headquarters,

14  DFEH observed a pattern:  LSAC was using "white out" on the "Internal Use – Disability Request

15  Form" which summarizes the candidate's testing accommodation requests and the actions LSAC took

16  on those requests.  As a result, the requested testing accommodations noted on the internal form do

17  not match those requested on the candidate's forms. Carrasco Dec., ¶35.

18  **D.     Misleading Reporting of "50% Email" as Granted in Full:**  While at LSAC's

19  headquarters, DFEH discovered that candidates accepting the "50% email" were reported to DFEH,

20  the United States, and the Monitor as "granted in full."  Carrasco Dec., ¶31.

21    LSAC's misleading reporting had consequences.  The Monitor relied on statistics regarding

22  the number of requests denied by LSAC to support his conclusions.  In reviewing whether LSAC

23  complied with the Best Practices, the Monitor began by "observing the significant trends regarding

24  accommodation practices that correspond in time with the implementation of [sic] Final Report as

25  modified." Carrasco Dec., ¶30, Ex. 9 at 5.  The Monitor went on to compare statistics noting that

26  prior to the Panel Report, LSAC had a 16% denial rate per test administration but after the Panel

27  Report "the average number of testing accommodations denied was 1 per test administration."  Ex. 9

28  at 5.  Additionally, the Parties relied on LSAC's reporting to agree to lower the number of outside

-15-

consultants LSAC was required to list and train.  Carrasco Dec., ¶41. The denial rates upon which both Plaintiffs and the Monitor relied would have been much higher with accurate reporting rates.

1. **The No Decision Practice:**  Plaintiff's document review confirmed that LSAC's  practice of labeling actions as "no decision" violated the Court's orders by denying candidates a decision through the two step internal review, the reviews by two external consultants and the two appeals required by the Panel Report.  Carrasco Dec., ¶¶31-33.

2. **Reporting Violations:**  From reviewing candidate files, DFEH determined that LSAC was not reporting outside reviewers -- at all.  DFEH's determined that LSAC's reporting of internal reviewers was erroneous.  LSAC lists only one internal reviewer:  Kim Dempsey, the Manager of Accommodated Testing, that was not consistent with DFEH's review of documents which contain names of individuals we assume to be Disability Specialists. Carrasco Dec., ¶36.

3. **Candidate Files Demonstrate Incompetence of the Monitor:**  The numerous deficiencies in the Monitor's report and the misleading nature of LSAC's reporting combined to make it difficult for DFEH to uncover LSAC's substantial violations of the Decree until Plaintiffs themselves reviewed the underlying documents.

The file review provided additional information about a major change in the LSAT for accommodated test takers which is absent from the Monitor's report.  Starting with the September 2016 administration of the LSAT, without notice to test takers or to Plaintiffs, LSAC made a substantial change to the LSAT by requiring candidates with the testing accommodation of additional time to take an LSAT which was 20% longer than previous administrations.  It did so by adding an "experimental section" which is not scored but is used by LSAC to research potential future test questions.  Carrasco Dec., ¶37.  Test takers requesting a waiver of the experimental section are routinely denied; nearly all of the reported denials in California concern requests to waive the experimental section. Carrasco Dec., ¶37. As the Monitor did not mention this change, DFEH was deprived of notice of as well as an evaluation as to whether LSAC's actions comply with the Decree.

## V.  NOTICE OF VIOLATION AND MEET AND CONFER WITH LSAC

DFEH gave both LSAC and the Monitor opportunities to cure deficiencies, attempting to resolve matters informally. Plaintiffs provided specific comments to the Monitor and provided LSAC

1   with a detailed notice of its violations.  The Parties engaged meet and confer sessions over a five

2   month period during which both parties attempted to narrow the issues. Carrasco Dec., ¶44.  It was

3   difficult if not impossible for DFEH to realize the full extent of LSAC's violation of the Decree

4   before reviewing candidate files in Pennsylvania.  LSAC's data reports were misleading.  The

5   Monitor's report was cursory in its analysis and lacking in detail.

6   ## VI.  LSAC'S VIOLATIONS SPANNED NEARLY TWO YEARS

7        The first LSAT to which Panel Report (Dkt. 220) and this Court's Order (Dkt. 245) applied

8   was the December 2015 test.  While LSAC placed substantial limitations on DFEH's access to files,

9   DFEH can establish that the "50% email" was being used as early as January 2016.  LSAC continued

10  this practice even after being formally and explicitly apprised of the violation by Plaintiffs in May,

11  2017.  Carrasco Dec., ¶47.  The "50% email" practice remained in use for the most recent

12  administration of the LSAT in September, 2017.  Harris Dec., ¶¶5-7; Kallman Dec., ¶6.

