MARI MAYEDA (#110947)
 Associate Chief Counsel
Mari.Mayeda@dfeh.ca.gov
JONI CARRASCO (#287679)
 Staff Counsel
Joni.Carrasco@dfeh.ca.gov
IRINA TRASOVAN (#290372)
 Staff Counsel
Irina.Trasovan@dfeh.ca.gov
DEPARTMENT OF FAIR EMPLOYMENT
 AND HOUSING
2218 Kausen Drive, Suite 100
Elk Grove, CA  95758
Telephone: (916) 478-7251
Facsimile:  (888) 382-5293

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEPARTMENT OF FAIR EMPLOYMENT
AND HOUSING, an agency of the State of
California,

                    Plaintiff,

       vs.

LAW SCHOOL ADMISSION COUNCIL, INC.,

                  Defendant.

UNITED STATES OF AMERICA,

             Plaintiff-Intervenor,

       vs.

LAW SCHOOL ADMISSION COUNCIL, INC.,

                  Defendant.

**Case No. CV 12-1830-JCS**

**DFEH's REPLY MEMORANDUM RE:
MOTION FOR AN ORDER HOLDING
DEFENDANT IN CIVIL CONTEMPT
IN THE ALTERNATIVE MOTION
FOR MODIFICATION OF THE
CONSENT DECREE or AN ORDER TO
SHOW CAUSE RE CIVIL CONTEMPT**

Date:      February 23, 2018
Time:     9:30 am
Location: Courtroom G (15th Floor)
Judge:   Hon. Joseph C. Spero



**COURT PAPER**
State of California
**Std. 113**

1

**TABLE OF CONTENTS**

2   I. INTRODUCTION………………………………………..………………………………………...1

3   II. LSAC VIOLATED THE COURT'S ORDERS AND IS LIABLE FOR CIVIL CONTEMPT .........2

4      A. DFEH Identified Specific and Definite Court Orders ...........................................................3

5         1. The Panel Report Is Enforceable by Contempt. ..................................................................3

6         2. LSAC Violated Specific Provisions of the Court's Orders .................................................3

7      B. LSAC's Last Minute Efforts on the Eve of Contempt Do Not Defeat the Motion .................4

8      C. LSAC Relies on Mischaracterized or Inaccurate Facts ..........................................................6

9      D. LSAC Violated and Continues to Violate the Court's Orders ................................................7

10        1. LSAC Violated ¶5(a) of the Decree ...................................................................................7

11        2. By Denying Requests Based On Lack of Documentation but Attempting to Shield Those

12        Decisions from External ....................................................................................................7

13        3. LSAC Violated and Continues to Violate the Requirement That it Engage in Cooperative

14        and Interactive Communications (Issue 5). ..........................................................................10

15        4. LSAC Violated the Requirement that it Not Attempt to Alter Requests for Additional

16        Time (Issue 5). ...................................................................................................................11

17        5. LSAC Violated the Decree Reporting and Recordkeeping Requirements (¶¶8, 23) ........12

18        6. LSAC Denied DFEH Access to Records (Decree, ¶¶ 8, 26).............................................12

19   III. LSAC TOOK A CALCULATED RISK ...............................................................................14

20   IV. LSAC FAILED TO TAKE ALL REASONABLE STEPS TO COMPLY WITH THE COURT'S

21   ORDERS ......................................................................................................................................14

22   V. A COLLATERAL ATTTACK ON THE DECREE IS IMPERMISSIBLE .................................16

23   VI. THE RELIEF REQUESTED IS APPROPRIATE TO REMEDY LSAC'S CONTEMPT ............16

24      A. The Decree Should be Extended by Two Years As A Compensatory Remedy ...................17

25      B. The Monitor Should be Replaced and DFEH Is Entitled to Costs and Fees ........................17

26      C. Increased Access to Records and DFEH Entitlement to Fees and Costs ..............................18

27   VII. DFEH MEETS THE REQUIREMENTS FOR MODIFICATION OF A DECREE ....................19

28   VIII. CONCLUSION ......................................................................................................................20



**COURT PAPER**
State of California
**Std. 113**

1

**TABLE OF AUTHORITIES**

2

<u>Federal Cases</u>

3   *California v. Randtron*,

4       284 F.3d 969 (9th Cir. 2002)..................................................................................................3

5   *Emma C. v. Eastin*,

6       No. C96-4179 TEH, 2001 WL 1180636 (N.D. Cal. Oct. 4, 2001) .......................................3, 15

7   *Gates v. Shinn*,

8       98 F.3d 463 (9th Cir. 1996)...................................................................................................3

9   *General Signal Corp. v. Donallco, Inc.*,

10      787 F.2d 1376 (9th Cir. 1986)..............................................................................................15

11  *Harris Teeter Supermkts*,

12      215 F.3d 32 (D.C. Cir. 2000) ...............................................................................................20

13  *Hook v. Ariz. Dept. of Corr.*,

14      107 F.3d 1397 (9th Cir. 1997).....................................................................................14, 16, 19

15  *In re Crystal Palace Gambling Hall, Inc.*,

16      817 F.2d 1361 (9th Cir. 1987)..............................................................................................2, 15

17  *Inst. of Cetacean Research v. Sea Shepard Conserv'n Soc'y*,

18      774 F.3d 935 (9th Cir. 2014).................................................................................................2

19  *Int'l Bhd. of Teamsters v. United States*,

20      431 U.S. 324 (1977) .............................................................................................................10

21  *Irwin v. Mascott*,

22      370 F.3d 924 (9th Cir. 2004).................................................................................................16

23  *Kelly v. Wengler*,

24      822 F.3d 1085 (9th Cir. 2016)........................................................................................ passim

25  *Kelly v. Wengler*,

26      979 F.Supp.2d 1104 (D. Idaho 2013)..............................................................................4, 15, 17

27  *Labor/Cmty Strategy Ctr v. L.A. Cty Metro. Transp. Auth.*,

28      564 F.3d 1115 (9th Cir. 2009)..............................................................................................19, 20

COURT PAPER
State of California
Std. 113

1  *Mannick v. Kasier Found. Health Plan, Inc.*,

2      No. C 03-5905 PJH, 2006 WL 3734390 (N.D. Cal. Dec. 18, 2006)...................................4, 5, 15, 19

3  *McComb v. Jacksonville Paper Co.*,

4      336 U.S. 187 (1949) ...........................................................................................................2, 14

5  *Nat'l Presto Indus., Inc. v. Dazey Corp.*,

6      107 F.3d 1576 (Fed. Cir. 1997)........................................................................................3

7  *Richmark Corp. v. Timber Falling,*

8      *Consult.*, 959 F.2d 1468 (9th Cir. 1992) ...........................................................................16

9  *Rufo v. Inmates of Suffolk Cty. Jail*,

10      502 U.S. 367 (1992) .........................................................................................................19

11  *SEC. v. Worthen*,

12      98 F.3d 480 (9th Cir. 1996) .............................................................................................20

13  *SEC v. Hickey*,

14      322 F.3d 1123 (9th Cir. 2003).........................................................................................16

15  *Shell Offshore Inc. v. Greenpeace, Inc.*,

16      815 F.3d 623 (9th Cir. 2016)............................................................................................6

17  *Stone v. City & Cty. of S.F.*,

18      968 F.2d 850 (9th Cir. 1992)..................................................................................2, 16, 17

19  *Sublime v. Sublime Remember*,

20      No. CV 06-6059 CAS (FMOx), 2013 WL 3863960 (C.D. Cal. July 22, 2013) ...............15

21  *Thompson v. Enomoto*,

22      542 F.Supp. 768 (N.D. Cal. 1982) .................................................................................2, 20

23  *Trans Ocean Export Packing, Inc.*,

24      473 F.2d 612 (9th Cir. 1973).....................................................................................2, 14, 15

