ERIC A. HERZOG (BAR NO. 229066)
NORTON ROSE FULBRIGHT US LLP
555 South Flower Street, 41st Floor
Los Angeles, CA  90071
Telephone:    (213) 892-9200
Facsimile:     (213) 892-9494
eric.herzog@nortonrosefulbright.com

ROBERT A. BURGOYNE (pro hac vice)
CAROLINE M. MEW (pro hac vice)
PERKINS COIE LLP
700 13th Street, NW, Suite 600
Washington, D.C.  20005
Telephone:    (202) 654-1744
Facsimile:     (202) 624-9548
rburgoyne@perkinscoie.com

Attorneys for Defendant
LAW SCHOOL ADMISSION COUNCIL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING,<br><br>       Plaintiff,<br><br>v.<br><br>LAW SCHOOL ADMISSION COUNCIL,<br><br>       Defendant.<br>_____<br><br>THE UNITED STATES OF AMERICA,<br><br>       Plaintiff-Intervenor,<br><br>v.<br><br>LAW SCHOOL ADMISSION COUNCIL,<br><br>       Defendant. | No. CV 12-1830-JCS<br><br>**LSAC'S POST-HEARING BRIEF REGARDING THE COURT'S TENTATIVE RULING ON DFEH'S MOTION FOR CIVIL CONTEMPT OR, IN THE ALTERNATIVE, MODIFICATION UNDER RULE 60(B)(5)**<br><br>Date:      February 23, 2018<br>Time:     9:30 a.m.<br>Location: Courtroom G (15th Floor)<br>Judge:    Hon. Joseph C. Spero |

At the hearing held in this case last Friday, the Court announced its tentative ruling on DFEH's Motion for an Order Holding Defendant in Civil Contempt and in the Alternative for Modification of the Consent Decree or an Order to Show Cause Re Civil Contempt (Dkt. 254). This brief provides supplemental information that LSAC respectfully asks the Court to consider before entering a final decision.

The tentative ruling announced by the Court was that LSAC violated certain obligations imposed by the Consent Decree, to a degree that warrants a finding of civil contempt, and that the appropriate remedy is a two-year extension of the Decree's term. With respect, LSAC strongly disagrees with this tentative ruling.

For almost four years, LSAC has conscientiously performed its obligations under the Consent Decree and the report of the "Best Practices" panel. This includes drastically altering its accommodation policies and practices, cooperating fully with the ADA Monitor in his review of LSAC's compliance with the Decree, generating voluminous reports after every examination, processing over 14,000 requests for accommodations, and providing testing accommodations to thousands of LSAT examinees across the United States.

To do this, LSAC staff had to put procedures in place that operationalized the terms of the Decree and the panel's guidelines -- guidelines that, as the Court has noted, are anything but "simple." *See* Dkt. 245 at p. 31; *see also* Dkt. 268-1 at pp. 33-62 (panel report). The procedures reflected good faith interpretations of the Decree and panel report[1] and allowed LSAC to process -- in a timely and effective manner -- an ever-increasing volume of accommodation requests. As LSAC has noted, no other testing organization in the country is required to comply with the complex accommodation policies and procedures and compressed deadlines imposed on LSAC by the Decree and "best practices" panel. Nor has any other testing organization voluntarily adopted those policies and procedures, despite their "best practices" label.

---

[1] *See Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) ("[A] person should not be held in contempt if his action 'appears to be based on a good faith and reasonable interpretation of the court's order.'") (citation omitted).

91471622.1

- 1 -

DOCUMENT PREPARED ON RECYCLED PAPER

The overarching purpose of the Americans with Disabilities Act is to ensure that disabled test-takers are provided with the accommodations they need to take an examination in an accessible manner. LSAC has been, and will continue to be, committed to respecting the rights of disabled individuals who take the LSAT. Thousands of examinees have received testing accommodations over the life of the Decree, including extra testing time, private testing rooms, extended breaks, additional breaks, readers, scribes, auxiliary aids, special test formats, and other types of accommodations.

DFEH's Motion does not go to the substance of LSAC's accommodation decisions. Instead, DFEH has objected to certain practices that LSAC used to implement the Decree and panel report, most of which LSAC voluntarily discontinued following notice of DFEH's concerns and participation in the dispute resolution process agreed to by the parties in the Decree. *See* Decree ¶ 31.

