UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEPARTMENT OF FAIR EMPLOYMENT
AND HOUSING,

               Plaintiff,

     v.

LAW SCHOOL ADMISSION COUNCIL
INC,

            Defendant.

Case No. 12-cv-01830-JCS

**ORDER REGARDING MOTION FOR
CONTEMPT AND MOTION TO
EXCLUDE CONCLUSIONS OF
DECREE MONITOR**

Re: Dkt. Nos. 250, 254

## I.  INTRODUCTION

The present motions arise from a consent decree entered by the Court in 2014 (the

"Consent Decree" or "Decree," dkt. 203) on the joint motion of Defendant Law School Admission

Council, Inc. ("LSAC") and Plaintiffs, the California Department of Fair Employment and

Housing ("DFEH") and the United States, regarding LSAC's procedures to accommodate

individuals with disabilities taking the Law School Admission Test (the "LSAT").  DFEH now

moves for an order holding LSAC in contempt, arguing that LSAC has failed to comply with the

Consent Decree and with procedures established by a panel of experts pursuant to the Decree.

DFEH also brings a motion in limine to exclude the opinions of Arthur Coleman, an independent

monitor appointed under the Decree.  The Court held a hearing on February 23, 2018.  For the

reasons discussed below, DFEH's motion for contempt is GRANTED in part, and DFEH's motion

in limine is DENIED.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all
purposes pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Overview and Procedural History

DFEH brought this action against LSAC in state court in March of 2012, alleging that LSAC's process for considering requests to accommodate disabilities by individuals seeking to take the LSAT violated the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101–213, and in doing so also violated California's Unruh Civil Rights Act, Cal. Civ. Code § 51. LSAC removed to this Court, and the Court granted the United States' motion to intervene as a plaintiff in October of 2012. *See* dkt. 60. A number of individual plaintiffs who had requested accommodation on the LSAT also joined the case.

The parties reached a settlement, and on May 29, 2014, this Court, the Honorable Edward Chen presiding, issued an order granting the parties' joint motion to enter a Consent Decree and dismiss the action with prejudice. Dkt. 202. As discussed in more detail below, the Consent Decree called for payment of damages to individual plaintiffs and other individuals who had sought accommodation on the LSAT,[2] altered certain aspects of how LSAC treated requests for accommodations and reported scores for tests taken with accommodations, delegated other issues of how to treat such requests to a panel of experts selected by the parties (the "Panel"), imposed recordkeeping and reporting requirements, granted DFEH and the United States limited access to LSAC's records, and called for the appointment for a monitor (the "Monitor" or "ADA Monitor") to audit LSAC's compliance, among other effects. *See generally* Consent Decree. Except for LSAC's agreement not to annotate whether tests were taken with accommodations in score reports that LSAC provided to law schools, the Consent Decree limited its effects to a term of four years. *Id.* ¶ 30.

After the Panel established by the Consent Decree issued its report (the "Report" or "Panel Report," dkt. 220-2) calling for changes to LSAC's procedures, LSAC appealed to the Court, arguing that the report exceeded the Panel's authority under the Decree. *See generally* Appeal

---

[2] The individual plaintiffs are no longer parties to the case. For the purpose of LSAC's ongoing obligations under the Consent Decree, the remaining parties are LSAC, DFEH, and the United States.

(dkt. 220).  On consent of the parties, the case was reassigned for all purposes to the undersigned magistrate judge, who had previously overseen the parties' settlement discussions.  *See* dkts. 240–44.  The Court largely upheld the Panel's Report in an order dated August 7, 2015.  *See* Order Granting in Part & Denying in Part Appeal of Best Practices Panel Report ("Appeal Order," dkt. 245).[3]

With the scheduled lapse of the Consent Decree on May 29, 2018 approaching, DFEH now moves for an order holding LSAC in contempt for failing to comply with the Consent Decree, the Panel Report, and the Court's order on LSAC's appeal from the Report, and asks that this Court: (1) extend the term of the Consent Decree, on a nationwide basis, by two years; (2) replace the ADA Monitor and require quarterly audits; (3) grant DFEH and the United States additional access to LSAC's records; and (4) award DFEH its attorneys' fees and costs.  *See generally* Contempt Mot. (dkt. 254).  In the alternative, DFEH seeks the same relief based on the Court's authority to modify the consent decree pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.  *See id.*  DFEH also moves to exclude the conclusions and testimony of the Monitor appointed under the Consent Decree, Arthur Coleman.  *See generally* Mot. to Exclude (dkt. 250).  LSAC opposes both motions, and the United States has not taken a position on either motion.[4]

## B.    Consent Decree

As noted above, the Consent Decree encompasses a wide range of issues ranging from monetary relief for individual plaintiffs to LSAC's recordkeeping requirements.  This section briefly summarizes the provisions implicated by the present motions.

Paragraph 5 of the Consent Decree classifies requests for accommodations into two

---

[3] *Dep't of Fair Emp't & Housing v. Law Sch. Admissions Council, Inc.*, No. 12-cv-01830-JCS, 2015 WL 4719613 (N.D. Cal. Aug. 7, 2015).  Citations herein to the Court's previous order refer to page numbers of the version appearing in the Court's ECF docket.

[4] At the hearing, counsel for the United States—the Chief of the Civil Division of the United States Attorney's Office for this district—informed the Court that the Civil Rights Division of the Department of Justice did not authorize the United States to take a position.  Counsel stated that she believed the United States' non-position to be a reasoned decision by the Civil Rights Division that would not change if given more time.  The Court notes as a point of interest, but does not rely on, the fact that the United States largely joined DFEH's current position in correspondence sent to LSAC before DFEH filed the present motion.  *See, e.g.*, Carrasco Decl. (dkt. 255) Ex. 15 (letter dated May 17, 2017, jointly signed by DFEH and the United States on Civil Rights Division letterhead).

groups. The first group consists of applicants seeking certain accommodations that they have previously received on "any standardized examination offered in the United States related to applications for post-secondary admission." Consent Decree ¶ 5(a). LSAC must grant those accommodations so long as: (1) the applicant provides proof that the sponsor of the earlier test granted the accommodation; (2) the applicant checks a box certifying that the applicant continues to experience the functional limitations that required accommodation; (3) the accommodation at issue is either an extension of time, up to double time, or a non-time accommodation listed in Exhibit 1 to the Consent Decree; and (4) the accommodation would not require administering testing on more than one day. *Id.*

All other requests for accommodation are governed by Paragraphs 5(b) through 5(d). LSAC's requests for documentation supporting such requests must be "reasonable and limited to the need for the testing accommodation requested." *Id.* ¶ 5(b). LSAC must "consider all facts and explanations offered by the candidate," must "give considerable weight to documentation of past testing accommodations received in similar testing situations not covered by Paragraph 5(a)" or in the context of certain formal special education settings, and must "consider documentation provided by a qualified professional who has made an individualized assessment of the candidate." *Id.* ¶¶ 5(d)(i)–(iii) (footnote omitted). Many of the parameters and procedures for such requests were delegated to the Panel.

The Panel consisted of "five experts: two selected by LSAC; two selected by the United States and the DFEH; and a fifth selected by those four experts from a list prepared by the United States and the DFEH." Consent Decree ¶ 7(a). Each member had expertise in standardized testing accommodations, cognitive disabilities, or ADA compliance. *Id.* The Panel was charged with preparing "a written report establishing Best Practices that comport with the requirements of 28 C.F.R. § 36.309, all of which LSAC shall implement to the extent that it is not already following such Best Practices." *Id.* ¶ 7(b). Issues delegated to the Panel included how LSAC should diversify its outside consultants, what documentation LSAC may request to support requests for accommodations, the qualifications of LSAC's staff and outside consultants who review such requests, whether more than one person should review such requests, "criteria and

4

guidelines for use by persons who review" such requests, the parameters for documenting review of and decisions on such requests, the parameters for explaining decisions to applicants, if and how LSAC should automatically review full or partial denials of requests, what if any appeal process should be available to applicants, and the parameters for training LSAC's staff and outside consultants. *Id.* ¶ 7(c). The Panel was to provide a report within six month after all of its members were appointed, and the parties had a right to appeal to the Court if the Panel's recommendations conflicted with the Consent Decree or applicable law. *Id.* ¶ 7(d). As discussed below, LSAC invoked that right in 2015. Any party could also reconvene the Panel and request changes to its Report after the first administration of the LSAT implementing the Panel's initial conclusions. *Id.* ¶ 7(d)(vi). The record does not reflect any party having invoked that provision.

The Consent Decree also requires LSAC to appoint an ADA Monitor (as discussed in more detail below in the summary of the Monitor's activities) and to maintain records tracking, among other information, applicants' requests for accommodations, whether LSAC requested additional documentation, whether LSAC granted or denied each accommodation requested in full or in part, and reasons for any denials. *Id.* ¶ 8(a). LSAC must provide that data in reports to the ADA Monitor, DFEH, and the United States after each administration of the LSAT, and must also provide annual reports discussing its efforts to comply with the Decree and any difficulties that it has faced. *Id.* ¶ 23. LSAC must maintain "appropriate supporting records for the information contained in the Reports," and must provide DFEH, the United States, and the Monitor access to such records "upon reasonable request." *Id.* The Decree also more broadly grants the Monitor access to all of LSAC's records and staff relevant to evaluating compliance, and states that LSAC "will provide" DFEH and the United States "with access to data underlying the ADA Monitor's Audit Reports," and "may provide" DFEH and the United States "with access to additional information as reasonably requested." *Id.* ¶ 26(a). Access is limited to reviewing documents at LSAC's office in Pennsylvania for no longer than five business days, following ten days' written notice, and DFEH's access is further restricted to "documents and information pertaining to individuals who tested in California." *Id.* ¶¶ 23, 26(a).

The Court retained jurisdiction to enforce the Consent Decree. *Id.* ¶ 30. "The United

States, the DFEH, and/or LSAC may apply to the Court for such further orders as may be necessary for, or consistent with, the enforcement of [the] Decree." *Id.* If disputes arise regarding "compliance with, interpretation of, or implementation of the terms of [the] Decree," and a process for resolving such disputes among the parties is unsuccessful, "any of these Parties may pursue the issue with the Court." *Id.* ¶ 31. "Failure by any Party to seek enforcement of this Decree pursuant to its terms with respect to any instance or provision will not be construed as a waiver of such enforcement with regard to other instances or provisions." *Id.* ¶ 37.

### C. Best Practices Panel Report and Court Order on Appeal

As noted above, the Consent Decree provides that "LSAC shall implement" the best practices established by the Panel, except to the extent that such practices conflict with the Consent Decree or applicable law. *See* Consent Decree ¶ 7(b). The portions of the Panel's Report most applicable to the current dispute relate to the procedures LSAC must use when it denies an applicant's request for accommodations in full or in part.

The Report lays out a process for first-level review as follows:

> The Disabilities Specialist [(an LSAC employee)] shall review each file and make a recommendation whether to approve the requested accommodations in full, to approve in part, or to deny in full. He or she will then prepare a written summary based on a checklist of decision-making criteria . . . that explains the reasoning for that decision, using a holistic approach to the file.

Report at 22. After the "first-level review" by the Disabilities Specialist, the Report provides that another existing LSAC employee, the Manager of Accommodated Testing (the "Manager"), shall review the file and either "approve the requested testing accommodation in full, or write a clear rationale explaining the decision not to approve a testing accommodation in full." *Id.* at 22–23. If the Manager approves the request in full, the written summaries prepared by LSAC staff "shall be retained in LSAC's records to be reviewed in the future for consistency or training purposes," and LSAC shall notify the applicant that the request was approved. *Id.* at 23.

If the Manager determines that a request should be denied in full or in part, the Report sets forth a procedure for automatic external review. LSAC must transmit the file to an outside consultant of its choice who has relevant expertise and agrees to review the file within two

working days. *Id.* The outside consultant must then review the file and reach a conclusion to agree with the candidate's request in full, agree in full with LSAC's full or partial denial, or suggest a partial approval falling between the candidate's request and LSAC's position. *Id.* "The outside consultant will provide a justification of his or her decision in writing." *Id.* If the consultant agrees with the candidate in full, then the "consultant's determination will become the final determination of LSAC for that candidate's request." *Id.* at 23–24. Otherwise, the file goes to a second consultant selected by the same process, who may either approve the request in full or endorse the position of the first consultant. *Id.* at 24. The second consultant must also justify his or her decision in writing. *Id.* "Where a second outside consultant is used . . . the decision by the second outside consultant is the final decision on the request for testing accommodation." *Id.*

LSAC must notify the candidate of a final decision that denies a request in full or in part, and must provide an opportunity for the candidate to appeal. *Id.* at 24, 25. If the candidate appeals and LSAC elects not to grant the accommodation in response to the appeal, LSAC must transmit the appeal and the candidate's file to another outside consultant for review under a process similar to that described above, but with a twenty-four hour deadline. *Id.* at 28. That consultant may approve the request in full, approve in part (but not less than LSAC's initial determination), or concur with LSAC's initial decision. *Id.* at 28. If the consultant does not grant the request in full, the appeal goes to another consultant—the fourth overall, and the second on the appeal—who has twenty-four hours to "choose between the recommendation of the first outside appeals consultant and the candidate's request." *Id.* LSAC must provide the result to the candidate within one week of the candidate submitting the appeal. *Id.* at 26. "LSAC will never refuse to provide the results of an appeal (or a full consideration) because there is insufficient time to implement the requested testing accommodation for that examination cycle, unless the candidate indicates that he or she would like to terminate the testing accommodation request." *Id.*

The Panel repeatedly emphasized that LSAC must provide a clear explanation of any denial regardless of whether the denial was based on a lack of documentation, and that LSAC must inform candidates of the option to appeal:

> In cases where the candidates' requests for testing accommodations are not approved in full, the candidates shall be informed, in writing, why each of their requests for testing accommodations are not approved in full [footnote], and what additional information, if any, could lead LSAC to approve their requests in the future. An explanation of the appeals process . . . shall be included in all correspondence to candidates whose requests for testing accommodations are not approved in full.