13       On October 13, 2017 -- on the eve of DFEH's filing of this motion -- five months into the

14  meet and confer process, counsel for LSAC represented (for the first time) that LSAC had not used

15  the "50% email" for the December 2017 LSAT. Given LSAC's pattern of misleading reporting and

16  Decree violations, DFEH is skeptical as to LSAC's representations.  Moreover, even assuming LSAC

17  has stopped its use of the "50% email," absent a Decree extension, the December 2017 and February

18  2018 LSATs are the only remaining tests subject to the safeguards of the Court's Orders. This belated

19  change does nothing to compensate Plaintiff for the fact that LSAC violated the Court's Orders

20  depriving applicants of the benefit of those Orders for two years.  Plaintiffs lost two years of Decree

21  compliance due to obvious substantial violations that go to the heart of the Court's orders.

22  ## VII.  LSAC SHOULD BE HELD IN CIVIL CONTEMPT

23       Courts have "inherent power to enforce compliance with their lawful orders through civil

24  contempt." *Shillitani v. U.S.*, 384 U.S. 364, 370 (1966).  A court "may exercise its civil contempt

25  power for one or both of two purposes: 'to coerce the defendant into compliance with the court's

26  order, and to compensate the complainant for losses sustained.'" *Mannick v. Kaiser Foundation*

27  *Health Plan, Inc.*, No. C 03-5905 PJH, 2006 WL 3734390, at *11 (N.D. Cal. Dec. 18, 2006) (citing

28  *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04 (1947)).  In a civil contempt

-17-

proceeding, "[t]he moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999).

Once DFEH shows noncompliance with a clear Court order, "the burden shifts to the party sought to be held in contempt to prove that it took all reasonable steps within its power to insure compliance." *Mannick*, 2006 WL 3734390 at *11 (citing *Hook v. Arizona Dep't of Corrections*, 107 F.3d 1396 (9th Cir. 1997)); *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973) [holding defendant in contempt for failing to provide access to records; "To satisfy this burden the respondent must show "categorically and in detail" why he is unable to comply."].  Because the "sole question is whether a party complied with a district court's order," the contempt "need not be willful." *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987) [holding that proffered good faith defense to civil contempt action "has no basis in law"]; *Mannick*, 2006 WL 3734390, at *11.  Intent "is irrelevant" as there is no good faith exception to the requirement of obedience of a court order.  *Stone v. City and County of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992).

Given that LSAC likely committed scores of violations for nearly two years, LSAC cannot possibly meet its burden of proof.  DFEH has not raised a few technical violations but issues central to the underlying litigation and Decree:  LSAC's requirement of excessive documentation and failure to provide for adequate safeguards such as explanations for denials, internal and external review, appeals and interactive and cooperative communications.

A.    **LSAC Violated Specific and Definite Orders of this Court**

The Consent Decree (Dkt. 203) and the Panel's Report (Dkt. 220) coupled with the Court's Order Approving In Part the Best Practices Panel's Report (Dkt. 245) constitute clear and definite orders of the Court.  District courts may exercise their contempt power to enforce agreements, plans, and other documents incorporated into consent decrees.  *See, e.g., California v. Randtron*, 284 F.3d 969, 974 (9th Cir. 2002) [District court has jurisdiction to enforce settlement agreement incorporated into a consent decree]; *Emma C. v. Eastin*, No. C 96-4179 TEH, 2001 WL 1180636 (N.D. Cal. Oct. 4, 2001) [Defendant held in contempt for violating corrective action plan that it agreed to implement

-18-

1  under the terms of a consent decree]; *National Presto Industries, Inc. v. Dazey Corp.*, 107 F.3d 1576,

2  1583 (Fed. Cir. 1997) [court may use its contempt power over a settlement agreement incorporated

3  into a consent decree "such that a breach of the agreement also violates the court's decree."].