25  *United States ex rel. Anti-Discrim. Ctr of Metro New York, Inc. v. Westchester Cty*,

26      No. 06 Civ. 2860 (DLC), 2017 WL 728702 (S.D. N.Y., Feb. 23, 2017).........................19

27  *United States v. Asarco, Inc.*,

28      430 F.3d 972 (9th Cir. 2005)...........................................................................................20

COURT PAPER
State of California
**Std. 113**

*United States v. United Mine Workers of America,*

   330 U.S. 258 (1947) ........................................................................................................16

*Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.,*

   689 F.2d 885 (9th Cir. 1982) ..........................................................................................2

*Walker v. City of Birmingham,*

   388 U.S. 307 (1967) ........................................................................................................16

**State Cases**

*City of Moorpark v. Super. Ct. of Ventura Cty.,*

   18 Cal. 4th 1143 (1998) ..................................................................................................19

**Federal Rules**

Fed. R. Civ. P. 53 .................................................................................................................17

Fed. R. Evid. 401, 402 ....................................................................................................2, 18

Fed. R. Evid. 403 ...................................................................................................................6



**COURT PAPER**
State of California
**Std. 113**

**I. INTRODUCTION**

LSAC uses its response to attempt to renegotiate the terms upon which this case was settled. But, the settlement in this case is a court order and LSAC was bound to comply with its terms. DFEH presented clear and convincing written proof that, for nearly two years, LSAC violated central provisions of the Court's orders by pressuring test takers into accepting partial accommodations, submitting false reports to DFEH, the United States and the Monitor, using "white out" on internal reporting forms, and denying candidates the right to the protections of internal review, external review and appeal mandated by this Court's orders. LSAC was legally required to take all reasonable steps to comply with the Orders. If – as it now claims – it had concerns that the Panel Report was "unworkable" or that the number of requests for accommodations had increased, it had appropriate remedies: to reconvene the Best Practices Panel pursuant to Paragraph 7(d)(vi) of the Consent Decree or to file a motion for modification before this Court. LSAC chose not to do any of those things. Instead, LSAC agreed to the Decree, then attempted to conceal its conduct, denying DFEH access to the so-called "granted in full" files that would have revealed the extent of its discriminatory practices. And because the Monitor failed to fully perform his own role and did not himself detect LSAC's violations,[1] LSAC's deceptions almost paid off.

In its response, LSAC fails to demonstrate why it should not be held in civil contempt. Controlling case law makes clear that it does not matter whether LSAC was intentionally violating the Court's orders – although there is clear and convincing evidence that it was. Nor does LSAC's claim that it has belatedly ceased its practice of sending "50% emails" defeat this motion. Irrelevant, too, is LSAC's repeated citation of the monetary amount it has expended to resolve claims of pre-Decree discrimination, or to comply with the terms of the Decree. Neither the contempt determination nor the remedy turn on these facts. Contempt lies because regardless of its intent, LSAC repeatedly and systematically violated clear, detailed orders of the Court. Contempt lies because regardless of LSAC's compliance with *some* Decree terms, LSAC repeatedly and flagrantly violated an array of

---

[1] Because he failed to detect LSAC's numerous violations of the Consent Decree, the Monitor's assessment of LSAC's compliance is not due any weight in this Court's review, and should be stricken, as set forth in DFEH's accompanying Motion in Limine.



**COURT PAPER**
State of California
**Std. 113**

1   other key provisions in the Court's orders. The remedy lies because Plaintiffs and test takers were

2   deprived of the proper functioning of the Court's orders for two years. As compensation, to return

3   DFEH and the public to the position they would have occupied but for the civil contempt, the Court's

4   orders should be extended for two years.

5   **II. LSAC VIOLATED THE COURT'S ORDERS AND IS LIABLE FOR CIVIL CONTEMPT**

6          It is undisputed that DFEH bears the initial burden to demonstrate by clear and convincing

7   evidence that LSAC violated an order that placed a specific and definite duty on LSAC. DFEH having

8   done that, the burden then shifts and LSAC "must show 'categorically and in detail' why [LSAC] is

9   unable to comply." *NLRB. v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973). A

10  defendant's subjective intent is "irrelevant" and good faith is not a defense. *McComb v. Jacksonville*

11  *Paper Co.*, 336 U.S. 187, 191 (1949); *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 856 (9th Cir. 1992);

12  *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361,1365 (9th Cir. 1987).[2] The parties agree

13  contempt is appropriate "to compensate a party for losses sustained." Dkt. 268 (Opp'n) at 1:22.

14         LSAC incorrectly asserts that "[a] court cannot find a defendant in contempt where the

15  defendant has been 'reasonably diligent'" in attempting to comply. Opp'n at 14:19-23 (citing

16  *Thompson v. Enomoto*, 542 F.Supp. 768, 769 (N.D. Cal. 1982)). In *Thompson,* the Court used the term

17  "reasonably diligent" to describe a defendants' failure to comply with a consent decree due to

18  changing circumstances that made compliance impossible despite their "reasonably diligent" attempt

19  to do so. 542 F.Supp. at 769-70. Since defendants' non-compliance was the result of impossible

20  circumstances, rather than their own "deliberate failures," the Court concluded that a finding of

21  contempt was inappropriate and instead ordered modification of the decree. *Id.* at 770.

22  _____

23  [2] LSAC's assertion that "a person should not be held in contempt if his action 'appears to be based on
    a good faith and reasonable interpretation of the court's order," is an incomplete statement of law.

24  Opp'n at 14:16-17. This quote comes from *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689
    F.2d 885, 891-92 (9th Cir. 1982), where the Ninth Circuit declined to hold a party in contempt for

25  failing to prevent a single telephone directory listing from appearing under a disputed trade name
    despite taking all reasonable steps to comply. *Vertex* created a "narrow 'good faith' exception to the

26  rule that intent is irrelevant in civil contempt" predicated on two conditions: that the party is
    interpreting "impermissibly vague" language *and* their interpretation is "reasonable." *Inst. of*

27  *Cetacean Research v. Sea Shepard Conserv'n Soc'y*, 774 F.3d 935, 953 (9th Cir. 2014). LSAC has
    identified no "impermissibly vague" language. Therefore the *Vertex* exception does not apply and

28  LSAC's intent remains irrelevant and inadmissible. Fed. R. Evid. 401, 402. LSAC's status as a non-
    profit entity and arguments about the "industry standard" are similarly irrelevant and inadmissible. *Id.*



COURT PAPER
State of California
Std. 113

**A. DFEH Identified Specific and Definite Court Orders**

**1. The Panel Report Is Enforceable by Contempt:** LSAC contends that "the panel report was not a court order." Opp'n at 17:21. This admission – that LSAC regards the Panel Report as something of lesser import than a court order enforceable by contempt – may indeed explain how this dispute arose. Contrary to LSAC's seeming assumption, the Panel Report is a court order with which it was bound to take all reasonable steps to comply.

As a matter of law, the Panel Report is enforceable by contempt because it is expressly integrated into the Decree and indistinguishable from a court order. *See, e.g.*, *California v. Randtron*, 284 F.3d 969, 974 (9th Cir. 2002) (enforcement of settlement agreement incorporated into consent decree); *Emma C. v. Eastin*, No. C96-4179 TEH, 2001 WL 1180636 (N.D. Cal. Oct. 4, 2001) (contempt for violating corrective action plan agreed to in consent decree); *Nat'l Presto Indus., Inc. v. Dazey Corp.*, 107 F.3d 1576, 1583 (Fed. Cir. 1997). Like the contemnor in *Emma C.*, LSAC treated the Best Practices "as an intrusion to be avoided rather than a challenge to be embraced." *Id.* at *10.