The Court's tentative finding of civil contempt is grounded in (1) LSAC's sending "50% emails" to a relatively small number of examinees, and (2) LSAC's use of the phrase "no decision" in reporting the outcome of requests where LSAC had, in fact, made no decision. As explained at the hearing, LSAC made no decision on a request when a candidate (a) had not registered to test (as candidates are required to do before requesting accommodations), (b) had missed a deadline for requesting accommodations or providing supporting documentation, or (c) had not provided baseline documents that LSAC had the right to request under the terms of the Decree and panel report.[2]

---

[2] The "no decision" designation has been included since 2015 on the reports that LSAC provides to DOJ and DFEH after each test administration, with an explanation for why no decision was made. *See* Decl. of Caroline Mew at ¶¶ 16-18, Ex. A at 7, Ex B. at 17-18, Ex. C at 45, Ex. D at 5-6, and Ex. E (Dkt. 268-2). Because no decision was made, there was no LSAC decision to send out for external review. The "no decision" approach was discussed with DFEH in 2015 as part of an earlier invocation of the dispute resolution process provided for in the Decree. *See id.* If DFEH believed that any aspect of LSAC's ongoing use of the "no decision" designation violated the Decree, the Decree called upon DFEH to "promptly" notify LSAC. Consent Decree ¶ 31. DFEH, however, waited two years before raising the "no decision" issue again, after LSAC reasonably thought the issue had been resolved. Consistent with LSAC's understanding on that point, DFEH referenced LSAC's use of the "no decision" designation when it provided written comments to the ADA Monitor on his draft report, but it did not suggest that LSAC's use of the designation violated the Decree or panel report. *See* Dkt. 249-2 at p. 43 ("Information regarding LSAC's treatment of testing accommodation requests (*e.g.*, whether granted in part or whole, denied, or given 'no decision') … may be extracted from these data reports").

DOCUMENT PREPARED ON RECYCLED PAPER

The Court noted during the hearing various ways in which it believes the 50% emails and "no decision" designation violated the Decree or panel report (*e.g.*, by denying candidates the opportunity for external review, and because LSAC was not reporting all instances in which "additional documentation" had been requested by LSAC).[3] The Court also noted its tentative finding that LSAC violated the Decree by not providing DFEH access to all the "granted in full" files that it asked to review at LSAC's offices.[4] At bottom, however, the Court's tentative ruling was grounded in LSAC's sending 50% emails and its use of the no-decision designation. The information that follows therefore provides additional facts regarding "50% emails" and the "no decision" designation.

## I.  BACKGROUND FACTS

### A.  Number of Accommodation Requests Processed by LSAC

LSAC noted in its prior brief (filed in early January) that there has been a significant increase in the number of accommodation requests since the Decree went into effect. The chart attached hereto at <u>Exhibit 1</u> provides updated and more detailed information. As shown, the number of accommodation requests submitted to LSAC has increased from 1,473 requests in

---

[3] The Decree requires LSAC to track and report "whether LSAC requested additional documentation from the candidate." Decree ¶ 8.a (j). It does not define "additional documentation." LSAC understood this to mean documentation that is in addition to the information called for by the forms that LSAC's counsel provided to the Court during the hearing; those forms solicit the baseline information that the panel identified as appropriate for the three categories of accommodation requests that it established. *See* Panel Report, Dkt. 268-1 at pp. 35-40; *see also* Dkt. 245 at 10-11 (Court's discussion of the panel's documentation guidelines). Based upon this understanding, LSAC did not include in its reports to DFEH and DOJ instances in which it notified a candidate, by way of a 50% email, that information called for by the panel's baseline "documentation requirements" had not been provided by the candidate. LSAC's understanding in this regard appears to be consistent with the panel's understanding. As used by the panel, a request for "additional information" is a request for information other than the information that is called for by the "documentation requirements" established by the panel. *See* Dkt. 268-1 at 38, 39 and 40 ("*If a candidate meets these documentation requirements* [(as set forth for Category 1, Category 2 or Category 3 requests)], … LSAC shall approve the requested testing accommodations, *without requiring the candidate to provide additional information*.") (emphasis added). LSAC did not violate "a specific and definite order of the court" in this regard, because the term "additional documentation" is not defined in the Decree and LSAC's interpretation is consistent with the panel's discussion of requests by LSAC for "additional information."