*Id.* at 21. The footnote in that section reads as follows:

> The phrase "not approved in full" is intended to include situations where LSAC denies a testing accommodation request due to a lack of documentation. Such denials will be subject to the outside consultant review rules.

*Id.* at 21 n.11. In an earlier section of the Report, the Panel required that "[i]n cases where the reviewer concludes there is a lack of documentation, the reviewer shall provide a clear statement of what additional documentation is necessary so that the request for testing accommodation could be considered in the future." *Id.* at 11–12.

The Panel addressed the topic of notice to candidates again after describing the internal review process:

> The letter will address those aspects of the documentation and request for testing that contributed to the decision. Quoted statements from the written summaries and checklist indicators [by internal and external reviewers] shall form the content of these letters. In this manner, the process will be a transparent and objective one that is communicated to the candidate. The letter shall also include clear suggestions, with examples, for any additional information that might be helpful in the appeal process. Additionally, an explanation of the appeals process . . . shall be included in all correspondence to candidates whose requests for testing accommodation were not approved in full.

*Id.* at 24. The Panel further discussed such communications in the section of its Report addressing the appeal process:

> When a candidate is notified that his or her request for testing accommodation has not been approved in full, the candidate shall receive within one business day a comprehensive decision letter explaining the rationale for the denial using language described in the internal and consultant written summaries as described above. The candidate will then be provided [at least one day to indicate the candidate's intent to appeal and] at least four days to submit an appeal.
>
> [. . .]

8

> The result of the appeal shall be provided to the candidate within one week of the submission of the appeal. LSAC will never refuse to provide the results of an appeal (or a full consideration) because there is insufficient time to implement the requested testing accommodation for that examination cycle, unless the candidate indicates that he or she would like to terminate the testing accommodation request.

*Id.* at 25–26.

The Panel also required LSAC to keep records of how often decisions to deny requests for accommodation were reversed on further review, so that relevant staff members could receive remedial training if their reversal rates exceeded 25% during a particular test cycle. *Id.* at 30.

When LSAC appealed the Panel's recommendations to this Court, it did not directly challenge the Panel's conclusions regarding the issue of if and how LSAC should provide written explanations to candidates who are denied accommodations. *See* Appeal Order at 6. LSAC challenged much of the procedure set by the Panel for internal review and appeals of denials, but the Court largely declined to alter the Panel's prescriptions on those topics. *Id.* at 28–40. The Court's limited modifications to those topics were as follows: (1) LSAC need not comply with specific time limits for LSAC's internal staff to complete their reviews, although LSAC must nevertheless complete its review in time to allow for external review and, in the case of applications submitted by the normal registration deadline, in time to allow for appeal; (2) LSAC need not necessarily hire additional staff, but could determine for itself how it would fulfill its obligations; (3) LSAC need not provide second-level review of initial decisions to *grant* accommodation requests, or notify applicants of such decisions within one business day; and (4) in the case of requests submitted after the initial registration deadline but before the "late registration" deadline, LSAC need not provide time for an appeal before the upcoming test administration, but may instead defer consideration to the next test date if applicants chose to appeal a denial. *Id.* at 43–44 (summarizing the Court's modifications to the Panel Report). Although the Report established a number of presumptions about how requests for accommodation should be treated under particular circumstances, the Court interpreted the Report as preserving reviewers' discretion to depart from those presumptions so long as they explained in detail why, in their professional opinions, a different outcome was warranted. *Id.* at 21–23, 42–43.

### D. LSAC's Handling of Requests for Accommodation

The Consent Decree became effective when signed by the Court on May 29, 2014, and after the Court issued its order on LSAC's appeal of the Panel's Report, the parties agreed that LSAC would implement the Report beginning with the December 2015 administration of the LSAT. *See* Carrasco Decl. (dkt. 255) Ex. 9 at 1. In the years since the Consent Decree went into effect, the number of people taking the LSAT has not changed significantly, but the number of requests for accommodations has increased to more than three times the number of pre-Decree requests ranging from 1,474 requests for the 2013–2014 testing year to "at least 5,372" requests for the 2017–2018 testing year. Dempsey Decl. (dkt. 268-1) ¶¶ 7–10. DFEH's counsel Joni Carrasco states that, based on a review of LSAC's reports for the December 2015 through December 2017 administrations of the LSAT, LSAC has referred only approximately seventy candidates' accommodation requests to outside consultants for review, and has processed only eight appeals. Carrasco Reply Decl. (dkt. 271-1) ¶¶ 63–64.

LSAC requires certain basic documentation to support requests for accommodation, including a candidate form, evidence of a disability, and an explanation of the candidate's need for the accommodations requested. Dempsey Decl. ¶¶ 35–39, 43–46. If candidates did not submit that documentation, LSAC did not process their requests for accommodation. *Id.* ¶¶ 44–48. LSAC initially left the field to indicate the result of such requests blank in its reports, and Plaintiffs objected to that practice on the basis that LSAC was effectively denying those requests. Mew Decl. re Contempt (dkt. 268-2) Exs. A–D. LSAC began to list such requests as "no decision" in its February 2015 report, and Plaintiffs indicated that the issue of blank fields had been resolved. *Id.* ¶ 18 & Ex. E. LSAC continued to report such requests as "no decision," with an explanation for why it purportedly did not reach a decision, through the September 2017 LSAT. *Id.* ¶¶ 18–28. LSAC did not provide multi-level review or an opportunity appeal its determinations that no accommodations would be provided in the cases that it reported as "no decision." Carrasco Decl. ¶ 33. DFEH objected to that practice in a notice of violation that it provided to LSAC in May of 2017. Carrasco Decl. Ex. 15. DFEH also objects to other aspects of LSAC's reporting practices as discussed in detail in the Court's analysis below.

Beginning with the February 2016 administration of the LSAT, LSAC began using a procedure it referred to internally as the "50% email," and continued to do so through mid-October of 2017, at which point LSAC was beginning to process requests for the December 2017 LSAT and had already sent "50% emails" to forty candidates for that test before it made the decision to stop using that practice. Dempsey Decl. ¶¶ 53–54. LSAC sent such emails when it determined that the documentation submitted by a candidate supported some but not all of the candidate's requested accommodations. *Id.* ¶ 54. The language of the emails varied somewhat, but typically read in relevant part approximately as follows:

> Based on a preliminary screening of your request for accommodations on the [date] LSAT, we are prepared to approve you for:
>
> [certain accommodations]
>
> However, we are unable to process your request for [other accommodations] because the documentation necessary to support this request was not submitted.
>
> You have two options:
>
> 1. You can revise your request and accept the accommodations described above for which you are currently eligible.
>
> Or
>
> 2. You can pursue your request for an additional [accommodation] by submitting [other documents].

*Id.* ¶¶ 60–61 & Ex. R. Some versions of the letter informed candidates that because the deadline to submit requests had passed, choosing the second option would require deferring the request to a subsequent administration of the LSAT, and some stated that candidates would not receive any accommodations if they did not respond to the "50% email" and choose one of the two options presented by a particular deadline, sometimes forty-eight hours or less after LSAC sent its email. *See id.* ¶ 62 & Ex. R.

DFEH submits declarations from three LSAT candidates who received "50% emails." *See generally* Harris Decl. (dkt. 249-6); Movaghar Decl. (dkt. 249-5); Kallman Decl. (dkt. 249-4). One candidate, Russell Dean Harris, felt pressured to accept the lesser option offered by LSAC, attempted to appeal LSAC's decision, was told that LSAC would not provide an appeal process

for its determination that his documentation was not sufficient (and that the appeal process was reserved for "final decisions on the merits"), and ultimately reached a stipulation with LSAC after threatening litigation and applying pro se for a temporary restraining order. *See generally* Harris Decl. & Ex. B; Dempsey Decl. ¶¶ 90–92. Another candidate, Phillip Movaghar, accepted LSAC's proposal to revise his request and forego a requested accommodation because he felt that he had no other choice, did not understand LSAC's request for an "appropriately documented statement of need," and did not understand why LSAC would not provide the accommodations that it had already determined he was eligible for if he did not revise his request. *See generally* Movaghar Decl.[5] A third candidate, Michael Kallman, states that he called LSAC after he received a "50% email" to inquire about his options. Kallman Decl. ¶ 8.[6] According to Kallman, an LSAC representative told him there was no way to obtain all of the accommodations he requested on the administration of the LSAT that he was registered for, so Kallman accepted the lesser offer over the phone, and the representative told him that was sufficient. *Id.* ¶¶ 9–10. When Kallman arrived for the LSAT, he was told that he was registered to take it with no accommodations and there was nothing that could be done at that time. *Id.* ¶¶ 13–15. He did not take the test, and LSAC representatives later told him by telephone and email that a telephone call was not sufficient to accept the offer presented in LSAC's "50% email,"[7] relying on the statement in the email reading: "If you do not reply by [the deadline] LSAC will be unable to provide ANY accommodations and you will remain registered to test as a standard test taker." *Id.* ¶¶ 18–22 & Ex. B. Kallman registered for a later administration of the test, submitted additional documentation, and received all of the accommodations that he requested. Dempsey Decl. ¶ 100. DFEH also submits a

---

[5] Kim Dempsey, LSAC's Manager of Accommodated Testing notes that Movaghar has requested accommodations on seventeen administrations of the LSAT and has sat for the test three times. Dempsey Decl. ¶ 101.

[6] LSAC's Manager of Accommodated Testing states that LSAC has no record of this call. Dempsey Decl. ¶ 98.

[7] The representative whom Kallman spoke with after the test told him that he could not have accepted the offer by telephone because there was no way to speak to LSAC's accommodations department by telephone. Kallman Decl. ¶ 20. Kallman pointed out that LSAC's automated telephone system included an option to press "4" to speak to the accommodations department, and the representative agreed with him that it did not make sense but told him there was nothing she could do. *Id.*

declaration from another candidate, Aidee Campa Escorza, who is completely blind and was told by LSAC that she would have to take the test without accommodations, and with no opportunity for appeal or reconsideration, after she twice inadvertently failed to include the first page of her candidate form with her request for accommodations. *See generally* Campa Escorza Decl. (dkt. 271-2). LSAC ultimately granted Campa Escorza's request after DFEH lodged a complaint on her behalf. *Id.* ¶ 29.

DFEH first received copies of "50% emails" no later than December of 2016 when it obtained Movaghar's file in connection with an administrative complaint that he filed. Mew Decl. re Contempt ¶ 33. DFEH discovered that LSAC used "50% emails" as a standard practice when it reviewed documents at LSAC's Pennsylvania office in April of 2017 and found that LSAC began using such emails as early as January of 2016, and that by June of 2016 LSAC had added a standard field reading "50% email" to its internal form for tracking correspondence sent to candidates who requested accommodation. Carrasco Decl. ¶ 34. DFEH determined that when a candidate accepted LSAC's offer of less than all of the accommodations originally requested, LSAC would use white-out to replace the initial request with the modified request on its internal form, and would report the request as "granted in full" on reports required under the Consent Decree. *Id.* ¶¶ 31, 34. If a candidate did not respond to a "50% email," LSAC would provide no accommodations and report the request as "no decision." *Id.* ¶ 31. LSAC refused to provide DFEH with access to files reported "granted in full" when DFEH visited LSAC's office, and provided a redacted copy of only one such file afterwards. *See id.* ¶ 29; Carrasco Reply Decl. ¶ 60. DFEH believes that most instances of "50% emails" would be found in the "granted in full" files to which it was denied access. Carrasco Decl. ¶ 31.

Based on the very small number of requests that LSAC reported as "denied," the United States and DFEH agreed to waive a requirement established by the Panel that LSAC maintain a list of twenty-five to forty outside consultants to review denials, and instead agreed to reduce that number to only eight to ten consultants. *Id.* ¶ 41. DFEH now contends that its agreement was based on inaccurate reporting by LSAC due to LSAC's use of "50% emails" and "no decision" reports. *Id.* ¶¶ 41–42.

LSAC presents evidence regarding other candidates' requests for accommodation that it believes illustrate the efforts it has taken to comply with the Consent Decree and the procedures established by the Panel. For example, a candidate recently diagnosed with Attention Deficit Hyperactivity Disorder and a "Learning Disability Not Otherwise Specified" requested fourteen accommodations for the LSAT. Dempsey Decl. ¶¶ 15, 24–31. LSAC determined that all requested accommodations should be granted except waiver of the "experimental" section of the test—an unscored section that allows LSAC to develop questions or future versions of the LSAT—and two outside consultants agreed with the denial of his request to waive the experimental section, while opining that some of the accommodations LSAC had decided to grant were excessive. *Id.* ¶ 15 & Exs. E–H. LSAC sent the candidate a letter explaining the decision to deny waiver of the experimental section, the candidate appealed, two additional consultants affirmed the denial, and LSAC informed the candidate of that final decision. *Id.* ¶¶ 15 & Exs. I–N.[8] LSAC also highlights two test takers who, LSAC suggests, abused the Panel's determination that candidates who receive "stop-the-clock" breaks as accommodation for disabilities (typically for medical conditions requiring frequent bathroom breaks) should receive one minute of extra time per break to account for the disruption of stopping and resuming testing. *See id.* ¶¶ 18–20; Panel Report at 17–18. One candidate took 150 breaks, which, when added to the extra time that he also received as an accommodation, resulted in over sixteen hours to complete the LSAT, which is normally completed in three hours. *Id.* ¶ 19 & Ex. C. Another took forty-five breaks, which, when added to extra time separately granted, resulted in his test lasting from 8:30 AM to nearly 10:00 PM, and a suggestion from the test proctor that LSAC reconsider its policy on stop-the-clock breaks to prevent abuse. *Id.* ¶ 20 & Ex. D.