4       In *Emma C. v. Eastin*, for example, Judge Henderson held a school district in civil contempt

5  for failing to implement provisions a Corrective Action Plan, which was incorporated into the parties'

6  consent decree.  2001 WL 1189636, at *1, 3.  The plan identified "specific corrective activities,

7  expected results, a timeline for performing the activity, the individual responsible for performance,

8  and measures to determine compliance." Id. at *2-3. The school district was found to have violated

9  the corrective action plan and was held in contempt. Id. at *1.

10      Here, the Decree (Dkt. 203), Panel Report (Dkt. 220) and this Court's Order (Dkt. 245)

11 contain specific and definite requirements.  Like the defendant in *Emma C.*, LSAC expressly agreed

12 in the Decree to implement the Best Practices.  Dkt. 203, ¶7. The Decree includes specific deadlines

13 by which LSAC was to have implemented the Best Practices, and the district court retained

14 jurisdiction to hear appeals related to the panel's final report.  Dkt. 203, ¶7(d)(v).

15      The provisions of these Orders violated by LSAC are detailed above and are too numerous to

16 repeat here.  A few examples include:

17      By sending the 50% email to candidates automatically entitled to prior testing

18 accommodations, LSAC violated Paragraph 5(a) of the Decree which required that prior approved

19 testing accommodations be provided "*without further inquiry* or request for additional

20 documentation."  Dkt. 203, ¶5(a) at 4 [emphasis added];  Movaghar Dec., ¶¶7-10.

21      By reporting that a candidate's request had "no decision" LSAC violated the requirements of

22 the Decree and Panel Report which state that the only permitted reporting categories are "granted" or

23 "denied in full" or "denied in part."  Dkt. 203, ¶8(a), (k).

24      By using "white out" to alter its internal form summarizing the candidate file, LSAC violated

25 the Decree's requirement that it "maintain appropriate supporting records for the information

26 contained in the Reports, including… those described in Paragraph 8…." Dkt. 203, ¶23 at 32:17-19.

27      By feigning that it was not making any decision on the candidate's original request -- and

28 instead making a "50% email" offer or a "no decision" -- LSAC deprived candidates of the two tiered

-19-

1   internal LSAC review, the review by two external reviewers, and the two appeals mandated by the

2   Panel's Report, as approved by this Court.  Dkt. 220 at 25-26; 21, n.11.  To take just one example, a

3   student was told LSAC's "determination" was that his "request did not meet documentation

4   guidelines" but that he had no right to the appeals process.  Harris Dec., ¶¶10-11.

5         By presenting candidates with a time sensitive ultimatum (accept partial accommodations or

6   risk not receiving "ANY" accommodations) LSAC violated the requirement that "LSAC shall engage

7   in cooperative and interactive communication with candidates concerning any modifications or

8   specific arrangements needed for the provision of testing accommodations."  Dkt. 220 at 15;

9   Movaghar Dec., ¶¶30, 32; Harris Dec., ¶¶8-9; Kallman Dec., ¶¶24, 26.

10         By denying DFEH access to critical "granted in full" files, LSAC violated DFEH's right to

11   review documents at LSAC's headquarters in Pennsylvania. Dkt. 203, ¶26(a).  In short, LSAC has

12   committed violations concerning  nearly every major Issue (Nos. 2, 4, 5, 6, 7, 8 and 9)  addressed by

13   the Panel Report and this Court's Order as well as numerous provisions of the Consent Decree itself.

14   **B.    LSAC Failed to Take Every Reasonable Step to Comply With the Court's Orders**

15         A contemnor in violation of a court order may avoid a finding of civil contempt "only by

16   showing it took *all* reasonable steps to comply with the court order."  *Kelly v. Wengler*, 822 F.3d

17   1085, 1096 (9th Cir. 2016) (emphasis in original); *Inst. of Cetacean Research v. Sea Shepherd*

18   *Conservation Soc'y,* 774 F.3d 935, 945 (9th Cir. 2014).

19         In *Kelly*, a class action against a private prison company for understaffing, the district court

20   incorporated the parties' settlement agreement into its order dismissing the case.  822 F.3d at 1091.

21   The plaintiffs later learned that the company had violated the settlement by falsifying staffing records

22   over a seven-month period, and moved the court to hold the company in contempt.  *Id.*  The

23   defendants argued that they were in substantial compliance with the settlement agreement because

24   they had begun taking steps to correct the violation before the plaintiffs moved for contempt. *Id.* at

25   1113. The defendants argued that taking any corrective steps prior to a contempt motion could release

26   them from liability. *Id.* The court disagreed, and affirmed the district court's ruling.  *Id.*; *see also*

27   *Sublime v. Sublime Remembered,* No. CV 06-6059 CAS (FMOx), 2013 WL 3863960, at *8 (C.D.