Paragraph 7 of the Decree makes the Panel Report binding on LSAC. *See, e.g.* Dkt. 203 (Consent Decree), ¶7(d)(v). The Decree specifies deadlines by which LSAC "shall implement" the Best Practices, provided LSAC rights to appeal and reconvene the Panel, and provided that this Court retained jurisdiction to hear disputes as to LSAC's compliance. Decree, ¶¶7, 31.[3]

**2. LSAC Violated Specific Provisions of the Court's Orders:** DFEH's Opening brief at pages 3 to 11 details at length each specific and detailed provision of the Consent Decree, Best Practices Panel Final Report, and this Court's appeal order ("Orders") which LSAC has violated. LSAC ignores this lengthy recitation and misleadingly argues that DFEH provided only "examples" of LSAC's violations. Opp'n at 18:11-12. In truth, the *second* time DFEH referenced the Orders violated by LSAC, DFEH noted the violations had been "detailed above and are too numerous to repeat here" and went on to list a few examples. Dkt. 254 (Contempt Mot.) at 19:15-16. A summary

---

[3] LSAC's citation to *Gates v. Shinn*, 98 F.3d 463 (9th Cir. 1996) to support its contention that the Best Practices Panel Report is not enforceable by contempt (Opp'n at 17:20-18:3) is misleading. *Gates* is simply an example of the court applying the rule that consent decrees must be interpreted within their "four corners," with the court declining to find defendants in contempt for refusing to agree with a mediator's interpretation of an undefined term. In this case, LSAC's duty to implement the Best Practices pursuant to the Consent Decree is clear beyond dispute.



1   of DFEH's original listing is attached in a chart as Exhibit 21 to the Carrasco Reply Declaration.

2       **B. LSAC's Last Minute Efforts on the Eve of Contempt Do Not Defeat the Motion**

3       LSAC's "no decision" practice – which it has *not* ceased – as well as its practice of sending a

4   "50% email" constitute clear and convincing written proof that LSAC violated the Decree and

5   committed violations affecting nearly every category of issue addressed by the Orders. After being put

6   on notice of the violations in May 2017, LSAC continued to send "50% emails" until "early to mid-

7   October 2017." Opp'n at 11:27-28. LSAC continued to send "50% emails" for the December 2017

8   LSAT. LSAC admits sending the email to 40 test takers, three of whom ended up taking the

9   December 2017 LSAT with partial accommodations offered via the "50% email." Opp'n at 12:1-6.

10   Even by an extremely conservative estimate,[4] the email was likely sent to hundreds of test takers.

11       *Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) supports the imposition of contempt even if

12   LSAC had ceased its noncompliant practices -- which it has not. In *Kelly*, the defendants argued that

13   the district court's contempt order was an abuse of discretion because the defendants had

14   "implemented a number of corrective measures immediately after discovering that [they were] not in

15   compliance with the settlement agreement." *Id.* at 1096. The Ninth Circuit affirmed the contempt

16   order because the district court had found that defendants "had failed to take several reasonable steps

17   to ensure compliance." *Id.* at 1096-97. The Ninth Circuit applied what it noted was the "well

18   established" proposition that "[a] contemnor in violation of a court order may avoid a finding of civil

19   contempt only by showing it took all reasonable steps to comply with the order." *Id.* at 1096 (citation

20   omitted); *see also Kelly v. Wengler*, 979 F.Supp.2d 1104, 1114 (D. Idaho 2013) ("[W]hile

21   [respondent's] newfound transparency in record keeping is also for the better, this is a long overdue

22   move. It was part of the reasonable steps CCA should have taken years ago, and it is not a reason to

23   find that CCA should not be held in contempt."); *Mannick v. Kasier Found. Health Plan, Inc.*, No. C

24   03-5905 PJH, 2006 WL 3734390, at *13 (N.D. Cal. Dec. 18, 2006) (contempt where defendant, inter

25   alia, did not make all reasonable efforts to complete construction of accessible patient room in

26

27   ––––––––––––––––––––
[4] LSAC claims to have ceased using the "50% email" in early to mid-October but concedes that 40
"50% emails" were sent to December 2017 LSAT test takers. Using a conservative estimate of 40

28   emails per test administration multiplied by the 8 administrations for which LSAC concedes the email
was in use results in an estimated 320 such emails. DFEH fears the true total is far higher.



COURT PAPER
State of California
Std. 113

1   compliance with deadline, but had completed it prior to contempt hearing).

2       DFEH's ongoing concerns are illustrated by the lengthy example of one particular test taker

3   cited on pages 12-13 of LSAC's brief.   That test taker had an accommodation denied, but as recently

4   as January 2018 LSAC reported the test taker as one for whom accommodations were "granted in

5   full." Carrasco Reply Dec., ¶65.  That LSAC, with its superior access to every nationwide file, chose

6   as an example a case in which its conduct failed to satisfy the Decree should do nothing to reassure

7   this Court that LSAC has ceased the practice of misreporting denials of accommodations as "granted

8   in full."

9       DFEH also remains concerned that LSAC continues to operate in an outcome driven fashion to

10  deny requests for accommodations. In LSAC's selected example, all four reviewers (Lovett,

11  Lewandowski, Murphy, Beherns-Blake) were signatories to an amicus letter (Dkt. 222) supporting

12  LSAC's opposition to the Best Practices. Carrasco Reply Dec., ¶66. Moreover, the four external

13  consultants utilized most often by LSAC are signatories to the opposing letter: Kevin Murphy, Ph.D.

14  (utilized as an external consultant by LSAC nine times); John Ranseen, Ph.D. (14 times); Larry

15  Lewandowski, Ph.D, (32 times); and Benjamin J. Lovett, Ph.D. (50 times, or approximately 71% of

16  the time that LSAC has sent files out for external review). *Id.* LSAC's heavy reliance on vehement

17  opponents of the Best Practices evidences its failure to take all reasonable steps to ensure compliance

18  with said Best Practices. [5]

19      The past and ongoing violations DFEH uncovered may be just the tip of the iceberg. Due to

20  the poor quality of the Monitor's report—his failure to conduct an "audit" as that term is generally

21  defined and his admission that he considered it too burdensome to go behind the numbers reported by

22  LSAC—the practices outlined in this motion recount only those violations Plaintiffs could observe

23

24  _____

[5] In addition to LSAC's heavy reliance on reviewers who opposed the Best Practices, DFEH noticed
25  that one external consultant who reviewed two files where waiver of the experimental section was
    granted as an accommodation for the September 2016 exam was never used again. Thereafter, no
26  external consultants have overturned LSAC's denial of waiver of the experimental section. Carrasco
    Reply Dec., ¶67. Rather, after September 2016, over 80% of the experimental section files were
27  reviewed by some combination of Lovett, Lewandowski, Murphy, Ranseen, or Behrens-Blake, who
    appear to have all agreed with LSAC 100% of the time regarding this type of accommodation request.
28  All five of these external consultants are signatories to the Amicus Curiae Letter filed in this matter on
    April 29, 2015, opposing the Best Practices. Dkt. 222; Carrasco Reply Dec., ¶68.



1   from their partial review of files at LSAC's headquarters. As all parties agree, Plaintiffs' access to

2   LSAC data is inferior to the Monitor's access. Opp'n at 23:25.

3        *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623 (9th Cir. 2016) does not support denial

4   of compensatory relief. Opp'n at 16:18-21. In *Shell*, the Ninth Circuit simply held that a contemnor's

5   appeal was moot because the underlying preliminary injunction had expired. *Shell* demonstrates why

6   DFEH filed this motion: to obtain a ruling prior to the expiration of the Court's orders in May 2018.

7        **C. LSAC Relies on Mischaracterized or Inaccurate Facts**

8        LSAC largely repeats unsupported assertions previously made regarding the Best Practices

9   Panel Report. For example, LSAC argues that the Panel recommendations as approved by this Court

10  (Dkt. 245) are "unworkable, impose unnecessary costs and administrative burdens." Opp'n at 26:28.