[4] *But see* DFEH Motion at 10 (Dkt. 254) (acknowledging that the Decree gives the ADA Monitor broader access rights than DFEH); 10/29/15 Email Message from DOJ's Counsel to LSAC's Counsel, Dkt. No. 249-2 at 30 ("The decree grants the Monitor access to 'LSAC staff, facilities and documents' to which the plaintiffs are not privy.").

DOCUMENT PREPARED ON RECYCLED PAPER

testing year 2013-2014 (the testing year immediately preceding entry of the Decree), to 5,505 requests in testing year 2017-2018 -- an increase of almost 375%.

The chart breaks the requests down based upon the primary disability reported by the candidate as the basis for the request. In the last testing year, for example, Attention-Deficit/ Hyperactivity Disorder (ADHD) was far and away the primary impairment relied upon by candidates to support their request for accommodations.

What the chart does not reflect is the increasing number of instances in which candidates request not just extra testing time, as had historically been the case, but also numerous additional accommodations. For example, one of DFEH's declarants requested 16 accommodations -- all of which had to be evaluated, arranged for if approved, and then separately addressed by LSAC in the reports that the Decree requires after each test administration. *See* Dkt. 249-4 at ¶ 4 (candidate requested 100% additional time, use of a computer for the writing sample, a non-Scantron answer sheet, additional 20 minutes of rest time, 10-minute breaks between test sections, reading ruler, isolated test setting, scratch paper, ability to mark answer choices in the test booklet, silent timer, ear plugs, medication in the test room, drinks and snacks, use of spell check, stop-the-clock breaks, and the ability to stretch and pace around the testing room).

### B. 50% Emails

Under the Decree's current four-year term, 17 administrations of the LSAT will be governed by the Decree, beginning with the June 2014 LSAT and ending with the June 2018 LSAT. "50% emails" were used as part of the processing of accommodation requests on 7 of those 17 administrations (from the February 2016 LSAT to the September 2017 LSAT). A handful of 50% emails were also sent in processing accommodation requests for the December 2017 LSAT, before LSAC voluntarily stopped sending them after participating in the Decree's dispute resolution process. LSAC thus used 50% emails for less than two years, and with respect to **8 of the 17 administrations.** *See generally* Decl. of Dr. Kim Dempsey at ¶ 53 (Dkt. 268-1).

Based upon a search of its electronic records, LSAC believes that approximately **859 individuals** received 50% emails from LSAC, of whom roughly **124 individuals** were California examinees (and 73 were from Canada). *See* Supplemental Decl. of Dr. Kim Dempsey ¶ 3

DOCUMENT PREPARED ON RECYCLED PAPER

(attached hereto as Exhibit 2). By way of comparison, LSAC has processed over **14,000** requests for accommodations under the Decree to date.[5] See id. Some of those 859 individuals qualified for automatic approval of certain of their requested accommodations under Paragraph 5(a) of the Decree, while others were governed by Paragraphs 5(b) through 5(d) of the Decree. Per the panel report, the latter candidates could be asked to provide certain baseline documentation before their request was properly viewed as "complete" and subject to substantive review. See Panel Report, Dkt. 268-1 at p. 37 ("The Panel recommends that LSAC shall consider a file complete if it meets the documentation requirements of at least one of the [three] categories noted below….") (discussion of Issue 2, "Documentation"); and p. 55 ("The Manager of Accommodated Testing shall make a decision to approve or deny requested accommodations within 4 working days of LSAC staff designating a file as being 'complete.'") (discussion of Issue 8, "Automatic review of partial and full denials").

The 50% emails alerted candidates that information was missing from their request (often with a link to the form that requests the information they had neglected to submit). See Dempsey Decl. ¶¶ 53-58 (Dkt. 268-1).

### C. "No Decision" Requests

During the hearing, the Court asked how many people had their accommodation request reported by LSAC as "no decision." LSAC's counsel only had data regarding the December 2017 test at that time. LSAC has since reviewed its electronic records and provides the following additional data: starting with the June 2015 LSAT administration and extending through the September 2017 administration, LSAC believes that a total of approximately 87 requests were categorized as "no decision" because the candidate had not registered to take the LSAT; 921 were categorized as "no decision" because the candidate missed a deadline; and 748 were categorized as "no decision" because the candidate did not provide one or more pieces of baseline information

---

[5] The 14,000 requests include multiple requests from some individuals. That means that the number of individuals who have submitted requests over the life of the Decree is lower. Based upon figures for the most recent testing year, LSAC estimates that the number of individuals who have requested accommodations during the Decree's term is closer to 9,000. See Supp. Dempsey Decl. ¶ 4 (Ex. 2 hereto).