DFEH and the United States sent LSAC a letter in May of 2017 raising a number of purported violations of the Consent Decree, including but not limited to LSAC's use of "50% emails" and the "no decision" reporting category, LSAC's failure to include all required

---

[8] According to DFEH, even though LSAC ultimately denied this candidate's request to waive the experimental section of the test, LSAC inaccurately reported that all of his requests were granted in full. Carrasco Reply Decl. ¶ 65.

information in its reports, and LSAC's refusal to provide DFEH with access to files reported as "granted in full." Carrasco Decl. Ex. 15. In August and mid-October of 2017, the parties reached a limited agreement that LSAC would cease using the "no decision" designation where candidates submitted requests late or had not registered for the LSAT and would instead report those requests as denials, but would not be required to refer them to outside consultants or permit appeals. Mew Decl. re Contempt Exs. L, M. The parties were not able to resolve other issues, including LSAC's use of "no decision" for requests that it concluded lacked sufficient documentation. *Id.* Ex. M. In late October of 2017, DFEH sent a letter to LSAC and the United States stating its position that most of the issues raised in the May 2017 letter remained outstanding and could not be resolved. Carrasco Decl. Ex. 19.

### E. Appointment and Activities of the ADA Monitor

The Consent Decree calls for LSAC to "retain an independent ADA Monitor, to be mutually agreed upon by the United States, the DFEH, and LSAC" within sixty days of its effective date, in order to "assist the United States, the DFEH, and the Court in evaluating LSAC's compliance with the Decree." Consent Decree ¶ 24. "No Party . . . shall have any supervisory authority over the ADA Monitor's activities or interfere with the independent functions of the ADA Monitor," except that LSAC retained some authority regarding the ADA Monitor's activities on LSAC's premises. *Id.* The ADA Monitor is charged with auditing LSAC's compliance with the Consent Decree "by first evaluating LSAC's Reports" under the Decree "and then by requesting access to additional information, such as LSAC data and personnel, and independently observing LSAC's operations, to the extent reasonable and deemed necessary by the ADA Monitor in order to evaluate LSAC's compliance." *Id.* ¶ 25. Specifically, the Monitor was to conduct audits one year, two years, and four years after the effective date of the Consent Decree and provide written audit reports to the parties. *Id.* ¶¶ 25–26. The Consent Decree called for the first audit to address LSAC's reporting requirements, and the remaining audits to address both reporting requirements "and LSAC's implementation of the Best Practices" established by the Panel. *Id.* ¶ 25.

On July 28, 2014—exactly sixty days after the effective date of the Consent Decree—

1    LSAC reached out to DFEH and the United States to propose retaining Salome Heyward as the

2    ADA Monitor.  Mew Decl. re Mot. to Exclude (dkt. 267-1) Ex. A.  The United States and DFEH

3    were not familiar with Heyward and proposed Peter Blanck as an alternative.  *Id.* Ex. B.  The

4    parties spent months unsuccessfully trying to persuade each other that their respective nominees

5    were appropriate, and on November 19, 2014, LSAC proposed Arthur Coleman as an alternative.

6    *See id.* Exs. C, D.  Coleman is an attorney who specializes in education policy and previously

7    served as Deputy Assistant Secretary of the U.S. Department of Education's Office for Civil

8    Rights.  *Id.* Ex. E.  By May 4, 2015, the United States and DFEH had met with Coleman but

9    remained concerned that he lacked directly applicable experience as a monitor or working with

10   ADA issues, and continued to propose appointing Blanck.  *Id.* Ex. F.  LSAC objected to Blanck's

11   involvement with an organization that criticized LSAC's policies for accommodating disabilities.

12   *Id.* Ex. G.  DFEH and the United States ultimately agreed to appoint Coleman as monitor on the

13   condition that LSAC fund additional staff to help him perform his duties, including analyzing

14   voluminous spreadsheet data, and LSAC agreed to do so to the extent Coleman determined such

15   support was necessary.  *Id.* Exs. H, I; Carrasco Decl. ¶¶ 12–13.  The United States did not confirm

16   its and DFEH's agreement to those terms until June 19, 2015, Mew Decl. re Mot. to Exclude Ex.

17   J, and Coleman was not retained as Monitor until October of 2015—well over a year after the

18   sixty-day deadline by which a monitor was supposed to be selected.  *See* Carrasco Decl. ¶ 14 &

19   Ex. 3.

20          Due to the delay in appointing Coleman as ADA Monitor, the parties did not initially ask

21   him to complete the first audit contemplated under the Consent Decree, assessing LSAC's

22   compliance with its reporting requirements during the first year of the Decree.  *See* Mew Decl. re

23   Mot. to Exclude Ex. L.  On April 13, 2016, the parties requested that Coleman complete the first

24   audit and suggested that he prepare a report by May 1, 2016.  *Id.*  Coleman responded that he

25   intended to complete the report by the end of May, but did not meet that deadline.  Carrasco Decl.

26   ¶ 16 & Ex. 5.  On June 8, 2016, Coleman informed the parties that he expected to send the report

27   near the end of June.  *Id.*  On July 22, 2016, the United States and DFEH requested a status update

28   from Coleman on the report for the one-year audit, and suggested a deadline of September 30,

2016 for Coleman's two-year report, which was to evaluate LSAC's compliance through May of that year. *Id.* Coleman provided a draft report combining the subject matter of the one-year and two-year audits to DFEH and the United States on October 6, 2016. *Id.* ¶ 17 & Exs. 5, 7. Plaintiffs informed Coleman of concerns that they had with the report by telephone on October 14, 2016 and by email on October 28, 2016, including a redline of the draft report with comments and questions from DFEH and the United States. *Id.* ¶¶ 17–18 & Ex. 5. Coleman acknowledged Plaintiffs' email on November 2, 2016 and provided a final report on February 16, 2017. *Id.* ¶ 20 & Exs. 5, 9.

Coleman's final report found LSAC to be in substantial compliance with the topics of the Consent Decree and the Panel's Report that he was called upon to evaluate. *Id.* Ex. 9. A footnote addressing one of the concerns raised by DFEH and the United States reads as follows:

> Counsel for plaintiffs complains that the Monitor did not analyze [LSAC's] data reports. To the contrary, the Monitor reviewed the reports submitted, and relied on a distillation of fields from the massive data runs from the LSAC to inform conclusions. Nothing in the Decree requires more. (And, notably, any argument that it did would seem to call into question the Monitor's ability even to rely on actual data entries in the report.) With clear evidence of rigorous protocols and faithful adherence to the Order's[9] requirements, the Monitor made a judgment that [a] nothing more was required by the Decree; and [b] "going behind the numbers" would be unnecessarily burdensome and unwarranted. In addition, despite a request from the Monitor that counsel for plaintiffs provide their data analysis (represented as inconsistent with the Monitor's report, but without providing detail), no information was forthcoming. If that information and analysis is provided, the Monitor will attempt to reconcile any discrepancies with a supplemental analysis and report.

*Id.* Ex. 9 at 5 n.6 (brackets on "[a]" and "[b]" in original). Coleman addressed other concerns raised by DFEH and the United States in an appendix, generally concluding that Plaintiffs' requests fell outside the scope of his mandate under the Consent Decree. *Id.* at 13–14. Coleman's report did not discuss most of the practices at issue in the present motion, including LSAC's use of "50% emails" and its use of the "no decision" designation for requests lacking sufficient

---

[9] Coleman's report defines the term "Order" as referring to the Court's August 2015 order on LSAC's appeal from the Panel's Report. *See* Carrasco Decl. Ex. 9 at 1.

documentation.  *See generally id.*[10]

### F.    The Parties' Present Arguments

#### 1.    DFEH's Motion for Contempt or to Modify the Consent Decree

DFEH moves for an order holding LSAC in contempt, generally focusing on LSAC's use of "50% emails" and "no decision" reports.  *See generally* Contempt Mot.  According to DFEH, the "50% emails" violate the Consent Decree's requirement that LSAC automatically grant accommodations that candidates previously received on certain other tests "without further inquiry or request for additional documentation," because although LSAC's emails indicated that it would be willing to grant those accommodations, LSAC required candidates to revise their requests and forego additional accommodations as a condition of receiving the accommodations to which they should have been entitled automatically.  *Id.* at 3–4.  Similarly, DFEH argues that LSAC violated the Panel's requirement that it presumptively grant certain accommodations if supported by specific documentation, again because LSAC conditioned those accommodations on candidates revising their requests.  *Id.* at 4, 6.  DFEH also contends that LSAC violated the Panel's requirements that it provide multiple levels of internal and external review before denying accommodations, and an opportunity to appeal after denial, because LSAC did not provide such review or opportunity when it induced candidates to revise their requests through "50% emails" or where it classified a request as "no decision" for purportedly insufficient documentation.  *Id.* at 4–5, 8–9.  According to DFEH, the "50% emails" and "no decision" classifications violated LSAC's obligations to provide clear explanations of any denials and of any need for additional documentation, and to engage in "cooperative and interactive communication."  *Id.* at 5–6, 7–8.  Finally, DFEH argues that LSAC violated requirements related to reporting, recordkeeping, and access by classifying requests as "no decision" or, after a candidate acquiesced to a "50% email," "granted in full," by using white-out to alter internal forms, and by denying DFEH access to files

---

[10] In a footnote, Coleman explained that the total number of requests he reported as having been denied in full on the merits "does not include denials due to non-registration or late requests following established deadlines."  Carrasco Decl. Ex. 9 at 8 n.8.  He did not address a question in Plaintiffs' redline of the draft report as to whether those categories were "the only types of denials not 'based on the merits.'"  *See id.* Ex. 8 at 7.

that LSAC had reported as "granted in full" even after DFEH limited its request to ten such files, among other conduct. *Id.* at 9–11.

DFEH contends that the Monitor failed to fulfill his duties, arguing that he improperly consolidated the first and second reports called for by the Consent Decree, that his report was conclusory and failed to address concerns that Plaintiffs raised regarding a preliminary draft, that he was wrong to conclude that "going behind the numbers would be unnecessarily burdensome and unwarranted," and that he failed to discuss LSAC's use of "50% emails" and the "no decision" category. *Id.* at 11–13. DFEH also takes issue with the Monitor's failure to identify what DFEH characterizes as an increased length of the test (i.e., the use of the experimental section) for people with additional time accommodations, as well as the Monitor's designation of his report as "confidential" and the lack of specificity in his billing records. *Id.* at 13.

According to DFEH, the Consent Decree, the Panel's Report, and this Court's previous order on LSAC's appeal all "constitute clear and definite orders of the Court" subject to enforcement through civil contempt. *Id.* at 18. DFEH contends that because it has identified violations by LSAC, the burden shifts to LSAC to "prove that it took all reasonable steps within its power to insure compliance," and LSAC cannot do so *Id.* at 18, 20–21 (citation and internal quotation marks omitted). As relief, DFEH asks the Court to extend the term of the Consent Decree by two years, replace the ADA Monitor, and grant both DFEH and the United States an additional fifteen days of access to LSAC's documents—a significant increase over the five days of access originally provided under the Consent Decree. *Id.* at 21–23. In support of its request to replace the Monitor, DFEH relies on a case where the parties' settlement agreement had not originally called for a monitor, but the court appointed a monitor as part of its order holding the defendant in contempt for noncompliance with the settlement agreement, which was incorporated by the court's order of dismissal. *Id.* at 22 (citing *Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1116 (D. Idaho 2013), *aff'd*, 822 F.3d 1085 (9th Cir. 2016)).

In the alternative, DFEH seeks the same relief under Rule 60(b) of the Federal Rules of Civil Procedure, specifically subdivisions (b)(5) and (b)(6), which permit a court to grant relief from an order or judgment where "'applying [the judgment] prospectively is no longer equitable'"

19

or "'any other reason . . . justifies relief,'" respectively. *Id.* at 23–24 (quoting Fed. R. Civ. P. 60(b)) (first alteration in original). DFEH also argues that any relief granted should be applied on a nationwide basis, and that DFEH should recover its attorneys' fees and costs. *Id.* at 24–25.

### 2. Amicus Brief

A number of interested organizations and individuals filed an amicus brief in support of DFEH's motion for contempt. *See* Amicus Br. (dkt. 258-1). Amici argue that LSAC "has a long history of disability discrimination" resulting in a denial of equal access to the LSAT and ongoing adverse effects, including where state bar examiners base decisions regarding accommodations for the bar exam on the accommodations that a candidate received for the LSAT. *Id.* at 2–5. According to amici, LSAC's use of "50% emails" represented not only a violation of the Consent Decree, but also "a deliberate 'end run' around" the ADA. *Id.* at 5–8. Amici contend that nationwide relief would serve the public interest. *Id.* at 8.