28   Cal. July 22, 2013) [holding Defendant in contempt "for only a single violation" of a court order].

*Kelly* directly supports DFEH's request because LSAC's manipulated the data by: 1) sending coercive letters requiring candidates to modify their requests or risk no accommodations at all;  2) altering internal documents with "white out";  3) reporting requests of candidates who accepted the "50% email" as requests that had been "granted in full"; and 4) labeling other requests as having "no decision" when those requests were in fact denied for lack of documentation.  LSAC's conduct goes right to the edge of, if not past, falsification and establishes a distinct absence of good faith or reasonable efforts by LSAC to comply.

## C.    LSAC Should be Required to Comply with the Court's Orders for An Additional 2 Years

The Supreme Court and the Ninth Circuit have made it clear that when a contempt of court has occurred, the district court must issue and the plaintiff is entitled to receive an effective remedy.  As the Supreme Court explained in *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193-94 (1949):

> We are dealing here with the power of a court to grant the relief that is necessary to effect compliance with its decree.  The measure of the court's power in civil contempt is determined by the requirements of full remedial relief.

*See also Hutto v. Finney*, 437 U.S. 678, 690 (1978) ["federal courts are not reduced to issuing [orders] and hoping for compliance."].

The Ninth Circuit's decision in *Kelly* supports DFEH's request for the Decree to remain in effect for an additional two years. The district court in *Kelly* held the company in contempt and extended the term of the two-year settlement agreement by an additional two years. *Kelly,* 822 F.3d at 1093.  The court concluded that the extension was suitably tailored to the change because it returned the plaintiffs to the position they would have occupied if the company had not violated the agreement from its inception.  *Id.*  The court rejected the argument that the extension should have applied only to the specific staffing requirements the company was known to have violated, reasoning that "the district court was reasonably concerned that [the company's] failure to comply with staffing requirements affected its ability to comply with the settlement agreement's other requirements."  *Id.*

## D.    The Court Should Replace the Decree Monitor

The Monitor failed to address the "50% email" practice,[3] LSAC's use of the "no decision"

---

[3] It is clear from the 12 files reviewed by the Monitor that he did either did not notice or he ignored the "50% email" practice.  Blanck Dec. ¶43.

1   category, failed to notice that LSAC was not reporting outside reviewers, that LSAC lengthened the

2   LSAT by 20% for many accommodated test takers, that LSAC reported "50% email" acceptances as

3   "granted in full," and, as set forth in the Blanck declaration, failed to comply with the professional

4   standards and practices of Court Monitors.  He failed in his fundamental purpose under the Decree:

5   "to assist the United States, the DFEH and the Court in evaluating LSAC's compliance with the

6   Decree." Dkt. 203, ¶24.  Replacement of the Monitor is warranted because it is now clear that the

7   "50% email" and the "no decision" practices are the kinds of conduct in which LSAC will risk

8   engaging it knows that a Monitor is not examining its conduct.  The Monitor ignored or failed to

9   notice LSAC's sweeping violations of Court orders.  This does not "assist" DFEH or this Court.

10      The Ninth Circuit's decision in *Kelly* supports the request to replace the monitor.  In *Kelly,* the

11   district court's contempt order not only extended the settlement as a remedy for noncompliance but

12   also appointed a monitor where there had been none before.  *Kelly v. Wengler*, 979 F.Supp.2d 1104,

13   1116 (D. Idaho 2013).  While the Ninth Circuit affirmed the extension of the Decree without

14   addressing the appointment of the monitor, the Court's reasoning for affirming the extension supports

15   the request to replace the monitor.  *Kelly*, 822 F.3d at 1097-98.  The court reasoned that the extension

16   was suitably tailored because it returned the plaintiffs to the position they would have occupied but

17   for the defendant's noncompliance. *Id.* at 1098.  Here, simply extending the Decree for two years is

18   insufficient to return the DFEH to its starting position because the current monitor's deficiencies will

19   deprive DFEH of meaningful assistance in monitoring LSAC's compliance.  *See McComb v.*