11  But, the reports LSAC is required to provide under the Decree show the opposite:  LSAC has

12  processed very few outside appeals or external reviews nationwide. LSAC also relies on a recent

13  example of a candidate's request which was sent to external review and appeal (Opp'n 12:18-13:28)

14  to support its complaints about the burdensomeness of the review and appeals processes.[6] It ignores

15  the fact that the example it highlights was the *only* appeal nationwide for that test administration.

16  Carrasco Reply Dec., ¶63. LSAC also fails to mention that there have been only approximately eight

17  appeals during the entire time LSAC has been subject to the Best Practices – an average of only one

18  appeal per test administration nationwide. *Id.* Indeed, LSAC has processed no appeals for California

19  test takers for the entire Best Practices period. *Id.*

20       LSAC ignores the fact that for the entire time it has been subject to the Best Practices, there

21  have been only approximately 70 candidate files sent to outside review for the entire country – on

22  average seven to eight files per test administration. Carrasco Reply Dec., ¶64. While not a defense, it

23

24

---

25  [6] LSAC contends that while "test volume has remained stable," the number of accommodation
    requests has increased. Opp'n 7:6-13. It may be true that test-takers with disabilities are no longer
26  deterred from requesting accommodations since the Consent Decree eliminated the practice of
    annotating or "flagging" score reports. However, it has also been reported that LSAT test volume has
27  generally experienced an increase in the past year. Debra Cassens Weiss, *Increase In LSAT Test
    Takers Is Seen As Evidence of 'Trump Bump,'* ABA Journal, Nov. 21, 2017.
28  LSAC's suggestion that there has been an increase in requests motivated by LSAC's alleged granting
    of accommodations is purely speculative, unsupported by any evidence. Fed. R. Evid. 403.



**COURT PAPER**
State of California
**Std. 113**

1    is disingenuous for LSAC to assert it has been burdened by these processes.[7]

2          LSAC was required to report annually "any difficulties LSAC has had, or anticipates having, in

3    complying with this Decree." Dkt. 203 ¶23, p. 32:9-16. By the time the two-year report was issued,

4    LSAC was required to have implemented the Best Practices for the December 2015, February 2016,

5    June 2016 and October 2016 administrations of the LSAT. Yet LSAC's report states "There were no

6    unanticipated difficulties associated with implementation of the Consent Decree that warrant reporting."

7    Thus, rather than being burdensome, after a full year had passed since LSAC was required to implement

8    the Best Practices, LSAC reported no difficulties complying with the Decree. Carrasco Reply Dec., ¶59.

9          **D. LSAC Violated and Continues to Violate the Court's Orders**

10          **1. LSAC Violated ¶5(a) of the Decree:** Paragraph 5(a) requires LSAC to

11   automatically grant test takers the accommodations received on other standardized tests "without

12   further inquiry or request for additional documentation." Decree, ¶5(a). Although compliance with

13   this provision should have been easy, it was systemically violated.  The "50% email" constitutes

14   written proof of a regular and repeated violation of the Decree's clear and specific language. LSAC

15   concedes that candidates were instructed that they needed to "revise" their requests to receive partial

16   accommodations based on "preliminary review". Opp'n at 9:25-28. By conditioning the automatic

17   granting of prior testing accommodations upon conditions not found in the Decree, and by requiring a

18   candidate to "revise your request," LSAC repeatedly violated Paragraph 5(a).

19          **2. By Denying Requests Based On Lack of Documentation but Attempting to**

20   **Shield Those Decisions from External Review and Appeal, LSAC violated Paragraph 7 of the**

21   **Decree as Well as Issues 4 (Multiple Reviewers Prior to Denial of Requests), 5 (Criteria and**

22   **Guidelines for Reviewers), 6-8 (Written Explanations/Automatic Review of Partial/Full Denials)**

23

---

24   [7] LSAC raises the example of stop-the-clock breaks resulting in two test-takers receiving 45 and 150
     "extra minutes of testing time." LSAC never raised this concern regarding stop-the-clock breaks with
25   the DFEH prior to the filing of the motion, despite the parties engaging in five months of meet and
     confer communications in 2017. Thus, DFEH does not know whether this ever arose at all prior to the
26   two examples raised by LSAC, and on which LSAC appears to rely on in making the statement "Such
     manipulation of a panel-required accommodation imposes enormously on test administrators (making
27   them less inclined to assist with future administrations) and significantly increases test administration
     costs." Opp'n at n.14. Based on a review of the exhibits submitted by LSAC, these appear to be two
28   isolated incidents that occurred at the same test center during the same month, December 2017.

COURT PAPER
State of California
Std. 113

**and 9 (Appeal):** The Orders require that LSAC provide external review and a right of appeal prior to denying any request. LSAC, however, declined to do so, routinely telling candidates that they had not submitted adequate documentation, but failing to inform them of their right to challenge this conclusion (or falsely telling them that they could not). For example, when candidate Harris attempted to appeal the "50% email" containing LSAC's "preliminary determination" that he had not submitted an appropriately documented statement of need, LSAC replied that "LSAC's determination was that your request did not meet documentation guidelines and therefore your request is not subject to the appeals process." Dkt. 249-6 (Harris Dec.), ¶11. Similarly, LSAC admits the "no decision" category was and is being used for requests denied "due to lack of appropriate documentation." Dkt. 255 (Carrasco Dec.), Ex. 16 (Norton Rose Letter, June 15, 2017, at 2).

LSAC now attempts to recharacterize that failure by describing the decisions it made as "preliminary" and thus not requiring review. But the Consent Decree did not establish such a two-tiered system for providing candidates with appellate rights. Indeed, the Panel Report explicitly states that all requests not "approved in full" "include situations where LSAC denies a testing accommodation request due to lack of documentation" and that "[s]uch denials will be subject to the outside consultant review rules." Report at 21 n.11.

This is not a minor matter; rather it goes right to the core of the Consent Decree and order. The very reason for the Panel's recommendation—and the Court's order—that a process of review and appeal be established was because of the Panel's determination that "LSAC's documentation requirements are excessive for most candidates who seek testing accommodations on the LSAT." Dkt. 220-2 (Panel Report), at 4. The Panel further determined that "LSAC staff does not give adequate weight to prior testing accommodations" and that LSAC staff presumes candidates lack entitlement to accommodations. *Id.* at 11. The Panel thus concluded that, "It shall be the role of the LSAC reviewer(s) to look for evidence that supports the candidate's request for testing accommodation, rather than to look for evidence that denies the candidate's request." *Id.* By casting its decisions as "preliminary," LSAC has essentially reestablished the status quo, enabling its staff to impose documentation requirements with no ready means for students to challenge these decisions.

Perhaps in recognition of these facts, LSAC attempts to argue that Plaintiffs have known about



1   the "no decision" practice, misleadingly quoting correspondence to state that this issue was resolved.

2   Opp'n at 21:23-26. However, that correspondence concerned the blank cells LSAC left in the

3   "decision" column. What was resolved in that exchange was that LSAC agreed not to leave blank

4   spaces in the reports – nothing more. Later, LSAC began filling in some entries as "no decision," but

5   Plaintiffs never agreed that a designation of "no decision" was allowed under the Decree. Carrasco

6   Reply Dec., ¶70. LSAC fails to mention that the Best Practices had not yet been issued at that time.

7       LSAC contends that the Court should not hold it in contempt because it has provided and

8   continues to provide multiple external reviews and an appeals process. However, LSAC's data shows

9   LSAC has processed only eight appeals since the Best Practices were implemented, Carrasco Reply

10  Dec., ¶63, despite LSAC's contention that it has received thousands of requests for accommodation.

11  Opp'n at 7:11-12; Dkt. 268-1 (Dempsey Dec.), ¶¶ 8-9. The low number of appeals can be explained

12  by the fact that individuals who received "50% emails" were not allowed to appeal LSAC's so-called

13  "preliminary" decision, an example of which is admitted in LSAC's opposition. *See* Dempsey Dec. at

14  ¶¶ 88-92. Withholding an appeal or external review on the basis of failure to "meet documentation

15  guidelines," *id.*, violates the Decree and the Best Practices. Report, n.11.