DOCUMENT PREPARED ON RECYCLED PAPER

called for under the best practices report, which LSAC requested by way of the Candidate Form, the Evidence of Disability form, and the Statement of Need form. *See* Supp. Dempsey Decl. ¶ 5 (Ex. 2 hereto).

As part of the meet-and-confer/dispute resolution process called for by the Decree, LSAC, DFEH and DOJ agreed that LSAC would report late requests or requests made when the candidate was not registered to test as "denials," but these requests would not be subject to the initial external review or the appeal process set out in the best practices report (thereby amicably resolving an issue as to which the Decree and panel report did not provide specific and definite guidance). *See* Mew Decl., Ex. L, Ex. M (Dkt. 268-2). In LSAC's report for the December 2017 administration, the only requests reported as "no decision" were those with insufficient documentation. There were 71 candidates with "no decision" requests in this report, 46 of whom did not submit a Candidate Form. The Candidate Form sets out basic information needed to initiate a request, such as the test on which accommodations are requested, the nature of the candidate's impairment, the accommodations the candidate is requesting, and the candidate's certification that the information provided on the form is correct. *See* Dempsey Decl., Ex. O (Dkt. 268-1).

### D. Relevance of Background Facts to DFEH's Motion

The question whether LSAC should be held in contempt must be evaluated against the background facts set forth above. To date, LSAC has processed over 14,000 requests for accommodations under the Decree and approved accommodations for the overwhelming majority of those individuals. That is on top of its unquestioned performance of its many other obligations under the Decree. Taking a "holistic" view and giving "due weight" to "the many ways [LSAC] met or exceeded its obligations" under the Decree, LSAC should be found to have substantially complied with both the Decree and the panel guidelines. *See Labor/Cmt'y Strategy Ctr. v. L.A. Cty. Metro. Transp. Auth*., 564 F.3d 1115, 1122 (9th Cir. 2009). This case is "nowhere close to the near total noncompliance in cases in which courts concluded that extensions of the consent decree were warranted." *Id*. at 1122-23.

## II. IF THE DECREE IS EXTENDED, IT SHOULD BE EXTENDED BY WAY OF RULE 60(B)(5), NOT AS A REMEDY FOR CIVIL CONTEMPT, AND THE PERIOD OF THE EXTENSION SHOULD BE ONE YEAR, NOT TWO

LSAC believes that there is no basis for extending the decree. However, if the Court remains of the view that an extension is warranted, LSAC respectfully urges the Court to base the extension on DFEH's alternative grounds for relief -- Fed. R. Civ. P. 60(b)(5) -- rather than extending the decree as a remedy for civil contempt. *See* DFEH Motion at 23-24. A finding of civil contempt suggests that LSAC willfully violated a court order, as DFEH has argued. The facts, however, do not support any such inference. The facts support at best errors in implementing a complicated review process, but not a contemptuous refusal to comply. *See generally* Dempsey Decl. ¶¶ 5-59, 75-82 (Dkt. 268-1).

LSAC also urges the Court to extend the Decree for only one year. LSAC used 50% emails while processing accommodation requests on 7 test administrations (with a handful of emails also sent in connection with an 8th administration). LSAC will have 8 test administrations in testing year 2018-2019. Extending the Decree one year would thus ensure that the Decree remains in effect for the same number of additional test administrations that corresponds to the number of administrations as to which LSAC sent 50% emails.

## CONCLUSION

LSAC requests that the Court reconsider its tentative ruling and deny DFEH's Motion. Alternatively, LSAC urges the Court to base any extension of the Decree on Fed. R. Civ. P. 60(b)(5), not on a finding of civil contempt, and to extend the Decree for one year instead of two.

Respectfully submitted,

PERKINS COIE LLP

By: /s/ Robert A. Burgoyne

Attorneys for the Law School Admission Council

DOCUMENT PREPARED ON RECYCLED PAPER