### 3. LSAC's Opposition

LSAC asserts that "DFEH's motion seeks to punish a non-profit entity that has already been punished to a degree that finds no parallel in the history of the U.S. Department of Justice's enforcement of the ADA or DFEH's enforcement of the Unruh Act," arguing that the requirements imposed by the Consent Decree and the Panel "far exceed industry norms," "are not evidence-based," and "are unworkable." Opp'n to Contempt (dkt. 268) at 2, 4. LSAC notes that it has spent millions of dollars settling claims and complying with the Consent Decree, and argues that any "further nationwide obligations . . . should happen only as the result of a notice-and-comment rulemaking that produces reasonable standards that apply to all testing entities." *Id.* at 2; *see also id.* at 25–26 (listing the payments and policy changes that LSAC has made in response to the Decree). LSAC contends that DFEH's motion should be denied "[b]ecause LSAC has substantially complied with all of its obligations over the years in which the Decree has been in effect and has voluntarily addressed DFEH's core concerns." *Id.* at 2–3. According to LSAC, it "had to establish" the procedures that DFEH now challenges in order to "allow the accommodation process to function in an environment of ever-increasing numbers of requests, in a manner consistent with the Decree and the panel's recommendations." *Id.* at 5.

LSAC concedes that it sent "50% emails" beginning with the February 2016 administration of the LSAT and ending with the December 2017 test. *Id.* at 9 & n.9, 11–12. LSAC argues, however, that DFEH's contention that candidates felt pressured by those emails "is not supported by the broader universe of communications that LSAC received in response to 50% emails," and that candidates who accepted LSAC's proposals to revise their requests "often thank[ed] LSAC for its communication." *Id.* at 10. LSAC also argues that it did not attempt to hide its use of "50% emails," but that its "accommodations personnel . . . often use white-out to make changes on the tracking forms," and that updating forms to show that candidates had revised their requests after receiving "50% emails" was necessary to "ensure[] that the tracking form had updated and accurate information when it was used by staff members to enter data required to be reported under the Decree"—apparently working under the assumption that where a candidate accepted to lesser accommodations offered in a "50% email," the appropriate data to report was that the request had been granted in full. *See id.* at 11.

LSAC raises a number of arguments why DFEH's motion for contempt should be denied. Perhaps most broadly, LSAC argues that imposing sanctions here would not serve either of the two purposes of civil contempt—coercing compliance or compensating loss—because LSAC has already ceased using "50% emails" and DFEH has not sustained any cognizable loss. *Id.* at 16–17. LSAC also contends that because the Panel's Report was neither itself a court order nor "clear enough . . . to support a finding that LSAC violated any 'specific and definite' requirements," the Report and this Court's previous order interpreting it provide no basis for contempt, and the Court must look only to the requirements of the Consent Decree itself, although LSAC also argues that even if the Court considers the Report, LSAC has not violated the Panel's requirements. *See id.* at 17–18 (quoting *Gates v Shinn*, 98 F.3d 463, 468–69 (9th Cir. 1996), for the proposition that consent must rest on violation of specific directives "'within the four corners of the consent decree'").

With respect to candidates entitled under Paragraph 5(a) of the Consent Decree to accommodations previously granted on other tests, LSAC argues that although it "did not use the word 'granted' in its [50%] emails," its statements that it was prepared to approve those

accommodations complied with the Consent Decree, because LSAC did not request additional documentation or support for the previously-granted accommodations, but instead merely asked whether the candidates wished to submit additional documentation to pursue *other* requested accommodations not subject to that section of the Decree. *Id.* at 18–19.

As for other candidates who received "50% emails," LSAC contends that the emails did not violate the Panel's requirement to presumptively grant certain requests because LSAC only used those emails when candidates did not provide the documentation that the Panel determined was necessary to support such a presumption. *Id.* at 19. LSAC asserts, without citation to evidence, that the "50% emails" did not violate the Panel's requirement for multiple levels of review before denials because "the emails make clear that they reflected LSAC's 'preliminary' determination, not a final decision by LSAC staff," and "[w]hen a final decision was subsequently made, candidates retained their appeal rights." *Id.* at 20. LSAC also argues that the emails did not violate the requirement to engage in cooperative and interactive communication—according to LSAC, the emails constitute such communication—nor the recommendation that LSAC not attempt to alter requested accommodations, because LSAC merely informed candidates which portions of their requests were sufficiently supported by documentation and which were not. *Id.*

LSAC contends that it appropriately designated certain requests as "no decision" where: "(a) the request was received after the deadline; (b) the candidate had not registered for the test; or (c) the request lacked the necessary baseline documentation." *Id.* at 20–21. According to LSAC, the Panel had no authority to (and did not purport to) address LSAC's reporting requirements, and the Consent Decree provides only that LSAC must "track 'whether' a request was 'granted in full or denied in full or denied in part,'" with no requirement that those are the only possible outcomes for a request. *Id.* at 21. LSAC argues that "no decision" is accurate where "a request was neither granted [n]or denied." *Id.* LSAC asserts that after Plaintiffs objected to LSAC having left fields blank for such candidates on its early reports, LSAC began using the "no decision" designation in subsequent reports, and Plaintiffs "raised no further objection to this practice for almost two years." *Id.* at 21–22.

LSAC argues that the other reporting practices that DFEH challenges were also proper. *Id.*

22

at 22–23.  It contends that it did not need to report "50% emails" as requests for "additional" documentation under Paragraph 8(a)(j) of the Consent Decree because it permissibly interpreted that requirement as applying only where a candidate "fulfilled his or her threshold documentation requirements under the Decree and [Panel] recommendations" and LSAC nevertheless requested more documentation—not where LSAC determined that a candidate failed to meet the "threshold" requirements.  *Id.* at 22.  LSAC also contends that it quickly remedied an "oversight" where it failed to report the names of outside consultants, that it permissibly reported its Manager of Accommodated Testing, Kim Dempsey, as the "individual who made a substantive decision whether to grant or deny each request," and that it has nevertheless changed its practices to conform to DFEH's interpretation of the reporting requirements.  *Id.* at 22–23.

With respect to DFEH's access to records, LSAC objects to DFEH's implication that reviewing files at LSAC's office was an undue burden or a compromise by DFEH, noting that the Consent Decree specifically calls for files to be made available at LSAC's office.  *Id.* at 23–24.  LSAC also asserts that although it initially declined to provide access to files for requests granted in full, it subsequently "provided DFEH with copies of 'granted in full' files that [DFEH] requested following [DFEH's] visit to LSAC."  *Id.* at 24 (citing Mew Decl. re Contempt ¶ 31).  LSAC notes that it provided one candidate file including a "50% email" to DFEH several months before DFEH visited LSAC's office, which, LSAC argues, negates DFEH's accusation that it concealed files in bad faith, and that LSAC has since offered to allow DFEH to review additional candidates' files at LSAC's office.  *Id.* at 24–25.

LSAC also addresses DFEH's request to modify the Consent Decree under Rule 60(b), arguing that extension of the Decree would be inequitable in light of LSAC's view that the Panel's prescriptions are unworkable and ill-advised, and because LSAC has complied with many of the Decree's requirements.  *Id.* at 26–28.  Finally, LSAC argues that the Monitor should not be removed because he has fulfilled his duties under the Decree and because the Decree provides no mechanism for any party to challenge, remove, or replace the Monitor.  *Id.* at 28–30.

### 4.  DFEH's Reply

DFEH argues that the Panel's Report is enforceable by contempt, citing decisions where a

23

consent decree specifically incorporated a settlement agreement or other plan of action. Reply re Contempt (dkt. 271) at 3. DFEH asserts that it clearly described LSAC's violations of the Decree and Report in its motion, and argues that even if LSAC had since brought its procedures into compliance (which DFEH disputes), contempt would still be appropriate in light of past violations. *Id.* at 3–6.

According to DFEH, LSAC's contention that the Panel's Report is "unworkable" rings hollow in light of the small number of external reviews and appeals that LSAC has actually conducted, as well as LSAC's report that it encountered "'no unanticipated difficulties associated with implementation of the Consent Decree that warrant reporting.'" *Id.* at 6–7 (quoting Carrasco Reply Decl. ¶ 59). DFEH contends that, if LSAC truly believed the requirements unworkable, LSAC could have sought a stipulation from Plaintiffs or reconvened the Panel pursuant to Paragraph 7(d)(vi) of the Consent Decree to request modification of those requirements. *Id.* at 14. DFEH characterizes the increased number of requests for accommodation as indicating "that test-takers with disabilities are no longer deterred from requesting accommodations." *Id.* at 6 n.6.

DFEH reiterates its contentions regarding the "50% emails," arguing that the Consent Decree did not authorize "preliminary" decisions as part of "a two-tiered system for providing candidates with appellate rights," and that the issues related to those emails "go[] right to the core of the Consent Decree and order" because "LSAC has essentially reestablished the status quo, enabling its staff to impose documentation requirements with no ready means for students to challenge these decisions." *Id.* at 8. DFEH asserts that LSAC's failure to offer an appeal when it sent a "50% email" explains why LSAC has processed a total of only eight appeals in the years since it purported to implement the Panel's Report. *Id.* at 9. DFEH also disputes LSAC's characterization of the "50% emails" as collaborative communication that merely stated which accommodations a candidate had sufficiently justified, arguing that candidates felt pressured by the emails and that the language therein calling for candidates to "revise [their] request[s]" constitutes an impermissible effort to alter candidates' requests. *Id.* at 11–12. DFEH contends that LSAC "does not attempt to defend" its practice of reporting requests as "granted in full" when candidates accepted the option of revising their requests in response to "50% emails." *Id.* at 12.

24

Contrary to LSAC's contention that it "provided DFEH with copies of 'granted in full' files that [DFEH] requested," *see* Opp'n to Contempt at 24, DFEH argues that LSAC provided only a single file to DFEH that LSAC had reported as "granted in full."  Reply re Contempt at 13 (citing Carrasco Reply Decl. ¶ 60).  DFEH also contends that LSAC's earlier provision of a single candidate file including a "50% email" did not provide any basis for DFEH to discover that LSAC had sent such emails as part of a widespread practice before DFEH inspected LSAC's files in Pennsylvania. *Id.*

As in its motion, DFEH requests that the Decree be extended for two years, that the Monitor be replaced, and that DFEH be granted fifteen days of access to LSAC's nationwide records and recover its costs and fees. *Id.* at 17–19.  Although DFEH initially requested reimbursement of airfare for its attorneys who visited LSAC's headquarters, DFEH withdraws that request in its reply. *Id.* at 18–19.  It is not entirely clear whether DFEH intends to forego recovery of that expense entirely, or whether DFEH merely withdraws its request for the Court to order that specific recovery and intends to include airfare in its discussion of costs and fees with LSAC if the motion is successful. *See id.*

### 5.  LSAC's Supplemental Brief

Following the hearing, LSAC filed an unsolicited and unauthorized supplemental brief asking the Court to deny DFEH's motion, or in the alternative, to base relief only on Rule 60(b) rather than holding LSAC in contempt. *See generally* Supp'l Br. (dkt. 275).  The brief and supplemental evidence submitted therewith demonstrate that the practices at issue affected a significant number of people: approximately 859 candidates received "50% emails," and of the subset of requests submitted for the June 2015 through September 2017 LSAT administrations, approximately 1,756 were classified as "no decision," nearly half of which received that designation because LSAC concluded that they lacked sufficient documentation. *Id.* at 4–6 & Ex. 2 ¶¶ 3, 5.  Assuming for the sake of argument that this untimely submission should be taken into account, it does not alter the Court's conclusions.  DFEH's administrative motion to strike the supplemental brief (dkt. 276) is therefore DENIED as moot.

United States District Court
Northern District of California

### 6. DFEH's Motion in Limine and Related Briefing

DFEH argues that ADA Monitor Arthur Coleman's report should be considered only for the purpose of finding him incompetent to continue as monitor and not for the purpose of evaluating LSAC's compliance, on the basis that Coleman "refused to go 'beyond the numbers' because it 'would be unnecessarily burdensome and unwarranted.'" Mot. to Exclude at 1. According to Peter Blanck, an expert witness retained by DFEH (and, incidentally, DFEH's initial choice to serve as the Monitor), the Monitor's report "'lacks basic validity and reliability, and therefore, fails to assist the Court and the Plaintiffs to meaningfully evaluate LSAC's compliance with the Consent Decree.'" *Id.* at 4 (quoting Blanck Decl. (dkt. 249-3) ¶ 48). DFEH relies on Blanck's conclusions that Coleman failed to explain his methodology, relied on data selected and provided by LSAC, and apparently failed to investigate sufficiently whether LSAC complied with certain requirements of the Panel Report. *Id.* at 6–9. DFEH therefore argues that Coleman's report fails to meet both the relevance and reliability prongs of the test for expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in part because Coleman's report does not discuss the purported violations at issue in DFEH's present motion. Mot. to Exclude at 9–14.

LSAC contends that it is "absurd" for DFEH to request that "the Court not . . . consider the analysis and opinions of the very person who DFEH agreed would review LSAC's compliance with the Decree and then prepare a report for DOJ, DFEH, and the Court." Opp'n to Mot. to Exclude (dkt. 267) at 1. According to LSAC, the Consent Decree does not require the Monitor to explain his methodology and grants the Monitor discretion as to what materials to review beyond LSAC's reports, and the Monitor properly reviewed "'an appropriate cross-section of files'" produced by LSAC. *Id.* at 5–6 (quoting the Monitor's report).[11] LSAC also argues that the

---

[11] LSAC takes the opportunity in its brief on this issue to revisit its critique of the Panel's Report, arguing that "if DFEH had been as concerned about the quality and integrity of the report of the 'best practices' panel as it purports to be about the Monitor's report, the parties would likely not be before the Court today because LSAC would not have found itself trying to implement such a poorly drafted and non-evidence based set of procedural requirements." Opp'n to Mot. to Exclude at 6–7. The merits of the Panel's decisions have no bearing on the motion to exclude the Monitor's conclusions.