20   *Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) [court has the power "to grant the relief that is

21   necessary to effect compliance with its decree"].[4]

22   **E.      The Court Should Remedy LSAC's Repeated Refusal to Grant DFEH's Access to Files**

23      LSAC's unyeilding responses to Plaintiffs repeated requests to access files at LSAC's

24   headquarters is detailed in the Carrasco Declaration, paragraphs 21-29 and demonstrates, we submit,

25   a bad faith attempt to withhold from Plaintiffs evidence of LSAC's violations.  As an evidentiary

26   remedy for this contemptuous conduct, DFEH submits that the Court could deem all "granted in full"

27

28

---

[4] The court could also appoint a replacement monitor as an exercise of its own powers, independently of the Decree under both Federal Rule of Civil Procedure 53(b) and the inherent power of the court to enforce its orders where, as here, there is a record of noncompliance or compliance is especially complex. *Nat'l Org. For the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 542–44 (9th Cir. 1987).

1  decisions -- many of which are likely the result of "50% emails" as constituting violations of the

2  Decree for purposes of this motion.  *McComb*, 336 U.S. at 193-94; *Hutto*, 437 U.S. at 690-91 [federal

3  courts have an array of mechanisms to enforce compliance with their orders].

4         DFEH incurred the unusual expense of flying three attorneys to Pennsylvania to review

5  LSAC's records.  As a remedy for LSAC's multiple violations, DFEH requests that LSAC reimburse

6  DFEH's actual airfare for three attorneys which totals $2,391.43.  Carrasco Dec., ¶53; *United Mine*

7  *Workers of America,* 330 U.S. at 303-04 (1947) [civil contempt appropriate to compensate for losses

8  sustained based on evidence of actual loss].

9         Both Plaintiffs should be granted an additional 15 days of access to documents.  To work

10 efficiently, Plaintiffs had planned to review files at the same time but LSAC denied that request.

11 Carrasco Dec., ¶¶23-25.  Upon the request of DFEH, simultaneous file review should be permitted.

12 **VIII.   IN THE ALTERNATIVE, THE COURT SHOULD INVOKE FED. R. CIV. P. 60(B)**

13 **TO EXTEND THE DECREE FOR TWO YEARS AND REPLACE THE MONITOR**

14        Should the Court decide not to invoke its contempt powers, DFEH requests that the Court

15 modify the Decree under Fed. R. Civ. P. 60(b).  *Hook v. State of Ariz., Dept. of Corrections*, 972 F.2d

16 1012, 1016 (9th Cir. 1992).  The Ninth Circuit has indicated that the appropriate subdivision of Rule

17 60(b) for modification of a consent decree is either subdivision (5), which authorizes relief where

18 "applying [the judgment] prospectively is no longer equitable," or subdivision (6), which authorizes

19 relief for "any other reason that justifies relief."  *Hook*, 972 F.2d at 1016-17.

20        The courts follow standards originating in the Supreme Court's decision in *Rufo v. Inmates of*

21 *Suffolk County Jail*, 502 U.S. 367 (1992).  Under *Rufo*, "a party seeking modification of a consent

22 decree must establish that a significant change in facts or law warrants revision of the decree and that

23 the proposed modification is suitably tailored to the changes circumstance."  *Id.* at 393.

24        LSAC's failure to substantially comply with the consent decree constitutes a significant

25 change. *Kelly*, 822 F.3d at 1098 ["Under well established law, substantial violation of a court order

26 constitutes a significant change in factual circumstances."].   In *Kelly*, The Ninth Circuit held that an

27 extension was within the district court's discretion as an exercise of its inherent power, codified in

28 Rule 60(b), to modify its own orders.  *Id.* at 1097-98.

1   LSAC's misleading reporting weighs in favor of modification.  As in *Kelly* "[t]he manner of

2   reporting made it difficult to determine" LSAC's lack of compliance and this factor supports Decree

3   modification.  *Kelly*, 822 F.3d at 1092.  As DFEH did not anticipate that LSAC would violate the

4   Decree, the Panel Report and this Court's order, DFEH satisfies the *Rufo* requirements.  Carrasco

5   Dec., ¶42.  DFEH's action in agreeing to reduce the number of outside consultants due to the number

6   of denials reported by LSAC (as requested by LSAC) demonstrates that it did not "anticipate" that