16      LSAC was required to exercise judgment and make decisions (Issue 8; Dkt 245 (Appeal

17  Order) at 29:3-5; 31:13-16) which would have resulted in candidates receiving the protections of

18  external review and appeal, rather than pretending it had conducted only a "preliminary review" or

19  come to "no decision" at all. In their appeal of the Panel Report, LSAC objected that the Panel was

20  mandating outcomes and taking away LSAC's ability to exercise judgment. This Court explained that

21  the Panel was empowered to mandate outcomes but interpreted language in the Report to allow LSAC

22  to exercise judgment. *Id.* at 20:17-23:1. Thus, LSAC fought for the right to exercise judgment, but

23  when it figured out it was better to pretend that it had not exercised this judgment, but had made "no

24  decision" or performed only a "preliminary review," LSAC created a fiction through which LSAC

25  pretended to abdicate this decision making function so that it could go on to deny candidates the

26  protections of the Court's orders: two step internal review, two external reviews, a two-step appeals

27  process. Had LSAC honestly and fairly labeled its decisions for what they were – denials for lack of

28  documentation – the candidates would have received the protections of the Court's orders.

COURT PAPER
State of California
Std. 113

**3. LSAC Violated and Continues to Violate the Requirement That it Engage in Cooperative and Interactive Communications (Issue 5):** LSAC violated ¶7 of the Decree, Issue 5 of the Panel Report, by not engaging in cooperative and interactive communication with candidates. Dkt. 245 at 15. LSAC, of course, has criticized DFEH for submitting anecdotal information such as that of Aidee Campa, below. *See* Opp'n at 2:1-3. But DFEH is not using the declarations to prove the illegal practice; that illegal practice is proven by the evidence of LSAC's use of the "50% email" and "no decision" designations. Rather, DFEH submitted anecdotal testimony because "individuals who testified about their personal experience…[bring the discrimination] convincingly to life." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977).

A recent example is the experience of Aidee Campa, a future law student who requested the same accommodations for the December 2017 LSAT which she received from LSAC in 2016. Campa Dec., at ¶¶1, 3, Ex. A. Aidee Campa is legally blind – her eyes were removed due to disease before she was two. *Id.* at ¶2. LSAC initially denied her request for accommodations, including use of a test booklet in Braille and Braille paper, because the Candidate Form she turned in contained an "incorrect" page – incorrect because of LSAC's inaccessible requirement that she print and sign the Candidate Form in ink. *Id.* at ¶¶6, 14. Campa attempted to fix her form but was told only after the deadline had passed that her request was still considered incomplete and she would be required to take the LSAT as a standard test taker. *Id.* at ¶16. Because Campa is completely blind, taking the LSAT without even a Braille test booklet would be impossible. *Id.* at ¶15. Campa emailed and called LSAC multiple times asking for help, but LSAC was unwilling to review its denial. *Id.* at ¶¶16-17, 22-25. As a last resort, Campa contacted the DFEH for assistance, and finally, three hours after the DFEH served LSAC with Campa's complaint, LSAC granted her the accommodations she needed and had previously been granted by LSAC. *Id.* at ¶¶21, 28-29. As Campa states:

> Throughout this process I repeatedly told LSAC's Accommodations Department about the nature of my disability, but no one seemed to realize or care how it impacted my ability to apply for accommodations. There was no attempt to work with me to ensure that my paperwork was complete. . . . This whole situation has left me with the belief that on top of all of LSAC's deadlines and paperwork requirements, in order to get reasonable accommodations you also need to find an advocate that will force LSAC to listen to you."

¶¶ 32, 39. Campa's experience is but one example of LSAC's failure to engage in a cooperative and

COURT PAPER
State of California
Std. 113

1   interactive process, and demonstrates how a complete refusal to use professional experience and

2   judgment nearly left a blind test taker to sit for the LSAT without even a test booklet in Braille.

3       LSAC attempts to portray the "50% email" as something helpful or "precisely the sort of

4   cooperative and interactive communication that was contemplated."[8] Opp'n at 20:12-13. Students

5   faced with LSAC's "50% email" disagree. Harris Dec., ¶ 9 ("I felt pressured to give up my request for

6   double time, or risk receiving no accommodations for the September LSAT."); Dkt. 249-4 (Kallman

7   Dec.), ¶10 ("I had no choice but to accept Option 1."). LSAC's view is also directly contradicted by

8   the wording of the 50% email, which threatens that a test taker will not receive "ANY

9   accommodations and you will remain registered as a standard test taker." Kallman Dec., ¶ 22; Harris

10  Dec., ¶6. Contrary to LSAC's assertion (Opp'n at 9 n.9), the language "You will remain registered to

11  test as a standard test taker" was used well before the June 2017 LSAT. *See* Dempsey Dec. at Ex. R

12  (pp. 131, April 12, 2016 email from "Accom Testing"; 134, June 30, 2016 email; 136, Oct. 13, 2016

13  email; 139, Dec. 16, 2016 email); *See also* Dkt. 249-5 (Movaghar Dec.), Ex. A (July 7, 2016 email).

14  To be a "standard test taker" means to be without, in fact, *any* accommodations.

15      **4. LSAC Violated the Requirement that it Not Attempt to Alter Requests for**

16  **Additional Time (Issue 5):** LSAC violated the requirement that it "not attempt to alter the request for

17  an extended time testing accommodation, such as suggesting 75% additional time for an individual

18  who has requested double-time." Report at 19-20. Every single 50% email before this Court states

19  Option 1 as either "1. *You can revise your request* and accept the accommodations described above

20  for which you are currently eligible," or "1. *You can revise your request* so that LSAC can determine

21  whether you are eligible for the accommodations for which you have submitted the required

22  documentation." *See e.g.* Dempsey Dec. at 166, 168, 172, 175, 178; Harris Dec., Ex. A; Kallman

23  Dec., Ex. A; Movaghar Dec., Ex. A. LSAC's assertion that the email "simply told the candidate what

24  amount of extra time was supported and what amount of time was not," is false. LSAC's own exhibits

25

26  _____

27  [8] Similarly, LSAC's assertion that examinees would "often thank[] LSAC for its communication" Opp'n at 10:12, is not supported by their documentation. The emails LSAC cites use the phrase "thank you" to sign off their emails, not necessarily to express thanks. *See, e.g.*, Dempsey Dec. at 171,178. One student writes "Thank you." Yet, in the same paragraph requests to appeal. *Id.* at 183.

28  Another ends an email with "thanks" after attaching extra documentation. *Id.* at 178.

COURT PAPER
State of California
Std. 113

1   show that students understood Option 1 to be telling them to revise their requests. *See* Dempsey Dec.

2   at 142 ("I would like to accept 50% additional time approved on all multiple choice sections and

3   would like to revise my request from 100% additional time on the writing sample portion to match the

4   50% additional time I will be receiving on all other sections."); 145 ("I would like to pursue option 1,

5   and revise my request by withdrawing my request for a 30 min break between sections 3 and 4."). The

6   language LSAC used in all 50% emails makes clear that Option 1 is only available if the a test taker

7   alters the original request and this message was perfectly understood by the test takers.