*Daubert* standard is not applicable here because the Monitor is not an expert witness retained by a party and DFEH has cited no authority applying that standard to an independent monitor appointed with the consent of both parties. *Id.* at 7–8. Finally, LSAC contends that it would be prejudicial to exclude the Monitor's conclusions after LSAC devoted substantial resources to appointing and cooperating with the Monitor pursuant to the parties' settlement agreement as memorialized in the Consent Decree, and LSAC relied on the Monitor's conclusions that LSAC had substantially complied with the Decree. *Id.* at 8–9.

DFEH renews its arguments in its reply that the *Daubert* standard is appropriate here and that Coleman did not fulfill his obligation as Monitor to audit LSAC's compliance because his review lacked methodological rigor, as evidenced by the Monitor's failure to detect or discuss LSAC's use of "50% emails" and other purported violations. *See generally* Reply re Mot. to Exclude (dkt. 272). DFEH's position remains that the "Monitor's Report should only be relied upon for the purpose of addressing Mr. Coleman's removal as ADA Monitor." *Id.* at 6.

## III. ANALYSIS

### A. Legal Standards

#### 1. Interpretation of a Consent Decree

"A consent decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles." *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 861 (9th Cir. 2007) (quoting *City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985)). The Supreme Court has set forth the applicable standard as follows:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues

27

> raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

*United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971). Accordingly, arguments that "would have great force if addressed to a court that had the responsibility for formulating original relief in this case, after the factual and legal issues raised by the pleadings had been litigated," may nevertheless be "out of place" in "deal[ing] with the construction of an existing consent decree." *Id.* at 681.

### 2. Civil Contempt

"'Civil contempt . . . consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply.'" *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). The moving party bears the burden of showing the contemnor's noncompliance by clear and convincing evidence. *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999). The court may exercise its civil contempt power for one or both of two purposes: "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–304 (1947). "The measure of the court's power in civil contempt is determined by the requirements of full remedial relief." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949).

A party may be held in contempt even if its conduct was not willful,[12] *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1156, 1130 (9th Cir. 2006), and "there is no good faith exception to the requirement of obedience to a court order," *Dual-Deck Video*, 10 F.3d at 695, but substantial compliance can serve as a defense, *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989). The Ninth Circuit has in some cases placed the burden on the movant to "establish '(1) that

---

[12] LSAC's belated argument that any relief the Court is inclined to grant should be granted under Rule 60(b) rather than as a remedy for contempt because a "finding of civil contempt suggests that LSAC willfully violated a court order" misstates the law. *See* Supp'l Br. at 7. The Court does not reach the question of whether LSAC's violations were willful.

[the respondent] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence.'" *Labor/Cmty. Strategy Ctr. v. L.A. Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (quoting *Dual-Deck Video*, 10 F.3d at 695); *see also id.* at 1121 ("BRU must demonstrate that MTA failed to substantially comply with the decree in order to justify its extension."). In other cases, the Ninth Circuit has placed the burden on the respondent as to at least one issue, stating that "contemnor in violation of a court order may avoid a finding of civil contempt only by showing it took *all* reasonable steps to comply with the order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (citing *Sea Shepherd*, 774 F.3d at 945); *see also Hook v. Ariz. Dep't of Corr.*, 107 F.3d 1397, 1403 (9th Cir. 1997). While it is tempting to simply separate the issues—placing the burden on the movant to show a lack of substantial compliance, and then on the respondent to justify any such noncompliance by showing that it took all reasonable steps to comply—Ninth Circuit authority suggests that the two issues are more interrelated, and reasonable efforts are in fact a necessary component of substantial compliance. *See Dual-Deck Video*, 10 F.3d at 695 ("'Substantial compliance' with the court order is a defense to civil contempt, and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply." (citations omitted)).

"When a party does not appeal an injunction and is later held in contempt for violating that same injunction, [it] may not challenge the merits of the underlying injunction in a contempt proceeding, subject only to the exceptions" permitting a party to challenge an order through noncompliance as recognized "in fairly narrow circumstances, such as when the order was 'transparently invalid or had only a frivolous pretense to validity,' . . . or if there has been a judicial declaration of its unconstitutionality in other proceedings." *Irwin v. Mascott*, 370 F.3d 924, 931 (9th Cir. 2004) (quoting *Walker v. City of Birmingham*, 388 U.S. 307, 315 (1967)). Because such circumstances are not present here, the Court does not reconsider the validity of the Consent Decree or the merits of its previous decision regarding the Panel's Report.

### 3. Rule 60(b)

In relevant part, Rule 60(b) of the Federal Rules of Civil Procedure permits a court to grant

relief from terms of a judgment where "applying it prospectively is no longer equitable" or "any other reason . . . justifies relief." Fed. R. Civ. P. 60(b)(5), (6). The catch-all provision of Rule 60(b)(6) "is to be 'used sparingly as an equitable remedy to prevent manifest injustice and is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment.'" *Harvest v. Castro*, 531 F.3d 737, 749 (9th Cir. 2008) (quoting *Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097, 1103 (9th Cir. 2006)). Despite the extraordinary nature of such relief, altering judgment under Rule 60(b) can be appropriate in response to changed circumstances—indeed, although codified in the Rule, such authority falls within a court's inherent power—and "[u]nder well established law, substantial violation of a court order constitutes a significant change in factual circumstances" that can justify Rule 60(b) relief. *Kelly*, 822 F.3d at 1098. "[M]odification of a court order is 'suitably tailored to the changed circumstance' when it 'would return both parties as nearly as possible to where they would have been absent' the changed circumstances," and extending the term of a consent decree by the amount of time that a party failed to comply with the decree meets that standard. *Id.* at 1097–98 (quoting *Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002)); *see also Labor/Cmty.*, 564 F.3d at 1120–21 ("The failure of substantial compliance with the terms of a consent decree can qualify as a significant change in circumstances that would justify the decree's temporal extension.").

### B. DFEH's Motion to Exclude the Monitor's Conclusions Is Denied

While not relevant to the outcome, the Court agrees with LSAC that the *Daubert* standard is not applicable to the Monitor's conclusions. Where a settlement agreement calls for the consideration of particular documents or evidence—here, the Monitor's reports, which the Consent Decree requires the Monitor to prepare in order to assist the Court and parties in monitoring LSAC's compliance—that agreement will be respected in evaluating compliance with the agreement regardless of whether the documents at issue would otherwise be admissible under the Federal Rules of Evidence. *See CSL, L.L.C. v. Imperial Bldg. Prods., Inc.*, No. 05-15931, 2006 WL 679891, at *1 (9th Cir. Mar. 15, 2006). Applying the Consent Decree, the Court finds no basis to exclude the Monitor's conclusions as stated in his February 16, 2017 report, and

DENIES DFEH's motion to do so.

Nevertheless, the Monitor's conclusions have no bearing on DFEH's primary motion for contempt or to alter the Consent Decree. The relevant facts underlying that motion are largely not in dispute, and the Monitor did not address the practices at issue in his report. Although the Monitor's role under the Consent Decree is in part "to assist . . . the Court in evaluating LSAC's compliance," nothing in the Consent Decree requires the Court to defer to the Monitor's conclusions as to whether LSAC has complied, and the Court finds the Monitor's conclusions that LSAC substantially complied with its obligations to be unpersuasive as applied to the conduct at issue here, which the Monitor did not address and of which he might not even have been aware.

## C. The Panel Report Is Enforceable by Contempt

LSAC is correct that the Panel's Report is not a court order. Relying on the Ninth Circuit's decision in *Gates*, LSAC argues that the Report is therefore irrelevant to DFEH's present motion because any enforceable command must be found "'within the four corners of the decree.'" *See* Opp'n to Contempt at 17–18 (quoting *Gates*, 98 F.3d at 468).

In *Gates*, the administrators of a state medical facility for inmates drawn from throughout the California prison system entered a consent decree requiring, in relevant part, "'appropriate psychiatric evaluation and treatment' for prisoners." *Gates*, 98 F.3d at 464 (quoting the consent decree). "Pursuant to the consent decree, the [district] court had appointed a mediator nominated by the defendants to develop institutional reforms in consultation with the prison officials, lawyers for the plaintiff class, prison psychiatry experts, and others." *Id.* at 465. When the prisoners sought to hold the defendants in contempt for failure to provide adequate "outpatient"[13] psychiatric care, the court directed the defendants to present a revised plan to the mediator, and the mediator "suggested thirteen modifications" and recommended that the defendants be held in contempt if they did not implement those modifications. *Id.* When the defendants refused to do so, the court held them in contempt, on the basis that failure to adopt the mediator's suggestions

---

[13] As the *Gates* court noted, the term "outpatient" is unintuitive in the context of prisoners incarcerated at a state medical facility. *See Gates*, 98 F.3d at 465 ("The prisoners are of course not 'outpatients' in the usual sense of the word. They do not get out.").

violated the consent decree's requirement to provide "appropriate psychiatric evaluation and treatment for all inmates." *Id.* The Ninth Circuit reversed, holding that the "consent decree itself, not merely the mediator's subsequent directives, must command the prison officials to provide the level of psychiatric care at issue," *id.* at 468, and that the decree's standard of "appropriate psychiatric treatment" was not sufficiently specific to compel compliance with the mediator's more specific directives, *id.* at 471–72. The Ninth Circuit noted that it had previously affirmed a finding of contempt based on the same operative language, but held that the fact that "reasonable minds can and do differ" as to the mediator's recommendations distinguished the order at hand from the earlier contempt order, where the "tactic" at issue—shooting incarcerated mental health patients with rubber bullets to extract them from their cells—"was so clearly inappropriate." *Id.* at 472 (distinguishing *Gates v. Gomez*, 60 F.3d 525 (9th Cir. 1995)).

DFEH argues that *Gates* is distinguishable because the Ninth Circuit held that the district court could not impose contempt based on "a mediator's interpretation of an undefined term," as opposed to the present case, where DFEH contends that "LSAC's duty to implement the Best Practices pursuant to the Consent Decree is clear beyond dispute." Reply re Contempt at 3 n.3. In contrast, DFEH cites cases addressing the enforceability of agreements and plans incorporated by reference into consent decrees. *Id.* at 3 (citing, *e.g.*, *Nat'l Presto Indus., Inc. v. Dazey Corp.*, 107 F.3d 1576, 1583 (Fed. Cir. 1997); *Emma C. v. Eastin*, No. C96-4179 TEH, 2001 WL 1180636, at *3 (N.D. Cal. Oct. 4, 2001)); Contempt Mot. at 18–19 (same).

Neither party's authority is directly on point. As DFEH notes in its reply, there is no indication that the defendants agreed as part of the consent decree in *Gates* to delegate modification of any aspect of the facility's procedures to the mediator. The focus by both the district court and the Ninth Circuit in that case on whether the defendants violated their commitment to provide "appropriate" treatment, as opposed to any commitment to comply with the mediator's determinations, suggests that the latter commitment was not a part of the decree. On the other hand, the cases on which DFEH relies appear to address consent decrees incorporating existing documents, as opposed to this case, where the Panel had not yet been selected, much less issued its Report, at the time the parties entered the Consent Decree. *See Nat'l*

*Presto*, 107 F.3d at 1582–83 (stating that courts may enforce settlement agreements through contempt when an order or judgment incorporates the agreement and the court retains jurisdiction to enforce it); *Emma C.*, 2001 WL 1180636, at *3.[14]

The Court concludes that a party's agreement, adopted by the Court as a consent decree, to abide by a third party's determinations on specified topics can be enforced through contempt. Unlike the requirement to provide "appropriate" treatment in *Gates*, there is nothing unclear or nonspecific about the Court's order that "LSAC shall implement the Best Practices" established by the Panel except to the extent that any such practices were successfully challenged as conflicting with the Decree or applicable law. Consent Decree ¶ 7(d)(v). To the extent that enforcing such a commitment might in some circumstances implicate due process concerns—an argument that LSAC has not raised—such concerns are mitigated in this case, where LSAC had a role in selecting the members of the Panel, *id.* ¶ 7(a), agreed to specific topics for the Panel to address, *id.* ¶ 7(c), and retained a right to challenge directives that fell outside of the Panel's authority or conflicted with the parties' agreement, *id.* ¶ 7(d)(iv); *see generally* Appeal Order. To the extent that LSAC has failed to comply with the Panel's Report (except to the extent invalidated by the Court's previous order), such failure is enforceable by contempt as a violation of the Consent Decree's clear order that "LSAC shall implement the Best Practices." *See* Consent Decree ¶ 7(d)(v); *see also id.* ¶ 7(b) ("It shall be the Panel's duty to prepare a written report establishing Best Practices . . . , all of which LSAC shall implement . . . .").

While the Court concludes that LSAC's failure to comply with the Panel's Report, and thus failure to comply with Paragraphs 7(b) and 7(d)(v) of the Consent Decree, can support a finding of contempt, that conclusion is not essential to the outcome of DFEH's motion. Even if LSAC's agreement to implement the practices set by the Panel were not enforceable by contempt, violation of that agreement would still support relief under Rule 60(b), and LSAC's violation of

---

[14] In a third case cited by DFEH, "the settlement agreement was memorialized by the federal district court in a final Consent Decree." *California v. Randtron*, 284 F.3d 969, 972 (9th Cir. 2002). It is not entirely clear that the settlement agreement enforced in that case was a distinct document from the consent decree. Regardless, there is no indication that the case involved enforcement of any requirements drafted after the entry of the decree.