7   the promises contained in the Decree would be or were being broken.  Carrasco Dec., ¶42; *United*

8   *States ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County*, No. 06

9   CIV. 2860 (DLC) 2017 WL 728702, at *4-5 (S.D. N.Y. Feb. 23, 2017) [modifying consent decree to

10  eliminate cap on monitor's compensation because nonmoving party's noncompliance was a

11  significant change that was "unexpected" because the nonmoving party had duties to comply and to

12  do so in good faith].  Absent a contempt finding or decree modification, LSAC's noncompliance will

13  allow it to escape its obligations--to the detriment of the public interest--if the consent decree

14  proceeds unmodified and expires on its original end date of May 28, 2018.  Under the existing

15  Decree, there are only two remaining administrations of the LSAT.

16      The requested modifications are tailored to the violation.  Because LSAC has violated the

17  Panel Report for nearly two years, DFEH requests a two year extension.  LSAC denied DFEH access

18  to files and submitted misleading reports.  This justifies a modification in the provision regarding

19  access to documents which currently limits Plaintiffs to five days of access.  DFEH therefore requests

20  that the Decree be modified to permit Plaintiffs an additional 15 days of access to LSAC's records

21  and that DFEH have access on a nationwide basis.  At the request of DFEH, Plaintiffs should be

22  allowed to review files concurrently.  Finally, based on the Mr. Coleman's failure to detect LSAC's

23  obvious violations of the Decree, DFEH requests that the Court replace him and direct the new

24  Monitor to complete a report in 3 months, and quarterly reports thereafter.

25  **IX.  THE COURT SHOULD ENFORCE ITS ORDERS ON A NATIONWIDE BASIS**

26      Any party may raise Decree compliance issues with the Court upon notification to "the other

27  two parties."  Decree ¶31.  Consent decrees "are construed as contracts for purposes of enforcement."

28  *Hook v. State of Arizona, supra,* 972 F.2d at 1014. The power of this Court is not limited to the

-24-

1   District in which the Court sits but extends across the country. *Earth Island Inst. v. Ruthenbeck*, 490

2   F.3d 687, 699 (9th Cir. 2006) (upholding nationwide injunction issued by the Eastern District of

3   California); see also *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017); *Hawaii v.*

4   *Trump*, 859 F.3d 741, 787-88 (9th Cir. 2017).  Because courts have the inherent power to enforce

5   compliance with their own orders, it follows that district courts have the authority to enforce their

6   own nationwide consent decrees on a nationwide basis. *Shillitani v. U.S.*, 384 U.S. 364, 370 (1966).

7   ## X.   DFEH'S ENTITLMENT TO ATTORNEY'S FEES AND COSTS

8   Should DFEH prevail, DFEH requests that the Court rule on only its entitlement to attorney's

9   fees and costs; the parties must attempt to resolve the amount of fees and costs. Dkt. 203, ¶21(b).

10   ## XI.  IN THE ALTERNATIVE, AN ORDER TO SHOW CAUSE SHOULD ISSUE

11   DFEH submits there is sufficient evidence to establish contempt.  However, LSAC wrongly

12   limited DFEH's access to information.  There are likely numerous violations in the "granted in full"

13   files to which DFEH was denied access. Should the court determine that additional proof is

14   necessary, the DFEH requests that the Court issue an Order to Show Cause Why Defendant Should

15   Not be Held in Civil Contempt and Why the Monitor Should Not Be Removed and schedule a prompt

16   case management conference.  *California Dept. of Social Services v. Leavitt,* 523 F.3d 1025, 1033-34

17   (9th Cir. 2008) ("the kind and amount of evidence of noncompliance required to justify discovery is,

18   necessarily, considerably less than is needed to show actual noncompliance.")   The order should

19   include a requirement that LSAC show cause why the monitor should not be replaced for failure to

20   actively monitor and report on compliance.  *Herrera v. Pierce County*, 2007 WL 858341, at *1–*2,

21   No. C95-5025 FDB (W.D. Wash. Mar. 19, 2007).

22   Dated:  October 30, 2017                         DEPARTMENT OF FAIR EMPLOYMENT
                                                       AND HOUSING

23

24                                                   _____/s/_____

25                                                   Mari Mayeda, Associate Chief Counsel

26                                                   _____/s/_____

27                                                   JONI CARRASCO, Staff Counsel
                                                     Attorneys for the Department

28