8        **5. LSAC Violated the Decree Reporting and Recordkeeping Requirements (¶¶8,**

9   **23):** LSAC falsely reported accepted "50% emails" as "granted in full," a practice it does not attempt

10  to defend. LSAC's January 2018 reporting reveals that LSAC continues to use the "no decision"

11  category, which includes candidates who submit "insufficient" documentation (and whose

12  accommodation requests would thus properly be reported as "denied in full"). Carrasco Reply Dec.,

13  ¶69. LSAC's use of white out to erase accommodations originally requested by a candidate violated

14  its obligation to "maintain appropriate supporting records for the information contained in the

15  Reports."[9] Decree, ¶23.

16       **6. LSAC Denied DFEH Access to Records (Decree, ¶¶ 8, 26):** DFEH's complaint is

17  not that it had to go to Pennsylvania to review records as LSAC contends. Opp'n at 23:14-16. Rather,

18  the issue is that, having complied with the Decree by providing 10 days' notice and traveling to

19  Pennsylvania, DFEH was entitled to review relevant records – a request LSAC systematically denied

20  by declining DFEH access to "granted in full" files. Indeed, LSAC denied the request despite DFEH's

21  good-faith amendment of its request in response to LSAC's protest that an original request was too

22  burdensome, and DFEH's provision of an explanation for why the files were relevant to its review.[10]

23  LSAC unavailingly attempts to justify this violation by relying on conduct that occurred after DFEH

24

---

25  [9] LSAC admits its internal form "was used by staff members to enter data required to be reported under the Decree." Opp'n at 11:18-19. Thus the forms were "supporting records for the information
26  contained in the Reports" submitted to DFEH, the United States and the Monitor. The use of "white out" to erase a candidate's original request for 70 minutes, and write 53 minutes over it did not
27  "maintain" that record, and violated Paragraph 23 of the Decree.
    [10] DFEH urges the Court to review Paragraphs 21 to 29 of the Carrasco declaration which detail
28  LSAC's withholding of evidence.



COURT PAPER
State of California
Std. 113

1   had returned to California. But DFEH had expended resources to fly three attorneys to Pennsylvania

2   in order to review original files; particularly important under these circumstances given that LSAC's

3   "core staff" "often use white out." Opp'n at 11:9.

4         LSAC mischaracterizes the facts, arguing it provided DFEH with copies of "granted in full"

5   files following its visit to LSAC. Opp'n at 24:20-22. After returning from Pennsylvania, DFEH and

6   DOJ requested copies of 100 candidate files. Carrasco Reply Dec. ¶ 60. LSAC only provided copies

7   of 19 requested files to DOJ. *Id.* Of those 19 files, LSAC provided eight redacted files to the DFEH.

8   *Id.* Only one of those eight files was reported to the DFEH as entirely "granted in full." *Id.* LSAC

9   relies on this file to argue that it did not deny access to "all 'granted in full' files." (Opp'n at 24:21-

10  22). But access to one redacted file is not, in fact, access to "all 'granted in full' files."

11        LSAC also attempts to blame DFEH for not realizing LSAC had engaged in nationwide

12  violations sooner. LSAC is correct that DFEH had the file of a single test taker who had filed an

13  administrative complaint and that the file contained what DFEH later discovered was the standardized

14  "50% email." Opp'n at 24:27-25:6. But not until DFEH reviewed files in Pennsylvania did DFEH

15  understand the "50% email" to be a widespread, regular *practice*. Carrasco Dec., ¶¶ 30-34.

16        DFEH's purpose is not to punish LSAC.[11] LSAC agreed to the terms of the Decree. It agreed

17  to grant, automatically, previous testing accommodations to those who had received such

18  accommodations on certain prior examinations. Decree, ¶5(a). LSAC agreed to the appointment of a

19  Best Practices Panel comprised of two members selected by LSAC, two by Plaintiffs. *Id.* at ¶7. LSAC

20  agreed that it "shall implement" the Best Practices to the extent not challenged or approved by the

21  Court. *Id.* The Panel went on to require two internal reviews, two external reviews and two appeals,

22  and this was upheld over LSAC's challenge by this Court. Dkt. 245 at 29-38. LSAC agreed it would

23  report specific information to Plaintiffs and the Monitor and agreed that it would provide DFEH

24  access to records in Pennsylvania. Decree, ¶¶8, 23, 26. It was LSAC's own actions – not doing the

25

---

26  [11]LSAC's attempt to characterize DFEH's actions as punitive, claiming the nationwide monetary recovery in this case finds "no parallel" in DFEH's enforcement of Unruh (Opp'n at 17-21) is
27  mistaken. Carrasco Reply Dec., ¶73. Moreover, DFEH met and conferred and exchanged detailed position statements with LSAC over a five-month period. LSAC argues DFEH "should have accepted
28  LSAC's" proposed resolution rather than filing for contempt. Because LSAC categorically refused to extend the Best Practices, the meet and confer was unsuccessful. Carrasco Reply Dec., ¶71.

COURT PAPER
State of California
Std. 113

1  numerous things to which it had agreed, falsely reporting information, and denying DFEH access to

2  files – that triggered DFEH to move for contempt.

3  **III. LSAC TOOK A CALCULATED RISK**

4       LSAC took a calculated risk in attempting to circumvent the requirements of the Orders and

5  failing to reasonably comply with those orders. LSAC compounded these violations with actions

6  taken in bad faith: using the inflated statistics on the number of requests granted in full to successfully

7  negotiate modifications of the court's orders with Plaintiffs. Carrasco Dec., ¶41.

8       Such risk taking has consequences. *McComb*, 336 U.S. at 193 (Defendants "took a calculated

9  risk when under the threat of contempt they adopted measures designed to avoid the legal

10  consequences of the Act. . . They knew full well the risk of crossing the forbidden line."). If, as LSAC

11  now contends, the Court's orders were "unworkable" (Opp'n at 4:12) they could have approached

12  Plaintiffs as they did when they negotiated a reduction in the number of outside consultants. Carrasco

13  Dec., ¶41. LSAC could have reconvened the Panel (Decree ¶7(d)(vi)) or sought modification of the

14  Orders. LSAC's failure to do so supports a finding of contempt. *See McComb*, 336 U.S. at 192 (cit.

15  omitted) (holding that "if there were extenuating circumstances or if the decree was too burdensome

16  in operation," respondents could have petitioned the court for a modification, but when they instead

17  "undertook to make their own determination of what the decree meant," they "acted at their peril.")

18  **IV. LSAC FAILED TO TAKE ALL REASONABLE STEPS TO COMPLY WITH THE**

19  **COURT'S ORDERS**

20       Even though LSAC persistently, flagrantly, and substantially violated the court's orders,

21  LSAC argues it does not matter. All that matters, LSAC contends, are other actions it took regarding

22  different provisions of the Orders. *See* Opp'n at 25:18-19. But this is not the test for contempt. Here,

23  contempt lies because LSAC has failed to prove that it took "all reasonable steps within [its] power to

24  insure compliance." *Hook v. Ariz. Dept. of Corr.*, 107 F.3d 1397,1403 (9th Cir. 1997); *Trans Ocean*

25  *Export*, 473 F.2d at 616 ("the respondent must show 'categorically and in detail' why he is unable to

26  comply"). LSAC does not assert that it took all reasonable steps; only that "LSAC has taken numerous

27  actions to comply with its obligations." LSAC's mere listing of 17 provisions LSAC *did* comply with

28  (six of which involve payment of money for pre-Decree discrimination) is merely an attempt to

COURT PAPER
State of California
**Std. 113**

1    obscure the multitude of violations that DFEH seeks to rectify through this motion.

2         LSAC would have the Court abandon the well-settled test for civil contempt and fashion a new

3    test that completely ignores whether a defendant repeatedly violated specific and definite court orders.