Paragraph 5(a) of the Consent Decree and the Decree's recordkeeping and reporting requirements, as discussed below, would also warrant both contempt and Rule 60(b) relief. In the interest of reducing uncertainty going forward, based on the unforeseen circumstances of LSAC's substantial noncompliance with the Decree and the Panel's Report discussed below, the Court hereby modifies the Consent Decree to explicitly incorporate the Report, as modified by the Court's previous order.

### D. LSAC Violated the Consent Decree

#### 1. 50% Emails

LSAC's routine use of "50% emails" violated at least one provision of the Consent Decree as well as several provisions of the Panel's Report, and thus the Consent Decree's requirement that LSAC implement the practices established therein.

Paragraph 5(a) of the Consent Decree requires LSAC to grant certain accommodations previously provided on certain other standardized tests for postsecondary admission so long as a candidate submits proof of approval of such accommodation and certifies that the candidate still experiences the limitations that required such accommodation. Consent Decree ¶ 5(a). "Upon receipt of such proof in accordance with LSAC's established deadlines, *without further inquiry* or request for additional documentation, LSAC shall grant those previously approved testing accommodations." *Id.* (emphasis added). Despite that clear and specific instruction, LSAC's Manager of Accommodated Testing concedes that when candidates requested some accommodations that LSAC believed fell within Paragraph 5(a) and others that LSAC believed did not, as was the case for "many" candidates, LSAC used "50% emails" to "reach out to candidates" and give them "the option[s] of revising their requests to match the supporting documentation, or to provide additional documentation or information to support the additional requested accommodations." Dempsey Decl. ¶¶ 56–58. In at least some cases, choosing the second option would require deferring the request to a subsequent administration of the LSAT. *See, e.g.*, *id.* Ex. R (emails sent May 4, 2017 to a candidate from Richmond, Virginia and August 10, 2017 to a candidate from Greer, South Carolina). LSAC suggests that because it indicated that it was "prepared to approve" candidates' Paragraph 5(a) accommodations, it is not important that

34

it "did not use the word 'granted' in its emails." Opp'n to Contempt at 18. The distinction is not merely semantic. At least some of the emails that LSAC sent specifically told candidates that they would not receive "ANY accommodations" if they did not choose one of the two options presented. Dempsey Decl. ¶ 62. At least one candidate, Michael Kallman, in fact received no accommodations because he did not respond to LSAC's inquiry in the manner that LSAC desired, even though LSAC had determined that he was eligible for certain accommodations. *Id.* ¶¶ 97–99; Kallman Decl. ¶¶ 7, 13 & Exs. A, B.[15]

Sending additional communications requiring candidates to take further substantive action—either withdrawing portions of their requests or submitting additional documentation—in order to receive accommodations falls within any reasonable reading of the phrase "further inquiry" in Paragraph 5(a) of the Consent Decree. By routinely sending such "further inquiries" to candidates eligible for accommodation under Paragraph 5(a), LSAC violated the Consent Decree.

LSAC's use of "50% emails," and more generally its handling of requests that it deemed to be unsupported by sufficient documentation, also violated several requirements of the Panel's Report. Most notably, the Panel made clear that the procedures it imposed for denial of requests "include situations where LSAC denies a testing accommodation request due to a lack of documentation," and that "[s]uch denials will be subject to the outside consultant review rules." Panel Report at 21 n.11. LSAC's characterization of the "50% emails" as merely "'preliminary' determination[s]" and its unsupported assertion that "[w]hen a final decision was subsequently made, candidates retained their appeal rights," Opp'n to Contempt at 20, do not comport with the record. If a candidate did not accept the options of either revising the request or submitting additional documentation, or in some cases if LSAC otherwise determined that a candidate's submission lacked necessary documentation, LSAC did not conduct further internal or external review or provide an opportunity to appeal, but instead simply provided no accommodation. *See*

---

[15] Kallman does not appear to have been eligible for "automatic" approval under Paragraph 5(a). *See* Kallman Decl. ¶ 5 (listing the documents Kallman submitted in support of his request, which did not include proof of previous accommodations on standardized tests for postsecondary admissions). His experience nevertheless supports the conclusion that LSAC meant what it said when it told candidates, including those eligible for accommodation under Paragraph 5(a), that they would receive no accommodation if they did not accept one of the options offered.

Kallman Decl. Ex. B; Campa Escorza Decl. Ex. F (indicating that LSAC was "unable to process" a request missing a page of the "Candidate Form," and that the candidate would therefore "test as a standard test take [sic] for the December 2017 LSAT"). Despite LSAC's insistence to the contrary, such an outcome is indistinguishable from denying the candidate's request: the candidate requested certain accommodations, and LSAC declined to provide them.[16]

By effectively denying requests for accommodation without following the procedures set by the Panel for internal review, external review, notification to the candidate of the decision and of the opportunity to appeal, and external review of any appeal, LSAC routinely violated the Consent Decree's requirement that it "implement the Best Practices" imposed by the Panel. Consent Decree ¶ 7(d)(v). The Court previously upheld the validity of those requirements, *see* Appeal Order at 30–38, and they are sufficiently clear and specific to support a finding of contempt, particularly in light of the Panel's explicit statement that its procedures applied to denials for lack of documentation, *see* Panel Report at 21 n.11. LSAC's reporting of requests as "granted in full" when candidates chose to "revise" their requests rather submit additional documentation in response to "50% emails" also violated the Consent Decree, because by informing candidates that portions of their requests would not be granted as submitted, and providing no opportunity for further review or appeal of those decisions, LSAC effectively denied those requests in part. *See* Consent Decree ¶ 8(a)(k) (requiring LSAC to track and report its decisions on requests).[17]

---

[16] The only applicable definition of "deny" in Merriam-Webster's online dictionary is "to refuse to grant." *See* Deny, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/deny (accessed February 20, 2018). Black's Law Dictionary similarly defines "denial" as a "refusal or rejection." Denial, *Black's Law Dictionary*, (9th ed. 2009). Both definitions encompass LSAC's refusal to provide accommodations under the circumstances at issue.

[17] It is perhaps a closer question whether the "50% emails" violated the Panel's requirements that LSAC presumptively grant certain requests, *see* Panel Report at 16–17, "engage in cooperative and interactive communication," *id.* at 15, refrain from "attempt[ing] to alter [a] request for an extended time testing accommodation," *id.* at 19–20, and provide a "clear written explanation" of its decisions, *id.* at 21, as well as whether such requirements are sufficiently clear and specific to support a finding of contempt on this record. Although the Court has concerns regarding LSAC's compliance with those requirements, the Court need not and does not reach those questions to grant the relief awarded herein, nor would those violations entitle DFEH to any further relief than granted herein.

### 2. "No Decision" Reporting

The Consent Decree requires LSAC to track and report, "for each accommodation requested, whether the request was granted in full or denied in full or denied in part." Consent Decree ¶ 8(a)(k). LSAC initially left that field blank for certain requests, and after Plaintiffs objected to that practice, began reporting certain requests as "no decision," in particular where "(a) the request was received after the deadline; (b) the candidate had not registered for the test; or (c) the request lacked the necessary baseline documentation." Opp'n to Contempt at 20–21; *see* Dempsey Decl. ¶¶ 43–47. According to Dempsey, LSAC's Manager of Accommodated Testing, LSAC's use of that designation for insufficient documentation is limited to cases where LSAC does not receive "the basic form that allows LSAC to set up a file for [a particular] candidate," where a candidate submits no evidence of a disability, or where a candidate submits no statement of why the candidate needs a particular accommodation. Dempsey Decl. ¶¶ 44–46. Dempsey states that LSAC "cannot make a substantive decision" or "is not in a position to process or make a decision on" such requests. *Id.*

The Consent Decree's reporting and recordkeeping requirements make no distinction as to whether a decision is "substantive." *See* Consent Decree ¶ 8; *cf.* Dempsey Decl. ¶¶ 45–46. Regardless of the basis for its decision, if LSAC declines to provide an accommodation that a candidate requested, it has denied the request. Such denials might well be reasonable, but LSAC's failure to track and report that it denied requests where it based those decisions on non-"substantive" grounds constitutes a violation of Paragraphs 8(a) and 23 of the Consent Decree.[18]

LSAC's failure to provide outside review and an opportunity to appeal denials for lack of documentation also violates the Consent Decree's requirement that LSAC implement the practices established by the Panel, for the same reason discussed above in the context of LSAC's "50% emails." Although Dempsey might be correct that "there would be almost nothing meaningful for

---

[18] LSAC notes that DFEH has been aware of this practice since March of 2015 and, until its May 2017 notice of violation, raised no further objection after DFEH began using "no decision" rather than leaving fields blank in its reports. The Consent Decree provides that "[f]ailure by any Party to seek enforcement of this Decree . . . with respect to any instance or provision will not be construed as a waiver of such enforcement with regard to other instances or provisions." Consent Decree ¶ 37.

37

the external professional to review" in such cases, Dempsey Decl. ¶ 47, nothing in the Consent Decree or the Panel's Report grants LSAC the authority to unilaterally determine when the practices established by the Panel would be useful, and the Panel specifically provided that its procedures should apply to denials for lack of documentation, *see* Panel Report at 21 n.11.[19]

In defense of this and other practices at issue, LSAC argued at the hearing that its conduct was consistent with the Panel's determination that a file should be considered "complete" when certain documentation requirements are satisfied, *see id.* at 5, and with the Panel's deadline for LSAC's Disabilities Specialist to complete first-level review within two days of "receiving a completed file," *id.* at 22. For one thing, the Court previously struck down the two-day deadline, at LSAC's request, as outside of the Panel's authority. *See* Appeal Order at 29. More importantly, nothing in the Panel's Report indicates that LSAC's determination that a candidate has not met the documentation requirements for an accommodation request would be a reason to decline to consider the request, as opposed to a reason to deny it. To the extent that such a conclusion might otherwise be consistent with the Report, it is foreclosed by the Panel's instruction that the "phrase 'not approved in full' is intended to include situations where LSAC denies a testing accommodation request due to a lack of documentation," and that "[s]uch denials will be subject to the outside consultant review rules." *Id.* at 21 n.11. Read as a whole, the Panel's Report does not authorize LSAC to report requests that it declined to grant for lack of documentation as anything other than denials, or to treat such denials any differently than requests denied for other reasons.

### 3. Other Reporting and Recordkeeping Requirements

The Consent Decree imposes a number of other recordkeeping and reporting requirements on LSAC. For one, LSAC must track and report "the name of any outside consultant(s) who reviewed [each] request." Consent Decree ¶ 8(a)(m). LSAC concedes that certain reports to

---

[19] The Panel's procedures do not clearly apply to requests for accommodation that LSAC determines should be denied for failure to meet deadlines or register for the test, nor is it clear that such issues fell within the Panel's authority. The Court therefore concurs with the parties' agreement that although LSAC must report such denials as denials, it need not follow the procedures set by the Panel for internal and external review and appeal under those circumstances. *See* Mew Decl. re Contempt Exs. L, M.

38

1    Plaintiffs and the Monitor failed to include that information, but states that "the omission was due

2    to an inadvertent programming error" and has since been remedied.  Dempsey Decl. ¶ 51.  That

3    violation is significant because DFEH relied on LSAC's reports regarding outside consultants to

4    determine how many requests received external review and how many were appealed, *see*

5    Carrasco Reply Decl. ¶¶ 63–64, but DFEH does not dispute that it was unintentional and that the

6    issue has been resolved.

7         The Consent Decree also requires LSAC to track and report "the name(s) of all other

8    individual(s) who reviewed the request for the purpose of making a substantive decision whether

9    to grant or deny the request."  Consent Decree ¶ 8(a)(n).  LSAC initially reported only the name of

10   Kim Dempsey, its Manager of Accommodated Testing, as the person (other than outside

11   consultants) who reviewed each request, on the basis that she is "the sole individual ultimately

12   responsible for each substantive decision to grant or deny a testing accommodation request,"

13   Dempsey Decl. ¶ 52, even though candidates' files indicated that other LSAC employees had also

14   reviewed their requests, Carrasco Decl. ¶ 36.  Although LSAC has since remedied this issue as

15   well, *see* Dempsey Decl. ¶ 52, its interpretation of the Consent Decree was not reasonable.  The

16   Consent Decree charged the Panel with determining "whether more than one qualified

17   professional should review a . . . request . . . before LSAC may deny the request in whole or in

18   part," Consent Decree ¶ 7(c)(iii)(2), the Panel answered in the affirmative, Panel Report at 9, and

19   this Court affirmed that determination, Appeal Order at 15, 31.  LSAC does not attempt to square

20   its previous position that Dempsey was the only person "who reviewed [each] request for the

21   purpose of making a substantive decision," *see* Consent Decree ¶ 8(a)(n), with the procedure

22   requiring more than one person to conduct such a review in the case of requests not granted in full.

23   Moreover, LSAC's position that only the person with final authority must be reported is not

24   consistent with the language of the Consent Decree, which refers to "*all* other individual(s)" who

25   reviewed each request for the purpose of making a substantive decision.  *See id.*  Although the

26   Court appreciates that LSAC has since reformed its practice on this issue, its earlier approach

27   nevertheless represents a clear violation of the Consent Decree.