4    Here, LSAC's violations are so severe that some, even standing alone, support a finding of contempt.

5    These actions include denying DFEH access to records that it was specifically entitled to review. *See*

6    *Trans Ocean Export*, 473 F.2d 612 (holding defendant in contempt for failing to provide access to

7    records); *Kelly*, 822 F.3d 1085 (contempt where defendant violated provision regarding staffing levels

8    and submitted false reports). The fact that LSAC complied with other provisions and later changed an

9    offending policy does not excuse any of LSAC's past violations. *See Mannick*, 2006 WL 3734390, at

10   *13 (contempt where defendant, inter alia, did not make all reasonable efforts to complete

11   construction of an accessible patient room in compliance with Decree's 2005 deadline, but had

12   completed in 2006 prior to contempt hearing); *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376,

13   1379 (9th Cir. 1986) (contempt even though defendant had "implemented further inspection measures

14   to prevent such a mistake from occurring in the future."); *Sublime*, 2013 WL 3863960, at *5

15   (contempt for single performance of a single song in violation of order prohibiting such).

16        The "scale" of the harm caused by the 50% email practice also supports a contempt finding,

17   given how many students likely received the email. *Kelly*, 949 F.Supp.2d 1113-14 ("Defendants'

18   actions are simply not on the scale of the minimal harm caused by two erroneous phonebook listings

19   [referencing *Vertex*]"). Moreover, LSAC continues to violate the Decree by failing to engage in

20   interactive communications, in continuing to use the "no decision" category and in underreporting

21   requests which are denied. *See* Campa Dec.; Carrasco Reply Dec., ¶65, 69.

22        Court have found defendants in contempt in circumstances similar to those here. *See, e.g.,*

23   *Kelly*, 979 F.Supp.2d (contempt where defendant falsified records to show compliance); *In re Crystal*

24   *Palace*, 817 F.2d at 1365 (contempt for failure to execute sale as required by court order; contemnor

25   should have requested relief such as a stay from the court rather than disobey order), *Emma C*, 2001

26   WL 1180636, at *6 (contempt where defendant had yet to comply with 62.5% of decree items and

27   those items complied with involved the "least challenging activities" to obtain compliance); *Trans*

28   *Ocean Export*, 473 F.2d (contempt for failure to provide records and access to information).

COURT PAPER
State of California
Std. 113

-15-

On numerous occasions, the Ninth Circuit has affirmed findings of civil contempt where, as here, a defendant failed to take one or more reasonable steps to comply with a court order, even where the defendant made some effort to comply. *Hook*, 107 F.3d at 1403 (affirming contempt where defendant "did not demonstrate he took all the steps he could to avoid violating the district court's orders"); *Stone*, 968 F.2d at 853-54 (affirming contempt for city's failure to reduce jail population as required by court order, despite city's creation of a remedial plan and some implementation of it, due to city's failure to prove it had taken all reasonable steps to comply); *Richmark Corp. v. Timber Falling Consult.*, 959 F.2d 1468, 1479 (9th Cir. 1992) (affirming civil contempt where defendant made no "affirmative showing" that it had taken all reasonable steps to comply).

## V. A COLLATERAL ATTTACK ON THE DECREE IS IMPERMISSIBLE

LSAC laments that the requirements it agreed to implement "far exceed industry norms" and are "unworkable," disserve the interests of disabled examinees, and do not provide a framework LSAC could "reasonably operationalize." Opp'n at 4:11-14, 5:11-12. However, LSAC cannot avoid contempt by launching impermissible collateral attacks on the obligations it agreed to back in 2014. *Irwin v. Mascott*, 370 F.3d 924, 931 (9th Cir. 2004) (A party "may not challenge the merits of the underlying injunction in a contempt proceeding."); *Walker v. City of Birmingham*, 388 U.S. 307, 320 (1967) (attacks on an order or decree may not occur "in collateral proceedings").

## VI. THE RELIEF REQUESTED IS APPROPRIATE TO REMEDY LSAC'S CONTEMPT

This court has "broad equitable power to order appropriate relief in civil contempt proceedings." *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003). In fashioning an appropriate remedy, federal courts take into account "the character and magnitude" of the violation. *United States v. United Mine Workers of America,* 330 U.S. 258, 304 (1947).

The magnitude of LSAC's violations was seismic, both with respect to its duration (for virtually the entire time LSAC was required to comply with the Panel Report) and its scope (nationwide). LSAC *lied* to DFEH, the United States, and the Monitor about whether requests were granted in full and went on to use "granted in full" statistics to negotiate an advantage from Plaintiffs. Carrasco Dec., Ex 14. LSAC then denied DFEH access to the granted in full files which would prove LSAC's violations. LSAC committed hundreds of violations of multiple provisions of the Court's

1    orders, violating issues in nearly every category of the issues addressed in the Panel Report.

2        **A. The Decree Should be Extended by Two Years As A Compensatory Remedy**

3        The Decree should be extended by two years to compensate for the time that LSAC

4    systematically engaged in nationwide violations of the Orders. The Ninth Circuit has rejected LSAC's

5    contention that extension of a Decree "is not the type of 'compensation' that can support an exercise

6    of a court's civil contempt power." Opp'n at 17:6-7. As the Ninth Circuit explained:

7        We conclude the extension of the settlement agreement is a compensatory civil sanction.
         Rather than punishing CCA, this sanction sought to return Plaintiffs as nearly as possible
8        to the position they would have occupied had CCA not violated the agreement. The
         settlement agreement required CCA to provide a certain number of security personnel at
9        ICC for two years. CCA failed to provide the required number of personnel during that
         two-year period. By extending the settlement agreement for two years, the district court
10       thus ordered the relief to which Plaintiffs were originally entitled under the agreement but
         that CCA had failed to provide.
11

12   *Kelly*, 822 F.3d at 1097.

13       **B. The Monitor Should be Replaced and DFEH Is Entitled to Costs and Fees**

14       The current Monitor failed in his duties to assist the Plaintiffs and the Court. By his own

15   admission, he did not believe it was appropriate to "go[] behind the numbers" and thus failed to detect

16   any of the violations upon which DFEH's motion is based. Carrasco Dec., Ex. 9 at 5, n.6. It is

17   therefore appropriate for the Court to remedy LSAC's contempt by appointment of a new monitor, by

18   modifying the Decree or by invoking Fed. R. Civ. P. 53. *See Kelly*, 979 F.Supp. 2d at 1116

19   (appointment of independent monitor as remedy for civil contempt). "Federal courts repeatedly have

20   approved the use of special masters to monitor compliance with court orders and consent decrees."

21   *Stone*, 968 F.2d at 859 n. 18 (citations omitted).

22       DFEH does not dispute that the parties agreed to the Monitor. However, DFEH so agreed only

23   after the Monitor satisfied its concerns about his lacking certain critical competencies by assuring

24   DFEH that he could utilize staff to appropriately review and analyze the reports and after LSAC

25   agreed to pay for such staff. Given the Monitor's present admission that he did not "go[] behind the

26   numbers," he appears to have disregarded those representations, thus failing to conduct the required

27   "audit" as that term is commonly used.

28       LSAC contends that DFEH's and Professor Peter Blanck's criticism of the Monitor's report is



1  improper because of the independence and discretion afforded him by the Decree.[12] Opp'n at 28.

2  However, "[t]he purpose of the ADA Monitor is to assist the United States, the DFEH, and the Court

3  in evaluating LSAC's compliance with the Decree." Decree at ¶24. A general listing of information

4  collected, which lacks any methodology or analysis, is not sufficient to assist Plaintiffs in evaluating

5  LSAC's compliance. Dkt. 249-3 (Blanck Dec.), ¶27. LSAC further criticizes DFEH for providing

6  comments on the Monitor's draft report. Opp'n at 29:20-24. But what LSAC describes as "redlines"

7  were in fact primarily requests for further information regarding methodology and substantive analysis

8  – information that Plaintiffs needed to evaluate LSAC's compliance with the Decree. The Monitor's

9  failure to address the flaws in his report led Plaintiffs to review the records themselves in

10  Pennsylvania. Carrasco Dec., ¶21. That review, and further discussions with LSAC, made clear that

11  the Monitor failed to identify the violations which are the subject of this motion. For this reason, his

12  report should be disregarded. Fed. R. Evid. 401, 402.