28        Paragraph 8(a)(j) of the Consent Decree requires LSAC to report "whether LSAC

39

requested additional documentation from the candidate." Consent Decree ¶ 8(a)(j). According to DFEH's counsel Joni Carrasco, "LSAC repeatedly reported that it did not request additional documentation even though candidate files show that LSAC did request additional information," including requests made in the form of "50% emails." Carrasco Decl. ¶ 36. LSAC takes the position that "additional" documentation is limited to "documents other than the baseline documents that the Decree and panel report allow LSAC to request," and that it need not report instances where LSAC determined that "baseline" documentation was lacking and requested that a candidate submit such documentation. Dempsey Decl. ¶ 49. LSAC's position is not a reasonable reading of the Consent Decree. The provision calling for LSAC to track requests for "additional documentation" appears in a section of the Decree that does not discuss any "baseline" requirements, and draws no implicit distinction between such requirements and the "additional documentation" that triggers recordkeeping obligations. Although the Decree discusses types of documentation that LSAC must consider, Consent Decree ¶ 5(d), other than for previously-granted accommodations under Paragraph 5(a), the Decree does not define any "baseline" documentation, much less documentation that LSAC may request without reporting such a request. Moreover, LSAC's position—that "baseline" documentation requires a statement of need and evidence of disability adequately supporting each requested accommodation—would likely require subjective interpretation of a candidate's statements and evidence, as compared to each of the candidate's requests, that is not necessarily amenable to the sort of bright line distinction that LSAC has sought to apply. When LSAC sent "50% emails" informing candidates that they had submitted sufficient documentation for some accommodations but would need to submit other documentation if they wanted to pursue other accommodations, LSAC requested "additional documentation" within the meaning of the Consent Decree, and was required to track and report such requests.

Finally, the Court agrees with DFEH that LSAC's practice, when candidates accepted its proposed downward revisions of their accommodation request, of using white-out to alter its internal forms summarizing such requests—which LSAC then used to complete its required reports—violates LSAC's obligation to "maintain appropriate supporting records for information

contained in the Reports," notwithstanding the fact that LSAC also maintained a copy of the candidate's initial application and other correspondence reflecting the initial request. *See* Consent Decree ¶ 23; Dempsey Decl. ¶¶ 78–79. The Court takes no issue with LSAC's use of white-out to correct clerical errors such as "misspellings, incorrect entries, or entries made on the wrong line," *see* Dempsey Decl. ¶ 78, but altering a form to appear as if a substantive change was a candidate's original request—particular where such change was prompted by LSAC informing the candidate that the candidate's application was not sufficient for all of the accommodations initially sought and that the candidate must accept the revision in order to receive any accommodations at all—is not consistent with the requirement to "maintain appropriate supporting records." *See* Consent Decree ¶ 23.

Any one of LSAC's recordkeeping and reporting violations might alone be explained as merely a flawed interpretation of a particular requirement. Taken together, however, LSAC's approach to its obligations indicates that it "viewed the [Consent Decree] as an intrusion to be avoided rather than a challenge to be embraced." *See Emma C.*, 2001 WL 1180636, at *10. LSAC is expected to comply with these obligations going forward.

### 4. Access to Records

The Consent Decree requires LSAC to maintain records supporting its mandatory reports, and to provide access to such information (to the extent pertaining to California test takers) to DFEH at LSAC's office in Pennsylvania "upon reasonable request." Consent Decree ¶ 23. LSAC's reporting requirements include whether each request for accommodation "was granted in full or denied in full or denied in part." *Id.* ¶ 8(a)(k). Accordingly, files for candidates whose requests LSAC reported as having been granted in full fall within the scope of records that LSAC must maintain and allow DFEH to access upon reasonable request. *See id.* ¶ 23 (specifically providing that LSAC's recordkeeping and access requirements apply to the information described in Paragraph 8).

In preparation for visiting LSAC's office, DFEH and the United States requested access to files for all candidates whose requests were denied in part or in full or reported as "no decision," as well as all California requests that were granted in full. Carrasco Decl. Ex. 11 (email dated

March 16, 2017).  LSAC responded that there "does not appear to be any reasonable basis" to review files granted in full, and denied that request on the grounds that it "would result in unnecessary disruption and expense for LSAC."  *Id.* (email dated March 21, 2017).  DFEH thereafter requested access to ten specific files reported as granted in full, but LSAC twice denied that request, stating that it did not "understand what interest the DFEH has in reviewing the files of candidates whose requests for accommodation were granted in full," even after DFEH expressed its belief "that we are entitled to review a reasonable sample of these files to ensure ourselves that there are no irregularities in the reporting."  *Id.* (emails dated from March 30, 2017 through April 10, 2017).  According to LSAC's counsel, LSAC provided redacted copies of eight candidates' files to DFEH after the site visit, "some of which included 'granted in full' requests."  Mew Decl. re Contempt ¶ 31.  DFEH's counsel states that only one of those files was reported "as entirely 'granted in full.'"  Carrasco Reply Decl. ¶ 60.

DFEH's request for at least a sample of "granted in full" files was facially reasonable.  It is not clear what purpose DFEH's limited right of access to records underlying LSAC's reports would serve if DFEH were required simply to trust LSAC's reporting.  *See* Consent Decree ¶ 23.  LSAC's opposition brief does not explain why it was reasonable to deny the request even after DFEH narrowed the request to ten files, or why providing a single "granted in full" file after DFEH's visit to Pennsylvania fulfills LSAC's obligation to provide access upon reasonable request.  *See* Opp'n to Contempt at 23–25.  The importance of such review is illustrated by LSAC's use of the "granted in full" designation after candidates revised their requests in response to "50% emails" informing them that LSAC did not consider their documentation sufficient for all of the accommodations they initially requested.  *See* Carrasco Decl. ¶ 31.  Even if LSAC actually believed such a process to comply with the Consent Decree—which is itself an unreasonable interpretation of the Decree—LSAC's apparent position that DFEH had no reasonable interest in understanding how LSAC used and reported that procedure is difficult to explain except as bad faith.[20]  LSAC's repeated refusal to allow DFEH to review "granted in full" files for candidates

---

[20] LSAC notes that as a result of Movaghar's administrative claim, DFEH had access before the site visit to one file that included "50% emails."  Opp'n to Contempt at 25–26, Mew Decl. re

42

who tested in California constitutes another violation of the Consent Decree.

### E. The Consent Decree's Dispute Procedures Do Not Shield LSAC from Contempt

LSAC contends briefly in its opposition, and argued in more detail at the hearing, that contempt is not warranted because it modified its behavior after DFEH and the United States initiated the dispute resolution process called for by the Consent Decree. *See* Opp'n to Contempt at 16. Focusing on two of LSAC's most significant violations, LSAC's eventual decision to cease sending "50% emails" nearly six months after DFEH and the United States raised that issue in their May 2017 letter does not excuse LSAC's use of the "50% emails" for approximately two years, particularly where LSAC had effectively concealed that practice—or at least its prevalence—by failing to report that it had requested additional documents and that it had effectively denied portions of candidates' requests, and imposed a further barrier to DFEH's understanding of the practice by refusing to provide access to "granted in full" files when DFEH visited LSAC's office in Pennsylvania. As for LSAC's use of "no decision" to report requests that it effectively denied for insufficient documentation, although DFEH could have challenged that practice sooner, the Consent Decree specifically provides that failure to seek enforcement after a particular instance of a violation does not constitute waiver of enforcement as to other instances, Consent Decree ¶ 37, and after DFEH and the United States raised the issue in 2017, LSAC refused to change its practice. Mew Decl. re Contempt Exs. L, M; *see* Dempsey Decl. ¶ 47; Supp'l Br. Ex. 2 ¶ 6. Under these circumstances, the fact that LSAC eventually agreed to cease some but not all of its violations of the Consent Decree is not a sufficient reason to withhold a finding of contempt.

### F. LSAC Has Not Substantially Complied Such That Contempt Should Be Denied

LSAC argues that it has substantially complied with the Consent Decree because it fulfilled several of its obligations under the Decree, including but not limited to paying settlement funds, ceasing annotating scores for tests taken with accommodations, and retaining the Monitor.

---

Contempt ¶ 33. DFEH's explanation is persuasive that it could not know from a single file that LSAC's use of "50% emails" was a routine practice. *See* Reply re Contempt at 13. Regardless, DFEH's awareness that the practice existed would not negate its legitimate interest in reviewing other candidates' records to better understand the nature and extent of the practice.

Opp'n to Contempt at 25–26. Several of the obligations LSAC claims to have fulfilled, however, are in areas where its compliance was at best imperfect for the reasons discussed above, such as "[t]racking voluminous amounts of data for every candidate and every exam," "[p]reparing extensive reports after each test administration," "modif[ying] its accommodation forms and policies," and processing requests for accommodation "using Decree and panel procedures." *See id.*

LSAC relies on the Ninth Circuit's decision in *Labor/Community*, which affirmed a district court's denial of a motion to hold the defendant in contempt and extend a consent decree. *See* Opp'n to Contempt at 27 (citing *Labor/Cmty.*, 564 F.3d 1115, 1122–23). In that case, the plaintiff seeking contempt based its motion on the defendant transit agency's failure to achieve a target metric for bus passenger congestion set by the consent decree. *Labor/Cmty.*, 564 F.3d at 1121. The district court held that even though the agency did not meet that target based on the standard for measuring it described in the decree—which deemed the agency noncompliant if "a bus line exceed[ed] the load factor just once during a given quarter"—the agency substantially complied with the decree where: (1) a more granular analysis showed that the agency's bus lines achieved the goal for more than ninety-five percent of the time periods surveyed; and (2) the agency exceeded several other "core" requirements of the decree. *See id.* at 1121–22. The Ninth Circuit affirmed on the basis that the district court did not abuse its discretion. *Id.* at 1123.

This case is not like *Labor/Community*, where "aside from the imperfect compliance with the load factor targets," which "were de minimis in relation to the overall scheme of things," the defendant "complied fully with its numerous obligations under the decree." *See id.* at 1123. Here, as discussed above, LSAC violated numerous provisions of the Consent Decree, including but not limited to the provision requiring implementation of the Panel's Report. It deprived certain candidates of their automatic right to accommodations previously granted on comparable tests by improperly imposing substantive conditions on the candidates' ability to accept those accommodations, and denied those candidates and others the right to the procedural safeguards established by the Panel for requests not based on such past accommodations. LSAC also failed to comply with its recordkeeping and reporting obligations under the Decree, and failed to provide

44

DFEH with reasonable access to records as required by the Decree, creating roadblocks to DFEH's discovery of the substantive violations of accommodations and procedures that should have been provided to test takers.

Unlike in *Labor/Community*, these violations did not relate to target metrics that LSAC tried but barely failed to achieve. LSAC simply did not comply with actions that the Decree directed it to take. Nor is this case like *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885 (9th Cir. 1982), where a consent judgment provided that the defendants could not use the term "Falcon" in advertising unless they "include[d] a falcon bird perched on the 'F' of FALCON wherever possible and practical," but the defendants failed to prevent two listings not in compliance with that rule from appearing in a telephone book, which they quickly took steps to correct. *Vertex*, 689 F.2d at 889–90, 892. In contrast, many of LSAC's violations were implemented systematically and persisted for at least some period of time despite DFEH's objections.

While it is true that LSAC complied with other requirements, allowing such partial compliance to excuse LSAC's violations would reduce the Consent Decree to merely a set of guidelines from which LSAC could choose which provisions to follow and which to disregard. Nothing in the Consent Decree countenances such a result. *See Gen. Signal Corp. v. Donallco*, 787 F.32d 1376, 1378–79 (9th Cir. 1986) (affirming a finding of contempt where the scope of the defendant's violations was limited and the defendant had taken steps after the violations to prevent their recurrence). The defense of substantial compliance, which in the context of civil contempt can excuse "'a few technical violations' where every reasonable effort has been made to comply," is not a license for a party to comply with only some of the directives of a court order. *See Dual-Deck Video*, 10 F.3d at 695 (citation omitted). "[F]ederal courts are not reduced to issuing injunctions . . . and hoping for compliance." *Hutto v. Finley*, 437 U.S. 678, 690 (1978). When the Court issued the Consent Decree, LSAC was bound to comply with all of its provisions. The undisputed facts in the record reflect that LSAC did not "to take all reasonable steps within [its] power" to do so, regardless of whether the burden of proof is placed on LSAC or DFEH. *See Sea*

45

*Shepherd*, 774 F.3d at 945.[21]  The Court therefore finds LSAC in contempt.

## G.    Relief Warranted

### 1.  Extension of the Consent Decree

Where a party has failed to comply with a consent decree, extension of the term of the decree can serve as "a compensatory civil [contempt] sanction" because it seeks "to return [the moving parties] as nearly as possible to the position they would have occupied had [the contemnor] not violated the agreement."  *Kelly*, 822 F.3d at 1097.  Having ordered a particular period of compliance and determined that the contemnor failed to provide such compliance, a court gives effect to its previous order by extending the term of the decree to account for the time that the contemnor failed to comply.  *See id.*  Such relief is also permitted under Rule 60(b) as "a modification of a court order [that] is 'suitably tailored to the changed circumstance'" of the contemnor's noncompliance because "it 'would return both parties as nearly as possible to where they would have been absent' the changed circumstances."  *See id.* at 1098 (quoting *Pigford*, 292 F.3d at 927).