13      LSAC attempts to excuse the Monitor's failure to detect LSAC's failure to report the names of

14  outside consultants based on the fact that DFEH detected the issue (and it was addressed) without the

15  Monitor's participation. However, the fact remains that the Monitor did not raise this issue in his

16  report. It is also clear that the Monitor violated the Decree by not providing detailed invoices. Decree,

17  ¶28 ("The ADA Monitor shall provide sufficiently detailed monthly invoices justifying any fees,

18  costs, and expenses.") LSAC argues this provision could be ignored because it was for LSAC's

19  benefit. Opp'n at 29:12-15. But nothing in the four corners of the Decree gave LSAC or the Monitor

20  the unilateral power to modify this term, and such detailed invoices would, in fact, provide DFEH

21  with critical information about his activities. Because the Monitor has not fulfilled his responsibilities

22  under the decree, DFEH respectfully requests that he be removed and a new monitor appointed.

23      **C. Increased Access to Records and DFEH Entitlement to Fees and Costs**

24      Plaintiffs should be given an additional 15 days of access to LSAC's files, DFEH should be

25  given nationwide access, and the court should rule on DFEH's entitlement to attorney's fees and costs.

26

27  [12] Professor Blanck is a nationally recognized expert in disability law and policy, as well as an
    experienced court monitor. Plaintiffs believed he was exceptionally qualified to serve as Monitor and

28  therefore proposed him to LSAC. For the same reasons that Plaintiffs believe that Professor Blanck
    was qualified to serve as the Monitor, we sought his expertise to evaluate Mr. Coleman's report.



1   DFEH is withdrawing the request for reimbursement for airfare and should this motion be granted,

2   and will instead meet and confer with LSAC regarding the amount of fees and costs.

3   **VII. DFEH MEETS THE REQUIREMENTS FOR MODIFICATION OF A DECREE**

4         To establish that a modification is appropriate the moving party must show that (1) there has

5   been a "significant change either in factual conditions or in the law" after execution of the decree; (2)

6   the change was not anticipated by the parties at the time of execution; (3) the change has made

7   "compliance with the consent decree more onerous, unworkable, or detrimental to the public interest;"

8   and (4) the proposed modification is "suitably tailored to resolve the problems created by" the change.

9   *Labor/Cmty Strategy Ctr v. L.A. Cty Metro. Transp. Auth.*, 564 F.3d 1115, 1120 (9th Cir. 2009).  The

10  court has inherent authority to modify an order based on consent of the parties due to changed

11  circumstances and to impose additional obligations on the defendant to ensure implementation of the

12  order. *Rufo v. Inmates of Suffolk Cty. Jail,* 502 U.S. 367, 384 (1992); *Hook*, 107 F.3d at 1397.

13        Here, (1) substantial noncompliance with the Orders constitutes "a significant change in

14  circumstances that would justify the decree's temporal extension." (*Labor/Community,*564 F.3d at

15  1120-21); (2) DFEH did not and could not have anticipated LSAC's noncompliance, Carrasco Dec.,

16  ¶42 (*see United States ex rel. Anti-Discrim. Ctr of Metro New York, Inc. v. Westchester Cty*, No. 06

17  Civ. 2860 (DLC), 2017 WL 728702, at *4-5 (S.D. N.Y., Feb. 23, 2017) (modifying decree where the

18  nonmoving party's noncompliance was a significant change that was "unexpected" because the

19  nonmoving party had duties to comply and to do so in good faith)); (3) LSAC's violations of the

20  Orders are detrimental to the public interest (*see City of Moorpark v. Super. Ct. of Ventura Cty.*, 18

21  Cal. 4th 1143, 1161 (1998) (California's public policy against discrimination based on disability is

22  "substantial and fundamental")); and (4) DFEH's two year extension is tailored to LSAC's nearly two

23  year violation of the Orders (*see Kelly*, 822 F.3d at 1098 (affirming two year extension to return

24  Plaintiffs to the position they would have occupied but for the contempt and rejecting the argument to

25  limit extension to certain decree terms only)).

26        One of the most frequent modifications federal courts make is to extend the deadline of a court

27  order based on a finding that the defendant has not fulfilled its obligations. *See, e.g., Mannick*, 2006

28  WL 3734390; *Kelly*, 822 F.3d at 1098. Indeed, modification is supported by a case cited by LSAC

COURT PAPER
State of California
**Std. 113**

1   itself, *Thompson*, 542 F.Supp. at 769 (Opp'n at 14:19-23) where the court, in declining to hold

2   defendant in contempt due to impossibility of compliance, instead modified the parties' decree.[13]

3          LSAC's reliance on *Labor/Cmt'y Strategy Ctr.* is misplaced. Opp'n at 27:8-28:1. In that case

4   Plaintiffs moved to extend the decree based on defendant's noncompliance with one decree provision,

5   but the district court denied the motion. *Id.* at 1116-17. The Ninth Circuit affirmed because the

6   plaintiffs failed to show noncompliance substantial enough to satisfy the first prong of the test for

7   modification of a court order. *Id.* at 1123. The court referred to defendant's noncompliance as "de

8   minimis" and stated that its conclusion was "strongly inform[ed]" by the fact that the situation had

9   improved "greatly" under the decree. *Id.* at 1123. In contrast, LSAC's noncompliance has been far

10  greater and has had more of a frustrating effect on the purposes of multiple court orders.[14]

11  **VIII. CONCLUSION**

12         LSAC should be held in civil contempt, the Decree modified, or an OSC issued.

13  Dated: February 2, 2018                    Respectfully submitted,

14                                             _____/s/_____

15                                             Mari Mayeda, Associate Chief Counsel

16                                             _____/s/_____

17                                             Joni Carrasco, Staff Counsel
                                               Attorneys for the Department

18

19  _____
    [13] The "heavy burden" standard set forth in *United States v. Asarco, Inc.,* 430 F.3d 972 (9th Cir. 2005)
20  cited by LSAC is not applicable here. Opp'n at 15:19-21. That standard applies "[w]hen a party
    anticipates changing conditions that would make performance of the decree more onerous." *Id.* at 984.
    DFEH not anticipate the "50% email" or "no decision" practices which to our knowledge did not exist
21  until after the Panel Report was issued and which we assume were adopted to circumvent the Panel
    Report once LSAC's appeal to this Court was for the most part rejected.
22  [14] Additionally, the *Labor/Community* court noted that its holding was consistent with a federalist
    principle limiting the duration of federal courts' intervention in state institutions. As LSAC is not a
23  state institution, federalism does not weigh against extending the decree. The other cases cited by
    LSAC are distinguishable and in fact support this Court's authority to modify the decree. Both *NLRB.*
24  *v. Harris Teeter Supermkts*, 215 F.3d 32, 35-36 (D.C. Cir. 2000), and *SEC. v. Worthen*, 98 F.3d 480,
    482 (9th Cir. 1996) involve defendants attempting to have their consent decrees vacated due to the
25  passage of time. In both cases, the courts denied the requests. In *Harris Teeter*, the defendant also
    argued for vacating its decree because it had not yet been found in violation of its obligation and had
26  taken measures to ensure compliance. 215 F.3d at 34. The court held that this was also not a
    "significant change of facts" justifying vacation of the decree. *Id.* at 36. The legal standard LSAC
27  derives from these cases is correct; modification is an "extraordinary remedy" reserved for
    "extraordinary circumstances." Opp'n at 16:1-4. But what these cases show is that LSAC's ongoing
28  violations and creation of new and unforeseeable devices to skirt its obligations constitutes proof of a
    significant change warranting modification.



**COURT PAPER**
State of California
**Std. 113**

REPLY RE PLAINTIFF'S MOTION FOR CIVIL CONTEMPT
3:12-cv-01830-JCS