#### a.  <u>LSAC's Violations Warrant Extension of the Consent Decree</u>

LSAC argues that modification of a consent decree is disfavored because it "allows a party 'to escape commitments voluntarily made and solemnized by a court decree.'"  Opp'n to Contempt at 16 (quoting *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C. Cir. 2000)).  But LSAC has already taken unilateral action to escape its commitments under the Consent Decree.  LSAC voluntarily made an agreement, solemnized by a court decree, to grant requests for certain accommodations previously provided on certain other tests "without further inquiry or request for additional documentation," Consent Decree ¶ 5(a), but nevertheless engaged in "further inquiry" by routinely stating in its "50% emails" that, as a condition of receiving such

---

[21] LSAC argues in its unauthorized supplemental brief that DFEH's motion should be denied because the number of people affected by its noncompliance was, in LSAC's view, relatively small compared to the number of requests submitted.  Regardless of how many requests LSAC received, improperly subjecting approximately 859 people (constituting nearly ten percent of the estimated 9,000 people who requested accommodations) to the "50% email" procedure, and improperly reporting almost 2,000 requests that were effectively denied as "no decision" (or perhaps more, since LSAC bases its count on only a subset of the test administrations at issue), is not de minimis but rather a significant and systematic violation.  *See* Supp'l Br. at 4–6,

United States District Court
Northern District of California

1    accommodations, candidates must revise their requests to forego consideration of other

2    accommodations.  LSAC similarly agreed to appoint a panel of experts and abide by the panel's

3    directives with respect to certain aspects of LSAC's procedures for considering requests for

4    accommodation, but routinely violated that commitment as discussed above.  LSAC also violated

5    the commitments it made in the Consent Decree to reporting, recordkeeping, and access.  The

6    interest of holding parties to their voluntary, court-endorsed commitments weighs against LSAC

7    in this case.

8        LSAC also argues that DFEH's request to extend the entire consent decree is not narrowly

9    tailored because that approach would continue to impose requirements that LSAC has not

10   violated.  LSAC has not proposed a narrower form of relief, and it is not clear that severing

11   portions of the Decree would be either warranted or useful.  The requirements of the Decree in

12   large part support and depend on one another.  For example, the procedural safeguards of multiple

13   levels of review and appeal ensure that the more substantive criteria and guidelines of the Decree

14   and the Panel's Report are properly applied to candidates' requests for accommodation.  By

15   denying candidates that procedure, LSAC failed to provide the intended assurance that the

16   substantive guidelines would be respected.  The recordkeeping, reporting, and monitoring

17   requirements, some of which LSAC also violated as discussed above, similarly serve as a

18   safeguard for the Decree's effective implementation.  It would make little since to extend LSAC's

19   substantive obligations without any means to monitor compliance, or to extend the recordkeeping

20   and reporting requirements without also requiring the substantive compliance that those provisions

21   are intended to monitor.  In other words, deferring LSAC's compliance with the particular

22   provisions that it violated to a later time when other provisions of the Consent Decree were no

23   longer in effect would not provide the same relief to which Plaintiffs were entitled under the

24   Decree.

25       The record reflects violations of the Consent Decree in how LSAC considered, responded

26   to, recorded, and reported requests for accommodation.  The practices at issue spanned various

27   periods of time, but the most significant violation—LSAC's use of "50% emails" to place

28   conditions on accommodations that should have been automatic and to avoid providing multi-level

47

review, offering appeals, and reporting requests as denied—spanned approximately two years.

Extending the Decree for an additional two years is an appropriate remedy to approximate the four

years of compliance to which LSAC submitted and to which DFEH is entitled. *See Kelly*, 822

F.3d at 1097 ("By extending the settlement agreement for two years, the district court thus ordered

the relief to which Plaintiffs were originally entitled under the agreement but that [the defendant]

had failed to provide."). DFEH's request to modify the Consent Decree accordingly is

GRANTED.

### b. Nationwide Relief is Appropriate

LSAC briefly asserts in its opposition brief that "despite its limited jurisdiction, DFEH is

seeking relief on a nationwide basis rather than relief that applies only with respect to California

examinees." Opp'n to Contempt at 28. The Consent Decree grants each of the parties, including

DFEH, the right to "apply to the Court for such further orders as may be necessary for, or

consistent with, the enforcement of this Decree." Consent Decree ¶ 30. Although DFEH's access

to records is specifically limited to those related to California examinees, *id.* ¶¶ 23, 26(a), its right

to pursue enforcement is not, *id.* ¶ 30. There is no indication that any violation at issue was

limited to candidates requesting accommodations in California, and although the United States has

not joined DFEH's motion, it also has not opposed relief. The Court finds no basis to limit the

extension of the Consent Decree to California.

### c. Practical Considerations Do Not Excuse LSAC's Noncompliance

LSAC argued at the hearing that the Consent Decree should not be extended because

LSAC intends to offer the LSAT more often in the coming years than it has in the past, and if the

Panel's procedures are applied to LSAC's intended schedule, the periods in which LSAC must

consider requests for accommodation on different administrations of the LSAT would overlap.

LSAC asserted that such circumstances would likely lead to confusion and mistakes. The Court

declines to grant LSAC relief from its obligations under the Consent Decree (as extended) based

on LSAC's own decision to change its business model. If LSAC chooses to continue with its plan

to administer the LSAT more frequently, it must take all reasonable steps to comply with the

Consent Decree in doing so.[22]

LSAC also identifies certain circumstances where it believes the Panel's procedures, as interpreted by DFEH and the Court, call for inappropriate results, such as requiring outside review before denying applications that lack basic documentation and allowing test takers who receive stop-the-clock breaks to accumulate large amounts of additional time as a result of the Panel's determination that each break should add one minute to the time allowed for the test. As stated in the Court's previous order, "the Consent Decree does not permit the Court to substitute its judgment for that of the Panel on the merits of how requests for accommodation should be reviewed and decided." Appeal Order at 10. The parties are strongly encouraged, however, to meet and confer to consider whether the Panel's procedures have functioned as intended and whether any modifications to those procedures are appropriate, and to stipulate to any such modifications that have the support of all three parties.

### 2. DFEH's Access to Records

DFEH also seeks modification of the Consent Decree to provide it, and the United States, with fifteen additional days of access to LSAC's records, Contempt Mot. at 22–23, and to grant DFEH "nationwide access" to records, Reply re Contempt at 18. DFEH does not explain why the parties' agreement that DFEH's access should be limited to files related to California test candidates, memorialized at Paragraphs 23 and 26(a) of the Consent Decree, should be altered. Nor does it explain why providing it and the United States with fifteen days of access for the remaining two years of the extended Consent Decree, as opposed to the parties' original agreement of five days over a four-year term, is an appropriate remedy for LSAC having failed to reasonably grant access under the existing terms of the Decree. Instead, the Court finds that reinstating the days that DFEH spent reviewing documents with impaired access is an appropriate

---

[22] LSAC requests in its unauthorized supplemental brief that if the Court extends the Consent Decree, extension be limited to one year because the increased frequency of test administrations will cause a one-year extension to encompass the same number of tests as LSAC's approximately two years of noncompliance. *See* Supp'l Br. at 7. This argument is both untimely and unavailing. LSAC agreed to abide by the Consent Decree for a period of years, not for a specific number of test administrations. Moreover, LSAC submits no evidence that doubling the number of test administrations will result in more people—much less double the number of people—taking the test and requesting accommodations per year

remedy to "return both parties as nearly as possible to where they would have been absent" LSAC's violation of its obligation to provide access. *See Kelly*, 822 F.3d at 1098. To the extent that LSAC's violations evince a need for greater monitoring than originally anticipated, DFEH's five days of review for the remaining two years of the Decree constitute double the amount of time originally provided to review documents per year of the Decree.

Because the United States has not joined DFEH's motion, and because LSAC's violation of its obligation to provide reasonable access appears to have largely been limited to DFEH's (and not the United States') request for access to files reported as "granted in full," the Court declines to modify the Decree to grant the United States additional access.

### 3. Replacement of the ADA Monitor

DFEH also seeks to replace the ADA Monitor and to require quarterly reports. *See* Contempt Mot. at 21–22, 24; Proposed Order (dkt. 249-1) ¶ D. The Court shares several of DFEH's concerns regarding the adequacy of the Monitor's work thus far.

In response to Plaintiffs' early concerns that Monitor had not independently verified the accuracy of LSAC's data, the Monitor reported that he "reviewed the reports submitted [by LSAC], and relied on a distillation of fields from the massive data runs from the LSAC to inform conclusions." Carrasco Decl. Ex. 9 at 5 n.6. Based on unspecified "clear evidence of rigorous protocols and faithful adherence to the Order's requirements, the Monitor made a judgment that [a] nothing more was required by the Decree; and [b] 'going behind the numbers' would be unnecessarily burdensome and unwarranted." *Id.* at 6 n.6.

The Monitor also reported that, from the effective date of the Panel's Report through the second year of the Consent Decree, "only 3 prospective LSAT test-takers have been denied their requested accommodations based on the merits of the requests in full." Carrasco Decl. Ex. 9 at 8. In a footnote, he clarified that the total "does not include denials due to non-registration or later requests following established deadlines." *Id.* at 8 n.8. The Monitor either was not aware or did not specify that LSAC also elected not to report denials based on insufficient documentation, *see* Dempsey Decl. ¶¶ 44–46, despite a comment from Plaintiffs on the Monitor's working draft requesting clarification of whether non-registration or late requests were "the only types of denials

not 'based on the merits.'" Carrasco Decl. Ex. 8 at 7.

The Monitor's efforts were not sufficient to detect LSAC's violations addressed in this order. Even if the Monitor disagreed with the Court's conclusions that such practices violated the Consent Decree, the Monitor should at the very least have discussed those issues to allow the Court and the Plaintiffs to reach their own conclusions. The Monitor's failure to provide a separate report for the first year of LSAC's compliance, as required by the Consent Decree, also raises concerns, but can be attributed in part to the parties' lengthy delay in reaching a consensus on whom to appoint as Monitor.

Ultimately, however, the Court agrees with LSAC that these circumstances do not warrant replacing the Monitor where the Consent Decree provides no mechanism for doing so. Just as the Court has held LSAC to the requirements set by the Panel that it played a role in appointing, the Court will hold DFEH to its consent to appoint Coleman as the Monitor. Although DFEH is correct that the Court has inherent authority to appoint a special master to enforce compliance under Rule 53 of the Federal Rules of Civil Procedure, the Court is not persuaded that this case presents the sort of exceptional circumstances that justify such appointment without consent of all parties. *See* Fed. R. Civ. P. 53(a)(1). DFEH also fails to sufficiently explain the need for quarterly reports. Balancing the original structure of the Decree with the need to effectively monitor compliance before the Decree expires, the two-year extension warrants two additional reports by the Monitor beyond those originally contemplated, to occur at the end of the fifth and sixth years of the Decree. The Court has faith that LSAC will be motivated to comply with this order and the Decree in order to avoid further sanctions, and that the present Monitor is capable of carrying out his duties with the benefit of the guidance provided herein.

Going forward, in addition to his original charge, the Monitor is expected to review LSAC's compliance with the specific violations addressed in this order. The Monitor is expected to "go behind the numbers" and review a sufficient sample of candidates' files to determine whether LSAC's reporting is accurate, and to select those files in a way that does not permit LSAC to influence the choice of files. The Monitor is also expected to provide some accounting of his and his staff's time spent on this case to allow all parties and the Court to better understand

the scope of his activities.  *See* Consent Decree ¶ 28.

Any renegotiation of the Monitor's compensation agreement with LSAC in light of the extension of the Decree and clarification of the Monitor's duties must be completed or submitted to the Court no later than thirty days from the date of this order.  By the same date, the parties shall either jointly stipulate to deadlines for the Monitor's remaining reports or submit that issue to the Court.  If the current Monitor elects not to continue in his role, the parties shall either jointly stipulate to a new Monitor or submit candidates to the Court no later than sixty days from the date of this order.[23]

## IV.    CONCLUSION

For the reasons discussed above, DFEH's motion for contempt and to modify the Consent Decree is GRANTED in part.  Based on the Court's authority to enforce its orders through civil contempt, and on the Court's authority to grant relief from an order under Rule 60(b) of the Federal Rules of Civil Procedure, the Consent Decree is hereby modified as follows:

(1) Paragraph 30 of the Consent Decree, governing the term of the Decree, is modified to replace the phrase "four (4) years from that date" at page 37, line 2 with the phrase "six (6) years from that date";

(2) The "Final Report of the 'Best Practices' Panel" dated January 26, 2015, as modified by the Court's order dated August 7, 2015, is incorporated into the Consent Decree as if stated fully therein, and is enforceable by contempt;

(3) In addition to the audits called for by Paragraph 25 of the Consent Decree, the ADA Monitor shall also conduct two additional audits, five years and six years after the effective date of the Decree respectively, addressing the same subject matter as the two-year and four-year audits; and

(4) No time spent by DFEH reviewing documents at LSAC's Newtown, Pennsylvania office before the date of this order shall count towards the five days of access allotted to DFEH

---

[23] Based on his service as an expert witness for DFEH, the Court will not appoint Peter Blanck as Monitor without LSAC's consent.  This is not intended as a comment on Blanck's qualification for the role.

United States District Court
Northern District of California

under Paragraphs 23 and 26(a) of the Consent Decree.

DFEH is entitled to its fees and costs pursuant to Paragraph 21(b) of the Consent Decree, and the parties are ordered to engage in the procedures stated therein for determining the amount of such fees and costs.

**IT IS SO ORDERED.**

Dated: March 5, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge